## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                :   Chapter 15

GOLI NUTRITION INC., *et al.*,[1]      :   Case No. 24- 10438 (___)

                                       :   Joint Administration Requested

        Debtors in a Foreign Proceeding.   :

------------------------------------------------------------- x

### PETITIONER'S VERIFIED PETITION UNDER
### CHAPTER 15 FOR RECOGNITION OF THE CANADIAN
### PROCEEDINGS AND REQUEST FOR RELATED RELIEF

Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Petitioner"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("Goli Canada") and Goli Nutrition Inc., a company incorporated in Delaware ("Goli US," and together with Goli Canada, the "Debtors"), through its United States co-counsels, Landis Rath & Cobb LLP and Norton Rose Fulbright US LLP, respectfully submits this verified petition (the "Verified Petition"), accompanied by the *Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief, (B) Motion for Provisional Relief, and (C) Motion for Order Enforcing CCAA Vesting Orders* filed contemporaneously herewith (the "Zucker Declaration"), seeking (i) recognition of the Debtors' insolvency proceedings commenced under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA")

---

[1]    The Debtors in these Chapter 15 cases, are: Goli Nutrition, Inc., a company incorporated in Québec, Canada and the last 4 digits of its Canadian business number is 0002; and Goli Nutrition Inc., a company incorporated in Delaware and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

pending before the Superior Court, sitting in the Commercial Division for the district of Montréal

(the "<u>Canadian Court</u>"), File No. 500-11-063787-242 (the "<u>Canadian Proceedings</u>") as (a) foreign

main proceedings or, (b) in the alternative, foreign nonmain proceedings, (ii) provisional relief,

and (iii) related relief.  In support thereof, the Petitioner respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      The Petitioner, as the foreign representative of the Debtors, commenced these

Chapter 15 cases by filing petitions (the "<u>Petitions</u>") contemporaneously with, and accompanied

by, all certifications, statements, lists and documents required under Chapter 15 of the Bankruptcy

Code and the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  By this Petition,

the Petitioner seeks recognition of the Canadian Proceedings.  As set forth in greater detail below,

the Petitioner requests this Court enter an order finding that:

(a)     a foreign proceeding respecting each of the Debtors was duly commenced in Canada;

(b)     each Debtor's center of main interest is located in Québec, Canada;

(c)     the Petitioner is duly authorized to serve as the Debtors' foreign representative and to petition for relief under Chapter 15 of the Bankruptcy Code in connection with the Canadian Proceedings pending in Canada;

(d)     the Canadian Proceedings are recognized as foreign main proceeding; and

(e)     the Petitioner is entitled to the relief requested herein, including provisional relief.

2.      The Debtors commenced the Canadian Proceedings in order to implement a

restructuring centered around the sale of the Debtors' business and assets, which is to be

effectuated through two sale transactions.  In particular, following a lengthy sale investment

solicitation process that took place prior to the commencement of the Canadian Proceedings, Goli

Canada entered into a binding subscription agreement (the "<u>Subscription Agreement</u>") with an

entity affiliated with a group that includes Group KPS (a healthcare company), Bastion Capital (an

investment management firm) and one of the Debtors' founders (collectively, the "Purchaser").

Pursuant to the Subscription Agreement, the Purchaser will subscribe for new shares in Goli

Canada (the "Subscribed Shares") and effectively acquire 100% of the equity interest in Goli

Canada in accordance with the terms and conditions of the Subscription Agreement (the "Principal

Transaction").  Goli Canada will, in turn, cancel and terminate all of its existing shares so that the

Purchaser may become the sole shareholder of Goli Canada.  The Principal Transaction is intended

to be approved and implemented under the CCAA pursuant to a reverse vesting order (the "RVO").

Pursuant to the RVO, certain excluded assets, contracts, and liabilities will be transferred or

"vested" out of Goli Canada and transferred to a newly created "Residual Co." that will replace

Goli Canada as a debtor in the Canadian Proceedings.  Accordingly, Residual Co. will replace Goli

Canada as a debtor in the Chapter 15 case upon the closing of the Principal Transaction.

3.     In addition, the Debtors have negotiated and finalized the terms of a second and

separate transaction to implement the liquidation of the Atos Equipment (as defined below).

Specifically, the Debtors have entered into an Agency Agreement (as defined below), wherein the

Agent has agreed to sell and auction the Atos Equipment (the "Atos Sale," together with the

Principal Transaction, the "Sale Transactions") on behalf of the Debtors.  The Debtors are seeking

entry of an order from the Canadian Court approving the Atos Sale (the "Atos Sale Order").  By

separate motion, the Petitioner is seeking an order from this Court enforcing the RVO and Atos

Sale Order (collectively, the "CCAA Vesting Orders").

4.     The Petitioner commenced these Chapter 15 cases and seeks an order granting

recognition to each of the Canadian Proceedings substantially in the form of the proposed order

annexed hereto as **Exhibit A** (the "Proposed Order").  In particular, the Petitioner is requesting

recognition as a foreign representative as defined in section 101(24) of the Bankruptcy Code and

all relief afforded automatically upon recognition of a foreign main proceeding pursuant to sections 1509 and 1520 of the Bankruptcy Code or, in the alternative, discretionary relief pursuant to section 1521 of the Bankruptcy Code, including a stay of the commencement or continuation of any individual action or proceeding concerning the Debtors' assets, rights, obligations or liabilities. In addition, the Proposed Order grants comity and gives full force and effect in the United States to the Initial Order (defined below), including any and all extensions or amendments thereof authorized by the Canadian Court and extending the protections of the Initial Order to the Debtors in the United States on a final basis.

5.      The Debtors satisfy all of the requirements set forth in section 1515 of the Bankruptcy Code.  In addition, each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code.  Goli Canada has property in the United States in the form of stock in a United States subsidiary (Goli US) and the Atos Equipment.  Goli US is organized in the United States and holds property in the United States in the form of leases of a distribution facility.  In addition, both Debtors have an interest in an undrawn retainer in an amount of $25,000 in a non-interest bearing client trust account with Wilmington Savings Fund Society, FSB in Delaware (the "Client Trust Account").

6.      Based on the foregoing and the reasons described herein, the Petitioner is entitled to entry of an order granting recognition to the Canadian Proceedings as foreign main proceedings or, in the alternative, as foreign nonmain proceedings, under Chapter 15 of the Bankruptcy Code, as well as related relief under sections 1507, 1509, and 1521 of the Bankruptcy Code.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012.  The Petitioner properly commenced these Chapter 15 cases pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing petitions for recognition of the Canadian Proceedings under section 1515 of the Bankruptcy Code.

8.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Petitioner consents to the entry of a final order by the Court in connection with this Verified Petition to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper before the Court pursuant to 28 U.S.C. § 1410, as the Debtors have assets in the United States located in Delaware and such venue is consistent with the interests of justice and the convenience of the parties.

## BACKGROUND

## I.      The Debtors' Corporate Structure, Operations, and Assets and Liabilities

10.      On the date hereof (the "Petition Date"), the Petitioner filed with this Court a petition for each of the Debtors under Chapter 15 of the Bankruptcy Code.

### A.      The Debtors' Corporate Structure

11.      Goli Canada was incorporated on October 4, 2018, pursuant to the *Canada Business Corporations Act,* RSC (1985), c. C-44.  Goli Canada is domiciled in Saint-Laurent, Québec.  The majority and controlling shareholders of Goli Canada are 11028154 Canada Inc. (40.59%) and 11028227 Canada Inc. (40.59%) (collectively, the "Majority Owners"), which are ultimately controlled by Melina del Carmen Ash (the spouse of founder, Deepak Argwal) and Michael Bitensky, respectively.  Additionally, 9204-1797 Québec Inc., which is ultimately controlled by

Mr. Martin Leroux, owns 7.95%, of the shares in Goli Canada.  The balance of the shares are held by various other entities, including VMG Partners IV L.P., VMG Partners Mentors Circle IV L.P., and BMO Capital Partners.[2]  Goli Canada is the sole shareholder of Goli US.[3]

12.    Goli US was incorporated on April 30, 2019, pursuant to the General Corporation Law of the State of Delaware.  Although a Delaware corporation, Goli US's principal place of business is located at Goli Canada's principal place of business in Montreal, Québec, and all management, operational and financial decisions of Goli US are made by Goli Canada.  Goli US only has one board member—Deepak Agarwal, founder of Goli Canada who sits in Montreal.  An organizational chart showing the Debtors' corporate structure is annexed hereto as **Exhibit B**.

13.    Goli Canada and Goli US are debtors in ***both*** the Canadian Proceedings and these Chapter 15 cases. The Debtors' affairs and operations are conducted on a consolidated basis and directed from Québec.  The majority of the Debtors' tangible assets and property (in addition to accounts receivable and inventory) are owned by Goli Canada, some of which is currently stored in a manufacturing and distribution facility located in Norco, California (the "Norco Facility"), which is leased by Goli US (the "Norco Lease").  The Debtors also own inventory located in fulfillment centers in the United States and Canada.

14.    As of the date hereof, the Debtors have property in the United States and in this District as summarized below:

| Debtor Entity | Asset Description | Situs |
|---|---|---|
| **Goli Canada** | • Stock in Goli US. | • Delaware |

---

[2]    BMO Capital Partners, minority shareholder of Goli Canada, and Bank of Montreal, lender and agent under the Credit Facilities (described below) are separate, independent entities.

[3]    Goli Canada also owns 25% of the shares of Better Nutritionals, LLC ("BNL"), a California limited liability company currently in a case under chapter 7 of the Bankruptcy Code pending before the United States Bankruptcy Court for the Central District of California, Case No. 6:22-14723. BNL was previously the Debtors' primary manufacturer.

| Debtor Entity | Asset Description | Situs |
|---|---|---|
| | • Atos Equipment | • California |
| | • Undrawn retainer in the Client Trust Account | • Delaware |
| | • Inventory | • United States and Canada |
| **Goli US** | • Lease of distribution facility and related equipment and other property. | • California |
| | • Undrawn retainer in the Client Trust Account | • Delaware |

B.      The Debtors' Business

15.      At its core, the Debtors are a distributor and retailer of organic, vegan and gluten-free nutritional products and supplements that are sold in the form of gummies and bites. The Debtors market and sell a variety of nutritional and dietary supplements under the Goli® brand ("GOLI Products"), including its popular patented Apple Cider Vinegar gummies ("ACV Gummy"). In addition to the ACV Gummy, the Debtors also offer additional GOLI Products, including Ashwagandha gummies, Prebiotics-Probiotics-Postbiotics gummies, Beet Root Cardio gummies, and Women's PMS Relief gummies, amongst others.

