## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re:      :   Chapter 15

     :

GOLI NUTRITION INC., *et al.*,[1]      :   Case No. 24-10438 (LSS)

     :   Joint Administration Requested

Debtors in a Foreign Proceeding.    :

---------------------------------------------------------- x

### PETITIONER'S MOTION FOR ENTRY OF AN ORDER (I) RECOGNIZING AND ENFORCING THE RVO AND THE ATOS SALE ORDER, (II) APPROVING THE SALE TRANSACTIONS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF

Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Petitioner"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("Goli Canada") and Goli Nutrition Inc., a company incorporated in Delaware ("Goli US," together with Goli Canada, the "Debtors"), through its United States co-counsels, Landis Rath & Cobb LLP and Norton Rose Fulbright US LLP, respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code:

> 1. recognizing and enforcing the Canadian Court's order, (the "RVO"), approving (i) the subscription agreement (the "Subscription Agreement") attached hereto as **Exhibit B**, which is filed under seal in the Canadian Court, and (ii) the transactions contemplated thereunder;

> 2. recognizing and enforcing the Canadian Court's order, (the "Atos Sale Order," together with the RVO, the "CCAA Vesting Orders"), approving the Agency Agreement (the "Agency Agreement") attached hereto as **Exhibit C**, which is filed under seal in the Canadian Court, entered into by the Debtors with Gordon Brothers Commercial & Industrial, LLC, on behalf of its contractual joint venture Brandford

---

[1] The Debtors in these Chapter 15 cases, are: Goli Nutrition, Inc., a company incorporated in Québec, Canada and the last 4 digits of its Canadian business number is 0002; and Goli Nutrition Inc., a company incorporated in Delaware and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

Auctions, LLC, (the "Agent") pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment (as defined below), and (ii) the transactions contemplated thereunder;

3.   approving pursuant to section 363 of the Bankruptcy Code, the issuance of the Subscribed Shares (as defined below) to the Purchaser (as defined below) pursuant to the Subscription Agreement and the sale of the Atos Equipment pursuant to the Agency Agreement, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances as defined in the Subscription Agreement and the Agency Agreement, as applicable); and

4.   granting such other relief as the Court deems just and proper (collectively, the "Requested Relief").

In support of this motion (this "Motion"), the Petitioner relies upon and incorporates by reference the (1) *Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* (together with the form petitions filed concurrently therewith, the "Verified Petition"),[2] and (2) *Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief , (B) Motion for Provisional Relief, and (C) Motion for Order Enforcing CCAA Vesting Orders* (the "Zucker Declaration") filed contemporaneously herewith.  In further support of this Motion, the Petitioner respectfully states the following:

## JURISDICTION AND VENUE

1.       On March 19, 2024 (the "Petition Date"), the Petitioner commenced these chapter 15 cases as ancillary proceedings to the Canadian Proceedings pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

2.       The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 109 and 1501,

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.      Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, rule 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

5.      The Petitioner confirms its consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f) to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue in this district is proper under 28 U.S.C. § 1410.

## **BACKGROUND**

7.      A complete description of the Debtors and the events leading to the filing of the Canadian Proceedings (defined below) are set forth in the Petition.

8.      On March 15, 2024, the Debtors filed an application (the "<u>CCAA Initial Application</u>") with the Superior Court of Québec, sitting in the Commercial Division for the district of Montréal (the "<u>Canadian Court</u>") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "<u>CCAA</u>") seeking the entry of an initial order (the "<u>Initial Order</u>"), a copy of which is annexed to the Petition as Exhibit D (the "<u>Canadian Proceedings</u>").  Pursuant to the Initial Order, which was issued by the Canadian Court on March 18, 2024, the Petitioner was appointed as monitor in the Canadian Proceedings and was authorized to apply to act as the

"foreign representative" of the Debtors in connection with seeking cross-border approval of the Canadian Proceedings pursuant to Chapter 15 of the Bankruptcy Code.

9.     The Debtors commenced the Canadian Proceedings in order to implement a restructuring centered around the transfer of the Debtors' business and assets, which is to be effectuated through two transactions.  In particular, following a sale investment solicitation process (a "SISP") that took place starting in June 2023, prior to the commencement of the Canadian Proceedings, Goli Canada entered into the Subscription Agreement with an entity affiliated with a group of that includes Group KPS (a healthcare company), Bastion Capital (an investment management firm) and one of the Debtors' founders (collectively, the "Purchaser") pursuant to which the Purchaser will subscribe for new shares in Goli Canada (the "Subscribed Shares") and effectively acquire 100% of the equity interest in Goli Canada in accordance with the terms and conditions of the Subscription Agreement.  This transaction is intended to be approved and implemented under the CCAA pursuant to a reverse vesting order, the RVO, as requested in the CCAA Initial Application.  Pursuant to the RVO, certain excluded assets (including notably the Atos Equipment and the shares of Goli US), contracts and liabilities will be transferred or "vested" out of Goli Canada and transferred to a newly created "Residual Co." that will replace Goli Canada as a debtor in the Canadian Proceedings.  Accordingly, the Proposed Order provides, among other things, that Residual Co. will replace Goli Canada as a debtor in the Chapter 15 case and approves the form of an amended caption that reflects same upon the closing of the Principal Transaction.

10.     In addition, the Debtors have negotiated and finalized the terms of a second and separate transaction to implement the liquidation of the Atos Equipment.  Specifically, the Debtors have entered into the Agency Agreement, pursuant to which the Agent will sell and auction, if

necessary, the Atos Equipment (the "Atos Sale" and, together with the Principal Transaction (as defined below), the "Sale Transactions").

11.     By the CCAA Initial Application, the Debtors indicated that they would request entry of the RVO approving the sale of the Subscribed Shares pursuant to the Subscription Agreement at a comeback hearing scheduled for March 27, 2024. Initial Order, ¶ 45.  In addition, pursuant to the CCAA Initial Application, the Debtors requested entry of the Atos Sale Order approving the Agency Agreement, pursuant to which the Agent will sell the Atos Equipment.

12.     The Initial Order provides for a broad stay of proceedings in favor of the Debtors. In particular, for an initial ten-day period through and including March 27, 2024 (the "Stay Period"), "no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the [Debtors], or affecting the [Debtors'] business operations and activities (the "Business") or the Property … except with leave of this Court." Initial Order, ¶ 10.

13.     The Canadian Court has scheduled a hearing for March 27, 2024 (the "Comeback Hearing") to consider the Debtors' request for an extension of the Stay Period and entry of an amended and restated Initial Order. Initial Order, ¶ 46.  Thereafter, at the CCAA Sale Approval Hearing (as defined below), the Canadian Court will consider (i) the RVO approving the issuance of the Subscribed Shares pursuant to the Subscription Agreement, and (ii) the Atos Sale Order approving the Agency Agreement, pursuant to which the Agent will sell the Atos Equipment.

14.     Petitioner requests this Court schedule a hearing to consider the Petition and the relief requested by this Motion simultaneously ("Hearing").  The Petitioner anticipates that the CCAA Vesting Orders will be entered at the CCAA Sale Approval Hearing, which will occur prior

to the Hearing, and will file copies of the CCAA Vesting Orders with this Court as soon as reasonably practicable after they are entered by the Canadian Court.