16.      GOLI Products, are made in the United States from ingredients that have been locally and globally sourced. GOLI Products are sold globally through direct-to-consumer, and wholesale business-to-business channels, such as Amazon, Wal-Mart, Kroger, Walgreens and Target. The Debtors also sell their products through its online website, www.goli.com.

17.      The Debtors' headquarters is in Montréal, Quebec, from which all financial, business, managerial, and operational decisions for both Debtors are made.[4] The Debtors operate on a consolidated basis and all of the important decisions are taken in Canada by the senior

---

[4]    *See Judgment on Application for the Issuance of a First Day Initial Order, an Amended and Restated Initial Order and Other Relief, Including the Approval of a Transaction and an Agency Agreement*, No. 500-11-0637787-242 (Mar. 18, 2024), attached hereto as **Exhibit C** ("Judgment").

management of Goli Canada.  Judgment, ¶ 83.2.  As of the Petition Date, Goli Canada employs approximately 35 employees of which 32 employees are located and employed in Quebec and 3 employees elsewhere in Canada.  Goli US employs approximately 4 employees located in various states throughout the United States, all of whom take direction directly from Goli Canada management in Montreal.  Additionally, Goli Canada has an outsourcing contract with Liveketo Private Limited based in India, pursuant to which it provides finance, human resources, business intelligence, supply chain and retailer support services to Goli Canada.  Goli Canada also has an outsourcing contract with a Philippines entity, pursuant to which it provides customer service, shipping, influencer and sales support services to Goli Canada.  All finance, human resources, business intelligence, supply chain, retailer support, customer service, and related services required of Goli US are performed by Goli Canada.  Judgment, ¶ 83.6.

18.    The Debtors generally distribute their products utilizing third-party logistics providers ("3PL"), such as Amazon and Amware Fulfillment LLC, who handle the shipments to consumers in accordance with the logistics or fulfillment agreements in place between the Debtors and 3PL.  A significant portion of GOLI Products are held in 3PL storage facilities until they are sold.  As of December 31, 2023, the Debtors owned approximately $3.9 million in gummy and packaging inventory located at 3PL storage facilities, including in Indianapolis, Indiana; Los Angeles, California; and Milton, Ontario, Canada.

C.    The Debtors' Manufacturing

19.    Between 2018 and 2022, manufacturing of GOLI Products was contracted to BNL. To aid in BNL's performance of these manufacturing contracts and to support BNL's expansion strategy, the Debtors entered into two agreements.  First, Goli US entered into the Norco Lease with Saddle Ranch APG LLC, successor in interest to CRPF IV HCD, LLC (the "Norco

Landlord"). The Norco Landlord would not agree to lease the Norco Facility solely to BNL as it lacked the requisite financial wherewithal. To accommodate BNL, Goli US agreed to lease the Norco Facility from the Norco Landlord and agreed with BNL that BNL would occupy the Norco Facility on the condition BNL assume rental obligations and other expenses related to the Norco Facility and guarantee all of the Debtors' obligations under the Norco Lease. The Norco Lease contains an *ipso facto* provision. As described below, BNL ceased making these payments, as well as other payments that led to further defaults under the Norco Lease, causing significant financial difficulties for the Debtors.

20.    Second, Goli US assisted BNL in purchasing manufacturing machinery designed to fit the Norco Facility. As with the Norco Lease, BNL lacked the financial wherewithal to finance the purchase alone. Accordingly, Goli US assisted BNL and entered into an equipment financing and services agreement with ATOS IT Solutions and Services, Inc. ("Atos") for the purchase and servicing of state of the art "smart" manufacturing machinery ("Atos Equipment"). BNL agreed to make all payments on the Atos Equipment on Goli US's behalf, and executed a guaranty. While BNL made some payments under the Norco Lease and towards the Atos Equipment, BNL ultimately defaulted. To stave off repossession of the Atos Equipment, Goli Canada entered into a settlement agreement with Atos pursuant to which Goli Canada acquired the Atos Equipment for $32 million.

21.    On December 20, 2022, BNL filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. See Case No. 6:22-17723, Dkt. No. 1 (Bankr. C.D. Ca. Dec. 20, 2022). By order dated March 30, 2023, BNL's chapter 11 case was converted to Chapter 7. See Case No. 6:22-17723, Dkt. No. 402 (Bankr. C.D. Ca. Mar. 30, 2023). Effective on April 1, 2023, BNL relinquished its sublease to the Norco Facility and Goli US reassumed the Norco Lease, which was

approved by the bankruptcy court overseeing BNL's Chapter 7 case. *See* Case No. 6:22-17723, Dkt. No. 374 (Bankr. C.D. Ca. Mar. 21, 2023).

      D.    <u>Credit Facilities</u>

    22.    Goli Canada is the borrower under an amended and restated credit agreement dated September 2, 2022 (as amended, the "<u>Senior Credit Agreement</u>") entered into with Bank of Montreal (in its capacity as lender and administrative agent), National Bank of Canada, Fédération des Caisses Desjardins and HSBC Bank Canada (collectively, the "<u>Lenders</u>").  Pursuant to the Senior Credit Agreement, the Lenders provided (a) a revolving credit facility up to a maximum of $50,000,000 USD (the "<u>Revolving Credit Facility</u>"); (b) a term facility up to a maximum of $63,000,000 USD (the "<u>Term Facility</u>"); and (c) credit card facilities (together with the Revolving Credit Facility and the Term Facility, the "<u>Credit Facilities</u>").

    23.    Goli Canada's obligations under the Credit Facilities are secured by a security on all movable property, present and future, corporeal and incorporeal, of Goli Canada, including, without limitation, the Atos Equipment, all of its intellectual property rights, and all of its shares in Goli US, other than Excluded Property (as this term is defined in the Credit Agreement).  Goli US has guaranteed all of Goli Canada's obligations under the Credit Facilities, which guarantee is secured by all of Goli US's assets.  Upon a review by the Petitioner, it has been determined that the Lenders' liens are valid and enforceable. Also, based on information in public registries, the Lenders' liens appear to be first ranking.

    24.    As of the Petition Date, the Lenders hold claims of approximately $100 million, subject to adjustments, against the Debtors, all of which are secured by valid and enforceable first priority security interests.

## II.    Events Leading to the Filing of the Canadian Proceedings

### A.    Financial Difficulties

25.    The Debtors financial difficulties are generally the result of declining demand for the Debtors' products, certain questionable management and operational decisions, supply chain disruptions, and mounting legal battles.  The Debtors have seen their customer base shrink drastically, resulting in decreased gross revenues and gross profit reflected in financial statements for the year ended December 31, 2023.  The most significant reduction in the customer base is noted at the direct-to-consumer level, indicating that the Debtors must rely more and more on wholesalers and business-to-business operations.

26.    In parallel, the Debtors experienced material inventory management, quality, and aging issues resulting in high levels of customer returns.  The Debtors' primary product, the GOLI gummies, generally expire approximately 18 months after production.  Therefore, the Debtors face a strict timeline to market, distribute, and sell inventory immediately following production. Notwithstanding the indicated product expiry dates, many wholesalers impose additional earlier expiry deadlines on the products they accept to sell from distributors.

27.    From December 2021 to December 2023, the book value of the Debtors' inventory decreased from $70m to $5.1m.  This shortfall stems from significant inventory obsolescence issues as revenues declined, resulting in inventory write-offs and discounted liquidation sales. Considering the heavy reliance of wholesalers to the Debtors' operations and declining direct-to-consumers customers, this materially impacted the Debtors' recent financial performance and resulted in high levels of customer returns.  As a result, the Debtors are over-leveraged, and have recurring operating losses, working capital deficiencies, and insufficient cash flow to meet their obligations as they become due.

28.     Additionally, as a result of the Debtors' cash-flow issues it has, at times, been unable to pay suppliers and manufacturers in a timely manner, which has created disputes with affected suppliers and at times led to the withholding of shipments or implementation of various payment plans.  Finally, as a result of significant arrears outstanding under the Norco Lease, the Debtors are a risk of being evicted from the Norco Facility.  As described above, the Debtors entered into the Norco Lease with the Norco Landlord and subleased the Norco Lease to BNL. Unfortunately, BNL was unable to make these payments.  At the risk of being evicted from the Norco Facility—along with the repossession of crucial Atos Equipment inside the Norco Facility by lienholder Atos IT Solutions and Services, Inc.—the Debtors were left with no choice but to resolve such matters directly (*i.e.* Goli Canada made a settlement payment of $32m to acquire the Atos Equipment and Goli US assumed payment of the Norco Lease).

29.     Since assuming primary responsibility for the Norco Lease, the Norco Landlord has issued several notices of default for rental arrears, the most recent being on March 12, 2024, wherein the Norco Landlord demanded immediate payment of past due rent or turnover of possession of the Norco Facility.  The Debtors are in arrears on the Norco Lease in the approximate amount of $510,000, representing unpaid rent for the month of March 2024.  On February 29, 2024, the Norco Landlord applied a portion of its deposit in payment of the previous outstanding rental arrears (leaving a deposit balance of approximately $1.2m) and requested that the Debtors replenish said deposit within 10 days.  Since the Debtors will not be able to replenish the deposit and have not paid rent for the current month, they are now at serious risk of being evicted from the Norco Facility, and denied access to the Norco Facility where the Atos Equipment is located.