A.    **The Sales and Investment Solicitation Process**

1.    *Pre-Filing Restructuring Efforts*

15.    As detailed in the Petition, the Debtors tried to rationalize operations in the United States, Canada and worldwide by developing strategies to improve profitability and conducting a review of their operations to identify potential synergies and costs savings across the board.  Many changes were made, including but not limited to (i) negotiating the early termination of one of their leased office space and the non-renewal of other leased office space as following the COVID-19 pandemic, most of the employees were working from home; (ii) developing a new pricing strategy for both retailers and direct-to-consumers; (iii) reducing their workforce and payroll (including refraining from paying bonuses to management and equity drawing no salary); (iv) terminating any non-essential services; (v) engaging in negotiations with various vendors, service providers and suppliers for additional cost savings; (vi) settling (whether for monetary amounts or otherwise) certain legal disputes to try to avoid the substantial continued expense of further litigation; and (vii) subletting portions of the Atos Equipment to help with the financial burden.  Unfortunately, these efforts alone were not sufficient to offset the ongoing cash flow problems the Debtors suffered over the last several months and to pay liabilities as they become due.

16.    As part their strategic review of capital and business alternatives, with the support and input of their prepetition secured lenders (the "Lenders"),[3] the Debtors and their advisors

---

[3]    The Lenders are Bank of Montreal, HSBC Bank Canada, National Bank of Canada, and Fédération Des Caisses Desjardins Du Québec.  Pursuant to the amended and restated credit agreement dated September 2, 2022 (as amended, the "Credit Agreement"), the Lenders hold claims of approximately $100 million, subject to adjustments, against Goli Canada.  Goli US has guaranteed all of Goli Canada's obligations under the Credit

implemented the SISP for the Debtors, their assets and business.  Petitioner, then acting as financial advisor for the Lenders, was kept apprised of the progress of the SISP.  The objective of the SISP was to identify one or more transactions in respect of a potential sale, investment in, or refinancing of all or part of the business and/or assets of the Debtors that could, ideally, permit the Debtors to repay its substantial secured indebtedness, with any balance to be used to pay other debt and allow for the continuation of all or part of the Debtors' activities on a going concern basis.

17.    The SISP began in June 2023 and concluded in January 2024.  As described below, the long and comprehensive sale and marketing process included (i) the creation of a process for identifying and notifying potentially interested purchasers, and/or investors; (ii) the preparation of bidding procedures; (iii) the creation of a protocol for the selection of a successful bidder; and (iv) the establishment of procedures and requirements for approval of any proposed transaction.

2.    *The Execution and Results of the SISP*

18.    With the support, cooperation and input of the Lenders, the Debtors engaged the services of BMO Capital Markets ("BMOCM") to develop and implement the SISP.  In accordance with the SISP procedures, BMOCM, with the assistance of the Debtors, prepared and/or maintained all SISP related documents (including the preparation of a teaser letter, a target list of potential Purchaser or investors, and confidentiality agreements) and provided all required information to potential bidders.

19.    In June 2023, BMOCM delivered a teaser letter (the "Teaser") to forty-two (42) potential bidders from both strategic and financial sectors.  Two (2) other potential bidders were also contacted by BMOCM, for a total of forty-four (44) potential bidders.  The Teaser invited

---

Agreement.  The Lenders hold liens or security interests over all of the Debtors' present and after-acquired real and personal property in Canada and in the United States.

potential bidders to submit a (i) a confidentiality agreement to access the Debtors' virtual data room (the "VDR"), and (ii) a non-binding letter of intent for the entirety of the Debtors' business and assets, including the Atos Equipment.  Ultimately, twenty-nine (29) parties signed confidentiality agreements and were invited to submit non-binding letters of intent by no later than August 8, 2023.

20.    On August 8, 2023, the Debtors received four (4) non-binding letters of interest for their business (excluding the Atos Equipment).  The Debtors received an additional letter of interest from a late entrant in November 2023.

21.    On October 31, 2023, BMOCM sent a process letter to five (5) interested parties inviting the submission of final, binding proposals and including a draft definitive sale agreement for review and mark-up.  The Debtors set the deadline for submission of proposals as November 14, 2023 ("Binding Proposal Deadline").  No binding offers were received by BMOCM or the Debtors by the Binding Proposal Deadline.

22.    BMOCM continued its efforts to advance a transaction with interested parties and to facilitate due diligence requests, but several of the parties raised concerns regarding the Debtors' operating results and required more time for the Debtors to demonstrate an improvement in its results.  A number of the interested parties undertook financial and commercial due diligence from September 2023 to January 2024.  However, none of these parties decided to proceed with submitting a binding offer to acquire the Debtors.

3.    *The Debtors Enter Into the Subscription Agreement*

23.    On January 15, 2024, considering the worsening liquidity position of the Debtors and the failure of the SISP to generate a binding offer, the Purchaser submitted an LOI to Goli Canada (the "Initial Purchaser LOI").  The terms of the Initial Purchaser LOI provided for a rapid

transaction that would preserve the value of the business as a going concern and allow it to continue its operations.

24.     The transaction value put forward in the Initial Purchaser LOI was significantly less than the amount owed to the Lenders under the Credit Facilities. Accordingly, being the stakeholder with the primary economic interest in the outcome of the transaction, over the next three (3) weeks, the Lenders negotiated enhanced terms, including an increase to the proposed transaction value.

25.     On February 3, 2024, the Purchaser entered into a non-binding LOI with the Lenders, pursuant to which the Lenders agreed to work towards the drafting and execution of a definitive agreement in respect of the contemplated transaction.  This culminated in the Subscription Agreement.

26.     Goli Canada entered into the Subscription Agreement with the Purchaser pursuant to which the Purchaser agreed to subscribe for new shares in Goli Canada (i.e., the Subscribed Shares) and effectively acquire 100% of the equity interests in Goli Canada in accordance with the terms and conditions of the Subscription Agreement (the "Principal Transaction").

27.     The Principal Transaction is intended to be approved and implemented under the CCAA pursuant to a reverse vesting order (*i.e.*, the RVO) and thereafter recognized and enforced in the United States in this Chapter 15 case.  Certain excluded assets (including notably the Atos Equipment and shares of Goli US), contracts and liabilities will be vested out of Goli Canada and transferred to "Residual Co." as part of the contemplated RVO structure.

28.     Under the terms of the Subscription Agreement, consideration payable by the Purchaser will include a cash payment, the payment of any priority claims of Goli Canada and payment of certain amounts to cover the professional fees of the Monitor, its legal counsel and

legal counsel to the Lenders, in connection with the Sale Transactions, the Canadian Proceedings and this Chapter 15 Case.

29.    Pursuant to the terms of the Subscription Agreement, closing of the Principal Transaction is scheduled to occur on or around April 11, 2024, subject to the required court approvals, or as otherwise agreed upon by the Debtors and the Purchaser with the consent of the Petitioner, as monitor, and the Lenders ("Closing").  The transaction is not subject to any financing condition and the Purchaser has provided certain documents to the Lenders and the Monitor to demonstrate its ability to fund the transaction value.