B.     Pre-Petition Restructuring Efforts and SISP

1.     *Pre-Filing Restructuring Efforts*

30.     In an attempt to remedy their financial difficulties, the Debtors endeavored, without success, to implement operational restructuring efforts beginning in May 2023.  By such efforts, the Debtors tried to rationalize operations in the United States, Canada, and worldwide by developing strategies to improve profitability and conducting a review of their operations to identify potential synergies and costs savings across the board.  Many changes were made, including but not limited to: (i) negotiating the early termination of a leased office space and the non-renewal of other leased office space as, following the COVID-19 pandemic, most of the Debtors' employees were working from home; (ii) developing a new pricing strategy for both retailers and direct-to-consumers; (iii) reducing their workforce and payroll (including refraining from paying bonuses to management and equity drawing no salary); (iv) terminating any non-essential services; (v) engaging in negotiations with various vendors, service providers and suppliers for additional cost savings; (vi) settling (whether for monetary amounts or otherwise) certain legal disputes to try to avoid the substantial continued expense of further litigation; and (vii) subletting portions of the Norco Facility to help with the financial burden.  Unfortunately, these efforts alone were not sufficient to offset the ongoing cash flow problems the Debtors suffered over the last several months or to allow the Debtors to pay liabilities as they become due.

31.     As part of their strategic review of capital and business alternatives, with the support and input of the Lenders, the Debtors and their advisors implemented a Sale and Investment Solicitation Process (the "SISP") for the Debtors, their assets, and business.  The objective of the SISP was to identify one or more transactions in respect of a potential sale, investment in, or refinancing of all or part of the business and/or assets of the Debtors that could, ideally, permit the Debtors to repay its substantial secured indebtedness, with any balance to be

used to pay other debt and allow for the continuation of all or part of the Debtors' activities on a going concern basis.

32.     The SISP began in June 2023 and concluded in January 2024.  As described below, the long and comprehensive sale and marketing process included: (i) the creation of a process for identifying and notifying potentially interested purchasers and/or investors; (ii) the preparation of bidding procedures; (iii) the creation of a protocol for the selection of a successful bidder; and (iv) the establishment of procedures and requirements for approval of any proposed transaction.

2.     *The Execution and Results of the SISP*

33.     With the support, cooperation, and input of the Lenders, the Debtors engaged the services of BMO Capital Markets ("BMOCM") to develop and implement the SISP.  In accordance with the SISP procedures, BMOCM, with the assistance of the Debtors, prepared and/or maintained all SISP related documents (including the preparation of a teaser letter, a target list of potential Purchaser or investors, and confidentiality agreements) and provided all required information to potential bidders.  The Petitioner, then acting as financial advisor for the Lenders, was kept apprised of the progress of the SISP.

34.     In June 2023, BMOCM delivered a teaser letter (the "Teaser") to forty-two (42) potential bidders from both strategic and financial sectors.  Two (2) other potential bidders were also contacted directly by BMOCM, for a total of forty-four (44) potential bidders.  The Teaser invited potential bidders to submit (i) a confidentiality agreement to access the Debtors' virtual data room (the "VDR"), and (ii) a non-binding letter of intent for the entirety of the Debtors' business and assets, including the Atos Equipment.  Ultimately, twenty-nine (29) parties signed confidentiality agreements and were invited to submit non-binding letters of intent by no later than August 8, 2023.

35.     On August 8, 2023, the Debtors received four (4) non-binding letters of interest for their business (excluding the Atos Equipment).   The Debtors received an additional letter of interest from a late entrant in November 2023.

36.     On October 31, 2023, BMOCM sent a process letter to five (5) interested parties inviting the submission of final, binding proposals and including a draft definitive sale agreement for review and mark-up.   The Debtors set the deadline for submission of proposals as November 14, 2023 ("Binding Proposal Deadline").   No binding offers were received by BMOCM or the Debtors by the Binding Proposal Deadline.

37.     BMOCM continued its efforts to advance a transaction with interested parties and to facilitate due diligence requests, but several of the parties raised concerns regarding the Debtors' operating results and required more time for the Debtors to demonstrate an improvement in its results.   A number of the interested parties undertook financial and commercial due diligence from September 2023 to January 2024.   However, none of these parties decided to proceed with submitting a binding offer to acquire the Debtors.

3.     *The Debtors Enter Into the Subscription Agreement*

38.     On January 15, 2024, considering the worsening liquidity position of the Debtors and the failure of the SISP to generate a binding offer, the Purchaser submitted a LOI to Goli Canada (the "Initial Purchaser LOI").   The terms of the Initial Purchaser LOI provided for a rapid transaction that would preserve the value of the business as a going concern and allow it to continue its operations.

39.     The transaction value put forward in the Initial Purchaser LOI was significantly less than the amount owed to the Lenders under the Credit Facilities.   Accordingly, being the stakeholder with the primary economic interest in the outcome of the transaction, over the next

three (3) weeks, the Lenders negotiated enhanced terms, including an increase to the proposed transaction value.

40.     On February 3, 2024, the Purchaser entered into a non-binding LOI with the Lenders, pursuant to which the Lenders agreed to work towards the drafting and execution of a definitive agreement in respect of the contemplated transaction.   This culminated in the Subscription Agreement.

41.     On March 15, 2024, Goli Canada entered into the Subscription Agreement with the Purchaser pursuant to which the Purchaser agreed to subscribe for new shares in Goli Canada (*i.e.*, the Subscribed Shares) and effectively acquire 100% of the equity interest in Goli Canada in accordance with the terms and conditions of the Subscription Agreement.   Goli Canada, will, in turn, cancel and terminate all of its existing shares so that the Purchaser may become the sole shareholder of Goli Canada.

42.     The Principal Transaction is intended to be approved and implemented under the CCAA pursuant to a reverse vesting order (*i.e.*, the RVO) and thereafter recognized and enforced in the United States in these Chapter 15 cases.   Certain excluded assets (including notably the Atos Equipment and shares of Goli US), contracts and liabilities will be vested out of Goli Canada and transferred to a "Residual Co." as part of the contemplated RVO structure.

43.     Under the terms of the Subscription Agreement, consideration payable by the Purchaser will include a cash payment, the payment of any priority claims of Goli Canada and payment of certain amounts to cover the professional fees of the Petitioner, its legal counsel and legal counsel to the Lenders in connection with the Sale Transactions, the Canadian Proceedings, and this Chapter 15 Case.

44.     Pursuant to the terms of the Subscription Agreement, closing of the Principal Transaction is scheduled to occur on or around April 11, 2024, subject to the required court approvals, or as otherwise agreed upon by the Debtors and the Purchaser with the consent of the Petitioner and the Lenders (the "Closing Date").  The transaction is not subject to any financing condition and the Purchaser have provided certain documents to the Lenders and the Petitioner to demonstrate its ability to fund the transaction value.

45.     Closing of the Subscription Agreement is conditional on approval of the Principal Transaction pursuant to the issuance of the RVO by the Canadian Court and the recognition and enforcement thereof in the United States.

4.      *Disposition of the Atos Equipment*

46.     As noted above, the four non-binding indications of interest for the Debtors' business received in August 2023 excluded the Atos Equipment.  However, in the same month, the Debtors received a separate indication of interest from another party for the Atos Equipment. Such party was granted access to the VDR and visited the Norco Facility to conduct due diligence.

47.     Following due diligence of the Norco Facility and the Atos Equipment, it became clear that the party was not interested in moving forward.  Left with no other options, Goli Canada, with the consent of the Lenders, engaged in a process to liquidate the Atos Equipment through an auction.  After receipt of multiple proposals and extensive negotiations, Goli Canada and the Lenders selected Gordon Brothers Commercial & Industrial, LLC acting on behalf of a contractual joint venture between itself and Brandford Auctions, LLC (the "Agent").  The proposal by the Agent (through which the Agent would serve as the agent of Goli Canada in the conduct of the sale) ultimately offered the highest guaranteed return and, given their familiarity and knowledge of the equipment, Goli Canada and the Lenders believe that they are best positioned to sell the

Atos Equipment at maximum value.  On March 15, 2024, Goli Canada entered into an agency agreement with the Agent for the purpose of liquidating the Atos Equipment for the benefit of Goli Canada's creditors ("Agency Agreement").  Pursuant to the Agency Agreement, the Agent will provide a net minimum guarantee, a portion of which will be paid in advance of the sale, and the Agent will share any further proceeds realized from the sale of the Atos Equipment with Goli Canada. The Agent is also entitled to mark up the price of the Atos Equipment by a certain percentage and to retain the benefit of that markup as compensation for its services.

48.    Pursuant to the Agency Agreement, the Agent has specified they will require a period commencing as at the date of the Agency Agreement, namely March 14, 2024, and expiring on June 30, 2024 of peaceful access to the Norco Facility where the Atos Equipment is located to complete the sale and auction process, during which time Goli US will pay occupation rent and certain other related expenses. All amounts payable to Goli Canada under the Agency Agreement are to be made to the Monitor for the benefit of the creditors.

49.    As security for all obligations of Goli Canada to the Agent under or in connection with the Agency Agreement, the Atos Equipment and all proceeds thereof including all proceeds from sales of the Atos Equipment shall be subject to a first ranking charge and security in favor of the Agent, as contemplated in the Atos Sale Order.

50.    The implementation of the Agency Agreement is conditional on approval of the Agency Agreement by the Canadian Court and the recognition and enforcement of the Atos Sale Order.

C.    The RVO

51.    The Subscription Agreement is the culmination of the Debtors' nearly year-long efforts to restructure.  Through the Canadian Proceedings, the Debtors seek to implement a strategy

that will enable Goli Canada to exit the Canadian Proceedings as a viable going-concern business and, at the same time, maximize the value of the Debtors' business for the benefit of stakeholders. Key features and aspects of the Principal Transaction can be summarized as follows:

(a) based on the price payable under the Subscription Agreement, all the Lenders are suffering a significant shortfall on their senior secured position such that no recovery would be expected for any other secured or unsecured creditors under the Principal Transaction, regardless of the structure employed;

(b) creditors and other stakeholders of the Debtors affected by the Principal Transaction will not be in a worse position than they would be if the transaction was implemented pursuant to a traditional asset sale or similar structure;

(c) the Subscription Agreement provides for various unsecured and contingent liabilities to be assumed by the Purchaser;

(d) various agreements, licenses and authorizations are part of the purchased assets that must be transferred to the Purchaser as part of the Principal Transaction.  It will be more complicated and costly to transfer these assets under a traditional sale order or other structure since consents, approvals or authorizations may be required.  An RVO structure will minimize the risks, costs or delays of having these assets transferred; and

(e) all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada shall terminate or be cancelled; and

(f) the completion of the Principal Transaction will allow for the Debtors to continue operations as a going concern, resulting in (i) the potential for employees to preserve their employment; (ii) suppliers of goods and services being able to maintain their business relationships with the Debtors; and (iii) many of the contractual distribution arrangements remaining intact without need for the Debtors to take further steps.