30.    Closing is conditional on approval of the Principal Transaction pursuant to the entry of the RVO by the Canadian Court and the recognition and enforcement thereof in the United States.

### 4.    *Disposition of the Atos Equipment*

31.    As noted above, the four non-binding indications of interest for the Debtors' business received in August 2023 excluded the Atos Equipment.  However, in the same month, the Debtors received a separate indication of interest from another party for the Atos Equipment.  Such party was granted access to the VDR and visited the Norco Facility to conduct due diligence.

32.    Following due diligence of the Norco Facility and the Atos Equipment, it became clear that the party was not interested in moving forward.  Left with no other options, Goli Canada, with the consent of the Lenders, engaged in a process to liquidate the Atos Equipment through an auction.  After receipt of multiple proposals and extensive negotiations, Goli Canada and the Lenders selected Gordon Brothers Commercial & Industrial, LLC (the "Agent") acting on behalf of a contractual joint venture between Agent and Brandford Auctions, LLC.  The proposal by the Agent (through which the Agent would serve as the agent of Goli Canada in the conduct of the sale) ultimately offered the highest guaranteed return and, given their familiarity and knowledge

of the equipment, Goli Canada and the Lenders believe that they are best positioned to sell the Atos Equipment at maximum value.  On March 15, 2024, Goli Canada entered into an agency agreement with the Agent for the purpose of liquidating the Atos Equipment for the benefit of Goli Canada's creditors ("Agency Agreement").  Pursuant to the Agency Agreement, the Agent will provide a net minimum guarantee, a portion of which will be paid in advance of the sale and will share any further proceeds realized from the sale of the Atos Equipment with Goli Canada.  The Agent is also entitled to mark up the price of the Atos Equipment by a certain percentage and to retain the benefit of that markup as compensation for its services.

33.     Pursuant to the Agency Agreement, the Agent has specified they will require a period commencing as at the date of the Agency Agreement, namely March 15, 2024, and expiring on June 30, 2024, of peaceful access to the Norco Facility where the Atos Equipment is located to complete the sale and auction process, during which time Goli US will pay occupation rent and certain other related expenses. All amounts payable to Goli Canada under the Agency Agreement are to be made to the Monitor for the benefit of the creditors.

34.     As security for all obligations of Goli Canada to the Agent under or in connection with the Agency Agreement, the Atos Equipment and all proceeds from sales thereof shall be subject to a first ranking charge and security in favor of the Agent as contemplated in the Atos Sale Order.

35.     The implementation of the Agency Agreement is conditional on approval of the Agency Agreement by the Canadian Court and the recognition and enforcement of the Atos Sale Order.

## B.     The Subscription Agreement

36.     The Subscription Agreement is the culmination of the Debtors' nearly year-long efforts to restructure.  Through the Canadian Proceedings, the Debtors seek to implement a strategy

that will enable Goli Canada to exit the Canadian insolvency proceedings as a viable going-concern business and, at the same time, maximize the value of the Debtors' business for the benefit of stakeholders.  Key features and aspects of the Principal Transaction can be summarized as follows:

    a.  based on the price payable under the Subscription Agreement, all the Lenders are suffering a significant shortfall on their senior secured position such that no recovery would be expected for any other secured or unsecured creditors under the Principal Transaction, regardless of the structure employed;

    b.  creditors and other stakeholders of the Debtors affected by the Principal Transaction will not be in a worse position than they would be if the transaction was implemented pursuant to a traditional asset sale or similar structure;

    c.  the Subscription Agreement provides for various unsecured and contingent liabilities to be assumed by the Purchaser;

    d.  various agreements, licenses and authorizations are part of the purchased assets that must be transferred as part of the Principal Transaction.  It will be more complicated and costly to transfer these assets under a traditional sale order or other structure since consents, approvals or authorizations may be required. An RVO structure will minimizes the risks, costs or delays of having these assets transferred;

    e.  all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada shall terminate or be cancelled; and

    f.  the completion of the Principal Transaction will allow for the Debtors to continue operations as a going concern, resulting in (i) the potential for employees to preserve their employment; (ii) suppliers of goods and services being able to maintain their business relationships with the Debtors; and (iii) many of the contractual distribution arrangements will remain intact without need for the Debtors to take further steps.

    37.    The Principal Transaction contemplated under the Subscription Agreement has been structured as a so-called "reverse vesting" transaction.  The Purchaser would not have entered into the Subscription Agreement and would not consummate the purchase of the Subscribed Shares and the related transactions, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if the sale of the Subscribed Shares to the Purchaser was not free and

clear of all liens, claims, encumbrances, and other interests. In sum, instead of providing for a traditional asset sale transaction where all purchased assets are purchased and transferred to the purchaser on a "free and clear" basis, the Principal Transaction provides for a transaction whereby essentially:

    a.  the Purchaser will subscribe for and purchase new shares of Goli Canada, which will, in turn, cancel and terminate all of its existing shares so that the Purchaser may become the sole shareholder of Goli Canada; and

    b.  all excluded contracts, excluded assets, and excluded liabilities with respect to the Debtors (including the Atos Equipment and the shares of Goli US) will be transferred and "vested out" to a Canadian corporation (Residual Co..) to be incorporated by Goli Canada in advance of the Closing, so as to allow the Purchaser to indirectly acquire Goli Canada's business and other assets, including, for the avoidance of doubt, all of the Debtors' assets, licenses, undertaking, and properties of every kind whatsoever and wherever situated, including property held in trust for the Debtors on a "free and clear" basis.

38.    The Subscription Agreement was structured as a reverse vesting transaction primarily because Goli Canada maintains various licenses that are required to maintain its operations, as well as in-progress trials and testing programs that are proceeding under and in the name of Goli Canada.  Under a traditional asset sale transaction structure, some of these licenses would be difficult to transfer to a purchaser and, to the extent that such transfer is possible, the steps required to proceed with such a transfer would likely result in additional delays, costs and uncertainty.  The Purchaser was willing to enter into the Subscription Agreement on the understanding that the Primary Transaction could be completed quickly and with certainty that the key licenses would be transferred.  As the Debtors are facing significant liquidity constraints, the delays, costs and uncertainty associated with transferring or obtaining new permits and licenses would have a detrimental impact on the Goli's business.  Therefore, the Subscription Agreement's structure as a reverse vesting transaction is appropriate and necessary to give effect to the Primary Transaction given the following:

(a)     A reverse vesting-order structure allows for the licenses, registrations, permits, and certifications that are essential to the Debtors' operations to remain in place. These include, among others, licenses, registrations, permits, and certifications granted by various food, health, and other authorities across the world, which are essential to its operations.