52.    The Principal Transaction contemplated under the Subscription Agreement has been structured as a so-called "reverse vesting" transaction.  The Purchaser would not have entered into the Subscription Agreement and would not consummate the purchase of the Subscribed Shares and the related transactions, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if the sale of the Subscribed Shares to the Purchaser was not free and

clear of all liens, claims, encumbrances, and other interests.  In sum, instead of providing for a traditional asset sale transaction where all purchased assets are purchased and transferred to the purchaser on a "free and clear" basis, the Principal Transaction provides for a transaction whereby, essentially:

    (a)    the Purchaser will subscribe for and purchase new shares of Goli Canada, which will, in turn, cancel and terminate all of its existing shares so that the Purchaser may become the sole shareholder of Goli Canada; and

    (b)    all excluded contracts, excluded assets, and excluded liabilities with respect to the Debtors (including the Atos Equipment and the shares of Goli US) will be transferred and "vested out" to a Canadian corporation (Residual Co.) to be incorporated by Goli Canada in advance of the Closing Date, so as to allow the Purchaser to indirectly acquire Goli Canada's business and other assets, including, for the avoidance of doubt, all of the Debtors' assets, licenses, undertaking, and properties of every kind whatsoever and wherever situated, including property held in trust for the Debtors on a "free and clear" basis.

53.    The Subscription Agreement was structured as a reverse vesting transaction primarily because Goli Canada maintains various licenses that are required to maintain its operations, as well as in-progress trials and testing programs that are proceeding under and in the name of Goli Canada.  Under a traditional asset sale transaction structure, some of these licenses would be difficult to transfer to a purchaser and, to the extent that such transfer is possible, the steps required to proceed with such a transfer would likely result in additional delays, costs and uncertainty. The Purchaser were willing to enter into the Subscription Agreement on the understanding that the Primary Transaction could be completed quickly and with certainty that the key licenses would be transferred.  As the Debtors are facing significant liquidity constraints, the delays, costs and uncertainty associated with transferring or obtaining new permits and licenses would have a detrimental impact on the Goli's business.  Therefore, the Subscription Agreement's

structure as a reverse vesting transaction is appropriate and necessary to give effect to the Primary

Transaction given the following:

(a)    A reverse vesting-order structure allows for the licenses, registrations, permits, and certifications that are essential to the Debtors' operations to remain in place. These include, among others, licenses, registrations, permits, and certifications granted by various food, health, and other authorities across the world, which are essential to its operations.

(b)    For instance, in Canada alone, Goli Canada holds:

i.    various natural-health-product licenses issued by the Minister of Health in according with section 7 of the Natural Health Products Regulations, SOR/2003-196 (the "NHP Licenses"), which are required in order to sell, market, and distribute its products in Canada. For illustrative purposes, the standard delay, according to the Natural and Non-Prescription Health Product Directorate (the "NNPHPD"), to get a NHP License is 60 days for a Class I product, 90 days for a Class II product, and 210 days for a Class III product. However, the NNPHPD frequently exceeds such delays. Goli Canada showed longer delays for its own products. The vast majority of GOLI Products are classified as Class III, including the Debtors' most popular products;

ii.    a site license issued by the Minister of Health in accordance with section 29 of the Natural Health Products Regulations, SOR/2003-196, which is required in order to import its licensed natural health products in Canada;

iii.    an import license issued by the Canadian Food Inspection Agency under the Safe Food for Canadians Act (S.C. 2012, c. 24), which is required to import its apple-cider vinegar food-product gummies;

iv.    Goli Canada's GS1 license, which holds all of Goli Canada's unique identifiers (UPCs and GTINS) necessary for the sale of GOLI Products with various retailers, online marketplaces, distributors, and other partners. Goli Canada has approximately 400 existing UPCs, which represents a substantial portion of Goli Canada's product catalog and market presence.  These UPCs are registered with over 30 different retailers.  Changes to UPCs could take 6- 9 months to implement, involve a significant amount of paperwork, and present logistical challenges (such as needing to update all new items with Goli Canada's 3PLs, relisting all items on each of the retailer-specific platforms, and recreating all new labels with the new barcodes) as well as strategic challenges.  Such changes could hinder market presence and risk losing shelf space with important

retailers as well as require reprinting all labels with the new UPCs; and

v.   Various brand and trademark registrations in international markets required to obtain regulatory permits and product registrations with the applicable authorities.

(c)   Those delays mentioned above will render the implementation of the Principal Transaction impossible. Indeed, the Debtors simply do not have required liquidity to wait that long to close the Principal Transaction. Moreover, the Lenders are unlikely to support any transaction which could take a minimum of 7 months to materialize.

(d)   The Lenders are the sole stakeholders that have a financial interest in the Principal Transaction and, therefore, the reverse vesting order structure is not prejudicing any creditor in the present instance.

54.   The reverse vesting structure will also allow the Debtors to maintain all of their licenses and intellectual property without requiring any additional steps or regulatory approvals to transfer them to the Purchaser. The Purchaser was willing to enter into the Subscription Agreement on the understanding that the Primary Transaction could be completed quickly and with certainty that the key licenses would be transferred. As the Debtors are facing significant liquidity constraints, the delays, costs, and uncertainty associated with getting licenses transferred is not a viable option.

55.   Under a traditional vesting order structure, the transfer of such permits, registrations, licenses, and certifications would involve a complex transfer and/or new application process of indeterminate risk, which as illustrated above, would interrupt or delay the continued operations of Goli Canada, impact current relationships and partnerships with third parties, and lead to regulatory challenges and significantly increased costs that could ultimately jeopardize the Sale Transaction as well as the value of the business.

56.   In light of the foregoing, the Petitioner, in its capacity as an officer of the Canadian Court, is confident that the market has been thoroughly canvassed and there is no other viable

alternative transaction available to the Debtors.  The only going-concern option that results in an ongoing customer or supplier for contract counterparties, among other benefits, are the transactions with the Purchaser under the Subscription Agreement, which are to be implemented through a reverse vesting structure.  The RVO represents the best outcome for all of the Debtors' stakeholders.

57.    At the request of the Debtors and the Purchaser, the RVO provides for releases and protections in favor of: (i) Goli Canada and certain of its directors and officers, and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors (the "Released Parties").  The releases cover any and all present and future claims against the Released Parties based upon any fact or matter of occurrence related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions.

58.    Further, the releases provided in the Subscription Agreement and RVO explicitly do not release or discharge: (a) any claim that is not permitted to be released pursuant to the CCAA; (b) any claims against the directors or officers of Goli Canada that: (i) relate to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; or (c) any obligations of any of the Released Parties under or in connection with the Subscription Agreement, the closing documents, and/or the consummation of the Principal Transaction.

59.    The Petitioner, in its capacity as an officer of the Canadian Court, believes that the Subscription Agreement is fair and reasonable under the circumstances and is generally beneficial to the Debtors' stakeholders, inclusion its creditors, employees, and trading partners. In that regard the Petitioner has considered that the Principal Transaction is supported by the Lenders, which

have the primary economic interest in the Debtors' assets. and that the Princiapl Transaction will allow for the continuation of the Debtors' business as a going concern. Moreover, the reverse vesting structure of the Principal Transaction is necessary and appropriate to preserve the going-concern value of the Debtors' business and produces an economic result more favorable than the available alternatives.  Indeed, the Petitioner is confident, given the results of the SISP and the Lenders' support for the CCAA Initial Application, that the Principal Transaction is the *only* viable going-concern transaction available to the Debtors that will allow Goli Canada to exit the Canadian insolvency proceedings, and continue its business.

        D.      <u>The Atos Sale Order</u>

60.      In addition, the Debtors have negotiated and finalized the terms of a second and separate transaction to implement the liquidation of the Atos Equipment.  As described above, the Debtors have entered into the Agency Agreement with the Agent pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment.

61.      The Agency Agreement contains certain indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement.

62.      The Agency Agreement, like the Subscription Agreement, has been concluded based on the results of the SISP.  Given the extensive marketing process and other protections provided by the SISP, the Petitioner believes that the Agency Agreement is fair and reasonable under the circumstances, and provides the highest and best value to the Debtors and their stakeholders for the Atos Equipment.  The proposal by the Agent (through which the Agent would serve as the agent of Goli Canada in the conduct of the sale) ultimately offered the highest guaranteed return and, given their familiarity and knowledge of the equipment, Goli Canada and the Lenders believe that they are best-positioned to sell the Atos Equipment at maximum value.

All amounts payable to Goli Canada under the Agency Agreement are to be made to the Petitioner for the benefit of the creditors.   In accordance with the Atos Sale Order, as security for all obligations of Goli Canada to the Agent under or in connection with the Agency Agreement, the Agent is granted a first priority security lien in the Atos Equipment and all proceeds from sales thereof in accordance with the Agency Agreement.   Given the above, the Petitioner is also confident that the Agency Agreement is the best way to maximize the value of the Atos Equipment.

## III.   **The Canadian Proceedings**

63.      On March 15, 2024, the Debtors commenced the Canadian Proceedings by filing an application (the "CCAA Initial Application") with the Canadian Court.   Contemporaneously, the Petitioner served its pre-filing report attached hereto as **Exhibit D** ("First Report").   On March 18, 2024, the Canadian Court entered an initial order (the "Initial Order"), a true and correct copy of which is annexed hereto as **Exhibit E.**   The Petitioner, by virtue of its appointment as Monitor by the Canadian Court, is subject to the supervision and oversight of the Canadian Court with respect to the performance of its duties.