(b)     For instance, in Canada alone, Goli Canada holds:

i.      various natural-health-product licenses issued by the Minister of Health in according with section 7 of the Natural Health Products Regulations, SOR/2003-196 (the "NHP Licenses"), which are required in order to sell, market, and distribute its products in Canada. For illustrative purposes, the standard delay, according to the Natural and Non-Prescription Health Product Directorate (the "NNPHPD"), to get a NHP License is 60 days for a Class I product, 90 days for a Class II product, and 210 days for a Class III product. However, the NNPHPD frequently exceeds such delays. Goli Canada showed longer delays for its own products. The vast majority of GOLI Products are classified as Class III, including the Debtors' most popular products;

ii.     a site license issued by the Minister of Health in accordance with section 29 of the Natural Health Products Regulations, SOR/2003-196, which is required in order to import its licensed natural health products in Canada;

iii.    an import license issued by the Canadian Food Inspection Agency under the Safe Food for Canadians Act (S.C. 2012, c. 24), which is required to import its apple-cider vinegar food-product gummies;

iv.     Goli Canada's GS1 license, which holds all of Goli Canada's unique identifiers (UPCs and GTINS) necessary for the sale of GOLI Products with various retailers, online marketplaces, distributors, and other partners. Goli Canada has approximately 400 existing UPCs, which represents a substantial portion of Goli Canada's product catalog and market presence. These UPCs are registered with over 30 different retailers. Changes to UPCs could take 6- 9 months to implement, involve a significant amount of paperwork, and present logistical challenges (such as needing to update all new items with Goli Canada's 3PLs, relisting all items on each of the retailer-specific platforms, and recreating all new labels with the new barcodes) as well as strategic challenges. Such changes could hinder market presence and risk losing shelf space with important retailers as well as require reprinting all labels with the new UPCs

v.   Various brand and trademark registrations in international markets required to obtain regulatory permits and product registrations with the applicable authorities.

(c)   Those delays mentioned above will render the implementation of the Principal Transaction impossible. Indeed, the Debtors simply do not have required liquidity to wait that long to close the Principal Transaction. Moreover, the Lenders are unlikely to support any transaction which could take a minimum of 7 months before to materialized.

(d)   The Lenders are the sole stakeholders that have a financial interest in the Principal Transaction and, therefore, the reverse vesting order structure is not prejudicing any creditor in the present instance.

39.   The reverse vesting structure will also allow the Debtors to maintain all of its licenses and intellectual property without requiring any additional steps or regulatory approvals to transfer them to the Purchaser.  Under a traditional vesting order structure, the transfer of such permits, registrations, licenses, and certifications would involve a complex transfer and/or new application process of indeterminate risk, which as illustrated above, would interrupt or delay the continued operations of Goli Canada, impact current relationships and partnerships with third parties, and lead to regulatory challenges and significantly increased costs that could ultimately jeopardize the Principal Transaction as well as the value of the business.

40.   In light of the foregoing, the Petitioner, in its capacity as an officer of the Canadian Court, is confident that the market has been thoroughly canvassed and there is no other viable alternative transaction available to the Debtors.  *Verified Petition*. ¶ 54.  The only going-concern option that results in an ongoing customer or supplier for contract counterparties, among other benefits, are the transactions with the Purchaser under the Subscription Agreement, which are to be implemented through a reverse vesting structure.  The reverse vesting order represents the best outcome for all of the Debtors' stakeholders.

41.   A reverse vesting transaction generally involves a series of steps, whereby: (1) the purchaser becomes the sole shareholder of the debtor company, (2) the debtor company retains its

assets, including key contracts and permits; and (3) the assets and liabilities not retained by the debtor company are "vested out" and transferred, together with any excluded assets, into a newly incorporated entity.[4] *See* Zucker Declaration ¶ 32.

42.    The Canadian Court may approve a reverse vesting transaction pursuant to sections 11 and 36 of the CCAA and may consider several factors in determining if such a transaction should be approved.  *See id*. ¶ 36.  Those factors, similar to those that United States bankruptcy courts consider in the context of a section 363 sale, include, but are not limited to: (i) whether the process leading to the proposed sale or disposition was reasonable in the circumstances; (ii) whether the monitor approved the process leading to the proposed sale or disposition; (iii) whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy; (iv) the extent to which the creditors were consulted; (v) the effects of the proposed sale or disposition on the creditors and other interested parties; and (vi) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.  *Id*.

43.    The Subscription Agreement includes releases in favor of: (i) Goli Canada and certain of its directors and officers; and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors (collectively the "Released Parties"). The releases cover any and all present and future claims against the Released Parties based upon any fact or matter of occurrence related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions.  Further,

---

[4]    While those liabilities and assets are "vested out" into a newly incorporated entity, the outcome would be the same as if the Principal Transaction had been carried out using an asset purchase structure.  There will be no inter-company transfer of assets and liabilities among the existing Debtors prior to closing.  Accordingly, there will be no material prejudice or impairment of any creditors' rights which would have been avoided in an asset purchase transaction.

the releases provided in the Subscription Agreement and RVO explicitly do not release or discharge: (a) any claims against the directors or officers of Goli Canada that: (i) relates to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; or (c) any obligations of any of the Released Parties under or in connection with the Subscription Agreement, the closing documents, and/or the consummation of the Principal Transaction.

44.     As a result of the entry of the RVO, and consistent with reverse vesting transactions previously approved by Canadian courts, all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada shall terminate or be cancelled. *Verified Petition,* ¶ 52(e).  As recognized by Canadian courts, in situations (as here) where shareholders have no economic interest, present or future, it is within the Canadian Court's jurisdiction to approve the cancellation of all outstanding shares and the issuance of new shares to the purchaser. *Zucker Declaration*, ¶ 32.

45.     The closing of the Subscription Agreement is subject to a number of customary conditions precedent, including the requirements that the RVO and the Proposed Order shall have been granted and become final orders.  The parties anticipate closing the Principal Transaction on or before April 11, 2024.  *Verified Petition,* ¶ 58.  Expeditiously consummating the Principal Transaction, which is supported by the Debtors' key stakeholders, is critical to preserving the going-concern value of the Debtors' enterprise.

46.     The Petitioner, in its capacity as an officer of the Canadian Court, believes that the Subscription Agreement is fair and reasonable under the circumstances, and is in the best interests of the Debtors, their creditors, and other stakeholders. *Verified Petition,* ¶ 59.  Moreover, the reverse vesting structure of the Principal Transaction is necessary and appropriate to preserve the

going-concern value of the Debtors' business and produces an economic result more favorable than the available alternatives. *Id*. at ¶60. In sum, the Subscription Agreement represents the best and only viable outcome for the Debtors, their creditors, and other stakeholders under the circumstances.

**C.    The Agency Agreement**

47.    In addition, the Debtors have negotiated and finalized the terms of a second and separate transaction to implement the liquidation of the Atos Equipment. As described above, the Debtors have entered into the Agency Agreement with the Agent pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment.

48.    The Agency Agreement, like the Subscription Agreement, has been concluded based on the results of the SISP. Given the extensive marketing process and other protections provided by the SISP, the Petitioner believes that the Agency Agreement is fair and reasonable under the circumstances and provides the highest and best value to the Debtors and their stakeholders for the Atos Equipment. *Verified Petition,* ¶ 62. The proposal by the Agent (through which the Agent would serve as the agent of Goli Canada in the conduct of the sale) ultimately offered the highest guaranteed return and, given their familiarity and knowledge of the equipment, Goli Canada and the Lenders believe that they are best-positioned to sell the Atos Equipment at maximum value. *Id*. All amounts payable to Goli Canada under the Agency Agreement are to be made to the Petitioner for the benefit of the creditors. *Id*.