64.      Pursuant to the Initial Order, the Canadian Court expressly authorized the Petitioner to seek recognition of the Canadian Proceedings under Chapter 15 of the Bankruptcy Code and ancillary relief in respect thereto.   Specifically, the Initial Order provides, in relevant part, that

> [the Petitioner] may act as a 'foreign representative' of the [Debtors] or in any other similar capacity in any insolvency, bankruptcy or reorganisation proceedings outside of Canada
>
> ***and further that***
>
> the [Petitioner] shall be authorized to apply and act as 'foreign representative' of the [Debtors] as it may consider necessary or desirable, with or without notice, to any other court or administrative body, whether in Canada, the United States of America or elsewhere, for orders which aid and complement the [Initial Order] and any subsequent orders of [the Canadian Court] and, without limitation to the foregoing, an order under Chapter 15 of the U.S. *Bankruptcy Code* (*US Code*, Title 11). All courts and administrative

bodies of all such jurisdictions are hereby respectively requested to make such orders and to provide such assistance to the Monitor or the Applicants as may be deemed necessary or appropriate for that purpose.

Initial Order ¶¶ 31(*l*), 53.  In addition, the Canadian Court requested "the aid and recognition of . . . any federal or state court or administrative body in the United States of America and any court or administrative body elsewhere, to act in aid of and to be complementary to this [Canadian Court] in carrying out the terms of the [Initial] Order" and found that "the Province of Quebec, Canada is the '*center of main interest*' of [the Debtors]."  Initial Order ¶¶ 54, 55.

65.     The Initial Order also provides for a broad stay of proceedings in favor of the Debtors.  In particular, for an initial ten-day period through and including March 27, 2024 (the "Stay Period"), "no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the [Debtors], or affecting the [Debtors'] business operations and activities (the "Business") or the Property … except with leave of this Court." Initial Order, ¶ 10.

66.     By the CCAA Initial Application, the Debtors indicated they would request (i) entry of the RVO approving the sale of the Subscribed Shares pursuant to the Subscription Agreement, and (ii) entry of the Atos Sale Order approving the Agency Agreement, pursuant to which the Agent will sell the Atos Equipment.

67.     On March 27, 2024, the Canadian Court will hold a hearing (the "Comeback Hearing") to approve an extension of the automatic stay that is in place in the CCAA Proceedings. Initial Order, ¶ 45. The Debtors are also requesting a subsequent hearing to take place approximately one week after the Comeback Hearing for the Canadian Court to consider approval of the Sale Transactions (the "CCAA Sale Approval Hearing").  The Petitioner anticipates that the

Canadian Court will approve the Sale Transactions and enter the CCAA Vesting Orders at or shortly following the CCAA Sale Approval Hearing.

**RELIEF REQUESTED**

68.    The Debtors' primary goals for the Canadian Proceedings and these Chapter 15 case are:

(a)    To stay ongoing and potential proceedings against the Debtors and their assets in order to preserve the status quo and be able to implement Sale Transactions;

(b)    To seek approval and recognition of the Subscription Agreement and the sale of the Subscribed Shares as provided thereunder pursuant to the RVO; and

(c)    To seek approval of the sale of the Atos Equipment on the terms set forth in the Agency Agreement pursuant to the Atos Sale Order.

69.    Pursuant to the Initial Order, the Canadian Court expressly authorized the Petitioner to seek recognition of the Canadian Proceedings under Chapter 15 of the Bankruptcy Code in this Court, and ancillary relief in respect thereto.  The Petitioner commenced these Chapter 15 cases and seeks an order substantially in the form of the Proposed Order.  In particular, the Petitioner is requesting all relief afforded automatically upon recognition of a foreign main proceeding pursuant to sections 1509 and 1520 of the Bankruptcy Code and, in the alternative, upon recognition as a foreign nonmain proceeding, discretionary relief available under section 1521 of the Bankruptcy Code.  Separately, the Petitioner also seeks provisional relief to maintain the status quo and protect the Debtors' United States operations and assets until this Court considers approval of the Verified Petition and entry of the Proposed Order.  The Petitioner submits that this Court's assistance is necessary to protect the Debtors' rights and assets and, ultimately, to implement their restructuring through the Canadian Proceedings.

## STATUTORY BASES FOR RECOGNITION OF CANADIAN PROCEEDINGS

70.     Chapter 15 of the Bankruptcy Code was specifically designed to assist foreign representatives, such as the Petitioner, in the performance of their duties.  One of the primary objectives of Chapter 15 is the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor." 11 U.S.C. § 1501(a)(3).

71.     Consistent with these principles, the Petitioner commenced ancillary proceedings for the Debtors under Chapter 15 of the Bankruptcy Code to obtain recognition of the Canadian Proceedings, and certain related relief.  The Petitioner believes that these chapter 15 cases will complement the Debtors' primary proceedings in Canada to ensure the effective and economic administration of the Debtors' restructuring efforts and prevent adverse actions in the United States.  Further, the Petitioner submits that recognition of the Canadian Proceedings and the related relief requested herein will not undermine the rights that United States creditors typically would enjoy in a chapter 11 case.

## I.      The Debtors are Eligible for Chapter 15 Relief

72.     Certain courts in this district have held that the requirements of section 109(a) of the Bankruptcy Code do not apply in chapter 15 cases.  *See, e.g., Hr'g Tr. 8:19-9:10, In re Bemarmara Consulting A.S.*, Case No. 13-13037 (Bankr. D. Del. Dec. 17, 2013), D.I. 38 (holding section 109(a) did not apply to chapter 15 case); *In re Metinvest B.V.*, Case No. 17-10130 (LSS) (Bankr. D. Del. Feb. 8, 2017), D.I. 19 (same).  However, the United States Court of Appeals for the Second Circuit has adopted a different approach.  *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013) ("Section 109 . . . applies 'in a case

under chapter 15.'"). Regardless, to the extent section 109(a) of the Bankruptcy Code is applicable in a Chapter 15 case, the debtor-eligibility requirements are satisfied here.

73.    Section 109(a) states, in relevant part, that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title." 11 U.S.C. § 109(a).  *See In re Octaviar Administration Pty Ltd.*, 511 B.R. 361, 373 (Bankr. S.D.N.Y. 2014) ("[T]he Court must abide by the plain meaning of the words in the statute.  Section 109(a) says, simply, that the debtor must have property; it says nothing about the amount of such property…."); *see also In re Suntech Power Holding Co. Ltd.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014) (same).

74.    Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code.  *First,* Goli Canada is eligible to be a debtor because Goli Canada has property in the United States in the form of (a) stock in Goli US, a United States corporation,[5] (b) the Atos Equipment located in the United States, (c) inventory located in 3PL facilities throughout the United States, and (d) Goli Canada has an interest in unearned portions of a retainer provided to local Delaware counsel.  *Second*, Goli US is eligible to be a debtor because (a) it has a place of business in the United States[6] as it continues to wind down operations at the Norco Facility, and (b) it has property in the United States in the form of (i) a lease of the Norco Facility and (ii) an interest in unearned portions of a retainer provided to local Delaware counsel.

---

[5]    Stock of a Delaware corporation constitutes property in Delaware. *See In re Glob. OCEAN CARRIERS Ltd.*, 251 B.R. 31, 37 (Bankr. D. Del. 2000).

[6]    A *principal* place of business is not required to satisfy Section 109(a)'s requirement, rather it is merely "*a*" place of business.  *In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 844 (Bankr. D.N.J. 2011) (emphasis original) (citing *In re Paper I Partners, L.P.,* 283 B.R. 661, 672 (Bankr. S.D.N.Y. 2002)).

**II.**    **These Cases are Proper under Chapter 15**

75.    Chapter 15 of the Bankruptcy Code provides a mechanism for a foreign representative to obtain, in the United States, recognition of, and assistance for, a foreign proceeding. *See* 11 U.S.C. § 1501(b)(l). Chapter 15 recognition shall be granted if: (a) recognition is sought for a "foreign proceeding" that qualifies as either "foreign main" or "foreign nonmain;" (b) recognition is sought by a "foreign representative;" and (c) the Chapter 15 petition meets certain procedural requirements. *See* 11 U.S.C. § 1517(a). The legislative history to Chapter 15 provides that:

> The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code. The requirements of [section 1517], which incorporates the definitions in section 1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition.

H.R. Rep. 109-31, pt. 1 (2005). Thus, recognition under sections 1517(a) and (b) of the Bankruptcy Code is mandatory where, as here, a Chapter 15 petition meets the statutory requirements.

A.    Each of the Canadian Proceedings is a Foreign Proceeding

76.    Each of the Canadian Proceedings is a foreign proceeding entitled to recognition under Chapter 15 of the Bankruptcy Code. Courts in this District have consistently held that proceedings under the CCAA are foreign proceedings entitled to relief under chapter 15 of the Bankruptcy Code. *See, e.g, In re Xebec Holding USA Inc.*, No 22-10934 (Bankr. D. Del. Sep. 30, 2022); *In re Spectra Premium Corp.*, No. 20-10614 (Bankr. D. Del. Mar. 11, 2020); *In re Motorcycle Tires & Accessories LLC*, No. 19-12706 (Bankr. D. Del. Jan. 22, 2020);. *In re Kraus Carpet Inc.,* No. 18-12057 (Bankr. D. Del. Oct. 1, 2018); *In re Artic Glacier Int'l Inc.,* No. 12-10605 (Bankr. D. Del. Mar. 16, 2012).

77.    A foreign proceeding has seven elements:

> (i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.

See *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 327 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (citation omitted); 11 U.S.C. § 101(23).  As set forth below, the Canadian Proceedings satisfy all of the elements.

78.     For the purpose of Chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that contains a company's actions and that regulates the final distribution of a company's assets" and includes "acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." *Flynn v. Wallace (In re Irish Bank Resolution Corp.*), 538 B.R. 692, 697 (D. Del. 2015) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009)).  Here, the relevant statutory framework is provided by the CCAA, a federal statute in Canada.  *See* Zucker Declaration ¶¶ 14, 17.  The CCAA is "Canada's analogue of Chapter 11 of our Bankruptcy Code."  *In re Artic Glacier Inter'l, Inc.*, 901 F.3d 162, 164 (3d Cir. 2018).  "The CCAA provides for a court-supervised reorganization procedure designed to enable financially distressed companies to avoid foreclosure or seizure of assets while maximizing the company's value as a going concern for the benefit of creditors and other parties in interest."  *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 611 (Bankr. S.D.N.Y. 2018); *see also* Zucker Declaration ¶ 17.  Because the Canadian Proceedings are subject to the CCAA, a statutory framework, they are each a "proceeding" within the meaning of 11 U.S.C. §101(23).