**D.    Local Rule 6004-1 Disclosures in regard to Subscription Agreement**

49.    The following is a summary of certain material provisions of the Subscription Agreement and/or the Agency Agreement as required by Local Rule 6004-1(iv):[5]

---

[5]    Any summary of, or reference to, the terms and conditions of the Subscription Agreement and/or the Proposed Order herein are qualified in their entirety by the actual terms and conditions of the Subscription Agreement and

| Provision | Description | Location in Order, Subscription Agreement, or Agency Agreement |
|---|---|---|
| Sale to Insider (L.R. 6004-1(iv)(A)). | Group KPS (a healthcare company), Bastion Capital (an investment management firm) and one of the Debtors' founders (collectively, the "Purchaser") | Subscription Agreement |
| Agreements with Management (L.R. 6004-1(iv)(B)). | N/A | N/A |
| Releases (L.R. 6004-1(iv)(C)). | The Subscription Agreement includes releases in favor of: (i) Goli Canada and certain of its directors and officers; and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors, (collectively the "Released Parties").  *See Verified Petition,* ¶ 58.<br><br>The releases cover any and all present and future claims against the Released Parties based upon any fact or matter of occurrence related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions.  *Id.*  Further, the releases provided in the Subscription Agreement and CCAA Vesting Order explicitly do not release or discharge: (a) any claim that is not permitted to be released pursuant to the CCAA; (b) any claim against the directors or officers of Goli Canada that: (i) relates to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; or (c) any obligations of any of the Released Parties under or in connection with the Subscription Agreement, the closing documents, and/or the consummation of the Principal Transaction..  *Id.* | *See* Subscription Agreement |

the Proposed Order. To the extent there is any inconsistency between any such summary or reference herein and the actual terms and conditions of the Subscription Agreement and the Proposed Order, the actual terms and conditions of the Subscription Agreement and/or the Proposed Order shall control.

| | | |
|---|---|---|
| Private Sale/No Competitive Bidding (L.R. 6004-1(iv)(D)). | N/A | N/A |
| Closing and Other Deadlines (L.R.6004-1(iv)(E)). | Section 7.1 of the Subscription Agreement includes the entry of an order by this Court recognizing the RVO as a condition precedent to close the transactions.  Similarly, section 8.1 of the Subscription Agreement provides that the Purchaser may terminate the agreement if this Court does not issue an order recognizing and enforcing the CCAA Reverse Vesting Order by the "Target Closing Date," which is defined as April 11, 2024. | *See* Subscription Agreement §§ 7.1, 8.1 |
| Good Faith Deposit (L.R. 6004-1(iv)(F)). | USD $5,000,000 held in escrow by the Monitor. If the Closing does not occur for any reason other than the Agreement having been terminated by the Corporation pursuant to Section 8.1(a)(iv), the Deposit will be refunded to the Purchaser. If the Agreement is terminated by the Corporation pursuant to Section 8.1(a)(iv), the Deposit shall be transferred to Goli Canada as liquidated damages. | *See* Subscription Agreement §2.2 |
| Interim Arrangements with Proposed Buyer (L.R. 6004-1(iv)(G)). | N/A | N/A |
| Use of Proceeds (L.R. 6004-1(iv)(H)). | Proceeds from the Principal Transaction shall be allocated as set forth as set forth in Schedule B. | *See* Subscription Agreement §2.6, Schedule B |
| Tax Exemption (L.R. 6004-1(iv)(I)). | The Proposed Order does not seek to have the Principal Transaction declared exempt from taxes under section 1146(a) of the Bankruptcy Code. | N/A |
| Record Retention (L.R. 6004-1(iv)(J)). | The Subscription Agreement contemplates that the members of the Debtors shall make all books and records reasonably available to the Monitor and any trustee in bankruptcy for a period of six (6) years after the Closing. | *See* Subscription Agreement § 5.7 |
| Sale of Avoidance Actions (L.R. 6004-1(iv)(K)). | N/A | N/A |
| Requested Findings as to Successor Liability (L.R. 6004-1(iv)(L)). | As stated herein, the Subscription Agreement and Proposed Order provides for certain releases as to the Purchaser.  *See, e.g.*, *Verified Petition*, ¶ 55. | *See* Subscription Agreement §§. |

| Sale Free and Clear of Unexpired Leases (L.R. 6004-1(iv)(M)). | N/A | N/A |
|---|---|---|
| Credit Bid (L.R. 6004-1(iv)(N)). | N/A | N/A |
| Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(iv)(O)) | Given the need to obtain final approval of the Sale Transactions in the United States by no later than April 11, 2024, the Petitioner seeks to waive the 14-day stay under Bankruptcy Rule 6004(h). | N/A |

### E.      Local Rule 6004-1 Disclosures in regard to Agency Agreement

| Provision | Description | Location in Order, Subscription Agreement, or Agency Agreement |
|---|---|---|
| Sale to Insider (L.R. 6004-1(iv)(A)). | N/A | N/A |
| Agreements with Management (L.R. 6004-1(iv)(B)). | N/A | N/A |
| Releases (L.R. 6004-1(iv)(C)). | The Agency Agreement contains certain indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement. | Agency Agreement §§ 13, 14. |
| Private Sale/No Competitive Bidding (L.R. 6004-1(iv)(D)). | N/A | N/A |
| Closing and Other Deadlines (L.R.6004-1(iv)(E)). | The Agency Agreement requires that the Assets (as defined therein) be sold within 120 days after entry of the Atos Sale Order by the Canadian Court, and shall use best efforts to complete the Sale by no later than June 30, 2024. | Agency Agreement § 1(a). |
| Good Faith Deposit (L.R. 6004-1(iv)(F)). | The Agent shall remit $3 million of the Guaranteed Minimum to Goli Canada within two business days of this Court's entry of the Recognition Order. | Agency Agreement §2(a). |
| Interim Arrangements with Proposed Buyer (L.R. 6004-1(iv)(G)). | N/A | N/A |

| Use of Proceeds (L.R. 6004-1(iv)(H)). | Proceeds from the Sale are payable to the Agent in amounts up to the Guaranteed Minimum; thereafter, amounts above the Guaranteed Minimum and to be split between the Agent (80%) and Goli Canada (20%). Amounts payable to Goli Canada shall be remitted to the Petitioner for the benefit of creditors. | Agency Agreement §2(b). |
|---|---|---|
| Tax Exemption (L.R. 6004-1(iv)(I)). | N/A | N/A |
| Record Retention (L.R. 6004- 1(iv)(J)). | N/A | N/A |
| Sale of Avoidance Actions (L.R. 6004-1(iv)(K)). | N/A | N/A |
| Requested Findings as to Successor Liability (L.R. 6004-1(iv)(L)). | N/A | N/A |
| Sale Free and Clear of Unexpired Leases (L.R. 6004-1(iv)(M)). | N/A | N/A |
| Credit Bid (L.R. 6004-1(iv)(N)). | N/A | N/A |
| Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(iv)(O)) | Given the need to obtain final approval of the Transaction in the United States as soon as possible, the Petitioner seeks to waive the 14-day stay under Bankruptcy Rule 6004(h). | N/A |

## **RELIEF REQUESTED**

50.     As of the date hereof, the Canadian Court has not considered entry of the RVO or

the Atos Sale Order, or the approval of the Sale Transactions.  The Petitioner, however, anticipates

the Canadian Court will shortly schedule a hearing to consider approval of the Sale Transaction

and entry of the RVO and the Atos Sale Order for a date after April 1, 2024 (the "CCAA Sale

Approval Hearing").  The Petitioner filed the Motion at this time in order to avoid delay and in

anticipation that the Canadian Court will enter the RVO and the Atos Sale Order at the CCAA

Sale Approval Hearing.  The Petitioner will file a copy of the RVO and the Atos Sale Order upon their entry as soon as reasonably practicable with this Court.