79.     Second, the Canadian Proceedings are clearly judicial in nature given the substantial oversight by the Canadian Court.  *See* Zucker Declaration ¶ 19 (the Canadian Court has

broad discretion "to make any order that it considers appropriate in the circumstances" on application by any person interested in the matter).  Moreover, all interested persons, including creditors, have access to the Canadian Court and may file an application seeking relief.  *See id*. The judicial character of the Canadian Proceedings is readily apparent as the Canadian Court appointed the Petitioner as the Monitor of the Debtors.  The Petitioner is an officer of the Canadian Court and is entrusted with monitoring the business and financial affairs of the Debtors and reporting to the Canadian Court on material matters.  *See* Zucker Declaration ¶ 22.  In some cases, the monitor will also be granted expanded powers to implement the restructuring process for and on behalf of the debtor company.  *Id*.  Moreover, the Canadian Court expressly authorized the Petitioner to file these Chapter 15 cases and to seek an order granting recognition to the Canadian Proceedings in the United States.  *See* Zucker Declaration ¶ 8.  Thus, the Canadian Proceedings are judicial in character.

80.     Third, the Canadian Proceedings are collective in nature.  A proceeding is "collective" if it considers the rights and obligations of all creditors.  *See In re ABC Learning*, 445 B.R. at 328; *see also In re Ashapura Minechem Ltd*., 480 B.R. 129, 136 (Bankr. S.D.N.Y. 2012) (A proceeding is collective in nature if it "considers the rights and obligations of all creditors."). "The 'collective proceeding' requirement is intended to limit access to Chapter 15 to proceedings which benefit creditors generally and to exclude proceedings which are for the benefit of a single creditor."  8 *Collier on Bankruptcy* ¶ 1501.03[1] (16th ed. Rev. 2019).  A proceeding under the CCAA is collective because it is designed to "facilitate compromises and arrangements between companies and their creditors" and to address creditors' claims against a debtor.  Zucker Declaration ¶¶ 17, 24.

81.     Fourth, the Canadian Proceedings are pending in a foreign country.  The Canadian Court, which is overseeing the Canadian Proceedings, is located in Québec, Canada.  Likewise, the Petitioner is located in Canada and is monitoring the restructuring of the Debtors from Canada under the auspices of the CCAA.

82.     Fifth, the Canadian Proceedings were initiated under a law relating to insolvency or adjustment of debt.  The Canadian Proceedings were commenced under the CCAA, a Canadian federal statute, which provides for the liquidation or reorganization of a debtor.  *See* Zucker Declaration ¶ 25.  Consequently, the CCAA constitutes a law relating to insolvency or the adjustment of debt.

83.     Sixth, the Canadian Proceedings subject the Debtors' assets and affairs to a foreign court's control or supervision.  Upon entry of the Initial Order, the Debtors' assets became subject to the supervision of the Canadian Court.  *See* Zucker Declaration ¶ 15.  Indeed, the Canadian Court appointed the Petitioner as Monitor, an officer of the court, to monitor the Debtors' business and financial affairs.  Moreover, various parties, including creditors, have access to the Canadian Court and may seek relief from the court to "make any order that it considers appropriate in the circumstances."  *See* Zucker Declaration ¶ 19.

84.     Finally, the Canadian Proceedings are for the purpose of reorganizing or liquidating the Debtors.  *See* Zucker Declaration ¶ 25 (noting that a company can liquidate or reorganize under the CCAA).  As described in the Zucker Declaration, a debtor may seek to reorganize by proposing a plan of compromise or arrangement to be voted upon by creditors, and if approved by the requisite majority of creditors, implemented with the approval of the Canadian Court.  *See id*.  In addition, a debtor may sell or liquidate its assets outside of the ordinary course of business with court approval pursuant to Section 36 of the CCAA. *Id*.  Further, a debtor may dispose of assets

through an RVO-structured transaction.[7] Zucker Declaration ¶ 32. Here, the Debtors are implementing a restructuring centered around the sale of the Debtors' business and assets, which is to be effectuated through two separate sale transactions, namely the Principal Transaction and the Atos Sale.

B.    These Cases were Commenced by the Debtors' Foreign Representative

85.    These Chapter 15 cases were commenced by a duly appointed and authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.  That section provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  Courts in this District have routinely concluded that a monitor appointed under the CCAA qualifies as a "foreign representative" for purposes of Chapter 15.  *See, e.g., In re Xebec Holding USA Inc.,* No 22-10934 (Bankr. D. Del. Sep. 30, 2022); *In re Spectra Premium Corp.*, No. 20-10614 (Bankr. D. Del. Mar. 11, 2020); *In re Motorcycle Tires & Accessories LLC*, No. 19-12706 (Bankr. D. Del. Jan. 22, 2020); *In re Kraus Carpet Inc.,* No. 18-12057 (Bankr. D. Del. Oct. 1, 2018); *In re Artic Glacier Int'l Inc.,* No. 12-10605 (Bankr. D. Del. Mar. 16, 2012).

86.    Pursuant to the Initial Order, the Canadian Court authorized and empowered the Petitioner to act as a foreign representative in respect of the Canadian Proceedings, and authorized

---

[7]    RVO transactions have been recognized and enforced in the U.S. under Chapter 15 on several occasions, including by bankruptcy courts in this district.  *See In re In re Acerus Pharmaceuticals Corp., et al.* , No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023), Docket No. 78; *In Re NextPoint Financial Inc., et al.*, No. 23-10983 (Bankr. D. Del. Dec. 11, 2023), Docket No. 155; *In re Just Energy Group Inc., et. al.*, No. 21-30823 (MI) (Bankr. S.D. Tex., Dec. 1, 2022), Docket No. 232.

the Foreign Representative to file the Chapter 15 cases in the United States for the purpose of

having the Canadian Proceedings recognized. *See* Initial Order, ¶29(*l*).

        C.      <u>These Chapter 15 Cases were Properly Commenced</u>

87.      The Petitioner filed the Petitions in compliance with sections 1504, 1509(a), and

1515 of the Bankruptcy Code.  Each of the Petitions meets the requirements of section 1515 and

was accompanied by: (a) a copy of the Initial Order commencing the Canadian Proceedings; (b) a

statement identifying all foreign proceedings known to the Petitioner with respect to the Debtors;

(c) a corporate ownership statement containing the information described in Bankruptcy Rule

1007(a)(4); and (d) on a consolidated basis, (i) a list containing the names and addresses of all

persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to

litigation pending in the United States, and (iii) all parties against whom provisional relief is sought

pursuant to section 1519 of the Bankruptcy Code.  Because the Petitioner has satisfied the

requirements set forth in section 1515 of the Bankruptcy Code, it has properly commenced these

Chapter 15 cases.

**III.**    **The Canadian Proceedings Should be Recognized as Foreign Main Proceedings**
          **or, Alternatively, as Foreign Nonmain Proceedings**

        A.      <u>The Canadian Proceedings should be recognized as foreign main proceedings.</u>

88.      This Court should recognize the Canadian Proceedings with respect to each Debtor

as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.  A foreign

proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where

the debtor has the center of its main interests ("<u>COMI</u>").  *See* 11 U.S.C. § 1517(b)(l).

89.      While the Bankruptcy Code does not define "center of main interests," it does

provide that "in the absence of evidence to the contrary, the debtor's registered office . . . is

presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c). "Registered office'

refers to the place of incorporation or the equivalent for an entity that is not a natural person." 8

*Collier on Bankruptcy* ¶ 1516.03 (16th ed. Rev. 2019) (citing H.R. Rep. No. 109-31, 109th Cong.,

1st Sess. 113 (2005)).  The "registered office" presumption is rebuttable.  In *Bear Stearns*, Judge

Lifland observed that:

> This presumption "permits and encourages fast action in cases where speed may be
> essential, while leaving the debtor's true 'center' open to dispute in cases where the
> facts are more doubtful.". . . . This presumption is not a preferred alternative where
> there is a separation between a corporation's jurisdiction of incorporation and its
> real seat. . . .  "[T]he Model Law and Chapter 15 give limited weight to the
> presumption of jurisdiction of incorporation as the COMI."

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 128

(Bankr. S.D.N.Y. 2007) (internal citations omitted).  Thus, where any "evidence to the contrary"

is presented, the presumption plays no role.  *Collins v. Oilsands Quest, Inc.*, 484 B.R. 593, 595

(S.D.N.Y. 2012).

90.     When considering a debtor's COMI, many courts consider the analogous concept

of an entity's "principal place of business" or "nerve center."  *See Morning Mist Holdings Ltd. v.

Krys (In re Fairfield Sentry Ltd.*), 714 F.3d 127, 138 n.10 (2d Cir. 2013).  In this regard, courts

have developed a list of factors to consider when determining a debtor's COMI where the

"registered office" presumption does not govern.  Those factors include (i) the location of the

debtor's headquarters, (ii) the location of those who actually manage the debtor, (iii) the location

of the debtor's creditors or a majority of the creditors who would be affected by the case, (iv) the

location of a debtor's assets, and (v) the jurisdiction whose law would apply to most disputes. *Id.*

at 137; *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).

91.     Moreover, when a foreign debtor is part of corporate group, a court's COMI

analysis will take into account the debtor's integration into and function within an integrated

corporate group, particularly where the debtor has no function independent from that of its group.

*See, e.g., In re OAS S.A.*, 533 B.R. 83, 101-03 (Bankr. S.D.N.Y. 2015) (COMI analysis for a foreign debtor included consideration of its participation in a larger corporate group).