51.    Pursuant to the Motion, the Petitioners seek entry of the Proposed Order, pursuant to sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code (i) recognizing and enforcing the RVO and the Atos Sale Order in the United States; (ii) approving the sale of the Subscribed Shares to the Purchaser pursuant to the Subscription Agreement and the sale of the Atos Equipment pursuant to the Agency Agreement, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances (as defined in the Subscription Agreement and the Agency Agreement, as applicable ); and (iii) granting such other relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

### A.    The Court Should Recognize and Enforce the CCAA Vesting Orders and Authorize the Sale Transactions Pursuant to Bankruptcy Code Section 363[6]

52.    Upon recognition of a foreign proceeding as a foreign main proceeding, relief is available to the foreign representative under section 1520 of the Bankruptcy Code.  *See* 11 U.S.C.

---

[6]    In addition to sections 1520 and 363, the Petitioner respectfully submits that the relief requested in this Motion is available under section 1521 and 1507.  Under section 1521(a)(7), this Court may grant "any additional relief that may be available to a trustee." Given that a trustee may sell a debtor's assets under section 363, the Petitioner should similarly be authorized to sell the Subscribed Shares and the Atos Equipment.  Moreover, the, relief requested may be granted pursuant to Bankruptcy Code section 1507.  Section 1507 authorizes this Court to "provide additional assistance to a foreign representative under [the Bankruptcy Code] or under other laws of the United States." 11 U.S.C. § 1507. In deciding whether to extend relief under section 1507, this Court must consider principles of comity and determine whether the requested relief would reasonably assure: (a) just treatment of the Debtors' creditors and equity holders; (b) protection of the Debtors' United States creditors against prejudice and inconvenience in claim processing; (c) prevention of preferential or fraudulent dispositions of the Debtors' property; and (d) distribution of the Debtors' property substantially in accordance with the Bankruptcy Code's priority scheme. *See id.* "These provisions embody the protections that were previously contained in section 304 of the Bankruptcy Code . . . ." *In re Rede Energia S.A.*, 515 B.R. 69, 95 (Bankr. S.D.N.Y. 2014). Given the long history of Canadian proceedings being recognized and relief granted in such proceedings being enforced by United States courts, we are not aware of any facts or circumstances that would counsel against granting comity to the RVO or the Norco Sale Order, including the authorization therein to sell the Subscription Share and the Atos Equipment, respectively.  Such relief will provide the Debtors and all parties in interest with certainty that the RVO and Norco Sale Order will be enforceable not only in Canada, but in the United States, and will therefore protect and prevent prejudice to such parties by ensuring uniform application of such orders.

§ 1520. Section 1520(a)(2) of the Bankruptcy Code provides, in relevant part, that, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . sections 363, 549 and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate." 11 U.S.C. § 1520(a)(2). Moreover, section 1520(a)(3) of the Bankruptcy Code provides that, upon recognition of a foreign main proceeding, "unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552." 11 U.S.C § 1520(a)(3); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 16, 2012) (holding that section 363 of the Bankruptcy Code applies to transfers of assets located within the United States outside of the ordinary course of business in connection with cases commenced under chapter 15 of the Bankruptcy Code).

53.    In addition, sections 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and "approval or implementation of agreements concerning the coordination of proceedings." 11 U.S.C. §§ 1525(a), 1527(4).

1.    *The Sale Transactions are a Prudent Exercise of Business Judgement*

54.    Bankruptcy Code section 363(b)(1) provides that the Petitioner, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin*), 91 F.3d 389, 395 (3d

Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991). The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990).

55.    In the context of an asset sale pursuant to section 363 of the Bankruptcy Code, it is well established that it is not required that debtors conduct an auction in order to meet the business judgment standard.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (A "section 363(b) sale transaction does not require an auction procedure.").

56.    Here, entering into the Transactions is a prudent exercise of the Debtors' business judgment.  The Transactions are the culmination of the Debtors' extensive restructuring efforts and a marketing process that lasted almost a year.  The process included extensive input and cooperation from the Lenders, and was overseen by professionals engaged by the Debtors to manage the process (BMOCM).  These efforts resulted in a transparent and fair marketing process pursuant to the SISP.  The implementation of the Transactions following the SISP is a prudent exercise of the Debtors' business judgment and is supported by Petitioner in its capacity as the court-appointed monitor.

57.    The Petitioner believes that the issuance  of the Subscribed Shares to the Purchaser and sale of the Atos Equipment in accordance with the terms and conditions of the Subscription Agreement and the Agency Agreement, respectively, represents the best realization of value of the Debtors' asset for the benefit of the Debtors' stakeholders under the circumstances.  Indeed, the

Petitioner is confident, given the results of the SISP and the Lenders' support for the Motion and CCAA Initial Application, that the Principal Transaction is the **only** viable going-concern transaction available to the Debtors, and will allow Goli Canada to exit the Canadian insolvency proceedings and continue its business. Given the above, the Petitioner is also confident that the Agency Agreement is the best way to maximize the value of the Atos Equipment. *Verified Petition*, ¶ 57. This Court's recognition of the CCAA Vesting Orders is a critical step in achieving that result.[7]

58.     Recognition and enforcement of the CCAA Vesting Orders will permit the Debtors to dispose of the Subscribed Shares and the Atos Equipment without disruption and in a timely and efficient manner.  Absent the relief requested herein, the Debtors, their creditors, their employees and their contract counterparties (and other business-related counterparties) will potentially suffer significant, if not irreparable, harm due to an inability to close the Transactions. Accordingly, the Petitioner hereby seeks recognition of the CCAA Vesting Orders in these chapter 15 cases.[8]

2.     *Creditors and Parties-in-Interest Received Adequate Notice*

59.     All creditors and parties-in-interest, including all U.S. based creditors, contract counterparties and litigation parties, received adequate notice of the Canadian Proceedings, the CCAA Initial Application, the Initial Order, and the Comeback Hearing.  As proposed in the *Petitioner's Motion for Entry of an Order Specifying Form and Manner of Service and Notice*,

---

[7]    Pursuant to Article 7.1 of the Subscription Agreement, and Section 5(a) of the Agency Agreement, entry of the Proposed Order substantially in the form attached hereto is a condition precedent to the consummation of the Principal Transaction and the Atos Sale.