92. Here, there should be little question that the COMI of each of the Debtors is in Canada, despite the fact that Goli US is incorporated in the United States. Indeed, as described above:

- all strategic decisions for both of the Debtors are made in Canada by the senior management of Goli Canada;

- All of Goli US's employees take direction from senior management at Goli Canada;

- Goli US's board is comprised of only one member, the founder of Goli Canada, who is located in Canada;

- the vast majority of the Debtors' assets (including its accounts receivable in the approximate amount of $11 million and its intellectual property rights) are managed and located in Canada;

- all human resource matters for both Debtors are managed through personnel in Canada by Goli Canada or parties contracted with Goli Canada;

- the Debtors utilize shared services administered in Canada, including among other areas, human resources, accounting, legal, information technology, marketing and sales and business applications (all of which, with the exception of the Chief Marketing Officer, are employed by Goli Canada);

- the Debtors' largest creditors, the Lenders, are located in Canada; and

- the Credit Agreement, which evidences the Debtors' most significant indebtedness, is governed by Canadian law.

93. Although not binding on this Court, it should be noted that the Canadian Court has determined, and as reflected in the Initial Order, that the Debtors' COMI is in Canada. Specifically, and consistent with the foregoing, the Canadian Court expressly determined as follows:

- Section 45(2) of the CCAA sets out that a debtor's company registered office is deemed the center of its main interest. This office is in Montreal both for GOLI Canada and GOLI USA.

- The Debtors operate on a consolidated basis and all of the important decisions are taken in Canada by the senior management of GOLI Canada.

- The majority of the Debtors' Assets are located in Canada and/or owned by GOLI Canada.  GOLI Canada is the sole owner of the Assets found in the United States of America.

- GOLI Canada is the ultimate parent, and sole beneficial owner of GOLI USA.

- All human resource matters for GOLI USA are managed through personnel in Canada on GOLI Canada payroll.

- GOLI Canada and GOLI USA utilize shared services, including among other areas, human resources, accounting, legal, information technology, marketing and sales and business applications (all of which, with the exception of the Chief Marketing Officer, are employed or subcontracted by GOLI Canada).

*See* Initial Order at ¶ 83.

94.    In short, the principal corporate management and strategic functions of the Debtors are undertaken on a consolidated basis in Canada, and the Debtors' Canadian and United States operations are integrated and function in a coordinated way such that Goli US would be unable to operate or function independently.  At this time, Goli US's primary, if not sole, function is as the counterparty to the Norco Lease.  In the foregoing circumstances, where there is a fully integrated corporate group, bankruptcy courts have found COMI to be in the jurisdiction of the group's COMI rather than that of a specific debtor's registered office, even if that registered office is in the United States.  *See, e.g., In re OAS S.A.*, 533 B.R. at 101-03 (COMI of debtor incorporated in Austria was Brazil rather than Austria where, among other things, it "was part of, and inseparable from, the OAS Group located in Brazil"); *see also In re Spectra Premium Corp.*, No. 20-10614 (Bankr. D. Del. Mar. 11, 2020) (recognizing Canadian proceeding as foreign main with respect to one United States debtor and Canadian debtors); *In re Kraus Carpet Inc.*, Case No. 18-12057 (KG) (Bankr. D. Del. Oct. 1, 2018) (recognizing Canadian proceeding as foreign main proceeding with respect to one United States debtor and five Canadian debtors); *In re Catalyst Paper Corp.*, Case No. 12-10221 (PJW) (Bankr. D. Del. Mar. 5, 2012) (recognizing Canadian proceeding as foreign main proceeding with respect to eight United States debtors and nine Canadian debtors); *In re Angiotech*

*Pharm.*, Case No. 11-10269 (KG) (Bankr. D. Del. Feb. 22, 2011) (recognizing Canadian proceeding as foreign main proceeding with respect to 14 United States debtors and three Canadian debtors); *In re Fraser Papers, Inc.*, Case No. 09-12123 (KJC) (Bankr. D. Del. July 14, 2009) (recognizing Canadian proceeding as foreign main proceeding with respect to two Canadian debtors and four United States debtors).

95.    Accordingly, given their predominant presence in Canada, each Debtor's COMI is Canada and the Canadian Proceedings are "foreign main proceedings" with respect to each Debtor under section 1517(b)(1) of the Bankruptcy Code.

B.    **Alternatively, the Canadian Proceedings Could be Considered Foreign Nonmain Proceedings**

96.    As demonstrated above, the Canadian Proceedings should be recognized as foreign main proceedings.  Nevertheless, should this Court conclude that any of the Debtors does not have its COMI in Canada, the Petitioner submits, that, in the alternative, the Canadian Proceeding of such Debtor should be recognized as a "foreign nonmain proceeding," and that discretionary relief should be granted under section 1521 of the Bankruptcy Code, namely, the application of the automatic stay to the full extent set forth in section 362 with respect to any such Debtor and its property located in the United States.

97.    A "foreign nonmain proceeding" is a "foreign proceeding" pending where the debtor has an "establishment."  Section 1502(2) of the Bankruptcy Code broadly defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2). "Non-transitory" economic activity requires "a seat for local business activity" in the applicable country with a "local effect on the marketplace." *See Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 806 (Bankr. W.D. Pa. 2019); *Mood Media*, 569 B.R. 556, 561–63 (Bankr. S.D.N.Y. 2017).  As described above, the Debtors have an "establishment"

in Canada given the scope of their business connections to Canada, and the Canadian Proceedings should, in the alternative, be recognized as "foreign nonmain proceedings."

98.     Should the Court recognize the Canadian Proceedings with respect to any of the Debtors as a foreign nonmain proceeding, then the Petitioner requests discretionary relief with respect to such Debtor and its property located in the United States pursuant to section 1521 of the Bankruptcy Code.  Specifically, the Petitioner requests that any relief that is granted pursuant to the Provisional Relief Motion be extended pursuant to section 1521(a)(6) of the Bankruptcy Code, including the continued application of section 362 and 365(e) with respect to any such Debtor and its property located in the United States.[8]

## IV.    The Requested Relief Should be Granted

99.     As set forth below certain of the requested relief by the Petitioner is automatically available under section 1520 of the Bankruptcy Code, which provides for automatic relief upon recognition of a foreign main proceeding.  *See* 11 U.S.C. § 1520.  Other portions of the requested relief are available under section 1521 of the Bankruptcy Code, which provide this Court with discretion to grant additional relief upon recognition of a foreign proceeding.  *See* 11 U.S.C. § 1521.[9]

---

[8]     Section 1521(a) provides that, upon recognition of a foreign main proceeding or foreign nonmain proceeding and at the request of the foreign representative, a court may grant "any appropriate relief" necessary to effectuate the purpose of Chapter 15 and to protect the assets of the debtor or the interest of the creditors, including "extending relief granted under section 1519(a)."

[9]     If this Court were to conclude that any of the requested relief is not available as a matter of right under section 1520 or at this Court's discretion under section 1521, relief may be granted pursuant to section 1507 of the Bankruptcy Code.  Section 1507 authorizes this Court to "provide additional assistance to a foreign representative under [the Bankruptcy Code] or under other laws of the United States."  11 U.S.C. § 1507.  In deciding whether to extend relief under section 1507, this Court must consider principles of comity and determine whether the requested relief would reasonably assure: (a) just treatment of the Debtors' creditors and equity holders; (b) protection of the Debtors' United States creditors against prejudice and inconvenience in claim processing; (c) prevention of preferential or fraudulent dispositions of the Debtors' property; and (d) distribution of the Debtors' property substantially in accordance with the Bankruptcy Code's priority scheme.  *See id.*  "These provisions embody the protections that were previously contained in section 304 of the Bankruptcy Code . . . ."  *In re Rede*

A.      The Petitioner is Entitled to Relief under Section 1520

100.    Upon recognition of a foreign main proceeding, certain relief is automatically granted as a matter of right.  *See In re Rede Energia S.A.*, 515 B.R. at 89 ("If a foreign case is recognized as a foreign main proceeding, as it was here, certain relief automatically goes into effect, pursuant to 11 U.S.C. § 1520 . . . ."); 11 U.S.C. § 1520.  This relief includes, among other things, imposition of an automatic stay with respect to the foreign debtor and all of its property in the United States.  *See* 11 U.S.C. § 1520(a)(l) ("Upon recognition of a foreign proceeding that is a foreign main proceeding . . . sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States.").

101.    An order recognizing a foreign proceeding shall be entered if all of the requirements for recognition have been met.  *See* 11 U.S.C. § 1517.  As set forth above: (i) the Debtors are eligible to be debtors pursuant to section 109(a) of the Bankruptcy Code; (ii) the Canadian Proceedings are foreign proceedings; (iii) the Petitioner is the Debtors' foreign representative; and (iv) the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.  Therefore, this Court should enter an order recognizing the Canadian Proceedings as to each Debtor as a foreign main proceeding and grant all relief that is automatically available upon recognition of a foreign main proceeding, including imposition of the automatic stay with respect to all of the Debtors' property in the United States.

---

*Energia S.A.*, 515 B.R. 69, 95 (Bankr. S.D.N.Y. 2014).  Given the long history of Canadian proceedings being recognized and virtually identical relief being granted under former section 304, there can be no doubt that these criteria are satisfied.  *See In re Davis,* 191 B.R. 577, 587 (Bankr. S.D.N.Y. 1996) ("Courts in the United States uniformly grant comity to Canadian proceedings.").

B.       The Petitioner is Entitled to the Relief Requested under Section 1521

102.     Should the Court find that the Canadian Proceedings are foreign nonmain proceedings with respect to any of the Debtors, then the Petitioner requests that the Court grant discretionary relief with respect to such Debtor and its US-located property pursuant to section 1521 of the Bankruptcy Code.  Under section 1521 of the Bankruptcy Code, upon recognition of a foreign proceeding, at the request of the foreign representative, the Court may, "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of creditors . . . grant any appropriate relief." 11 U.S.C. § 1521(a).[10]

103.     Here, the Petitioner requests that any injunctive relief that is the subject of the Provisional Relief Motion be extended pursuant to section 1521(a)(6) of the Bankruptcy Code,[11] including the continued application of the sections 362 and 365(e) with respect to any such Debtor and its property within the territorial jurisdiction of the United States.[12] *See* 11 U.S.C. §1521(a)(6); Provisional Relief Motion ¶ 23.