[8]    RVO transactions have been recognized and enforced in the U.S. under Chapter 15 on several occasions, including by bankruptcy courts in this district.  *See In re In re Acerus Pharmaceuticals Corp., et al.*, No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023), Docket No. 78; *In Re NextPoint Financial Inc., et al.*, No. 23-10983 (Bankr. D. Del. Dec. 11, 2023), Docket No. 155; *In re Just Energy Group Inc., et. al.*, No. 21-30823 (MI) (Bankr. S.D. Tex., Dec. 1, 2022), Docket No. 232.

filed contemporaneously herewith (the "Notice Motion"), the Petitioner intends to serve the Notice Package (as defined in the Notice Motion) on all known creditors, including litigation parties and contract counterparties, regardless of location, to ensure that all creditors are given notice and are afforded an opportunity to appear and be heard at the upcoming hearings in the Canadian Court, including the Comeback Hearing and the CCAA Sale Approval Hearing.  The Notice Package includes (i) a copy of the Initial Order; (ii) a notice of the Comeback Hearing and the deadline to object to the extension of the Stay Period ; (iii) a summary of the Sale Transactions, including the date of the CCAA Sale Approval Hearing and the deadline to object to the approval of the Sale Transactions and entry of the CCAA Vesting Orders. and (iv) a copy of the Recognition Notice (as defined in the Notice Motion).  In addition, the Petitioner posted copies of the CCAA Initial Application, the publicly available exhibits thereto, its First Report to the Court and the Initial Order on the Petitioner's webpage at http://www.insolvencies.deloitte.ca/goli, which will be maintained in connection with the Canadian Proceedings and updated to include pleadings filed in both the Canadian Proceedings and these Chapter 15 Cases.  Moreover, the Petitioner will serve, or cause to be served the Recognition Notice, which includes a notice of the hearing on this motion, by electronic mail and/or domestic or foreign mail upon the following parties or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) all parties to litigation in which any Debtor is a party and that is pending in the United States as of the date that the Chapter 15 Petitions were filed; (c) all secured creditors of the Debtors in these cases; (d) contract counterparties; (e) all other known creditors of the Debtors in these cases; (f) all parties that were served with the Notice Package in the Canadian Proceedings; (g) the United States Food and Drug Administration; (h) the Debtors; and (i) all other parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.

60.     The Recognition Notice will, among other things, (a) set forth the time for filing objections to the relief requested in this Motion, (b) the date, time, and place to attend a hearing on this Motion, (c) notify parties that copies of this Motion, including the Proposed Order, are available and may be examined (i) free of charge at the webpage maintained by the Petitioner at http://www.insolvencies.deloitte.ca/goli, or (ii) downloaded for a fee from the Court's electronic docket at https://ecf.deb.uscourts.gov.  As such, the Recognition Notice will provide notice that is "reasonably calculated, under all the circumstances, to inform interested parties of the pendency of a proceeding."  *In re Energy Future Holdings Corp.*, 522 B.R. 520, 529 (Bankr. D. Del. 2015) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)).  This notice comes in addition to the notice provided in the Canadian Proceedings in connection with the filing of the CCAA Initial Application.  Accordingly, the Petitioner submits that notice of the Sale Transactions and the hearing on approval thereof is sufficient and appropriate.

3.      *The Purchase Price is Fair and Reasonable*

61.     The purchase price for the Subscribed Shares and the Atos Equipment provided in the Subscription Agreement and the Atos Sale Order, respectively, is fair, reasonable, the result of the SISP and provides the highest and best value to the Debtors and their stakeholders for the Subscribed Shares and the Atos Equipment.  The fairness and reasonableness of the consideration to be received by the Debtors is validated by a "market test" through the SISP.  *See In re Champion Enterprises, Inc.*, No. 09-14019 KG, 2012 WL 3778872, at *35 (Bankr. D. Del. Aug. 30, 2012) ("A market test is the best evidence of a company's value at a given point in time.").  The Subscription Agreement presents the best and only opportunity to maximize the value of the Subscribed Shares will allow Goli Canada to continue on a going-concern basis and avoid any decline and devaluation of the Subscribed Shares.  The Agency Agreement is the best way to maximize the value of the Atos Equipment.  Indeed, the fact that the Lenders—the parties with the

greatest economic interest in the Sale Transactions—support the Motion is clear evidence that the Sale Transactions will yield maximum value.  For all of the foregoing reasons, the Petitioner have concluded that the Sale Transaction are in the best interests of the Debtors, their estates, creditors, and other parties in interest.

4.    *The Releases Under the Subscription Agreement and Agent Protections in the Agency Agreement Are Appropriately Recognized Under Chapter 15 and the Bankruptcy Code*

62.    As stated above, the definition of Released Parties under the Subscription Agreement includes releases and protections in favor of: (i) Goli Canada and Residual Co. and their respective present and former directors, officers, employees, shareholders, legal counsel and advisors, (ii) the Monitor and its legal counsel, and their respective present and former directors, officers, partners, employees and advisors, (iii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors, and (iv) the Lenders and their respective present and former directors, officers, employees, legal counsel and advisors.  In addition, the Agency Agreement contains certain indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement. The releases, as approved by the Canadian Court, are limited in scope and only cover present and future claims related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions.  They also do not release claims arising out of fraud, bad faith, illegal acts or claims that are not permitted to be released under Canadian law.

63.    Notably, Canadian courts have approved releases in similar reverse vesting transactions, and such releases have been in favor of the debtor's directors, officers, the monitors, counsel, employees of the debtor, shareholders and the debtor's advisors. *See Zucker Declaration*, ¶ 32 & n. 3.

64.     Recognition of such releases is appropriate and routinely granted to foreign debtors through chapter 15 of the Bankruptcy Code. *See, e.g.*, *In re In re Acerus Pharmaceuticals Corp., et al.* , No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023), Docket No. 78; *In Re NextPoint Financial Inc., et al.*, No. 23-10983 (Bankr. D. Del. Dec. 11, 2023), Docket No. 155; *In re Just Energy Group Inc., et. al.*, No. 21-30823 (MI) (Bankr. S.D. Tex., Dec. 1, 2022), Docket No. 232; *see also* .*In re Catalyst Paper Corp.*, No. 16-12419 (CSS), 2017 WL 5479405, at *2 (Bankr. D. Del. Jan. 20, 2017) (granting recognition to orders issued by the Canadian court, including the releases set forth therein).

65.     Here, recognition of the releases and similar protections under the Subscription Agreement and Agency Agreement serves the principal purpose of chapter 15—granting comity and full force and effect to the orders of foreign courts. *See In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (noting that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian [o]rders," even if those provisions may not be appropriate in a plenary chapter 11 case.). Moreover, as similar releases are also granted in a chapter 11 case there can be no finding that the releases are manifestly contrary to public policy and are prohibited under section 1506. Accordingly, the RVO, including the releases thereunder, and the Atos Sale Order should appropriately be recognized by this Court.

    5.    *The Cancellation of Interests Through the RVO is Appropriate and Permissible Under Chapter 15*

66.     As discussed above, the RVO terminates and cancels all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada. *Verified Petition* ¶ 51(e).   The shareholders of Goli Canada were, as recognized by the

Canadian Court, adequately notified of the Canadian Proceedings and the proposed Principal Transaction. *Zucker Declaration*, ¶ 39.  None of the shareholders of Goli Canada have objected to the Principal Transaction.