---

[10]   In addition, section 105(a) of the Bankruptcy Code empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" which, in a Chapter 15 case, include the purposes set forth in section 1501 of the Bankruptcy Code including fostering cooperation, greater legal certainty, fair and efficient administration, maximization of stakeholder value, and the rescue of financially distressed businesses in the context of cross-border insolvency cases.  11 U.S.C. § 105(a), 1501(a)(1).

[11]   Section 1521(a) provides that, upon recognition of a foreign main proceeding or nonmain proceeding and at the request of the foreign representative, a court may grant (with exceptions not here relevant) "any appropriate relief" necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including "extending relief granted under section 1519(a)." 11 U.S.C. § 1521(a)(6).  Section 1521 relief is available upon recognition of a foreign nonmain proceeding where "the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding."  11 U.S.C. § 1521(c).

[12]   The Petitioner is entitled to the continued application of the protective stay even if the Court were to recognize the Canadian Proceedings as foreign nonmain proceedings with respect to any of the Debtors because "chapter [15] gives the bankruptcy court the ability to grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings."  *SPhinX*, 351 B.R. at 116.  "The Court has power to grant extensive relief, whether the foreign proceeding is recognized as main or nonmain."  *In re Manley Toys Ltd*, 580 B.R. 632, 644-45 (Bankr. D.N.J. 2018).

104.    To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a); *see In re Grant Forest Products, Inc.*, 440 B.R. 616, 621 (Bankr. D. Del. 2010) (noting that "broad power" to grant section 1521 relief is subject to 1522).  Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H.Rep. No. 109-31, Pt. 1, at 116; *see In re Energy Coal S.P.A.*, 582 B.R. 619, 627 (Bankr. D. Del. 2018) (noting that under section 1522 "the court can place conditions on the granting of relief under §1521").  A determination of sufficient protection requires a balancing of the respective parties' interests.  *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see In Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor balancing the interest of the foreign representative and those affected by the relief."

105.    Here, the balance of interests weighs in favor of granting the relief requested.  First, recognition and the application of the stay will allow for the efficient and orderly administration of the Debtors' assets and affairs in a centralized, organized proceeding, thus protecting the interests of creditors and maximizing the value of assets through ensuring their equitable distribution and preventing certain opportunistic creditors from circumventing the Canadian Proceedings and commencing actions in the United States at the expense of the broader process.

106.    Furthermore, the interested parties will have the ability to participate in the Canadian Proceedings and assert their claims therein along with all similarly situated creditors.  As set forth more fully below and in the Zucker Declaration, the Canadian Proceedings afford significant procedural protections to creditors and other stakeholders to ensure a fair and equitable process by providing many of the same procedural safeguards present in chapter 11 of the

Bankruptcy Code. *See* Zucker Declaration ¶¶ 28, 40. The stay will not bar or otherwise disenfranchise parties from participating in the Canadian Proceedings, where each creditor's right to be heard will remain unaffected. Nor will the requested stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for "cause." *See generally* 11 U.S.C. § 362(d). Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Canadian Proceedings. Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

107.    In contrast, failure to grant the discretionary relief requested will cause tremendous harm to the Debtors and their stakeholders. As detailed more fully in the Petitioner's Provisional Relief Motion, absent relief, the Debtors are at risk to adverse creditor action which could threaten the proposed Sale Transactions and, in turn, the Debtors' ability to continue as a going concern. Accordingly, the balance between the minimal harm to those seeking to bring adverse actions against the Debtors, and the potential harm to the Debtors and the orderly administration of the Debtors' assets, tips in favor of granting the discretionary relief requested.

108.    Finally, section 1521(e) provides that the standards, procedures and limitations of an injunction apply to relief sought under section 1521(a)(6). 11 U.S.C. § 1521(e). Assuming the Court grants the Provisional Relief Moton, it would be appropriate to extend such relief post-recognition on the same basis.

## V.    Granting Recognition and Provisional Relief Would Not be Manifestly Contrary to the Public Policy of the United States

109.    Section 1506 of the Bankruptcy Code provides that nothing in Chapter 15 requires this Court to take any action that would be manifestly contrary to the public policy of the United States. 11 U.S.C. § 1506. "[F]ederal courts in the United States have uniformly adopted the narrow application of the public policy exception." *In re OAS S.A.*, 533 B.R. at 103 (citing

*Fairfield Sentry*, 714 F.3d at 139).  The relief requested by the Petitioner is not manifestly contrary to, but rather consistent with, United States public policy.

110.    One of the fundamental goals of the Bankruptcy Code is the centralization of disputes involving the debtor.  *See, e.g., In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code 'provide[s] for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court . . .'").  Indeed, "the firm policy of American courts is the staying of actions against a corporation which is the subject of a bankruptcy proceeding in another jurisdiction." *Cornfeld v. Investors Overseas Servs., Ltd.*, 471 F. Supp. 1255, 1259 (S.D.N.Y. 1979) (recognizing that a Canadian liquidation proceeding would not violate the laws or public policy of New York or the United States).  The Canadian Proceedings, like a case under the Bankruptcy Code, provides a centralized process to (i) assert and resolve claims against an estate and (ii) make distributions to creditors.  Recognizing the Canadian Proceedings and granting the requested relief would assist in the centralization of disputes in a single jurisdiction.  That result is demonstrably consistent with the public policy of the United States.  *See id.*

111.    Further, recognition of the Canadian Proceedings would be consistent with the purpose of Chapter 15 and its predicate, the UNCITRAL Model Law on Cross-Border Insolvency. Section 1501 of the Bankruptcy Code provides, in pertinent part that:

> The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of -
>
> (1)    cooperation between -
>
> * * *
>
> (B)    the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> * * *

(3)     fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4)     protection and maximization of the value of the debtor's assets.

11 U.S.C. § 1501.

112.    Granting recognition to the Canadian Proceedings and granting the Petitioner the relief requested is consistent with, and critical to effectuate, the objectives of Chapter 15 for multiple reasons.  First, recognition of the Canadian Proceedings would foster cooperation between the Canadian Court and United States courts because it would enable the Petitioner to assist the Canadian Court in administering the assets that are located in the United States and subject to the Canadian Court's supervision.

113.    Second, recognition of the Canadian Proceedings and related relief would enhance the Debtors' ability to maximize the value of their assets for the benefit of all creditors by ensuring that they can implement the restructuring centered around the sale of the Debtors' business and assets.  As described above, the Debtors have entered into the Sale Transactions embodied in the Subscription Agreement and the Agency Agreement.  Both of the Sale Transactions are subject to and conditioned on this Court entering an order recognizing and enforcing the RVO and Atos Sale Order.  Absent this Court's assistance, the Debtors may be unable to implement the Principal Transaction or Atos Equipment sale and effectuate a successful restructuring that would maximize value for creditors and permit the Debtors' business to continue as a going concern.

114.    Finally, Chapter 15 relief will provide the Debtors and the Petitioner with the traditional relief conferred on foreign debtors and representatives.  In particular, Chapter 15 relief would result in a stay of actions against the Debtors or their assets in the United States.  If such actions are not stayed, the orderly administration of the Debtors may be jeopardized and the

Debtors may be forced to expend resources unnecessarily (i) to defend actions against the Debtors or their assets in the United States, or (ii) to bring actions to enjoin the transfer of the Debtors' assets or to preserve the proceeds of such transfers for the benefit of all creditors and parties in interest.

115.    Accordingly, the relief requested would further the objectives of Chapter 15 by assisting the implementation of the Canadian Proceedings.

## OTHER PROCEEDINGS INVOLVING THE COMPANY

116.    Pursuant to section 1515 of the Bankruptcy Code, a Chapter 15 must "be accompanied by a statement identifying all foreign proceedings (as defined in the Bankruptcy Code) with respect to the debtor that are known to the foreign representative." 11 U.S.C. § 1515(c).

117.    Other than the Canadian Proceedings, the Petitioner is not aware of any other foreign proceeding involving the Debtors.  The Petitioner will promptly inform this Court if it becomes aware of any such foreign proceeding, or if it commences a foreign proceeding in another jurisdiction to aid in the administration of the Debtors' reorganization in the Canadian Proceedings.

## NOTICE

118.    Pursuant to section 1517(c) of the Bankruptcy Code, a petition for recognition shall be decided at the "earliest possible time."  Accordingly, the Petitioner requests that this Court set the Recognition Hearing for a date at the earliest possible convenience of the Court and in accordance with the Local Rules and Federal Rules of Bankruptcy Procedure.  In addition, the Petitioner requests that this Court approve the manner of service set forth in the *Petitioner's Motion for Entry of an Order Specifying Form and Manner of Service and Notice*, filed contemporaneously herewith.

## <u>CONCLUSION</u>

**WHEREFORE**, the Petitioner respectfully requests that this Court grant the relief requested herein and such other and further relief as may be just and proper.

*[Signature on following page]*

Dated: March 19, 2024
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  mcguire@lrclaw.com
       pierce@lrclaw.com
       brooks@lrclaw.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Andrew Rosenblatt (*pro hac vice* pending)
Francisco Vazquez (*pro hac vice* pending)
Michael Berthiaume (*pro hac vice* pending)
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: andrew.rosenblatt@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

*Counsel to the Petitioner*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
In re:                                                         :
                                                               :   Chapter 15
                                                               :
GOLI NUTRITION INC., et al.,[1]                                :   Case No. 24-_____  (___)
                                                               :
                                                               :   Joint Administration Requested
              Debtors in a Foreign Proceeding.                 :
-------------------------------------------------------------- x
```

I, Benoit Clouâtre, a Partner of Deloitte Consulting Inc., in its capacity as the Monitor of Goli Nutrition, Inc. and its affiliated Debtors (the "Monitor"), pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

I have the full authority to verify this petition on behalf of the Monitor.

I have read the foregoing petition, and I am informed and believe that the factual allegations contained therein are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, information and belief, the foregoing is true and correct.

Executed this 19th day of March 2024 in Montreal, Canada

Benoit Clouâtre, on behalf of Deloitte Consulting, Inc., in its capacity as the Monitor of Goli Nutrition Inc. and its affiliated Debtor

---

[1] The Debtors in these Chapter 15 cases, along with the last four digits of each Debtor's federal identification number, are: Goli Canada (as defined herein), federal tax identification number 732063086RC0002; and Goli US (as defined herein), federal tax identification number 35-2662655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.