67.    Additionally, the cancellation of all outstanding shares and the issuance of new shares to the Purchaser pursuant to the RVO, was within the jurisdiction of the Canadian Court. *See, e.g.*, *Harte Gold (Re)*, 2022 ONSC 653 at para. 62 (finding that where shareholders have no economic interest, present or future, it would be unnecessary and, indeed, inappropriate to require a vote of the shareholders to effectuate an action achievable through the court); CBCA, s. 173 and 191(2) (permitting the Canadian court to amend the articles of a corporation that is subject to a reorganization). *Zucker Declaration*. ¶ 33.

68.    Here, the Canadian Court has approved and permitted the cancellation of the shares in Goli Canada through the RVO and recognition of that order from the Canadian Court serves the purpose of chapter 15—extending comity and cooperation to the Canadian Court and its order. Additionally, the shareholders were adequately notified of the relief sought in respect of the Principal Transaction, were given notice of the Comeback Hearing and given the opportunity to appear and be heard in connection with such relief before the Canadian Court.  As such, the Canadian Court and the Canadian Proceedings provided an adequate mechanism through which the shareholders' interests were protected.

   **B.    The Court Should Authorize and Approve the Sale Transactions "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

69.    Bankruptcy Code Section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona

fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

70.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the approval of the Sale Transactions free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges or encumbrances), except with respect to any interests that may be assumed or preserved under the Subscription Agreement or the Agency Agreement, as applicable.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988)).

71.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors have obtained the requisite consent to enter into the Sale Transactions and sell the Subscribed Shares and the Atos Equipment free and clear of all liens, claims, interests, or encumbrances (other than Permitted Encumbrances as defined in the Subscription Agreement and the Agency Agreement, as applicable).  As noted above, the Lenders are fully supportive of, and have consented to, the Sale Transactions.  Any other creditors that may hold such liens, claims, encumbrances, or other interests who did not object, or who withdrew their objections, to the Motion, the CCAA Initial Application, entry of the RVO, the sale of the Subscribed Shares, entry of the Atos Sale Order, and the sale of the Atos Equipment should be deemed, subject to the terms of the Proposed Order and the CCAA Vesting Orders, to have consented to such sale free and clear pursuant to section 363(f)(2) of the Bankruptcy Code.  The Petitioner submits that the sale of the Subscribed Shares and the Atos Equipment free and clear of all interests, other than as provided in the Proposed Order

and the RVO or Atos Sale Order, as applicable, satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

72.     The sale of the Subscribed Shares and the Atos Equipment free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances as defined in the Subscription Agreement and the Agency Agreement, as applicable) is consistent with the best interests of the Debtors' estates and creditors.  Pursuing a sale other than one free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrance as defined in the Subscription Agreement and the Agency Agreement, as applicable) would yield substantially less value for the Debtors' estates.  Therefore, a sale free and clear of all interests is in the best interests of the Debtors, their creditors, and other stakeholders, and is consistent with the Sale Transactions for which the Debtors are seeking approval in the Canadian Proceedings, in accordance with the terms of the CCAA Vesting Orders. *Verified Petition*, ¶ 59.

**C.     The Court Should Afford the Purchaser All Protections Under Section 363(m) and (n) of the Bankruptcy Code as a Good Faith Purchaser.**

73.     The Petitioner also requests that the Court find that the Purchaser are entitled to the benefits and protections set forth in sections 363(m) and (n) of the Bankruptcy Code.  Specifically, section 363(m) of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

74.     Bankruptcy Code Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased

assets if the order allowing the sale is reversed on appeal so long as such purchaser leased or purchased the assets in "good faith."

75.     Such relief is appropriate as the Principal Transaction was the result of the SISP, which consisted of a robust marketing process, and provides parties in interest with the opportunity to review and object to the Principal Transaction both in the Canadian Court and in this Court.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders). Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable, and the terms of the transaction are fully disclosed.  *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986).

76.     Here, the Debtors' assets and business were subjected to a robust solicitation and competitive bidding process (*i.e.*, the SISP) conducted by an experienced third party.  *Verified Petition*, ¶ 31.  The Petitioner, in its capacity as an officer of the Canadian Court, believes that the Subscription Agreement is fair and reasonable under the circumstances, and is generally beneficial to the Debtors' stakeholders, including its creditors, employees and trading partners . In that regard the Petitioner has considered, in particular, that the Principal Transaction is supported by the Lenders, which have the primary economic interest in the Debtors' assets, and that the Principal Transaction will allow for the continuation of the Debtors' business as a going concern.  The protections of sections 363(m) and 363(n) of the Bankruptcy Code are essential to the willingness of the Purchaser to consummate the Sale Transactions.

77.     The Petitioner is not aware of any indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Principal Transaction to be avoided

under section 363(n) of the Bankruptcy Code. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 147 (describing types of misconduct that negate a purchaser's good faith status (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))). The Principal Transaction is the result of an extensive marketing process and the product of negotiations between the parties thereto, pursuant to the SISP, which was crafted by the Debtors and their advisors, in consultations with the Lenders, to ensure the maximum potential price was received by the Debtors.

78. Accordingly, the Petitioner seeks a finding that the Purchaser is a good faith Purchaser under section 363(m) of the Bankruptcy Code and have not violated section 363(n) of the Bankruptcy Code.

## **WAIVER OF RULE 6004(h)**

79. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The relief sought by the Petitioner herein is a condition precedent to closing each of the Transaction and is time sensitive. Any delay in closing could jeopardize the Sale Transactions to the detriment of the Debtors and their stakeholders. Accordingly, the Petitioner respectfully requests that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h).

## **NOTICE**

80. As set forth in the Notice Motion, the Petitioner intends to serve, or cause to be served, the Recognition Notice, which will, among other things, (a) set forth the time for filing objections to the relief requested in this Motion, (b) the date, time, and place to attend a hearing on this Motion, (c) notify parties that copies of this Motion, including the Proposed Order, are available and may be examined (i) free of charge at the webpage maintained by the Petitioner at

http://www.insolvencies.deloitte.ca/goli, or (ii) downloaded for a fee from the Court's electronic docket at https://ecf.deb.uscourts.gov, by electronic mail and/or domestic or foreign mail upon the following parties or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) all parties to litigation in which any Debtor is a party and that is pending in the United States as of the date that the Chapter 15 Petitions were filed; (c) all secured creditors of the Debtors in these cases; (d) contract counterparties; (e) all other known creditors of the Debtors in these cases; (f) all parties that were served with the Notice Package in the Canadian Proceedings; (g) the United States Food and Drug Administration; (h) the Debtors; and (i) all other parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Petitioner requests that this Court find that no further notice is required.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order, substantially in the form as the attached Proposed Order: (i) granting the relief requested herein and (ii) granting the Petitioner and the Debtors such other and further relief as the Court deems proper and just.

Dated: March 19, 2024
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5964)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  mcguire@lrclaw.com
          pierce@lrclaw.com
          brooks@lrclaw.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Andrew Rosenblatt (*pro hac vice* pending)
Francisco Vazquez (*pro hac vice* pending)
Michael Berthiaume (*pro hac vice* pending)
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: andrew.rosenblatt@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

*Counsel to the Petitioner*