## Exhibit A

**(Canadian Cases)**

**Arrangement relatif à Blackrock Metals Inc.**                    **2022 QCCS 2828**

# SUPERIOR COURT

(Commercial Division)

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No.:    500-11-060598-212

DATE:   July 8, 2022 (**RECTIFIED July 13, 2022**)
_____

**BY  THE HONOURABLE   MARIE-ANNE PAQUETTE, Chief Justice**
_____

**IN THE MATTER OF THE COMPROMISE OR ARRANGEMENT UNDER THE**
*COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36 OF:

**BLACKROCK METALS INC**.
**BLACKROCK MINING INC.**
**BRM METALS GP INC.**
**BLACKROCK METALS LP.**
        Debtors
-and-

**DELOITTE RESTRUCTURING INC.**
        Monitor
-and-

**INVESTISSEMENT QUÉBEC**
**OMF FUND II H LTD.**
        Secured Creditors
-and-

**13482332 CANADA INC.**
        Shareholder Bidder
-and-

**WINNER WORLD HOLDINGS LIMITED**
**4470524 CANADA INC.**
**GOLDEN SURPLUS TRADING**
**PROSPERITY STEEL**
        Intervenors

2022 QCCS 2828 (CanLII)

2022 QCCS 2828 (CanLII)

_____

### RECTIFIED JUDGMENT
**ON THE AMENDED SHAREHOLDER BIDDER'S APPLICATION TO EXTEND THE PHASE 2 BID DEADLINE (SEQ. 23)**
**AND**
**ON THE DEBTORS' APPLICATION TO APPROVE A VESTING ORDER (SEQ. 17)** [1]

_____

OVERVIEW ............................................................................................................2
   1.    Procedural background (Court Orders)...............................................4
   2.    Phases of the SISP...........................................................................5
   3.    Tasks performed by the Monitor in accordance with the SISP ..........5
   4.    Canada Inc.'s LOI.............................................................................6
   5.    Orders sought and conclusions of the Court......................................6
     5.1  The Bid Extension Application .......................................................6
     5.2  The RVO Application .....................................................................7
ANALYSIS .............................................................................................................7
   6.    Bid Extension Application ..................................................................7
     6.1  Facts relevant to the issue............................................................7
     6.2  Opposing arguments of the parties ...............................................8
     6.3  Legal principles ..........................................................................10
     6.4  Discussion ..................................................................................11
   7.    RVO Application ..............................................................................14
     7.1  Legal Principles .........................................................................14
     7.2  Discussion on criteria to approve an RVO....................................21
     7.3  Discussion on the releases..........................................................26
FOR THESE REASONS, THE COURT: .................................................................28

## OVERVIEW

[1] The debtors BlackRock Metals Inc., BlackRock Mining Inc., BlackRock Metals LP and BRM Metals GP Inc. (collectively: **BlackRock**) were established in 2008. They are developing a metals and materials manufacturing business with a mine in Chibougamau, and a metallurgical plant to be located at the Port of Saguenay (**Project Volt**).

[2] The mine and plant to be built under Project Volt will eventually supply vanadium, high purity pig iron and titanium products, three specialty metals which are, according to

_____
[1]    Reasons in support of orders issued on May 31, 2022 and rectified on June 1, 2022

BlackRock, central to the green materials transition in North America. BlackRock's business plan contemplates a forty-one year project life generating strong returns, with a small-scale mining operation.

[3] As of now, BlackRock has been in the process of raising the necessary capital to start the construction and implementation of Project Volt, which is now being estimated to cost approximately US$1.02 billion. Considering the early stage of its development, no revenues have ever been generated by the project.

[4] BlackRock's only secured creditors are OMF Fund II H Ltd. (**Orion**) and Investissement Québec (**IQ**). On January 18, 2019, BlackRock signed a loan credit agreement with Orion and IQ to supply the necessary working capital required to continue Project Volt. This loan was due and payable on December 1, 2022 and, as of now, Orion and IQ's secured claim amounts to approximately $100M, which constitutes the best part of BlackRock's pre-filing obligations. Orion and IQ also own, respectively, 18% and 12% of BlackRock's shares.

[5] On December 22, BlackRock filed an Application for an Initial Order and other ancillary relief in the present *Companies' Creditors Arrangement Act* (**CCAA**)[2] restructuring proceedings.

[6] On January 7, 2022, the Court issued a two-part order in view of the sale of the assets of BlackRock. Firstly, the Court established the parameters of a sale and investment solicitation process (**SISP**) for the sale of such assets.

[7] Secondly, the Court approved the Agreement of Purchase and Sale signed by Orion and IQ as purchaser (**Stalking Horse Agreement**) and ordered that this agreement be considered as constituting the "Stalking Horse Bid" under the SISP. The agreed purchase price under the Stalking Horse Agreement is to be equal to the fair market value of BlackRock's secured debt towards Orion and IQ (approximately $100M).

[8] Pursuant to the January 7, 2022 orders, Phase 2 Bids under the SISP were to be submitted before May 11, 2022, as will be discussed below.

[9] Two Applications are before the Court in relation to the above:

9.1.   Amended Application by the Shareholder Bidder, 13482332 Canada Inc. (**Canada Inc.**) to extend the Phase 2 Bid Deadline (**Bid Extension Application**); and

9.2.   BlackRock' Application to approve a vesting order (**RVO application**)

[10]    In the Bid Extension Application, Canada Inc. seeks to extend the deadlines provided for in the January 7, 2022 orders, with the view of continuing to canvass the

---

2    R.S.C. 1985, c. C-36.

market for financial partners that would allow it to submit a Phase 2 Bid after the Phase 2 Bid deadline.

[11]    In the RVO Application, BlackRock seeks an order approving the sale of its assets essentially along the terms of the IQ and Orion's Stalking Horse Agreement (**Proposed Transaction**).

[12]    On May 31, 2022, due to time constraints, the Court rejected the Bid Extension Application and granted the RVO Application, with reasons to follow. The reasons are found below.

## 1.    PROCEDURAL BACKGROUND (COURT ORDERS)

[13]    On December 22, 2021, BlackRock filed an Application for an Initial Order and other ancillary relief.

[14]    On December 23, 2021, the Court issued a First Day Initial Order pursuant to the CCAA and, *inter alia*, appointed Deloitte Restructuring Inc. as the monitor (**Monitor**).

[15]    On January 7, 2022, the Court issued an *Amended and Restated Initial Order* and an *Order Approving a Sale and Investment Solicitation Process (SISP) and Approving a Stalking Horse Agreement of Purchase and Sale*.

[16]    The January 7, 2022 orders (**Initial Orders**) provided that BlackRock was authorized to borrow from Orion and IQ, as interim lenders, such amounts from time to time as BlackRock may consider necessary or desirable, up to a maximum principal amount of $2M outstanding at any time, to fund the ongoing expenditures of BlackRock and to pay such other amounts as may be permitted (**Interim Facility**). The Court also authorized a corresponding Interim Charge, for a maximum amount of $2.4M, in favor or IQ and Orion.

[17]    The Initial Orders also approved a SISP to be conducted in accordance with the approved procedures (**Bidding Procedures**);

> 17.1.   authorized the Monitor and BlackRock to implement the SISP;

> 17.2.   approved the Stalking Horse Agreement, solely for the purposes of:

>> (i)    constituting the "stalking horse bid" under the SISP; and

>> (ii)   approving the Expense Reimbursement (as defined in the Stalking Horse Agreement), and subject to further Order of this Court.

[18]    Pursuant to the Initial Orders and at the request of the Intervenors (shareholders), the Court extended the SISP by an additional 30 days beyond what was originally contemplated.

2022 QCCS 2828 (CanLII)

[19]    The Stay of proceedings was thereafter extended to June 30, 2022, in accordance with further requests made and in accordance with the debate arising from the two Motions identified above.

## 2.    PHASES OF THE SISP

[20]    The objective of the SISP was to solicit interest either (i) in one or more sales or partial sales of all, substantially all, or certain portions of the BlackRock's business; and/or (ii) for an investment in a restructuring, recapitalization, refinancing or other form of reorganization of BlackRock or its business.

[21]    The Bidding Procedures provide that a party interested in participating in the SISP must sign and deliver to the Monitor a non-disclosure agreement (**NDA**) and upon doing so, is considered a "**Phase 1 Qualified Bidder**", following which the Monitor will provide to such party a confidential information memorandum (**CIM**) and access to the confidential virtual data room (**VDR**) set up by BlackRock and the Monitor.

[22]    The Bidding Procedures further provide that if a Phase 1 Qualified Bidder wishes to submit a bid, it must deliver to the Monitor a non-binding letter of intent (**LOI**) which must conform to certain specified requirements (**Phase 1 Qualified Bid**) no later than 5:00 p.m. on March 9, 2022 (**Phase 1 Bid Deadline**).

[23]    Following the Phase 1 Bid Deadline, BlackRock shall determine, in consultation with the Monitor, if an LOI qualifies as a "**Phase 1 Successful Bid**", in which case the bidder is thereafter deemed a "**Phase 2 Qualified Bidder**".

[24]    Phase 2 Qualified Bidders shall thereafter submit their Phase 2 Qualified Bid no later than 5:00 p.m. on May 11, 2022, or such other date or time as may be agreed by the Monitor in consultation with BlackRock and with the authorization of Orion and IQ as Stalking Horse Bidders, acting reasonably (**Phase 2 Bid Deadline**).

[25]    Also pursuant to the Bidding Procedures, the Stalking Horse Bidders are Phase 2 Qualified Bidders for all purposes under the SISP.

[26]    Therefore, Canada Inc. had until May 11, 2022, 5:00 p.m. (Eastern Standard Time) to submit its Phase 2 Qualified Bid (**Phase 2 Bid Deadline**).

## 3.    TASKS PERFORMED BY THE MONITOR IN ACCORDANCE WITH THE SISP

[27]    Further to the Initial Orders, the Monitor undertook the following steps to conduct the solicitation process in accordance with the SISP:

    a.    the Monitor contacted 415 potentially interested parties;

    b.    374 potentially interested parties received the Teaser according to email confirmations received by the Monitor;

2022 QCCS 2828 (CanLII)

c.    232 potentially interested parties were contacted directly by the Monitor, in addition to the general distribution that occurred on January 10, 2022;

d.    65 potentially interested parties participated in more serious discussions about the opportunity or confirmed that they were not interested;

e.    7 interested parties executed an NDA and were granted access to the VDR; and,

f.    1 interested party (Shareholder Bidder) submitted a non-binding Letter of Interest (LOI) prior to the Phase 1 Bid Deadline.[3]

## 4.    <u>CANADA INC.'S LOI</u>

[28]    Canada Inc. was incorporated on March 8, 2022, as a special purpose vehicle to participate in the SISP and submit a bid.

[29]    Canada Inc.'s shares are owned by 3 individuals, Mr. Edward Yu, Mr. Solomon (Sam) Pillersdorf and Mr. Leslie A. Wittlin, who, directly or through corporate entities under their control, own approximately 50% of the outstanding shares of BlackRock. Mr. Yu, Mr. Pillersdorf and Mr. Wittlin also act as directors and officers of the company. Canada Inc.'s representatives submit that they have well established links into the mining industry and, based on same, have assembled a team of experienced advisory professionals in the field.

[30]    The Monitor did not receive any other LOI on or before the Phase 1 Bid Deadline. Therefore, Canada Inc.'s non-binding LOI[4] of March 9, 2022 is the only Phase 1 Successful Bid.

[31]    In its LOI, Canada Inc. proposes a purchase price for BlackRock's shares that shall be either the sum of $100M or such greater amount as would be required to exceed the minimum purchase price as defined in the Initial Order.

## 5.    <u>ORDERS SOUGHT AND CONCLUSIONS OF THE COURT</u>

### 5.1 The Bid Extension Application

[32]    Canada Inc. argues that its tremendous efforts to submit a bid to the Monitor are on the verge of bearing fruit, albeit slightly past the Bid Deadline. Canada Inc. therefore begs the Court to extend the Phase 2 Bid Deadline (which expired on May 11, 2021) for an extra thirty days after the present judgment.

[33]    The Monitor, BlackRock and Orion and IQ object to such extension.

---

3    Fifth Report, par. 27.
4    Exhibits A-2, R-3.

2022 QCCS 2828 (CanLII)

[34]    For the reasons below, the Court refused the extension sought.

## 5.2  The RVO Application

[35]    The only pending bid therefore is the one made by Orion and IQ, the Stalking Horse Bidders. With the support of BlackRock and of the Monitor, they beg the Court to approve the drafted agreement.[5]

[36]    The **Intervenors**, who own approximately 50% of the shares of BlackRock, object to the structure of the Proposed Transaction, as it would amount to an illegal appropriation of their shares, without their consent. They also object to the granting of a release to Orion and IQ, as contemplated under the Stalking Horse Agreement.

[37]    For the reasons below, the Court dismissed the Intervenors' objection and approved the transaction in accordance with the RVO.

## ANALYSIS

## 6.    BID EXTENSION APPLICATION

## 6.1  Facts relevant to the issue

[38]    As indicated above, Canada Inc.'s LOI[6] is the only Phase 1 Successful Bid. Therefore, only IQ and Orion (Stalking Horse Bidders) and Canada Inc. (Shareholder Bidder) were permitted to proceed to Phase 2 of the SISP.

[39]    More particularly, on March 8-9, 2022, before the Phase 1 Bid Deadline, Canada Inc. was incorporated and delivered to the Monitor a non-binding LOI, which was confirmed as a Phase 1 Successful Bid. Canada Inc. therefore qualified for Phase 2 of the SISP.

[40]    To assist in making such a decision, BlackRock and the Monitor requested and received clarifications, particularly with respect to the ability of Canada Inc.'s representatives to fund its bid from their own assets or from third-party financing (**Clarification Letter**)[7], which will be discussed below.[8]

[41]    At a later meeting, held on May 9, 2022, Canada Inc. informed the Monitor and BlackRock that despite having initiated, with the help of its own financial advisors, a solicitation process to identify financial partners that would support its bid, it would not be in position to file a qualified bid by the Phase 2 Deadline.

---

[5]    Exhibit R-2.
[6]    Exhibits A-2, R-3.
[7]    Exhibit R-5.
[8]    See par. [68] and following of the present judgment.

[42]    Canada Inc. therefore verbally requested that the Phase 2 Bid Deadline be extended for an additional 30 days in order to continue to canvass the market for financing.[9]

[43]    The Monitor consulted with BlackRock and requested the position of Orion and IQ, as Stalking Horse Bidders, in accordance with paragraph 21 of the approved Bidding Procedures. They expressed serious concerns but were agreeable to considering an extension of the Phase 2 Bid Deadline, subject to several conditions. These conditions included the financing (subordinate to the DIP and to the approximately $100M of secured debt held by the Orion and IQ) of the costs resulting from the extra 30-day extension (estimated at $500K) and the confirmation that no further extension would be sought in the future.[10]

[44]    Canada Inc. replied that it was prepared to advance a first tranche of $200K of a DIP loan within one week of the acceptance date of their request for a SISP extension, and the balance of $300K as needed. Canada Inc. contemplated that this proposed loan totaling $500K was to be made on the same terms and conditions as the existing DIP loan of the Secured Lenders, and was to rank *pari passu* with them in all respects.

[45]    The Monitor estimated that it was unlikely that the extension sought would allow Canada Inc. to provide a proper bidding offer at the end of the extension. After further consultation with BlackRock and the Stalking Horse Bidders and with their support, the Monitor denied the extension and informed Canada Inc. accordingly on May 12, 2022.

[46]    On May 11, 2022, Canada Inc. filed the present Bid Extension Application.

## 6.2 Opposing arguments of the parties

[47]    Canada Inc. submits that its LOI conforms with the requirements of the Bidding Procedures in that, without limitation, it meets the "Minimum Purchase Price" requirement of providing at closing net cash proceeds that are not less than the aggregate of (a) the amount of cash payable under the Stalking Horse Agreement together with the amount of obligations being credit bid thereunder, (b) the amount of expense reimbursement payable to the Stalking Horse Bidders, plus (c) a minimum overbid amount of $1M.

[48]    Canada Inc. also pleads that there is equity for the stakeholders of BlackRock, including the shareholders, based on their knowledge of the company and on recent pre-money valuations performed by third parties which ranged between USD$175M and 350M. In order to assist in designing and financing its final bid, Canada Inc. has retained at its own costs the services of two consultants, FTI Capital Advisors Canada and ERG Securities US.

---

[9]    Exhibit R-6.
[10]   Exhibit R-7.

2022 QCCS 2828 (CanLII)

2022 QCCS 2828 (CanLII)

[49]    Canada Inc.'s consultants have contacted 156 investors to solicit interest in the opportunity. To date, seven remain highly interested in the opportunity and have executed NDAs and are continuing to perform due diligence on the asset. An additional three have expressed interest and are evaluating the opportunity internally before proceeding to execute an NDA. Investors that have executed NDAs have been added to the VDR and are actively analyzing and reviewing BlackRock's materials. The Consultants have prepared a report on the status of the financing process.[11] For example, Canada Inc. submits a signed non-binding letter of interest signed on May 6, 2022, from a serious investment fund for a USD$65M financing, conditional *inter alia* on a 30-day-due diligence.[12] Canada Inc. further argues that the recent events in Ukraine have improved the outlook of Project Volt and increased the value of its strategic metals.

[50]    However, according to Canada Inc., based on the feedback provided to its consultants from investors and given the complexity of this transaction, the condensed timeframe of the SISP is a significant hurdle for investors to perform the necessary due diligence in order to provide a commitment to finance the its Phase 2 Qualified Bid. As such, the Consultants believe that additional time will have a material impact on the likelihood of raising the capital required.

[51]    Canada Inc. argues that although it has made significant progress, it needs more time to pursue these various opportunities and finalize the business and financial terms which will form part of the its Phase 2 Qualified Bid.

[52]    To that effect, Canada Inc. reminds the Court of its broad discretion under section 11 of the CCAA and points to case law[13] that suggests that the Court would be justified to refuse an asset sale in the presence of impropriety in the sales process.

[53]    The Monitor, BlackRock, Orion and IQ and BlackRock's First Nation Partners[14] oppose to such extension of the Phase 2 Bid Deadline.

[54]    BlackRock, the Monitor and Orion and IQ argue that such extension would run contrary to the clear rules of the Bidding Procedures and would break the integrity of the SISP, to the prejudice of all potential bidders who made their decisions based on the rules known to all. Moreover, the extension sought would maintain uncertainty for BlackRock for an additional period, with no realistic chance of obtaining a better offer. Also, the extension would increase the costs and the amounts to be advanced by the Orion and IQ as interim lenders while Canada Inc. is not ready to pay for those expenses for the requested additional period.

---

[11]    Exhibit A-3.
[12]    Exhibit A-4, filed under seal.
[13]    *Royal Bank v. Soundair Corp.*, 1991 CanLII 2727 (Ont. CA); *Cameron v. Bank of Nova Scotia* (1981), 38 C.B.R. (N.S.) 1 (N.S.C.A.); *Bank of Montreal v. Maitland* (1983), 46 C.B.R. (N.S.) 75 (N.S.S.C.).
[14]    Exhibit R-11.

### 6.3 Legal principles

[55]    The CCAA primarily seeks to refinance and restructure insolvent companies rather than liquidate them.[15] When selling the assets of the company, one of the objectives is thus naturally to achieve the best possible price for the assets. This usually coincides with finding the best outcome for the company's creditors.

[56]    To achieve this goal, the court benefits from a wide discretionary power pursuant to section 11 of the CCAA:

> **11 [General power of court]** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, <u>make any order that it considers appropriate in the circumstances</u>.
>
> [Emphasis added]

[57]    The three baseline requirements to meet for an order to be considered "appropriate in the circumstances" are appropriateness, good faith and due diligence.

[58]    In addition, the order sought must advance the policy and remedial objectives of the CCAA to qualify as "appropriate" within the meaning of section 11.[16] The overarching remedial objectives pursued by the CCAA include:[17]

1.  providing for timely, efficient and impartial resolution of a debtor's insolvency;

2.  preserving and maximizing the value of a debtor's assets;

3.  ensuring fair and equitable treatment of the claims against a debtor;

4.  protecting the public interest; and

5.  in the context of a commercial insolvency, balancing the costs and benefits of restructuring or liquidating the company.

[59]    Hence, although the objective of any sale process is obviously to obtain the best possible price from prospective purchasers, monetary considerations cannot be the only relevant factor when the Court determines if it is appropriate to deviate from a process that has been duly followed by all parties involved.

---

[15]    *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, par. 14-15.
[16]    *Canada v. Canada North Group Inc.*, 2021 SCC 30, par. 21; *9354-9186 Québec inc v. Callidus Capital Corp*, 2020 SCC 10, par. 48-51.
[17]    *9354-9186 Québec inc v. Callidus Capital Corp*, 2020 SCC 10, par. 40.

2022 QCCS 2828 (CanLII)

[60]    On the contrary, it is well established that sale processes are important in CCAA proceedings and that modifying same *post facto* every time there is a chance of a better financial outcome could have a negative impact on all the parties involved. Therefore, Courts have often insisted on the importance of preserving the integrity of the sales process. As this court held in *Re Boutiques San Francisco Inc.*:

> [20] Dans le cadre des plans d'arrangement qu'elle autorise, le but de la LACC est, entre autres, de favoriser un processus ordonné et encadré où les paramètres choisis doivent par conséquent avoir un sens.  Dans le contexte de cette loi, tout comme par exemple dans celui de la *Loi sur la faillite et l'insolvabilité*, la recherche du meilleur prix possible pour les créanciers ne peut se faire en vase clos, en ignorant la protection nécessaire de l'intégrité et de la crédibilité du processus choisi pour atteindre cet objectif.[18]

[61]    The Bidding Procedures, which govern the SISP approved by this Court, are fundamentally important for assessing the Proposed Transaction as well as the arguments of the parties.[19]

## 6.4 Discussion

[62]    The Monitor also explains that efforts have already been made for some years before the beginning of the CCAA proceedings in order to further finance Project Volt. BlackRock, with the assistance of its financial advisors at the time, have conducted a global search since 2015, but, and despite considerable time and effort, have not been able to secure the required funding.

[63]    At the inception of the CCAA proceedings, the Court also modified the proposed Bidding Procedures to include a 30 day extension to the "Phase 1 Bid Deadline" based on a request from the Intervenors and their submission that such further time would suffice to ensure a fulsome and fair process. This extension has not led to the desired results.

[64]    The Monitor then conducted a thorough solicitation process as part of the Phase 1 of the SISP, as mentioned previously, which culminated in a single LOI submitted by Canada Inc.:

> Based on the various discussions with prospective bidders during Phase 1 of the SISP, it was apparent to the Monitor that the BRM project, which had previously been promoted extensively in the market by BRM and its financial advisors for financing purposes, was already very well known by most of the strategic and industry leaders. This situation likely explains why many potentially interested

---

[18]    *Boutiques San Francisco Inc., Re*, 2004 CanLII 480, par. 20 (QC CS). See also *Bloom Lake, g.p.l. (Arrangement relatif à)*, 2015 QCCS 3064, par. 70 (leave to appeal dismissed, 2015 QCCA 754).

[19]    See *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218, par. 14 (leave to appeal dismissed, 2020 QCCA 1488; leave to appeal to SCC dismissed, 2021 CanLII 34999).

2022 QCCS 2828 (CanLII)

parties declined the opportunity without signing an NDA and without performing due diligence of the VDR.[20]

[65]    The lack of interest of other bidders in taking part in the Debtor's restructuring has thus been apparent since the very first stages of the SISP process. According to the Monitor, potential players who were contacted either found the opportunity too risky, or not strategic or profitable enough, or did not believe in the feasibility of the technology involved. It remains unlikely that this situation will change in the near future.

[66]    Moreover, Canada Inc. was unable to secure financing of its own bid during the extended 60 days of Phase 1 of the SISP and waited all the way until that phase's deadline to execute an NDA and to enter into the process.

[67]    In determining that Canada Inc.'s non-binding LOI constituted a Phase 1 Successful Bid, the Monitor relied on Canada Inc.'s reassurance that it had both the ability and the means required to pay the offered purchase price and to raise or contribute further capital resources to BlackRock's business to continue it as a going concern. The LOI went on to state that the net worth of the Bidder's representatives was, collectively, well above the said amount and that "[b]ased on their extensive experience and engagement in the industry", they were "well placed to obtain both direct and/or third party financing in an aggregate amount sufficient both to complete the Transaction and thereafter required to proceed with the Business and lead it to profitability as a going concern."[21]

[68]    Canada Inc., in its Clarification Letter of March 14, 2022, refused to provide more details about its representatives' respective worth.[22]  Still, it is not in doubt that they have enough assets to finance its bid if needed.

[69]    However, Canada Inc. wrote that it was "unable to advise with certainty to what extent [its] three principals […] may contribute to the capital required to fund the transaction contemplated by the non-binding LOI." This issue would "clarify as [its] funding plan finalizes through [its] on-going efforts already well underway." Canada Inc. confirmed that it would "have its financing, to the extent necessary and sufficient for the purpose of the binding LOI, on or before the Phase 2 bid deadline", but added that "some or all" of the funds "may come from external sources", which was subject to further due diligence that could only be performed during Phase 2 of the SISP.

[70]    These answers are evasive and, in retrospect, proved to include many loopholes. Still, the Clarification letter was considered and the Monitor nonetheless qualified Canada Inc. for Phase 2.

[71]    The Monitor understood that Canada Inc.'s primary focus during Phase 2 of the SISP was to secure financing, through equity or debt, in order to submit a binding offer

---

[20]    Fifth Report, par. 28.
[21]    Exhibit A-2.
[22]    Exhibit R-5, par. 3.

2022 QCCS 2828 (CanLII)

prior to the Phase 2 Bid Deadline. Indeed, the due diligence performed during that Phase was limited. Only one meeting occurred, at the request of Canada Inc.'s consultants, with BlackRock and the Monitor, to review the assumptions supporting the financial model of BlackRock. Also, all the groups that were granted access spent a relatively short amount time on the VDR reviewing the information available for this kind of project.[23]

[72]    At the time of the meeting on May 9, 2022, despite some cursory interest manifested by certain potential capital partners, and except for a non-binding LOI received from a third party for an amount (USD$65M) significantly less than the one required to exceed the Stalking Horse Bid ($100M), Canada Inc. received no other letter of intent or confirmation of interest in writing from a potential capital partner during the SISP.

[73]    Critically, Canada Inc. also revealed on May 9, 2022 that none of its representatives actually intended to participate in the financing of an eventual Phase 2 Qualified Bid, should there be such a bid.

[74]    The Monitor testified that had he known in due time that the shareholders had no intention to finance the bid using their own personal assets, Canada Inc. would likely not have qualified for Phase 2 of the SISP. This aspect of the LOI was described as a key consideration in the Monitor's decision at the time.

[75]    In addition, the failure by Canada Inc. to confirm that it would fund all of the Debtor's costs, including professional costs, during the extended 30-day period, indicates that it is not willing to put "skin in the game" as evidence of its *bona fide* intentions. It appears that Canada Inc. is unwilling to fund the costs of a further delay notwithstanding that any successful bid would necessarily have to cover those costs in order to exceed the value of the Stalking Horse Bid.

[76]    The above findings remain, in spite of the letter from VanadiumBank Inc., which Canada Inc. filed the day before the hearing.[24] This letter is presented as a new "financing proposal" in favor of Canada Inc. for up to $125M in support of its bid.

[77]    Actually, it appears that VanadiumBank was incorporated only a few weeks before the hearing.[25] Notwithstanding its name, it is not a bank. Its offer to Canada Inc. is not to lend funds out of its own pocket, but rather to arrange a loan facility after seeking and obtaining the required financing from third parties in the market.

[78]    In other words, with VanadiumBank's proposal, Canada Inc. is nowhere closer to achieving its financial goals before the proposed extended Phase 2 Bid Deadline. The Court therefore gives no weight to VanadiumBank's letter.

---

[23]    Fifth Report, par. 38-41.
[24]    Exhibit A-11.
[25]    Exhibit R-14.

[79]    It now seems clear that, as it was unable to meet the requirements of the Initial order, Canada Inc. instead decided to launch what could be described as a parallel SISP, which was nowhere authorized and which runs contrary to the letter and spirit of the SISP as ordered by the Court.

[80]    Although the Court recognizes Canada Inc. and its representatives' efforts in securing third party financing for their bid, and their belief in the potential of BlackRock's projects to attract new interest as the market evolves, it is time for the SISP to come to an end and for the CCAA proceedings to move forward.

[81]    It is advantageous to the stakeholders generally that BlackRock complete the restructuring process as soon as possible in order to, in particular, end the negative narrative surrounding the company, to limit any further uncertainty and risk and facilitate the completion of the financing necessary for Project Volt, if possible.

[82]    The SISP provided for a level playing field to all potential bidders. The rules were known to all parties and certain potential bidders might have decided not to participate in the SISP because of its duration (which is often the case in insolvency proceedings). Any modification of the rules after they are set and after all the players have made their choices accordingly should not be taken lightly. In the case at hand, there is no justification whatsoever to such a disruption of the fairness of the process. The overarching remedial objectives of the CCAA are better served by rejecting the Bid Extension Application.

## 7.    RVO APPLICATION

[83]    The Court's refusal to further extend the Phase 2 Deadline leaves the Stalking Horse Bid from IQ and Orion as the only Phase 2 Qualified Bid. Pursuant to the RVO Application, the Court shall now turn to the question of whether it should approve the Proposed Transaction as per the terms of his bid and, in particular, BlackRock's restructuration through a reverse vesting order (**RVO**).

## 7.1 Legal Principles

[84]    In assessing the relevant criteria and determining whether the proposed transaction shall be approved, the Court is mindful not to modify the contractual terms that have been duly negotiated between the parties.[26] In this case, it takes the form of a RVO.

[85]    RVOs are a fairly new way to achieve the remedial objective of the CCAA: instead of selling the assets of a debtor, a series of transactions will result in i) the purchaser becoming the sole shareholder of a debtor and ii) the unwanted liabilities be vested out

---

[26]    *Mecachrome Canada Inc. (In the matter of the plan of compromise or arrangement of)* c. *Ernst & Young Inc.*, 2009 QCCS 6355, par. 28.

to a separate entity, thereby ensuring that the purchaser will not inherit the unwanted liabilities.[27]

[86]    Albeit new, RVOs have been confirmed by the courts as an appropriate way for a debtor to sell its business when the circumstances justify such structure.[28] In particular, CCAA courts have approved RVO structures in several complex mining transactions and have recognized that their benefits, which include maximizing recovery for creditors, importantly limiting delays and transaction costs, and facilitating the preservation of the insolvent business' going concern, justify the use of this innovative restructuring tool.

[87]    In addition to section 11, discussed above, section 36 of the CCAA has been interpreted as providing courts with the jurisdiction and the relevant criteria to issue an RVO:

> **36 (1) [Restriction on disposition of business assets]** A debtor company in respect of which an order has been made under this Act may not sell or otherwise dispose of assets outside the ordinary course of business unless authorized to do so by a court. Despite any requirement for shareholder approval, including one under federal or provincial law, the court may authorize the sale or disposition even if shareholder approval was not obtained.
>
> **(2) [Notice to creditors]** A company that applies to the court for an authorization is to give notice of the application to the secured creditors who are likely to be affected by the proposed sale or disposition.
>
> **(3) [Factors to be considered]** In deciding whether to grant the authorization, the court is to consider, among other things,
>
>> **(a)** whether the process leading to the proposed sale or disposition was reasonable in the circumstances;
>>
>> **(b)** whether the monitor approved the process leading to the proposed sale or disposition;
>>
>> **(c)** whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;
>>
>> **(d)** the extent to which the creditors were consulted;

---

[27]   Exhibit R-2.
[28]   See *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218, par. 71-79 (leave to appeal dismissed, 2020 QCCA 1488; leave to appeal to SCC dismissed, 2021 CanLII 34999); *Quest University Canada (Re)*, 2020 BCSC 1883, par. 151-172 (leave to appeal dismissed, 2020 BCCA 364); *Clearbeach and Forbes*, 2021 ONSC 5564, par. 24-26; *Harte Gold Corp. (Re)*, 2022 ONSC 653, par. 36-39, 77.

**(e)** the effects of the proposed sale or disposition on the creditors and other interested parties; and

**(f)** whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

[…]

**(6) [Assets may be disposed of free and clear]** The court may authorize a sale or disposition free and clear of any security, charge or other restriction and, if it does, it shall also order that other assets of the company or the proceeds of the sale or disposition be subject to a security, charge or other restriction in favour of the creditor whose security, charge or other restriction is to be affected by the order.

[…] [Emphasis added]

[88]    This Court approved an RVO in the face of opposition by a creditor in *Arrangement relatif à Nemaska Lithium inc.*[29]. It was held that section 36 should be interpreted broadly and in accordance with the policy and remedial objectives of the CCAA and the wide discretionary power vested to the supervising judge pursuant to section 11. The Court relied in part on the Supreme Court ruling in *9354-9186 Québec inc. v. Callidus Capital Corp.*[30] It added:

[52] La *LACC* donne donc au juge surveillant la flexibilité nécessaire pour rendre les ordonnances «indiquées» afin de faciliter la restructuration d'une compagnie insolvable.

[53] La nature des problèmes économiques contemporains commande que des solutions innovatrices soient envisagées et, si elles permettent que les objectifs fondamentaux de la *LACC* soient atteints, au bénéfice de tous, alors elles doivent être entérinées.

[…]

[71] Le Tribunal est d'avis que les termes «disposer, notamment par vente, d'actifs hors du cours ordinaire de ses affaires» / «sell or otherwise dispose of assets outside the ordinary course of business» de l'article 36(1) *LACC* permettent un grand éventail d'actes et modes de disposition, incluant, en partie ou en totalité, par voie de «dévolution inversée», une solution innovatrice, à être analysée au cas par cas.

[72] L'article 36(1) *LACC* ne comporte aucune restriction à cet égard.

---

[29]    2020 QCCS 3218 (leave to appeal dismissed, 2020 QCCA 1488; leave to appeal to SCC dismissed, 2021 CanLII 34999).
[30]    2020 CSC 10.

[73] Sortir des sentiers battus n'est pas contre-indiqué, au contraire, surtout lorsque cela permet de meilleurs résultats.

[74] D'ailleurs, dans l'Affaire *Callidus*, la Cour suprême mentionne ce qui suit quant au pouvoir discrétionnaire général du Tribunal prévu à l'article 11 *LACC* :

> «[…] le pouvoir conféré par l'art. 11 n'est limité que par les restrictions imposées par la *LACC* elle-même, ainsi que par l'exigence que l'ordonnance soit « indiquée » dans les circonstances.»

[75] Dans la présente affaire, la solution d'une «dévolution inversée», efficace et rapide, n'affecte pas le résultat final pour les créanciers des Débitrices, au contraire, elle l'améliore.

[76] En effet, le maintien des permis, licences et autorisations existants et des contrats essentiels à l'exploitation des entreprises, et l'utilisation possible des divers attributs fiscaux disponibles, ont facilité l'obtention de concessions de la part des Offrants, et confirmées par le Contrôleur, ce qui devrait permettre qu'une distribution plus importante soit éventuellement effectuée au bénéfice des créanciers des Débitrices.

[89]    The Court of Appeal refused leave in that case, while noting that some issues raised by the appeal did "appear to qualify as being significant to the practice of insolvency":

> [36] […] This is particularly the case regarding the issue of the scope of authority of the CCAA supervising judge in the context of an order that is not strictly limited to the "sale or disposition of assets" provided for under section 36 (6) CCAA, which, according to the Applicants, results in an outcome that would normally form part of an arrangement subject to prior approval by the creditors. There is also an issue of principle raised regarding the granting of broad third party releases (that are not limited to the transaction itself), outside the confines of an arrangement and without determining their appropriateness and submitting same to the required vote of creditors.[31]

[90]    In *Re Quest University Canada*, the Supreme Court of British Columbia cautioned that in the case of an RVO, "the ability of a CCAA court to be innovative and creative is not boundless; as always, the court must exercise its discretion with a view to the statutory objectives and purposes of the CCAA […]."[32] On the other hand, the Court added that "[t]here is no provision in the CCAA that prohibits an RVO structure. As is usually the case in CCAA matters, the court must ensure that any relief is 'appropriate' in the

---

[31]    *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCA 1488 (leave to appeal to SCC dismissed, 2021 CanLII 34999).

[32]    *Quest University Canada (Re)*, 2020 BCSC 1883, par. 154 (leave to appeal dismissed, 2020 BCCA 364).

2022 QCCS 2828 (CanLII)

circumstances and that all stakeholders are treated as fairly and reasonably 'as the circumstances permit' […]."[33]

[91]   Similarly, the Ontario Superior Court of Justice relied on sections 11 and 36 of the CCAA to issue an RVO in *Clearbeach and Forbes*.[34]

[92]   An RVO structure was approved most recently by the same court in *Harte Gold Corp.*[35] Although the Court was unconvinced that such an order could rely entirely on section 36 of the *CCAA*, it concluded that its discretion under section 11 was clearly broad enough to encompass it. Furthermore, the criteria set out at paragraph 36(3) provide an analytical framework that could be applied *mutatis mutandis* to an RVO transaction:

> [36] The jurisdiction of the court to issue an RVO is frequently said to arise from s. 11 and s. 36(1) of the CCAA. However, the structure of the transaction employing an RVO typically does not involve the debtor 'selling or otherwise disposing of assets outside the ordinary course of business', as provided in s. 36(1). This is because the RVO structure is really a purchase of shares of the debtor and "vesting out" from the debtor to a new company, of unwanted assets, obligations and liabilities.

> [37] I am, therefore, not sure I agree with the analysis which founds jurisdiction to issue an RVO in s. 36(1). But that can be left for another day because I am wholeheartedly in agreement that s. 11, as broadly interpreted in the jurisprudence including, most recently, *Callidus*, clearly provides the court with jurisdiction to issue such an order, provided the discretion available under s. 11 is exercised in accordance with the objects and purposes of the CCAA. And it is for this reason that I also wholeheartedly agree that the analytical framework of s. 36(3) for considering an asset sale transaction, even though s. 36 may not support a standalone basis for jurisdiction in an RVO situation, should be applied, with necessary modifications, to an RVO transaction.[36]

[93]   It is true that a Canadian appeal court has yet to rule definitively on the legality of an RVO under the CCAA. This being said, and although the contexts might differ, the Court sees no compelling reason why it should set aside its reasoning in *Nemaska Lithium*.

[94]   Even if this type of transaction was not contemplated by section 36 of the CCAA, section 11 could clearly step in as a basis for the Court's jurisdiction. The Supreme Court of Canada recently held that the other provisions of the CCAA, dealing with specific orders which the courts can issue, do not restrict the general language and power of section 11.[37]

---

[33]   *Id.*, par. 157, citing *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, par. 14-15.
[34]   2021 ONSC 5564, par. 24.
[35]   2022 ONSC 653.
[36]   *Harte Gold Corp. (Re)*, 2022 ONSC 653, par. 36-37.
[37]   *Canada v. Canada North Group Inc.*, 2021 SCC 30, par. 23. See also *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, par. 70.

[95]    The Court agrees with the judge in *Harte Gold Corp* that paragraph 36(3), in any event, lays out a useful analytical framework for the issue at bar. These criteria, which are laid out above, should be applied in conjunction with the factors enumerated in *Royal Bank v. Soundair Corp.*:[38]

> 95.1.    "whether sufficient efforts to get the best price have been made and whether the parties acted providently";

> 95.2.    "the efficacy and integrity of the process followed";

> 95.3.    "the interests of the parties"; and

> 95.4.    "whether any unfairness resulted from the process."[39]

[96]    The Court also agrees that an RVO structure should remain the exception and not the rule, and should be approved only in the limited circumstances where it constitutes the appropriate remedy.

[97]    Some authorities indeed call for caution. For instance, Professor Janis Sarra recently stressed the importance for courts to provide detailed reasons when approving RVOs.[40] Among other things, Professor Sarra reminds us that this type of order deviates significantly from the usual CCAA framework, which is meant to provide all creditors with an opportunity to be heard in the process:

> […] [T]here must be exceptional circumstances for the court to be persuaded to bypass provisions of insolvency legislation aimed at giving both secured and unsecured creditors a meaningful voice/vote in the proceedings, as they are the residual claimants to the value of the debtor's assets during insolvency. […]

> […]

> The CCAA, particularly in its various amendments over the years, has sought to achieve an appropriate balance between various interests affected by a debtor company's insolvency. Part I sets out the framework of the statute, well-known to practitioners and Canadian courts. It allows for a compromise or arrangement to be proposed between a debtor company and its secured and unsecured creditors, a meeting of the creditors to vote on the plan, and, if a majority in number representing two-thirds in value of the creditors, or the class of creditors, present and voting either in person or by proxy at the meeting, agree to any plan of compromise or arrangement, the plan may be sanctioned by the court and, if so sanctioned, is

---

[38]    1991 CanLII 2727 (Ont. CA); *AbitibiBowater inc. (Arrangement relatif à)*, 2010 QCCS 1742, par. 34-35.

[39]    See *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218, par. 50 (leave to appeal dismissed, 2020 QCCA 1488; leave to appeal to SCC dismissed, 2021 CanLII 34999); *Clearbeach and Forbes*, 2021 ONSC 5564, par. 25.

[40]    Janis SARRA, "Reverse Vesting Orders – Developing Principles and Guardrails to Inform Judicial Decisions", 2022 CanLIIDocs 431.

binding. There are specific provisions addressing Crown claims, employees and pensioners, and treatment of equity claims, all designed to balance multiple interests in complex proceedings.

[…]

This statutory framework represents a careful balancing of interests and prejudice, and gives voice and vote to the creditors that are the residual claimants to the value of the debtor company. Many of the provisions are aimed at mitigating the imbalance in power that secured creditors have in insolvency proceedings, at least during the period of negotiations for a plan, with a view to maximizing the value of the assets, preserving going-concern value, and protection of employees and the public interest.

It makes sense, therefore, that in any application to bypass this carefully crafted statutory process, the court consider whether there are compelling and exceptional circumstances to justify this extraordinary remedy, even where the RVO is not specifically contested, as the court needs to be satisfied of the integrity of the system and the potential prejudice to creditors and other stakeholders that may not be appearing before it. Reasons are important for stakeholders to understand the benefits and prejudice that may accrue to any particular transaction.[41]

[98]   As the Supreme Court of British Columbia held in *Quest University*:

[171] I do not consider that an RVO structure would be generally employed or approved in a CCAA restructuring to simply rid a debtor of a recalcitrant creditor who may seek to exert leverage through its vote on a plan while furthering its own interests. Clearly, every situation must be considered based on its own facts; different circumstances may dictate different results. A debtor should not seek an RVO structure simply to expedite their desired result without regard to the remedial objectives of the CCAA.[42]

[Emphasis added]

[99]   In particular, the following comments made in *Harte Gold Corp* are enlightening:

[38] Given this context, however, I think it would be wrong to regard employment of the RVO structure in an insolvency situation as the "norm" or something that is routine or ordinary course. Neither the BIA nor the CCAA deal specifically with the use or application of an RVO structure. The judicial authorities approving this approach, while there are now quite a few, do not generally provide much guidance on the positive and negative implications of this restructuring technique or what to look out for. Broader-based commentary and discussion is only now just now starting to emerge. This suggests to me that the RVO should continue to be regarded as an

---

[41]   *Id.*, p. 4, 26. See ss. 4-6 of the CCAA.
[42]   *Quest University Canada (Re)*, 2020 BCSC 1883, par. 171 (leave to appeal dismissed, 2020 BCCA 364).

2022 QCCS 2828 (CanLII)

unusual or extraordinary measure; not an approach appropriate in any case merely because it may be more convenient or beneficial for the purchaser. Approval of the use of an RVO structure should, therefore, involve close scrutiny. The Monitor and the court must be diligent in ensuring that the restructuring is fair and reasonable to all parties having regard to the objectives and statutory constraints of the CCAA. This is particularly the case where there is no party with a significant stake in the outcome opposing the use of an RVO structure. The debtor, the purchaser and especially the Monitor, as the court appointed officer overseeing the process and answerable to the court (and in addition to all the usual enquiries and reporting obligations), must be prepared to answer questions such as:

(a)     Why is the RVO necessary in this case?

(b)     Does the RVO structure produce an economic result at least as favourable as any other viable alternative?

(c)     Is any stakeholder worse off under the RVO structure than they would have been under any other viable alternative? and

(d)     Does the consideration being paid for the debtor's business reflect the importance and value of the licences and permits (or other intangible assets) being preserved under the RVO structure?

[Emphasis added]

## 7.2 Discussion on criteria to approve an RVO

[100]   The Court will now apply the criteria set out in paragraph 36(3) of the CCAA to the RVO Application, keeping in mind the other relevant factors identified by the case law, and will analyze the appropriateness of the RVO structure in particular.

[101]   The process leading to the proposed sale was reasonable in the circumstances (s. 36(3)(a) of the CCAA). As detailed in the Fifth Report, BlackRock and the Monitor have conducted the SISP in accordance with the Bidding Procedures approved by this Court on January 7, 2022. The market has been adequately canvassed through a fulsome, fair and transparent process. It should be reiterated that BlackRock had already deployed a global search for financing during the years leading up to the initiation of the CCAA Proceedings, to no avail.

[102]   In the present circumstances, the Court concludes that sufficient efforts have been made to get the best price for BlackRock's assets and that the parties acted providently. The record also shows the efficacy and integrity of the process followed.

[103]   The Monitor approved of the process leading to the proposed sale and filed with the court a report stating that in their opinion the sale would be more beneficial to the creditors than a sale or disposition under a bankruptcy (s. 36(3)(a) and (b) of the CCAA).

The Monitor not only approved the SISP but also participated in the negotiation and development of the Bidding Procedures and had primary carriage of the process throughout. In the course of the SISP, the Monitor consulted with BlackRock.

[104]   The Fifth Report concludes that the SISP was properly conducted and that the Proposed Transaction is beneficial for all the stakeholders compared to a bankruptcy scenario. The Monitor "is of the view that creditors who will suffer a shortfall following the Purchase Agreement would not obtain any greater recovery in a sale in bankruptcy." "Furthermore, bankruptcy proceedings would: (i) [c]ause additional delays and uncertainty in the sale of [BlackRock]'s assets; (ii) [j]eopardize the going concern operations of [BlackRock]; and, (iii) [l]ikely result in employees to be unemployed."[43]

[105]   BlackRock's creditors were duly consulted (s. 36(3)(d) of the CCAA). The secured creditors of BlackRock are Orion and IQ who are also the Stalking Horse Bidders. Obviously, they have been consulted extensively and they consent to the RVO Application.

[106]   Importantly, the Grand Council of the Crees (Eeyou Istchee) and the Cree Nation Government also expressed support for the Proposed Transaction, as outlined by their counsel in a letter sent to the Monitor on May 19, 2022:

> Our clients consider that the approval of the Stalking Horse Agreement offers the most, and perhaps the only, viable prospect to bring the BlackRock Mining Project into successful commercial operation and hence to secure for the Cree Nation of Eeyou Istchee the critically important benefits of the BallyHusky Agreement.[44]

[107]   The other creditors are unsecured creditors who have been duly advised of the Initial Application and Order, including the Bidding Procedures. They have decided not to participate in the SISP and nothing indicates that they would oppose to the RVO Application.

[108]   The effects of the proposed sale or disposition on the creditors and other interested parties are beneficial overall (s. 36(3)(e) of the CCAA). The Stalking Horse Bid is the best available alternative for BlackRock's creditors and other interested parties and should allow for BlackRock to emerge as a rehabilitated business in a stronger position to complete the Construction Financing and move forward with Project Volt. This outcome is advantageous to BlackRock and its stakeholders, including their creditors, employees, trading partners and First Nations partners.

[109]   It is true that the RVO will result in the claim of unsecured creditors being transferred to ResidualCo, an empty shell where all unassumed liabilities will be transferred. This transfer simply reflects the fact that the BlackRock's value, as tested in

2022 QCCS 2828 (CanLII)

---

[43]   Fifth Report, par. 57-60.
[44]   Exhibit R-11.

the market through the SISP and for many years prior to the current restructuring, is not high enough to generate value for these unsecured creditors.

[110]   As for the other stakeholders, they will benefit on the whole from the approval of the Proposed Transaction, as it will allow the Debtors' business to emerge in a position to move forward as a going concern. This will benefit the employees, trading partners and First Nations partners and it will have indirect socio-economic benefits in the province of Quebec.

[111]   The consideration to be received for the assets is reasonable and fair, taking into account their market value (s. 36(3)(f) of the *CCAA*). The consideration being paid by Orion and IQ, which is in excess of $100M, is importantly linked to the preservation the Debtor's permits (crucial to the conduct of the contemplated mining activities), certain existing contracts and its tax attributes.

[112]   The reasonableness of the consideration is well established. Given the amount of the secured debt held by Orion and IQ, the consideration which they will pay exceeds i) what the market would be willing to pay to inherit intangible assets BlackRock has been able to build over time and ii) the capacity to raise on the market the financing required for Project Volt.

[113]   Nobody submitted a higher bid after extensive attempts to raise financing over many years.

[114]   Exceptionally, the RVO structure is appropriate in the circumstances. In his Fifth Report, the Monitor outlines the reasons why, in his opinion, the reverse vesting order structure that would be implemented would be "more appropriate and beneficial than a traditional vesting order structure and that the reverse vesting order structure is necessary, reasonable and justified in the circumstances":[45]

> (i)    Numerous agreements, permits, licenses, authorizations, and related amendments are part of the assets that have to be transferred as per the Purchase Agreements. It could be more complex to transfer the benefits of these assets in a traditional vesting order structure since consents, approvals or authorizations may be required. A reverse vesting order structure minimizes risks, costs or delays of having these assets transferred;

> (ii)   The proposed reverse vesting order structure results in better economic results for some creditors of BRM who see their pre-filing claim being assumed and retained. Also, the reverse vesting order structure will avoid any delays or costs associated with the assignments of the assumed contracts;

---

45   Fifth Report, par. 65-66.

(iii)     The contracts or obligations of the creditors and the stakeholders that are considered Excluded Assets and Excluded Obligations according to Schedule B of the Purchase Agreement will not be in a worse position than they would have been with a more traditional vesting of assets to a third party;

(iv)     Most assets of BRM are intangibles, such as agreements, permits, licenses, authorizations and related amendments, and their value depend on the capacity of the purchasers to complete the financing and achieve the project. These assets would have no or limited value if some of them were not being preserved. The reverse vesting order structure allows to avoid any potential risks around the transfer to the purchaser.

[115]   The Court agrees with the Monitor's conclusions. RVO structures have been found by courts to be appropriate in situations such as the present case, where a traditional sale of assets would lead to uncertainty regarding the transfer of numerous agreements, permits, authorizations and other regulatory approvals that are required for the continuation of a company's business.[46]

[116]   Indeed, BlackRock operates in the highly regulated mining industry. Their business is almost entirely constituted of such intangible assets, which provide a head start of several years to the purchaser. Some of these assets cannot be assigned or are at least difficult to assign. Therefore, the capacity to restructure BlackRock depends heavily on the capacity to keep the existing legal entities in place while restructuring the share-capital of BlackRock. That is exactly what the RVO provides for.

[117]   If BlackRock was forced to proceed with a traditional asset sale, it could significantly increase the costs, generate uncertainties and reduce the value its assets, to the detriment of all parties involved.

[118]   Moreover, despite the Intervenors' firm belief, the SISP has unequivocally demonstrated that there is no realizable value in BlackRock's business or assets beyond the secured debt of IQ and Orion, such that there is no equity left for its unsecured creditors, let alone its shareholders.

[119]   The Court adds that Shareholders have little or no say in CCAA proceedings like the present one, where the debtor company is insolvent and its shares have lost all value. This goes to their legal interest in contesting an arrangement or transaction proposed by the company.[47]

[120]   In any case, the shareholders and unsecured creditors of BlackRock are not in a worse position with an RVO than they would be under a traditional asset sale. Either way,

---

[46]   See *supra*, note 28.

[47]   *Proposition de Peloton Pharmaceutiques inc.*, 2017 QCCS 1165, par. 65-78; *Forest c. Raymor Industries inc.*, 2010 QCCA 578, par. 4-6; *Stelco Inc., Re*, 2006 CanLII 1773, par. 18 (Ont. SC).

they would have no economic interest because the purchase price paid would not generate any value for the unsecured creditors (and even less so for the shareholders).

[121]  This is consistent with the conclusions of the Ontario Superior Court of Justice in *Harte Gold Corp.*:

> [59] Because the transaction contemplates the cancellation of all existing shares and related rights in Harte Gold and the issue of new shares to the purchaser, the existing shareholders of Harte Gold will receive no recovery on their investment. Being a public company, Harte Gold has issued material change notices as the events described above were unfolding. <u>By the time of the commencement of the CCAA proceedings, the shareholders had been advised in no uncertain terms that there was no prospect of shareholders realizing any value for their equity investment</u>.

> [60] The evidence of Harte's financial problems and balance sheet insolvency, the unsuccessful prefiling strategic review process, and the hard reality that the only parties willing to bid anything for Harte Gold were the holders of secured debt (and only for, effectively, the value of the secured debt plus carrying and process costs) only serves to emphasize that equity holders will not see, and on any other realistic scenario would not see, any recovery of their equity investment in Harte Gold.

> [61] <u>Under s. 186(1) of the OBCA, "reorganization" includes a court order made under the Bankruptcy and Insolvency Act or an order made under the Companies Creditors Arrangement Act approving a proposal. While the term "proposal" is unfortunate (because there are no formal "proposals" under the CCAA), I view the use of this term in the non-technical sense of the word; that is, as encompassing any proposal such as the proposed transaction brought forward for the approval of the Court under the provisions of the CCAA in this case.</u>

> [62] <u>Section 186(2) of the OBCA provides that if a corporation is subject to a reorganization, its articles may be amended by the court order to effect any change that might lawfully be made by an amendment under s. 168. Section 168(1)(g) provides that a corporation may from time to time amend its articles to add, change or remove any provision that is set out in its articles, including to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares. This provides the jurisdiction of the court to approve the cancellation of all outstanding shares and the issuance of new shares to the purchaser.</u>

> […]

> [64] […] In circumstances like Harte Gold's, where the shareholders have no economic interest, present or future, it would be unnecessary and, indeed,

inappropriate to require a vote of the shareholders [...]. The order requested for the cancellation of existing shares is, for these reasons, justified in the circumstances.[48]

[Emphasis added]

[122]   In particular, paragraphs 61 and 62 of the above excerpt answer the Intervenors' argument about the jurisdiction of the Court to cancel their shares under *the Canada Business Corporations Act*[49] (**CBCA**). The same logic applies with sections 173 and 191 of that statute. The power to cancel and issue shares in the context of an RVO is captures by the possibility for an court order to "change the designation of all or any of [the corporation's] shares, and add, change or remove any rights, privileges, restrictions and conditions [...] in respect of all or any of its shares, whether issued or unissued", pursuant to 191(2) and 173(1)(g) of the CBCA.

[123]   It should also be noted that the Intervenors' opposition to the RVO structure in particular appears to be new. Canada Inc.'s non-binding LOI had already conceded on March 9, 2022 that its proposed bid could itself "take the form of a reverse vesting order".[50] Ultimately, it seems that the Intervenors are not objecting to the use of an RVO *per se*, but only to the extinguishment of their equity interests, which would occur irrespective of the use of an RVO structure or of a traditional vesting order.

[124]   Therefore, the fact that the transaction is structured as an RVO only has benefits and does not prejudice any of the stakeholders. The Court finds that in the specific circumstances of the present case, the proposed RVO is an appropriate arrangement.

## 7.3 Discussion on the releases

[125]   The Proposed Transaction contemplates releases for various parties, including Orion and IQ, from all claims relating to, in particular, BlackRock, its restructuring or the Proposed Transaction.

[126]   While the Intervenors do not object to a release being granted to BlackRock directors or to the Monitor, they argue that Orion and IQ's actions constitute an abuse of both their rights as shareholders and of the CCAA process. Thus, the effect of the requested releases in favour of Orion and IQ would be to dismiss the Intervenors' potential claims without the benefit of hearing any evidence allowing for the determination of their potential liability.

[127]   For the reasons below, the Court holds that the releases in favor of Orion and IQ will form part of the Proposed Transaction.

---

[48]   *Harte Gold Corp. (Re)*, 2022 ONSC 653, par. 59-64.
[49]   R.S.C. 1985, c. C-44.
[50]   Exhibit A-2.

2022 QCCS 2828 (CanLII)

[128]   It is now commonplace for third-party releases, in favor of parties to a restructuring, their professional advisors as well as their directors, officers and others, to be approved outside of a plan in the context of a transaction.[51] In fact, similar releases have been approved by this Court in recent cases involving RVO transactions, including in *Nemaska Lithium*.[52]

[129]   This being said, the courts should not grant releases blindly and systematically.

[130]   In *Harte Gold Corp.,* the Court approved releases in favor of various parties that included the purchaser and its directors and officers and considered the criteria ordinarily canvassed with respect to third-party releases provided for under a plan, as articulated in *Re Lydian International Limited*[53] and elsewhere[54]. They are the following:

> a)   Whether the parties to be released from claims were necessary and essential to the restructuring of the debtor;

> b)   Whether the claims to be released were rationally connected to the purpose of the plan and necessary for it;

> c)   Whether the plan could succeed without the releases;

> d)   Whether the parties being released were contributing to the plan; and

> e)   Whether the release benefitted the debtors as well as the creditors generally.[55]

[131]   In the present file, IQ's and Orion's participation was obviously instrumental to the restructuring of BlackRock's business. Considering the SISP and the opportunity given to BlackRock's stakeholders to participate in the process, it is reasonable for IQ and Orion to now start with a clean slate and not to be under the threat of potential claims as they will be leading BlackRock's efforts with Project Volt. The release will provide more certainty and finality.

[132]   The release is thus reasonably connected and justified as part of the Proposed Transaction,[56] and it is to the benefit of BlackRock and its stakeholders generally as it will allow BlackRock to emerge as a solvent entity and be in the best possible position to,

---

[51]   See *Re Green Relief Inc.*, 2020 ONSC 6837, par. 23-25; *8640025 Canada Inc. (Re)*, 2021 BCSC 1826, par. 43.

[52]   *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218, par. 103-106 (leave to appeal dismissed, 2020 QCCA 1488; leave to appeal to SCC dismissed, 2021 CanLII 34999).

[53]   2020 ONSC 4006.

[54]   *Harte Gold Corp. (Re)*, 2022 ONSC 653, par. 78-86. See also *Re Green Relief Inc.*, 2020 ONSC 6837, par. 27-28.

[55]   *Re Lydian International Limited*, 2020 ONSC 4006, par. 54. See also: *Metcalfe & Mansfield Alternative Investments II Cord. (Re)*, 2008 ONCA 587;

[56]   See *Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, par. 70 (leave to appeal to SCC dismissed, 2008 CanLII 46997).

hopefully, secure financing for Project Volt. They are also fair and reasonable in the present circumstances.

[133]   The eventual claims for which Orion and IQ should not be released, according to the Intervenors, are based on allegations of abuse related solely to Orion's and IQ's Stalking Horse Bid and their conduct during the SISP.

[134]   The Court was sensitive to the shareholders' submissions initially and extended the SISP delays to ensure that the process was as fulsome and fair as possible. Still, and in spite of all the efforts made over the years, IQ and Orion remain the only entities who are ready to take over the development of BlackRock and to further invest in same.

[135]   In the process leading to the Bidding Procedures Order, to the refusal of the Bid Extension Application and to the approval of the Proposed Transaction (Reverse RVO), the Court was able to appreciate the context leading up to the final outcome ordered as per the present judgment and also found the Proposed Transaction, as proposed by Orion and IQ, to be fair and reasonable. The Court sees little to no room for a finding of abuse in the events leading to the CCAA proceedings, to the SISP or to the approved transaction.

[136]   To the contrary, there is no good reason to leave the door open to the Intervenors' potential claims against Orion and IQ, to BlackRock's detriment.

[137]   Therefore, the release provided for in the Proposed Transaction will be granted.

**FOR THESE REASONS, THE COURT:**

[138]   **DECIDES** in accordance with the attached orders.

_____
MARIE-ANNE PAQUETTE, <u>Chief Justice</u>

Me Jean Legault
Me Jonathan Warin
Me Ouassim Tadlaoui
**LAVERY DE BILLY**
Attorneys for Debtor

2022 QCCS 2828 (CanLII)

500-11- 060598-212                                                    PAGE : 29

Me Jean-Yves Simard
M. Laurent Crépeau
**DS AVOCATS**
Attorneys for the Shareholder Bidder

Me Alain Riendeau
Me Brandon Farber
**FASKEN MARTINEAU**
Attorneys for the Monitor

Me Luc Morin
Me Guillaume Michaud
Me Noah Zucker
**NORTON ROSE FULBRIGHT**
Attorneys for the Secured Creditor, Investissement Québec

Me Doug Mitchell
**IMK AVOCATS**
Attorney for the Intervenor

Me David Bish (Par Teams)
Me Julie Himo
**TORYS**
Attorneys for the Secured Creditor, OMF fund ii h ltd. (orion)

Me Brendan O'Neill
**GOODMANS**
Attorney for the Special Committee Of The Board Of Blackrock

Me Geneviève Cloutier
Me François Dandonneau
**GOWLING WLG (Canada) S.E.N.C.R.L., s.r.l.**
Attorneys For The Grand Council Of The Crees And The Cree Nation Government

Me Gilles Robert
Me Kloé Sévigny
**MINISTÈRE DE LA JUSTICE DU CANADA**
Attorneys For The Canada Revenue Agency

Hearing dates:        May 30, 31, 2022

2022 QCCS 2828 (CanLII)

2022 QCCS 2828 (CanLII)

**Arrangement relatif à Blackrock Metals Inc.**　　　　　**2022 QCCA 1073**

# COURT OF APPEAL

2022 QCCA 1073 (CanLII)

CANADA
PROVINCE OF QUEBEC
REGISTRY OF MONTREAL

No:　　500-09-030101-224
　　　　(500-11-060598-212)

DATE:　5 August 2022

_____

**BEFORE  THE HONOURABLE  PATRICK HEALY, J.A.**

_____

*IN THE MATTER OF THE COMPROMISE OR ARRANGEMENT UNDER THE COMPANIES' CREDITOR ARRANGEMENT ACT, R.S.C. 1985, C. C-36 OF BLACKROCK METALS INC., BLACKROCK MINING INC., BRM METALS GP INC. AND BLACKROCK METALS LP.*

**WINNER WORLD HOLDINGS LIMITED**
**4470524 CANADA INC.**
**GOLDEN SURPLUS TRADING**
**PROSPERITY STEEL**
　　　APPLICANTS – Intervenors
v.

**BLACKROCK METALS INC.**
　　　RESPONDENT – Debtor
and
**INVESTISSEMENT QUÉBEC**
**OMF FUND II H LTD.**
　　　RESPONDENTS – Secured creditors

_____

JUDGMENT

_____

[1]　　There is before me an application for leave to appeal against a judgment of the Superior Court, District of Montreal, dated 31 May 2022,[1] that granted a reverse vesting order (RVO) to the respondents pursuant to sections 11 and 36 of the

_____
[1] *Arrangement relatif à Blackrock Metals Inc.*, 2022 QCCS 2828 (written reasons 8 July 2022).

2022 QCCA 1073 (CanLII)

*Companies' Creditors Arrangement Act* (CCAA).[2] There is also an application to issue a safeguard order to prohibit the respondents from selling, transferring, or otherwise disposing of the company's shares, or to issue new shares or transfer, sell, assign or otherwise dispose of permits or agreements that are to the company's benefit and that are useful in its operations pending the outcome of appeal.

[2]    In 2008, one of the respondents, the debtor BlackRock Metals Inc. (BlackRock) began the development of "Project Volt" in the mining sector. During the search for financing, BlackRock signed a loan with two other of the respondents, OMF II H Ltd. (Orion) and Investissement Québec (IQ), which were secured creditors in this project and who held respectively 18% and 12% of the shares of BlackRock.

[3]    For their part, the petitioners were members of a group of shareholders holding 54% of the shares in the enterprise.

[4]    In December 2021, following the refusal of Orion and IQ to renew the loan, BlackRock, then facing financial difficulties, filed a request for an initial order in conformity with the CCAA. In January 2022, the Superior Court issued orders establishing the modalities of the process of call for submissions concerning the assets and companies, "Sale or Investment Solicitation Process" (SISP). During Phase 1 of the process, apart from the secured creditors, only one other submission was submitted and accepted, that of Canada Inc. In Phase 2, Canada Inc. sought an extension of the deadlines to complete the search for financing, which was denied and led to the failure of the SISP.

[5]    As a result of the failure of this process, the respondents submitted to the Superior Court a proposal for a RVO. The judge at first instance granted the order sought for various reasons, of which some are of particular importance to the application of which I am now seized.

[6]    At the outset, I note again that the petitioners did not have the benefit of the judge's written reasons at the time of filing the present application.

[7]    To begin, the judge noted that considerable efforts were made to obtain the best possible price for the assets of the company, but despite the intensive search for an interested investor or buyer to join the project or take it over, no reasonable offer was advanced. The requirements in the mining sector for permits and authorisations also complicated the transfer of the company's assets and the solution of an RVO was best suited to assure certainty in the restructuring of BlackRock.

---

[2] L.R.C. (1985), ch. C-36.

2022 QCCA 1073 (CanLII)

In this regard it is helpful to note one of the judge's conclusions, which well illustrates the singularity of the matter:

[116] Indeed, BlackRock operates in the highly regulated mining industry. Their business is almost entirely constituted of such intangible assets, which provide a head start of several years to the purchaser. Some of these assets cannot be assigned or are at least difficult to assign. Therefore, the capacity to restructure BlackRock depends heavily on the capacity to keep the existing legal entities in place while restructuring the share-capital of BlackRock. That is exactly what the RVO provides for.

[117] If BlackRock was forced to proceed with a traditional asset sale, it could significantly increase the costs, generate uncertainties and reduce the value its assets, to the detriment of all parties involved.

[118] Moreover, despite the intervenor's firm belief, the SISP has unequivocally demonstrated that there is no realizable value in BlackRock's business or assets beyond the secured debt of IQ and Orion, such that there is no equity left for its unsecured creditors, let alone its shareholders.

The judge then explained that the company's creditors and shareholders were not not in a more disadvantageous position with the RVO than they would have been with a more traditional transaction:

[119] The Court adds that shareholders have little or no say in CCAA proceedings like the present one, where the debtor company is insolvent and its shares have lost all value. This goes to their legal interest in contesting an arrangement or transaction proposed by the company.

[120] In any case, the shareholders and unsecured creditors of BlackRock are not in a worse position with an RVO than they would be under a traditional asset sale. Either way,they would have no economic interest because the purchase price paid would not generate any value for the unsecured creditors (and even less so for the shareholders).

[8]     In this court, the petitioners seek to contest even the power of supervising judges under the CCAA to issue an RVO. They submit also that in the circumstances the release of debtors that was contemplated in the RVO was not authorised.

2022 QCCA 1073 (CanLII)

The present motion for leave is governed by section 13 of the CCAA and the standard for granting leave is strict. To be granted leave the petitioners must satisfy four cumulative criteria:

1.    The point on appeal is of significance to the practice;

2.    The point is of significance to the action or proceedings;

3.    The appeal is prima facie meritorious;

4.    The appeal will not unduly hinder the progress of the proceedings.[3]

[9]    Even where these criteria are met, the court may still refuse leave if it is in the interest of justice to do so.[4] I note too that, due to the "obvious expertise » of judges at first instance in the matters, leave to appeal is granted only parsimoniously.[5]

[10]    In my view the application for leave to appeal should be dismissed.

[11]    On the first point, I recognise immediately that the questions raised in the petitioners' application are important in the law of insolvency. The RVO is a complex mechanism that consists in the sale « à un acquéreur des actions du capital-actions d'une compagnie insolvable, délestée de certains de ses actifs et dettes non voulus par l'acquéreur, lequel poursuit alors les opérations de la compagnie »[6]. Canadian courts have been rarely called upon to consider approval of such transactions under the CCAA.[7]

To begin, the ramifications of RVO's with regard to the powers given to a judge under the CCAA have not been addressed, to date, by an appellate court in Canada.[8] The grounds raised in the present matter appear similar to those in *Nemaska*,[9] in which Marcotte J.A. expressed herself as follows: [36]    Certain

---

[3] *Arrangement relatif à Nemaska Lithium inc.,* 2020 QCCA 1488, para. 31 (Judge in chambers) application for leave to appeal dismissed 2021 CanLII 35003 (SCC) [*Arrangement*]; *Cantore v. Nemaska Lithium inc.,* 2022 QCCA 598, para. 8 (Judge in chambers) [*Cantore*]; *Aviva compagnie d'assurances du Canada v. Béton Brunet 2001 inc.,* 2016 QCCA 1837, para. 13 (judge in chambers); *Bridging Finance inc. v. Béton Brunet 2001 inc.,* 2017 QCCA 138, para. 14-15 (judge in chambers); *Bloom Lake, g.p.l. (Arrangement relatif à),* 2015 QCCA 1351 (Judge in chambers); *Statoil Canada Ltd. (Arrangement relatif à),* 2012 QCCA 665, para. 4 (Judge in chambers).

[4] *Southern Star Developments Ltd. v. Quest University Canada*, 2020 BCCA 364, par. 23 (Judge in chambers) [*Southern*].

[5] *9354-9186 Québec inc. v. Callidus Capital Corp.*, 2020 CSC 10, para. 106.

[6] *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218, para. 2 application for leave to appeal dismissed 2020 QCCA 1488, application for leave to appeal 2021 CanLII 35003 (SCC).

[7] *Id.*, para. 8.

[8] Application for leave to appeal has been dismissed in: *Arrangement supra,* note 3; *Southern supra,* note 4; *Cantore supra,* note 3.

[9] *Arrangement, supra*, note 3.

2022 QCCA 1073 (CanLII)

issues raised in appeal do appear to qualify as being significant to the practice of insolvency. This is particularly the case regarding the issue of the scope of authority of the CCAA supervising judge in the context of an order that is not strictly limited to the "sale or disposition of assets" provided for under section 36 (6) CCAA, which, according to the Applicants, results in an outcome that would normally form part of an arrangement subject to prior approval by the creditors. There is also an issue of principle raised regarding the granting of broad third party releases (that are not limited to the transaction itself), outside the confines of an arrangement and without determining their appropriateness and submitting same to the required vote of creditors.[10]

[12]    Nevertheless, even if the first criterion for leave to appeal is satisfied, I cannot say the same for at least two of the three others, which makes dismissal of the application inevitable because the requirements of the four criteria are cumulative.

[13]    In the circumstances, I cannot conclude that the proposed appeal would be of significance to the action or proceedings or sufficiently meritorious, not just because the transaction is virtually complete but because the petitioners have no financial or legal interest with regard to the sale of the company's assets. The judge persuasively demonstrates that the RVO is no prejudicial to the shareholders given that they cannot in all probability draw anything from it irrespective of the nature of the transaction. There might be no doubt that the proposed appeal is meritorious in the sense that it raises a point of principle that merits the attention of this court but the point of principle does not imply in the circumstances of this case a case of comparable practical importance to the evolution and disposition of this matter. In no way do I suggest that the present application for leave is frivolous but, despite their importance in principle, the questions raised by the petitioners appear more abstract and advisory as their practical importance in this case diminishes toward mootness.

[14]    These observations entail inevitably that an appeal in these circumstances would unduly hinder the progress of the proceedings, which is the fourth ground on which the present application must fail. An appeal by the petitioners, especially in view of their lack of genuine financial interest, would unquestionably hinder the progress of proceedings.

---

[10] *Arrangement, supra*, note 3, para. 36.

[15]    On the second ground advanced by the petitioners, that is the release of the debtors by the RVO, the Superior Court of Ontario has acknowledged that the release of a debtor in respect of third parties can be granted under section 11 CCAA but to date no court of appeal has ruled on this point. In this regard the question is important but it is by nature a highly factual determination on which a judge at first instance has notable expertise. She was clearly aware that such releases should not be granted lightly et is careful to explain her decision in detail:

> [131] In the present file, IQ's and Orion's participation was obviously instrumental to the restructuring of BlackRock's business. Considering the SISP and the opportunity given to BlackRock's stakeholders to participate in the process, it is reasonable for IQ and Orion to now start with a clean slate and not to be under the threat of potential claims as they will be leading BlackRock's effort with Project Volt. The release will provide more certainty and finality.

> [132] The release is thus reasonably connected and justified as part of the Proposed Transaction, and it is to the benefit of BlackRock and its stakeholders generally as it will allow BlackRock to emerge as a solvent entity and be in the best possible position to, hopefully, secure financing for Project Volt. They are also fair and reasonable in the present circumstances.

[16]    In view of what the petitioners might obtain the risk that an appeal would hinder the transaction, which is practically complete, is too great. As well noted by the judge, the respondents exhausted all possible options to obtain financing or the sale of assets at a good price, and in the end the RVO was the most profitable solution.

[17]    I say nothing of the merits of the proposed because the questions posed will undoubtedly return in a case that will address them as required.

[18]    In view of my conclusion on the application for leave, I need not address the application for a safeguard order.

 **FOR THESE REASONS I :**

[19]    **DISMISS** the application for leave to appeal, without legal costs in view of the grounds that were raised.

_____
PATRICK HEALY, J.A.

500-09-030101-224                                                    PAGE: 7

Mtre Doug Mitchell
IMK
For Applicants

Mtre Jean Legault
Mtre Ouassim Tadlaoui
Mtre Jonathan Warin
LAVERY, DE BILLY
For Blackrock Metals inc.

Mtre Luc Morin
Mtre Noah Zucker
Mtre Guillaume Michaud
Mtre Arad Mojtahedi
NORTON ROSE FULBRIGHT CANADA
For Investissement Québec

Mtre Julie Himo
SOCIÉTÉ D'AVOCATS TORYS
For OMF FUND II H LTD.

Date of hearing:    2 August 2022

2022 QCCA 1073 (CanLII)

**Arrangement relatif à Nemaska Lithium inc.** **2020 QCCS 3218**

# COUR SUPÉRIEURE
## (Chambre commerciale)

CANADA
PROVINCE DE QUÉBEC
DISTRICT DE  MONTRÉAL

N° :      500-11-057716-199

DATE :    Le 15 octobre 2020

_____

**SOUS LA PRÉSIDENCE DE :   L'HONORABLE  LOUIS J. GOUIN, J.C.S.**

_____

**Dans l'affaire de la *Loi sur les arrangements avec les créanciers des compagnies* de :**

**NEMASKA LITHIUM INC.**
**NEMASKA LITHIUM SHAWINIGAN TRANSFORMATION INC.**
**NEMASKA LITHIUM P1P INC.**
**NEMASKA LITHIUM WHABOUCHI MINE INC.**
**NEMASKA LITHIUM INNOVATION INC.**
          Débitrices
c.
**PRICEWATERHOUSECOOPERS INC.**
          Contrôleur
et
**VICTOR CANTORE**
          Créancier opposant
et
**OMF FUND II (K) LTD. ET AL.**
**INVESTISSEMENT QUÉBEC**
**THE PALLINGHURST GROUP**
          Mises en cause
et
**FMC LITHIUM USA CORP.**
**BRIAN SHENKER**
          Mis en cause

_____

**JUGEMENT**
**(sur la Demande pour ordonnance de dévolution inversée des Débitrices)**

JG 2270

2020 QCCS 3218 (CanLII)

500-11-057716-199

_____

## 1.    MISE EN CONTEXTE

## 1.1    Demande pour ODI

[1]    Le Tribunal est saisi d'une «Application Seeking Leave to Enter into the Orion/IQ/Pallinghurst Transaction with Issuance of an Approval and Vesting Order and Ancillary Relief» (la «**Demande pour ordonnance de dévolution inversée**» ou la «**Demande pour ODI**») présentée par les débitrices Nemaska Lithium inc., Nemaska Lithium Shawinigan Transformation inc., Nemaska Lithium P1P inc., Nemaska Lithium Whabouchi Mine inc. et Nemaska Lithium Innovation inc. (collectivement les «**Débitrices**») aux termes des articles 11 et 36 de la *Loi sur les arrangements avec les créanciers des companies*[1] («*LACC*»).

[2]    Une ordonnance de «dévolution inversée» (une «**ODI**») consiste, en substance, en la vente à un acquéreur des actions du capital-actions d'une compagnie insolvable, délestée de certains de ses actifs et dettes non voulus par l'acquéreur, lequel poursuit alors les opérations de la compagnie.

[3]    Ainsi, la Demande pour ODI vise à autoriser une transaction comprenant une série d'opérations corporatives, fiscales et commerciales, à diverses étapes dans le temps, entre les Offrants (définis ci-après) et les Débitrices, incluant, entre autres, l'échange, le transfert, l'annulation, la réduction et la souscription d'actions du capital-actions de diverses compagnies, la fusion entre certaines d'entre elles, et la disposition de certains actifs et dettes, non nécessaires pour les fins des opérations, à des filiales nouvellement incorporées, lesquelles seront alors sous le régime de la *LACC* et déposeront éventuellement un plan d'arrangement.

[4]    L'ensemble de toutes ces opérations, dispositions et étapes projetées permet, entre autres, de maintenir en vigueur les permis, licences et autorisations existants, les contrats essentiels, et de maximiser l'utilisation des divers attributs fiscaux disponibles, dans un souci d'efficacité et rapidité.

[5]    Qui plus est, tout cet exercice de haute voltige corporative, fiscale et commerciale fait en sorte, en bout de ligne, qu'il est au bénéfice de tous.

[6]    Utiliser la voie plus connue de disposition d'actifs comme la vente (ordonnance de dévolution ou «Vesting Order») est certes beaucoup moins complexe, mais une vente ne permet pas, de façon générale, de maintenir en vigueur les permis, licences et autorisations existants, et les contrats essentiels, ainsi que les divers attributs fiscaux disponibles, surtout dans des secteurs hautement règlementés, tel que le secteur des mines.

_____

[1] L.R.C. 1985, c. C-36.

2020 QCCS 3218 (CanLII)

500-11-057716-199

[7]     Dès à présent, le Tribunal tient à mentionner que les explications demandées par le Tribunal en début d'audition afin que tous puissent bien saisir et comprendre la transaction envisagée et fournies par les fiscalistes Me Patrick Boucher, du cabinet McCarthy Tétrault, procureurs des Débitrices, et Me Derek G. Chiasson, du cabinet Norton Rose Fulbright, procureurs de IQ, et ce, à l'aide des document intitulés «Transaction Steps» (les «**Étapes**») et «Nemaska – Proposed reorganization structure» joints (Exhibit A) au projet de «Share Purchase Agreement», lui-même joint (Schedule A) au projet[2] d'ordonnance de dévolution inversée soumis par les Débitrices, furent très éloquentes et éclairantes, et ont convaincu le Tribunal du but légitime visé par la structure de «dévolution inversée» proposée dans la transaction sujette à son approbation.

[8]     Il s'agit d'une structure innovatrice très complexe et ce n'est que la 6e fois qu'une telle structure fait partie d'une transaction soumise à un tribunal canadien pour approbation aux termes de l'article 36 *LACC*, mais c'est la 1ère fois qu'elle est contestée, les transactions dans les 5 autres dossiers[3] ayant été approuvées sans aucune opposition.

[9]     Plus spécifiquement, par la Demande pour ODI, les Débitrices demandent au Tribunal d'approuver, aux termes de l'article 36 *LACC*, l'offre du 10 juillet 2020 déposée par OMF Fund II (K) Ltd., OMF Fund II (N) Ltd. et OMF (Cayman) Co-VII Ltd. (collectivement **«Orion»**), Investissement Québec (**«IQ»**) et The Pallinghurst Group (**«Pallinghurst»**), telle qu'amendée par lettres datées des 10 et 23 août 2020 (l'«**Offre Orion/IQ/Pallinghurst**»)[4], et ce, par l'émission d'une ODI.

[10]    Orion, IQ et Pallinghurst sont ci-après collectivement appelées les **«Offrants»**.

[11]    L'Offre Orion/IQ/Pallinghurst fut reçue dans le cadre du processus de demande de soumissions visant les actifs et entreprises des Débitrices et intitulé «Sale or Investment Solicitation Process» (le **«SISP»**), processus autorisé aux termes du jugement du 29 janvier 2020 du Tribunal et intitulé «SISP Approval Order» (l'«**Ordonnance SISP**»)[5].

[12]    L'Ordonnance SISP comprend une Annexe A, intitulée «SISP Procedures» (les **«Procédures SISP»**), décrivant les diverses procédures du processus à être suivi par les Débitrices, incluant les explications générales suivantes :

---

[2] Pièce P-3B.

[3] *Plasco Energy Group Inc., Re* (17 July 2015), Ont SJC, Toronto CV-15-10869-00CL (Settlement Approval Order), Spence J; *Stornoway Diamond Corporation, Re* (7 October 2019), Que SC, Montréal 500-11-057094-191 (Approval and Vesting Order), Gouin J; *Wayland Group Corp., Re* (21 April 2020, Ont SCJ, Toronto CV-19-00632079-00CL (Approval and Vesting Order), Haney J; *Comark Holdings Inc., Re* (July 13, 2020), Ont SCJ, Toronto CV-20-00642013-00CL (Approval and Vesting and CCAA Termination Order), Hainey J; *Beleave Inc., Re* (18 September 2020), Ont SCJ, Toronto CV-20-00642097-00CL (Approval and Vesting Order, and Endorsement), Conway J.

[4] Pièce P-2, déposée «sous scellés» et remise confidentiellement au procureur du Créancier Cantore.

[5] Pièce P-1.

2020 QCCS 3218 (CanLII)

500-11-057716-199

Recitals
[…]

C.  Pursuant to an order of the Court dated January 29, 2020 (as it may be amended, restated or supplemented from time to time, the «**SISP Approval Order**»), the Court approved a sale or investor solicitation process to be conducted <u>in respect of the business and assets of Nemaska</u> [les Débitrices] (as such process may be amended, restated or supplemented pursuant to the terms herein, the «**SISP**»), in accordance with the procedures, terms and conditions set our herein (the «**SISP Procedures**»).

D.  The SISP Procedures sets out the manner in which (i) bids and proposals <u>for a broad range of executable transaction alternatives (restructuring, recapitalization and/or refinancing) involving the business of Nemaska</u> [les Débitrices], as more particularly described in the Teaser Letter (the «**Business**»), and <u>all property, assets and undertaking of Nemaska</u> (the «**Property**»), <u>whether *en bloc* or any portion(s) thereof</u>, will be solicited from interested parties, (ii) any bids received will be negotiated, (iii) any Successful Bid(s) will be selected and, (iv) <u>the Court's approval of any Successful Bid(s) will be sought</u>.

E.  An investment in the Business may involve, <u>among other things, a restructuring, recapitalization, or other form of reorganization of the business and affairs of the Business or any part thereof</u>, and such investment may be consummated pursuant to a plan of compromise or arrangement (a «**Plan**»), an arrangement pursuant to the *Canada Business Corporations Act*, R.S.C., 1985, c. C-44 (respectively an «**Arrangement**» and the «**CBCA**») or otherwise.

F.  The SISP Approval Order, the SISP Procedures, and any other orders of the Court made in the CCAA Proceedings relating to the SISP shall exclusively govern the process for soliciting and selecting bids for the sale of the Property or investment in the Business <u>pursuant to a broad range of executable transaction alternatives</u>.

[…]

(le Tribunal <u>souligne</u>)

[13]    Ainsi, l'Ordonnance SISP, rendue sans opposition, vise tous les actifs des Débitrices, sans distinction, dans un tout ou séparément, et ouvre la porte à une panoplie de transactions possibles afin de trouver une solution aux problèmes financiers des Débitrices.

2020 QCCS 3218 (CanLII)

2020 QCCS 3218 (CanLII)

500-11-057716-199

[14]    L'Ordonnance SISP constitue donc la pierre angulaire, la toile de fond (la «**Toile de fond**») de la Demande pour ODI, et il est essentiel que les parties l'aient toujours à l'esprit, surtout lors de la présentation de leurs arguments.

[15]    De plus, la Demande pour ODI ne constitue pas une demande d'homologation d'un plan aux termes de la *LACC*, mais plutôt, tel que mentionné précédemment, une demande d'approbation par le Tribunal[6] de la soumission retenue par les Débitrices suite à l'Ordonnance SISP, soit l'Offre Orion/IQ/Pallinghurst.

[16]    L'offre Orion/IQ/Pallinghurst est soumise au Tribunal telle que déposée, et il ne revient pas au Tribunal d'indiquer aux Offrants quels termes et conditions doivent en faire partie.

[17]    Le choix du Tribunal est le suivant : il approuve ou il refuse l'Offre Orion/IQ/Pallinghurst.

## 1.2    Demande Cantore

[18]    La Demande pour ODI inclut, entre autres, une demande afin que les droits réels existants sur les actifs des Débitrices soient radiés.

[19]    Aussi, parallèlement à la Demande pour ODI, le créancier Victor Cantore (le «**Créancier Cantore**»), l'un des actionnaires de la débitrice Nemaska Lithium inc., a déposé une demande intitulée «Real Rights Application» (la «**Demande Cantore**») contre les débitrices Nemaska Lithium inc., Nemaska Lithium Shawinigan Transformation inc. et Nemaska Lithium Whabouchi Mine inc. (collectivement «**Nemaska**»).

[20]    Ce litige entre le Créancier Cantore et Nemaska fut l'élément déclencheur de l'opposition du Créancier Cantore à la Demande pour ODI et, même si le mérite de la Demande Cantore ne faisait pas l'objet de la Demande pour ODI, il n'en demeure pas moins que ce litige fut omniprésent tout au long de l'audition, le Créancier Cantore étant le seul à s'opposer à la Demande pour ODI, et ce, inlassablement.

[21]    Il est donc pertinent, dans ces circonstances, de bien situer ce litige entre le Créancier Cantore et Nemaska, en précisant qu'il origine de l'«Entente d'acquisition de 16 claims (Propriété Cantore) [la «**Propriété Cantore**»[7]]» du 17 septembre 2009 (l'«**Entente**»)[8], entre Exploration Nemaska inc. («**Exploration**») (maintenant la débitrice Nemaska Lithium inc.) et le Créancier Cantore, alors qu'Exploration a acquis 100% des intérêts du Créancier Cantore dans lesdits claims[9].

---

[6] Pièce P-1, Procédures SISP, art. 15.1.
[7] Pièce P-1 de la Demande Cantore.
[8] Pièce P-2 de la Demande Cantore.
[9] Pièces P-3 et P-5 de la Demande Cantore.

500-11-057716-199

2020 QCCS 3218 (CanLII)

[22]    À titre de considération pour cette acquisition, l'Entente prévoit, entre autres, le paiement d'une «Royauté» par Exploration au Créancier Cantore, et ce, comme suit :

### 1.  Royauté

Le paiement à Groupe Cantore, d'une Royauté égale à 3 % NSR [Net Smelter Return] sur tous les métaux. La royauté sera payable mensuellement, le 15 du mois et sera calculée pour la période de un (1) mois de calendrier précédent. La Société aura l'option à son gré, en tout temps jusqu'à l'expiration d'un délai de 3 mois suivant la déclaration de mise en production officielle, de racheter 1% NSR des détenteurs, au prorata de leur intérêt, pour une somme de 1,000,000 $, payable en 2 versements égaux, le premier le jour de l'exercice de l'option de rachat et le second 90 jours plus tard.

### (la «**Royauté NSR**»)

[23]    Lors d'une conférence de gestion de ce litige, tenue le 9 septembre 2020, le Créancier Cantore a reconnu que ce texte de l'Entente prévoyant le paiement de la Royauté NSR ne lui octroyait aucun droit réel comme tel et, s'il était strictement et limitativement question de ce texte, alors la Demande Cantore devrait être rejetée[10].

[24]    Par contre, tel qu'il appert de la Demande Cantore, le Créancier Cantore cherche plutôt à obtenir du Tribunal, dans un premier temps, une reconnaissance et déclaration à l'effet qu'il est bénéficiaire, par prescription acquisitive ou autrement, d'un «droit réel *sui generis*» rattaché à la Royauté NSR et constituant un démembrement du droit de propriété innommé, de telle sorte que le Tribunal devrait, selon le Créancier Cantore, ordonner éventuellement à Nemaska de signer, entre autres, un document, non encore produit, constatant ce prétendu «droit réel *sui generis*» affectant la Propriété Cantore (le «**Droit réel *sui generis* Cantore**») et procéder à sa publication au registre foncier du Québec, à défaut de quoi, le jugement à intervenir sur la Demande Cantore devrait avoir cet effet.

[25]    Dans un deuxième temps, le Créancier Cantore demande au Tribunal d'exempter expressément le Droit réel *sui generis* Cantore de la radiation des droits réels demandée par les Débitrices aux termes de la Demande pour ODI, d'où l'opposition du Créancier Cantore à la Demande pour ODI, non seulement au motif de cette radiation demandée, mais pour moult raisons, tel qu'expliqué ci-après, le Créancier Cantore faisant flèche de tout bois.

## 1.3   Cadre convenu pour l'audition de la Demande pour ODI

---

[10] Voir le jugement du Tribunal du 15 septembre 2020, paragr. [14].

500-11-057716-199

[26]    Afin d'alléger, dans la mesure du possible, l'audition de la Demande pour ODI, les parties ont tenu pour acquis, mais strictement pour les fins de cette audition, que le Créancier Cantore détenait effectivement un Droit réel *sui generis* Cantore, le débat au mérite de la Demande Cantore étant reporté à plus tard.

[27]    Ainsi, lors d'une conférence de gestion tenue le 18 septembre 2020[11], le Tribunal faisait état de ce qui suit à cet égard :

> b. Quant au Droit réel *sui generis* réclamé par le Créancier Cantore et pour lequel une purge est demandée aux termes de la Demande RVO [la Demande pour ODI], les Débitrices prétendent que, même s'il était éventuellement décidé que la Demande Cantore est bien fondée et que le Créancier Cantore détient effectivement un Droit réel *sui generis*, alors le Tribunal a, de toute façon et à tout événement, le pouvoir de le purger, et c'est ce qu'elles demandent dans la Demande RVO.
>
> À quoi cela sert-il alors d'entreprendre un long débat aux fins [de] déterminer si effectivement le Créancier Cantore détient un Droit réel *sui generis* si, en bout de ligne, il est demandé au Tribunal de le purger tout simplement.
>
> Les parties limiteront donc la première étape de la Demande Cantore à débattre du pouvoir du Tribunal d'ordonner une telle purge. Une réponse positive pourra ainsi couper court au débat aux fins de déterminer si oui ou non le Créancier Cantore bénéficie effectivement d'un Droit réel *sui generis*.

(le Tribunal souligne)

[28]    Par contre, après quelques jours d'audition de la Demande pour ODI, laquelle s'étirait beaucoup plus que prévu, il fut décidé de reporter à plus tard, non seulement la question de l'existence ou non du Droit réel *sui generis* Cantore, mais aussi celle relative au pouvoir du Tribunal de le purger, si tant est que le Droit réel *sui generis* Cantore existe, et ce, sans conséquence sur le pouvoir du Tribunal de purger les autres droits réels affectant les actifs des Débitrices.

[29]    Le projet d'ODI joint à titre de pièce[12] à la Demande pour ODI fut alors modifié afin de prévoir une exception temporaire pour la Demande Cantore et le Droit réel *sui generis* Cantore qui y est réclamé, de telle sorte que si jamais il est décidé par le Tribunal que ce droit existe et qu'il ne peut pas être purgé, alors il affectera les actifs visés et faisant partie de l'Offre Orion/IQ/Pallinghurst, et les Offrants devront en assumer les conséquences, le cas échéant.

---

[11] Voir le procès-verbal d'audience de la conférence de gestion du 18 septembre 2020.
[12] Pièce P-3B, amendée de nouveau lors de la dernière journée d'audition, soit le 8 octobre 2020, voir les paragr. [36] et [37].

2020 QCCS 3218 (CanLII)

500-11-057716-199

[30]    Le report de ce débat, lequel avait essentiellement pour but que la Demande Cantore ne soit plus un obstacle à l'obtention urgente de l'approbation par le Tribunal de l'Offre Orion/IQ/Pallinghurst, dans la mesure où le Tribunal était disposé à aller dans ce sens, n'a pas mis fin à l'opposition du Créancier Cantore à la Demande pour ODI, loin de là.

[31]    Ainsi, le Créancier Cantore a continué à prétendre que le Tribunal n'avait tout simplement pas l'autorité et la compétence pour accueillir la Demande pour ODI sauf, par contre, si elle incluait aussi un règlement de la Demande Cantore qui serait alors approuvé par le Tribunal.

[32]    Tel que discuté ci-après, il est apparu clairement au Tribunal, tout au long de l'audition, que le Créancier Cantore, par les arguments qu'il présentait, ne prenait nullement en considération ce qui avait été décidé par l'Ordonnance SISP, la Toile de fond de la Demande pour ODI.

[33]    Tout était décortiqué à la pièce par le Créancier Cantore, isolé du portait global, loin de ce que le Tribunal avait déjà autorisé.

[34]    À plusieurs occasions, le Tribunal a eu l'étrange impression que l'opposition du Créancier Cantore était un exercice de négociation avec les Débitrices et les Offrants, portant ainsi ombrage à la légitimité des arguments qu'il avançait.

[35]    À un tel point tel que, le 8 octobre 2020 05 :19, le Tribunal a fait parvenir un courriel aux procureurs présents à l'audition, mentionnant, entre autres, ce qui suit :

> […]
> I ask you all to be practical and don't take a legal position in front of the Court on this issue, <u>or any other issue</u>, as a bargaining tool.
> […]
>
> (le Tribunal <u>souligne</u>)

## 1.4    Incident malencontreux

[36]    Par ailleurs, lors de cette même conférence de gestion du 18 septembre 2020, le Tribunal a permis au procureur représentant quelques centaines d'actionnaires de Nemaska Lithium inc. ainsi que l'un des soumissionnaires dans le cadre du SISP, soit le soumissionnaire Edda Stock Finance S.A.S. et Zingher Construct S.R.L. («**E&Z**»), d'éventuellement poser des questions lorsque le SISP ayant mené au dépôt de la Demande pour ODI serait de nouveau expliqué, et ce, par strict souci de transparence, aucune contestation de la Demande pour ODI n'ayant été déposée par eux.

[37]    À cette occasion, le Tribunal a formulé, entre autres, les mises en garde suivantes, d'abord relativement au SISP, déjà autorisé par l'Ordonnance SISP, et quant aux droits des actionnaires de Nemaska Lithium inc. :

2020 QCCS 3218 (CanLII)

500-11-057716-199

2020 QCCS 3218 (CanLII)

Le Tribunal tient à réitérer que si le processus fut suivi aussi rigoureusement que le Contrôleur le laisse sous-entendre dans son Rapport et qu'un soumissionnaire, en l'occurrence EDDA [E&Z], n'a pas suivi et respecté les règles applicables au processus et que sa soumission fut ainsi rejetée, alors il n'a que lui à blâmer. Il n'est pas question, dans de telles circonstances, que ce soumissionnaire ait «*a second kick at the can*». Il en va de la crédibilité et du sérieux de tout le processus de demandes de soumissions.

De plus, le Tribunal tient à répéter que dans un contexte d'insolvabilité, tel que dans la présente affaire, les intérêts économiques des Actionnaires, si tant est que de tels intérêts existent encore, sont entièrement subordonnés à ceux de tous les créanciers des Débitrices, et ce, jusqu'à ce que ces créanciers aient été entièrement payés, ce qui n'est nullement envisagé dans le présent dossier et n'a, semble-t-il, jamais été envisagé par qui que ce soit. Il s'agit d'un principe fondamental en la matière et qui ne doit jamais être perdu de vue.

Nonobstant cela, et par strict souci de transparence, le Tribunal permettra au procureur des Actionnaires de poser aux 3 témoins mentionnés précédemment [un représentant des Débitrices (M. Jacques Mallette, président du conseil d'administration), leur conseiller financier (M. Thomas Bachand de FBN) et le Contrôleur (M. Christian Bourque)] quelques questions, mais ce principe fondamental ne devra jamais être oublié, ceci dit avec la plus grande sympathie ressentie pour les Actionnaires qui traversent une période très difficile.

[38]    Or, après avoir entendu, le 25 septembre 2020, le témoignage de M. Thomas Bachand, représentant du conseiller financier des Débitrices, soit Financière Banque Nationale («**FBN**»), alors interrogé par le procureur des Débitrices relativement au déroulement du SISP, incluant le dépôt de la soumission de E&Z (la «**Soumission E&Z**»), il est apparu clairement au Tribunal que E&Z avait fait fi des règles fondamentales applicables au SISP et établies par le Tribunal aux termes de l'Ordonnance SISP et des Procédures SISP et, sans ambages, le Tribunal l'a indiqué au procureur de E&Z en fin de journée.

[39]    Principalement, le dépôt requis de 5% du montant de la Soumission E&Z n'a jamais été effectué, ni le dépôt des documents contractuels correspondant à la structure transactionnelle proposée par E&Z aux termes de la Soumission E&Z, aussi requis lors du dépôt d'une soumission dans le cadre du SISP.

[40]    Avant de ce faire, E&Z exigeait que la Soumission E&Z soit d'abord acceptée par les Débitrices, telle que déposée, et que les termes et conditions imposés par

9

500-11-057716-199

l'Ordonnance SISP et les Procédures SISP soient mis de côté et ne s'appliquent pas à la Soumission E&Z[13].

[41]   Ce n'est qu'après une telle acceptation de la Soumission E&Z, que E&Z ferait ledit dépôt et déposerait lesdits documents contractuels, pour fins de négociation avec les Débitrices.

[42]   Totalement inacceptable!

[43]   Un refus catégorique des termes et conditions fondamentaux d'un processus sérieux et rigoureux, entériné par l'Ordonnance SISP.

[44]   Qui plus est, après de nombreuses demandes de FBN auprès de E&Z aux fins d'identifier qui était effectivement impliqué derrière E&Z, les documents[14] finalement remis par E&Z n'étaient constitués que de simples notes domestiques, préparées à la bonne franquette, sans pièce justificative, et ne faisant que confirmer au Tribunal que la Soumission E&Z n'était tout simplement pas sérieuse.

[45]   À la lumière des commentaires alors formulés par le Tribunal, le procureur de E&Z a demandé de suspendre l'audition jusqu'au lundi matin 28 septembre 2020, ce qui lui permettrait de revoir en détail le dossier et faire le point avec ses clients.

[46]   Or, dès le début de l'audition du 28 septembre 2020, le procureur de E&Z informait le Tribunal qu'il cessait d'occuper pour E&Z, et aussi pour les actionnaires Alain Fournier et Denis Carrier.

[47]   Parallèlement, les représentants de E&Z ont mis fin à leur présence semi-virtuelle à l'audition et les actionnaires de Nemaska Lithium inc. présents ont quitté la salle d'audience.

[48]   Le Tribunal a alors mis un terme à cette saga malencontreuse entourant la Soumission E&Z en demandant ce qui suit aux procureurs toujours présents, propos consignés au procès-verbal d'audience du 28 septembre 2020  9 :50 :

> [...]
> Vu cela, le Tribunal fait part aux procureurs présents que le sujet concernant l'offre qui avait été déposée par Edda Stock Finance S.A.S. et Zingher Construct S.R.L. ne doit plus être traité dans le cadre de la présente audition, et le Tribunal demande aux procureurs de faire en sorte qu'il en soit ainsi.

## 2.   CADRE LÉGISLATIF ET JURISPRUDENTIEL DE LA DEMANDE POUR ODI

---

[13] Voir, entre autres, Pièce-8A E.
[14] Pièces P-8A U et V.

2020 QCCS 3218 (CanLII)

500-11-057716-199

[49]    Tel que déjà mentionné, la Demande pour ODI est présentée aux termes de l'article 36 *LACC*, lequel prévoit ce qui suit :

**Restriction à la disposition d'actifs**

**36 (1)**   Il est interdit à la compagnie débitrice à l'égard de laquelle une ordonnance a été rendue sous le régime de la présente loi de disposer, notamment par vente, d'actifs <u>hors du cours ordinaire de ses affaires sans l'autorisation du tribunal</u>. Le tribunal peut accorder l'autorisation <u>sans qu'il soit nécessaire d'obtenir l'acquiescement des actionnaires</u>, et ce <u>malgré toute exigence à cet effet</u>, notamment en vertu d'une règle de droit fédérale ou provinciale.

**Avis aux créanciers**

**(2)** La compagnie qui demande l'autorisation au tribunal <u>en avise les créanciers garantis</u> qui peuvent vraisemblablement être touchés par le projet de disposition.

**Facteurs à prendre en considération**

**(3)** Pour décider s'il accorde l'autorisation, le tribunal prend en considération, <u>entre autres</u>, les facteurs suivants :

**a)** la <u>justification des circonstances</u> ayant mené au projet de disposition;

**b)** l'<u>acquiescement du contrôleur</u> au processus ayant mené au projet de disposition, le cas échéant;

**c)** le <u>dépôt par celui-ci d'un rapport</u> précisant que, à son avis, la disposition sera <u>plus avantageuse</u> pour les créanciers que si elle était faite dans le cadre de la faillite;

**d)** la <u>suffisance des consultations</u> menées auprès des créanciers;

**e)** les <u>effets du projet de disposition sur les droits de tout intéressé</u>, notamment les créanciers;

**f)** le <u>caractère juste et raisonnable</u> de la contrepartie reçue pour les actifs compte tenu de leur valeur marchande.

[…]

**Autorisation de disposer des actifs en les libérant de restrictions**

**(6)** Le tribunal peut autoriser la disposition d'actifs de la compagnie, <u>purgés de toute charge, sûreté ou autre restriction</u>, et, le cas échéant, est tenu d'<u>assujettir le produit de la disposition</u> ou d'autres de ses actifs

2020 QCCS 3218 (CanLII)

500-11-057716-199

> à une charge, sûreté ou autre restriction en faveur des créanciers touchés par la purge.
>
> [...]
>
> (le Tribunal souligne)

[50]   Lors de son analyse des facteurs énumérés à l'article 36(3) *LACC*, le Tribunal doit vérifier et s'assurer de ce qui suit :

- whether sufficient efforts to get the best price have been made and whether the parties acted providently;

- the efficacy and integrity of the process followed;

- the interests of the parties; and

- whether any unfairness resulted from the process.[15]

[51]   Par ailleurs, le Tribunal considère plus qu'approprié de citer de larges extraits de la décision unanime de la Cour suprême du Canada dans l'affaire *9354-9186 Québec inc. c. Callidus Capital Corp.*[16] (l'«**Affaire Callidus**»), afin de bien saisir la toile de fond que constitue la *LACC* pour une restructuration et la nature évolutive des procédures intentées sous son régime, et ainsi bien comprendre le rôle que le juge chargé de la supervision d'une restructuration doit jouer :

> [38]   Pour répondre aux questions ci-dessus, nous devons les situer dans le contexte contemporain de l'insolvabilité au Canada, et plus précisément du régime de la *LACC*. Ainsi, avant de passer à ces questions, nous examinons (1) la nature évolutive des procédures intentées sous le régime de la *LACC*; (2) le rôle que joue le juge surveillant dans ces procédures; et (3) la portée du contrôle, en appel, de l'exercice du pouvoir discrétionnaire du juge surveillant.
>
> (1)   La nature évolutive des procédures intentées sous le régime de la *LACC*
>
> [39]   La *LACC* est l'une des trois principales lois canadiennes en matière d'insolvabilité. Les autres sont la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985 c. B-3 (« *LFI* »), qui traite de l'insolvabilité des personnes physiques et des sociétés, et la *Loi sur les liquidations et les restructurations*, L.R.C. 1985 c. W-11 (« *LLR* »), qui traite de l'insolvabilité des institutions financières et de certaines autres personnes morales, telles que les compagnies d'assurance (*LLR*, par. 6(1)). Bien que la *LACC* et la *LFI* permettent toutes deux la restructuration de compagnies insolvables, l'accès à la *LACC* est limité

---

[15]  *AbitibiBowater inc. (Arrangement relatif à)*, 2010 QCCS 1742, paragr. [34]-[35]; *Royal Bank v. Soundair Corp.*, (1991) 7 C.B.R. (3d) 1 (Ont. C.A.) paragr. 16.
[16]  2020 CSC 10.

2020 QCCS 3218 (CanLII)

500-11-057716-199

aux sociétés débitrices qui sont aux prises avec des réclamations dont le montant total est supérieur à 5 millions de dollars (*LACC*, par. 3(1)).

[40]   Ensemble, les lois canadiennes sur l'insolvabilité poursuivent un grand nombre d'objectifs réparateurs généraux qui témoignent de la vaste gamme des conséquences potentiellement « catastrophiques » qui peuvent découler de l'insolvabilité (*Sun Indalex Finance, LLC c. Syndicat des Métallos*, 2013 CSC 6, [2013] 1 R.C.S. 271, par. 1). Ces objectifs incluent les suivants : régler de façon rapide, efficace et impartiale l'insolvabilité d'un débiteur; préserver et maximiser la valeur des actifs d'un débiteur; assurer un traitement juste et équitable des réclamations déposées contre un débiteur; protéger l'intérêt public; et, dans le contexte d'une insolvabilité commerciale, établir un équilibre entre les coûts et les bénéfices découlant de la restructuration ou de la liquidation d'une compagnie (J. P. Sarra, « The Oscillating Pendulum: Canada's Sesquicentennial and Finding the Equilibrium for Insolvency Law », dans J. P. Sarra et B. Romaine, dir., *Annual Review of Insolvency Law 2016* (2017), 9, p. 9-10; J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2e éd. 2013), p. 4-5, 14; Sénat du Canada, Comité sénatorial permanent des banques et du commerce, *Les débiteurs et les créanciers doivent se partager le fardeau : Examen de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrangements avec les créanciers des compagnies* (2003), p. 13-14; R. J. Wood, *Bankruptcy and Insolvency Law* (2e éd. 2015), p. 4-5).

[41]   Parmi ces objectifs, la *LACC* priorise en général le fait d'« éviter des pertes sociales et économiques résultant de la liquidation d'une compagnie insolvable » (*Century Services*[17], par. 70). C'est pourquoi les affaires types qui relèvent de cette loi ont historiquement facilité la restructuration de l'entreprise débitrice qui n'a pas encore déposé de proposition en la maintenant dans un état opérationnel, c'est-à-dire en permettant qu'elle poursuive ses activités. Lorsqu'une telle restructuration n'était pas possible, on considérait qu'il fallait alors procéder à la liquidation par voie de mise sous séquestre ou sous le régime de la *LFI*. C'est précisément le résultat qui était recherché dans l'affaire *Century Services* (voir par. 14).

[42]   Cela dit, la *LACC* est fondamentalement une loi sur l'insolvabilité, et à ce titre, elle a aussi [TRADUCTION] « comme objectifs simultanés de maximiser le recouvrement au profit des créanciers, de préserver la valeur d'exploitation dans la mesure du possible, de protéger les emplois et les collectivités touchées par les difficultés financières de l'entreprise [. . .] et d'améliorer le système de crédit de manière générale » (Sarra, *Rescue! The Companies' Creditors Arrangement Act*, p. 14; voir aussi *Ernst & Young Inc. c. Essar Global Fund Ltd.*, 2017 ONCA 1014, 139 O.R. (3d) 1, par. 103). Afin d'atteindre ces objectifs, les procédures intentées sous le régime de la *LACC* ont évolué de telle

_____
[17] *Century Services Inc. v. Canada (P.G.)* [2010] 3 R.C.S. 379.

500-11-057716-199

sorte qu'elles permettent des solutions qui évitent l'émergence, sous une forme restructurée, de la société débitrice qui existait avant le début des procédures, mais qui impliquent plutôt une certaine forme de liquidation des actifs du débiteur sous le régime même de la Loi (Sarra, « The Oscillating Pendulum: Canada's Sesquicentennial and Finding the Equilibium for Insolvency Law », p. 19-21). Ces cas, qualifiés de [TRADUCTION] « procédures de liquidation sous le régime de la *LACC* », sont maintenant courants dans le contexte de la *LACC* (voir *Third Eye Capital Corporation c. Ressources Dianor Inc./Dianor Resources Inc.*, 2019 ONCA 508, 435 D.L.R. (4th) 416, par. 70).

[43]  Les procédures de liquidation sous le régime de la *LACC* revêtent différentes formes et peuvent, entre autres, inclure la vente de la société débitrice à titre d'entreprise en activité; la vente « en bloc » des éléments d'actif susceptibles d'être exploités par un acquéreur; une liquidation partielle de l'entreprise ou une réduction de ses activités; ou encore une vente de ses actifs élément par élément (B. Kaplan, « Liquidating CCAAs : Discretion Gone Awry? » dans J. P. Sarra, dir., *Annual Review of Insolvency Law* (2008), 79, p. 87-89). Les résultats commerciaux ultimement obtenus à l'issue des procédures de liquidation introduites sous le régime de la *LACC* sont eux aussi variés. Certaines procédures peuvent avoir pour résultat la continuité des activités de la débitrice sous la forme d'une autre entité viable (p. ex, les sociétés liquidées dans *Indalex* et *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299 (C.J. Ont.) (Div. gén.)), alors que d'autres peuvent simplement aboutir à la vente des actifs et de l'inventaire sans donner naissance à une nouvelle entité (p. ex, la procédure en cause dans *Re Target Canada Co.*, 2015 ONSC 303, 22 C.B.R. (6th) 323, par. 7 et 31). D'autres encore, comme dans le dossier qui nous occupe, peuvent donner lieu à la vente de la plupart des actifs de la débitrice en vue de la poursuite de son activité, laissant à la débitrice et aux parties intéressées le soin de s'occuper des actifs résiduaires.

[44]  Les tribunaux chargés de l'application de la *LACC* ont d'abord commencé à approuver ces formes de liquidation en exerçant le vaste pouvoir discrétionnaire que leur confère la Loi. L'émergence de cette pratique a fait l'objet de critiques, essentiellement parce qu'elle semblait incompatible avec l'objectif de « restructuration » de la *LACC* (voir, p. ex., *Uti Energy Corp. c. Fracmaster Ltd.*, 1999 ABCA 178, 244 A.R. 93, par. 15-16, conf. 1999 ABQB 379, 11 C.B.R. (4th) 204, par. 40-43; A. Nocilla, « The History of the Companies' Creditors Arrangement Act and the Future of Re-Structuring Law in Canada » (2014), 56 *Rev. can. dr. comm.* 73, p. 88-92).

[45]  Toutefois, depuis que l'art. 36 de la *LACC* est entré en vigueur en 2009, les tribunaux l'utilisent pour consentir à une liquidation sous le régime de la *LACC*. L'article 36 confère aux tribunaux le pouvoir d'autoriser la vente ou la disposition des actifs d'une compagnie

2020 QCCS 3218 (CanLII)

14

500-11-057716-199

2020 QCCS 3218 (CanLII)

débitrice hors du cours ordinaire de ses affaires[18]. Fait important, lorsque le Comité sénatorial permanent des banques et du commerce a recommandé l'adoption de l'art. 36, il a fait observer que la liquidation n'est pas nécessairement incompatible avec les objectifs réparateurs de la *LACC* et qu'il pourrait s'agir d'un moyen « soit pour obtenir des capitaux [et faciliter la restructuration], ou éviter des pertes plus graves aux créanciers, soit pour se concentrer sur ses activités rentables » (p. 163). D'autres auteurs ont observé que la liquidation peut [TRADUCTION] « être un moyen de restructurer une entreprise » en lui permettant de survivre, quoique sous une forme corporative différente ou sous la gouverne de propriétaires différents (Sarra, *Rescue! The Companies' Creditors Arrangement Act*, p. 169; voir aussi K. P. McElcheran, *Commercial Insolvency in Canada* (4e éd. 2019), p. 311). D'ailleurs, dans l'arrêt *Indalex*, la compagnie a vendu ses actifs sous le régime de la *LACC* afin de protéger les emplois de son personnel, même si elle ne pouvait demeurer leur employeur (voir par. 51).

[46]  En définitive, le poids relatif attribué aux différents objectifs de la *LACC* dans une affaire donnée peut varier en fonction des circonstances factuelles, de l'étape des procédures ou des solutions qui sont présentées à la cour pour approbation. En l'espèce, il est possible d'établir un parallèle avec le contexte de la *LFI*. Dans l'arrêt *Orphan Well Association c. Grant Thornton Ltd.*, 2019 CSC 5, [2019] 1 R.C.S. 150, par. 67, notre Cour a expliqué que, de façon générale, la *LFI* vise deux objectifs : (1) la réhabilitation financière du failli, et (2) le partage équitable des actifs du failli entre les créanciers. Or, dans les cas où la société débitrice ne s'extirpera jamais de la faillite, seul le dernier objectif est pertinent (voir par. 67). Dans la même veine, sous le régime de la *LACC*, lorsque la restructuration d'une société débitrice qui n'a pas déposé de proposition est impossible, une liquidation visant à protéger sa valeur d'exploitation et à maintenir ses activités courantes peut devenir l'objectif réparateur principal. En outre, lorsque la restructuration ou la liquidation est terminée et que le tribunal doit décider du sort des actifs résiduels, l'objectif de maximiser le recouvrement des créanciers à partir de ces actifs peut passer au premier plan. Comme nous l'expliquerons, la structure de la *LACC* laisse au juge surveillant le soin de procéder à un examen et à une mise en balance au cas par cas de ces objectifs réparateurs.

---

[18]  Mentionnons que, bien que l'art. 36 codifie désormais le pouvoir du juge surveillant de rendre une ordonnance de vente et de dévolution, et qu'il énonce les facteurs devant orienter l'exercice de son pouvoir discrétionnaire d'accorder une telle ordonnance, il est muet quant aux circonstances dans lesquelles les tribunaux doivent approuver une liquidation sous le régime de la *LACC* plutôt que d'exiger des parties qu'elles procèdent à la liquidation par voie de mise sous séquestre ou sous le régime de la *LFI* (voir Sarra, *Rescue! The Companies' Creditors Arrangement Act*, p. 167-168; A. Nocilla, « Asset Sales Under the Companies' Creditors Arrangement Act and the Failure of Section 36 » (2012) 52 *Rev. can. dr. comm.* 226, p. 243-244 et 247). Cette question demeure ouverte et n'a pas été soumise à la Cour dans *Indalex* non plus que dans les présents pourvois.

500-11-057716-199

(2) Le rôle du juge surveillant dans les procédures intentées sous le régime de la *LACC*

[47]    Un des principaux moyens par lesquels la *LACC* atteint ses objectifs réside dans le rôle particulier de surveillance qu'elle réserve aux juges (voir Sarra, *Rescue! The Companies' Creditors Arrangement Act*, p. 18-19). Chaque procédure fondée sur la *LACC* est supervisée du début à la fin par un seul juge surveillant. En raison de ses rapports continus avec les parties, ce dernier acquiert une connaissance approfondie de la dynamique entre les intéressés et des réalités commerciales entourant la procédure.

[48]    La *LACC* mise sur la position avantageuse qu'occupe le juge surveillant en lui accordant le vaste pouvoir discrétionnaire de rendre toute une gamme d'ordonnances susceptibles de répondre aux circonstances de chaque cas et de « [s'adapter] aux besoins commerciaux et sociaux contemporains » (*Century Services*, par. 58) en « temps réel » (par. 58, citant R. B. Jones, « The Evolution of Canadian Restructuring: Challenges for the Rule of Law », dans J. P. Sarra, dir., *Annual Review of Insolvency Law 2005* (2006), 481, p. 484). Le point d'ancrage de ce pouvoir discrétionnaire est l'art. 11, qui confère au juge le pouvoir de « rendre toute ordonnance qu'il estime indiquée ». Cette disposition a été décrite comme étant le « moteur » du régime législatif (*Stelco Inc. (Re)* (2005), 253 D.L.R. (4th) 10 (C.A. Ont.), par. 36).

[49]    Quoique vaste, le pouvoir discrétionnaire conféré par la *LACC* n'est pas sans limites. Son exercice doit tendre à la réalisation des objectifs réparateurs de la *LACC*, que nous avons expliqués ci-dessus (voir *Century Services*, par. 59). En outre, la cour doit garder à l'esprit les trois « considérations de base » (par. 70) qu'il incombe au demandeur de démontrer : (1) que l'ordonnance demandée est indiquée, et (2) qu'il a agi de bonne foi et (3) avec la diligence voulue (par. 69).

[50]    Les deux premières considérations, l'opportunité et la bonne foi, sont largement connues dans le contexte de la *LACC*. Le tribunal « évalue l'opportunité de l'ordonnance demandée en déterminant si elle favorisera la réalisation des objectifs de politique générale qui sous-tendent la Loi » (par. 70). Par ailleurs, l'exigence bien établie selon laquelle les parties doivent agir de bonne foi dans les procédures d'insolvabilité est depuis peu mentionnée de façon expresse à l'art. 18.6 de la *LACC*, qui dispose :

**Bonne foi**

**18.6 (1)** Tout intéressé est tenu d'agir de bonne foi dans le cadre d'une procédure intentée au titre de la présente loi.

**Bonne foi — pouvoirs du tribunal**

16

500-11-057716-199

**(2)** S'il est convaincu que l'intéressé n'agit pas de bonne foi, le tribunal peut, à la demande de tout intéressé, rendre toute ordonnance qu'il estime indiquée.

(Voir aussi *LFI*, art. 4.2; *Loi n° 1 d'exécution du budget de 2019*, L.C. 2019, c. 29, art. 133 et 140.)

[51]  La troisième considération, celle de la diligence, requiert qu'on s'y attarde. Conformément au régime de la *LACC* en général, la considération de diligence décourage les parties de rester sur leurs positions et fait en sorte que les créanciers n'usent pas stratégiquement de ruse ou ne se placent pas eux-mêmes dans une position pour obtenir un avantage (*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (C.J. Ont. (Div. gén.)), p. 31). La procédure prévue par la *LACC* se fonde sur les négociations et les transactions entre le débiteur et les intéressés, le tout étant supervisé par le juge surveillant et le contrôleur. Il faut donc nécessairement que, dans la mesure du possible, ceux qui participent au processus soient sur un pied d'égalité et aient une compréhension claire de leurs droits respectifs (voir McElcheran, p. 262). La partie qui, dans le cadre d'une procédure fondée sur la *LACC*, n'agit pas avec diligence et en temps utile risque de compromettre le processus et, de façon plus générale, de nuire à l'efficacité du régime de la Loi (voir, p. ex., *North American Tungsten Corp. c. Global Tungsten and Powders Corp.*, 2015 BCCA 390, 377 B.C.A.C. 6 par. 21-23; *Re BA Energy Inc.*, 2010 ABQB 507, 70 C.B.R. (5th) 24; *HSBC Bank Canada c. Bear Mountain Master Partnership*, 2010 BCSC 1563, 72 C.B.R. (5th) 276 par. 11; *Caterpillar Financial Services Ltd. c. 360networks Corp.*, 2007 BCCA 14, 279 D.L.R. (4th) 701, par. 51-52, où les tribunaux se sont penchés sur le manque de diligence d'une partie).

[52]  Nous soulignons que les juges surveillants s'acquittent de leur rôle de supervision avec l'aide d'un contrôleur qui est nommé par le tribunal et dont les compétences et les attributions sont énoncées dans la *LACC* (voir art. 11.7, 11.8 et 23-25). Le contrôleur est un expert indépendant et impartial qui agit comme [TRADUCTION] « les yeux et les oreilles du tribunal » tout au long de la procédure (*Essar*, par. 109). Il a essentiellement pour rôle de donner au tribunal des avis consultatifs sur le caractère équitable de tout plan d'arrangement proposé et sur les ordonnances demandées par les parties, y compris celles portant sur la vente d'actifs et le financement provisoire (voir *LACC*, al. 23(1)d) et i); Sarra, *Rescue! The Companies' Creditors Arrangement Act*, p. 566 et 569).

[…]

[67]  Les tribunaux reconnaissent depuis longtemps que le libellé de l'art. 11 de la *LACC* indique que le législateur a sanctionné « l'interprétation large du pouvoir conféré par la *LACC* qui a été élaborée

2020 QCCS 3218 (CanLII)

17

500-11-057716-199

2020 QCCS 3218 (CanLII)

par la jurisprudence » (*Century Services*, par. 68). L'article 11 est ainsi libellé :

> **Pouvoir général du tribunal**
>
> **11** Malgré toute disposition de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liquidations et les restructurations*, le tribunal peut, dans le cas de toute demande sous le régime de la présente loi à l'égard d'une compagnie débitrice, rendre, sur demande d'un intéressé, mais sous réserve des restrictions prévues par la présente loi et avec ou sans avis, toute ordonnance qu'il estime indiquée.

> Selon le libellé clair de la disposition, le pouvoir conféré par l'art. 11 n'est limité que par les restrictions imposées par la *LACC* elle-même, ainsi que par l'exigence que l'ordonnance soit « indiquée » dans les circonstances.

> [68]    Lorsqu'une partie sollicite une ordonnance relativement à une question qui entre dans le champ de compétence du juge surveillant, mais pour laquelle aucune disposition de la *LACC* ne confère plus précisément compétence, l'art. 11 est nécessairement la disposition à laquelle on peut recourir d'emblée pour fonder la compétence du tribunal. Comme l'a dit le juge Blair dans l'arrêt *Stelco*, l'art. 11 [TRADUCTION] « fait en sorte que la plupart du temps, il est inutile de recourir à la compétence inhérente » dans le contexte de la *LACC* (par. 36).

> (le Tribunal souligne)

[52]    La *LACC* donne donc au juge surveillant la flexibilité nécessaire pour rendre les ordonnances «indiquées» afin de faciliter la restructuration d'une compagnie insolvable.

[53]    La nature des problèmes économiques contemporains commande que des solutions innovatrices soient envisagées et, si elles permettent que les objectifs fondamentaux de la *LACC* soient atteints, au bénéfice de tous, alors elles doivent être entérinées.

[54]    La présente affaire en est un très bel exemple.

## 3.    DÉCISION DU TRIBUNAL

[55]    À la lumière du rapport du contrôleur PricewaterhouseCoopers inc. (le «**Contrôleur**»), intitulé «Tenth Monitor's Report on the Approval of the Proposed Transaction» et daté du 10 septembre 2020 (le «**Rapport**»)[19], de larges extraits étant

---

[19] Pièce P-7.

500-11-057716-199

reproduits ci-après, et à la lumière des témoignages de Jacques Mallette, Thomas Bachand et Christian Bourque, le Tribunal ne peut que conclure que les Débitrices ont agi de bonne foi et avec la diligence voulue, et que l'ordonnance de dévolution inversée demandée par la Demande pour ODI est indiquée dans les circonstances.

[56]    Le Tribunal ne retient pas les motifs avancés par le Créancier Cantore, certains étant énumérés ci-après, afin de tenter de le convaincre de rejeter la Demande pour ODI, d'autant plus que les autres choix sont (i) la réalisation des sûretés détenues par Orion, laquelle patiente déjà depuis plusieurs mois, (ii) la «mise en veilleuse» des Débitrices pour éventuellement refaire un SISP, dans quelques mois, et ce, à un coût très élevé et dans un marché qui a déjà été analysé sous toutes ses coutures, fort incertain et risqué, ou (iii) la faillite des Débitrices, des choix catastrophiques pour tous, employés, créanciers, incluant le Créancier Cantore, fournisseurs, la Communauté Cree et, de façon générale, pour les économies des régions affectées.

[57]    C'est dans un cas comme celui-ci, alors que le Tribunal est satisfait que les facteurs à prendre en considération aux termes de l'article 36 *LACC* sont rencontrés et que les avantages sont, dans les circonstances, évidents, que le juge qui supervise la restructuration et qui a ainsi une vue d'ensemble du dossier et des intérêts de tous, doit exercer son pouvoir discrétionnaire à bon escient et permettre que la solution proposée, peu importe son degré d'innovation et créativité, soit autorisée et entérinée, car elle assure définitivement un meilleur résultat que les autres choix, et ce, pour tous.

[58]    D'ailleurs, devant l'opposition insistante du Créancier Cantore, et ce, malgré les conséquences désastreuses des autres choix, le Tribunal a demandé à son procureur, dans l'éventualité où le prétendu Droit réel *sui generis* Cantore était réglé à sa satisfaction et le règlement convenu alors incorporé dans l'Offre Orion/IQ/Pallinghurst pour approbation par le Tribunal, s'il maintiendrait ses motifs d'opposition à la Demande pour ODI, et sa réponse fut : NON.

[59]    C'est tout dire quant à la légitimité de ses motifs d'opposition à la Demande pour ODI, certains annoncés comme étant «fondamentaux».

## 4.    RAPPORT DU CONTRÔLEUR SUR LES SOUMISSIONS REÇUES

[60]    Tel que mentionné précédemment, le 29 janvier 2020, suite à l'audition non contestée de l'«Amended Application to Approve a Claims Process and a Sale or Investor Solicitation Process» présentée par les Débitrices et visant leurs actifs et entreprises, le Tribunal a rendu l'Ordonnance SISP.

[61]    L'Ordonnance SISP a donc établi les Procédures SISP applicables à toutes les soumissions, lesquelles furent analysées par les Débitrices et le Contrôleur dans ce cadre bien défini.

2020 QCCS 3218 (CanLII)

2020 QCCS 3218 (CanLII)

500-11-057716-199

[62]    Le Rapport du Contrôleur donne un compte rendu des diverses étapes, le tout menant à sa recommandation à l'effet que la Demande pour ODI soit accueillie par le Tribunal.

[63]    D'entrée de jeu, le Contrôleur précise que le Rapport a pour but :

> «[…] to provide a complete overview of the Sale and Investor Solicitation Process (the «**SISP**») leading to the acceptance of the sale proposal submitted by (i) Investissement Québec («**IQ**»), (ii) The Pallinghurst Group (acting through Quebec Lithium Partners (UK) Limited («**QLP**») («**Pallinghurst**», and together with IQ, the «**Sponsors**»), (iii) OMF Fund II (K) Ltd. and OMF Fund II (N) Ltd. (together «**Orion**») and (iv) OMF (Cayman) Co-VII Ltd. («**OMF Cayman**», collectively with the Sponsors and Orion, the «**Bid Group**») (the «**Accepted Bid**» or «**Proposed Transaction**»). The Monitor's report will also provide information on the other bids received as part of the SISP and on the Proposed Transaction.»[20]

[64]    Le Rapport revoit ainsi tout le processus suivi par les Débitrices afin de disposer de leurs actifs et entreprises, par vente ou investissement, à la lumière de l'Ordonnance SISP et des Procédures SISP, et le Tribunal retient, entre autres, les commentaires et constatations suivants du Contrôleur, lesquels furent répétés lors du témoignage de Christian Bourque, responsable du dossier des Débitrices auprès du Contrôleur et corroborés, quant à certains aspects, par Jacques Mallette, président du Conseil d'administration de Nemaska Lithium inc. et par Thomas Bachand de FBN:

> […]
> **C.    OVERVIEW OF THE SISP LEADING TO THE PROPOSED TRANSACTION**
> […]
> 21.    The Monitor is of the opinion that the SISP process that led to the Accepted Bid was conducted in a transparent and fair manner.
> […]
> **E.    STRUCTURE OF THE PROPOSED TRANSACTION**
>
> 26.    The transactions contemplated by the Accepted Bid (collectively, the «**RVO Transaction**») are achieved through a corporate structure consistent with a reverse vesting order («**RVO**») and provide for a reorganization of Nemaska Lithium and its subsidiaries (the «**Nemaska Entities**»).
>
> 27.    The RVO Transaction provides for the acquisition by the Sponsors of the Nemaska Entities' business and assets (other than certain excluded assets and excluded liabilities), by way of a RVO to be sought from the Court, the culmination of which will result in the

---

[20] Rapport, p. 2, parag. 2.

500-11-057716-199

2020 QCCS 3218 (CanLII)

Sponsors acquiring, on a 50-50 basis, all of the issued and outstanding shares of an entity resulting from the amalgamation of the Nemaska Entities («**AmalCo2**»), which will itself emerge from the CCAA proceedings and subsequently be amalgamated with Orion to form the entity that will operate the business of the Debtors («**AmalCo3**», referred to as «**New Nemaska Lithium**»).

28.    As mentioned above, the Bid Group consists of the IQ, Pallinghurst, Orion and OMF Cayman.

29.    The RVO Transaction will also involve: (i) the incorporation of a new entity («**New ParentCo**») to ultimately hold those liabilities that are designated by the Sponsors not to be assumed by New Nemaska Lithium (the «**Excluded Liabilities**»); (ii) the incorporation by New ParentCo of a wholly-owned subsidiary («**ResidualCo**» and collectively with New ParentCo, «**Residual Nemaska Lithium**») which will ultimately hold certain excluded assets (i.e., those assets of the Nemaska Entities that are designed by the Sponsors not to be kept by New Nemaska Lithium) (the «**Excluded Assets**»); and (iii) the exchange of the shares of Nemaska Lithium for common shares of Residual Nemaska Lithium, resulting in Residual Nemaska Lithium becoming a successor reporting issuer.

30.    New Nemaska Lithium will be a private company and will not be a reporting issuer under applicable Canadian securities laws.

31.    The RVO structure will not require the reissuance or transfer of the Nemaska Entities' mining lease, mining claims or environmental permits, which will ensure that the business can be developed on an expedited timeline by New Nemaska Lithium. It allows for all of the permits to stay in place.

32.    Pursuant to the Accepted Bid, substantially all of the current employees of the Nemaska Entities will be retained by New Nemaska Lithium in their current roles and responsibilities in all material respects.

33.    The RVO Transaction is not subject to significant closing conditions, other than (i) the issuance of the RVO and (ii) the completion of required steps provided for under the *Competition Act* (Canada).

34.    The Sponsors intend to invest, from and after closing of the RVO Transaction and subject to the fulfillment of certain conditions and receipt of appropriate approvals, up to $600,000,000 in New Nemaska Lithium (inclusive of amounts paid to OMF Cayman in connection with the transaction) for the financing of the project, comprised of the mine and the electrochemical plant.

500-11-057716-199

**F.    THE ACCEPTED BID** [l'Offre Orion/IQ/Pallinghurst]

[…]

36.    The Accepted Bid is submitted as a credit bid and the full amount of the Orion Secured Claim is used as such by the Bid Group as consideration.

37.    The consideration offered under the Accepted Bid includes (i) the assumption by New Nemaska Lithium of the Orion Secured Claim ($134,500,000); (ii) the assumption by New Nemaska Lithium of the Johnson Matthey Battery Materials Ltd. («**JMBM**») secured claim ($12,000,000); (iii) the assumption of various liabilities and obligation (including the Livent obligations and all of the Debtors' obligations under the Chinuchi Agreement from the closing onwards) and (iv) the transfer to Residual Nemaska Lithium of Nemaska Lithium's cash on hand on closing, subject to certain adjustments (the «**Residual Cash**») and any Excluded Assets.

38.    The Residual Cash is comprised of: (i) the cash still on hand as at the closing date (to be determined and subject to adjustments), the amount of US$7M from the US$20M escrowed funds held in respect of the Livent litigation (plus accrued interest on US$20M), an amount under the Directors and Officers (the «**D&O**») trust of approximately $2M, less (ii) the sum of $12M to be retained by New Nemaska Lithium to cover its assumption of the secured claim of JMBM.

39.    The Excluded Liabilities include, without limiting the liabilities forming part of the Excluded Liabilities, any claim on the part of construction suppliers and sub traders holding a valid legal hypothec against the Debtors' assets.

40.    With respect to JMBM, as a result of the issuance of the RVO and the implementation of the RVO Transaction, the JMBM's secured claim shall be secured only by the movable and immovable assets of Nemaska Lithium P1P Inc. as such assets exist immediately prior to the implementation of the RVO Transaction (including assets in replacement of such assets, as applicable), and only to the same extent that such assets are secured as at that time, with any other encumbrances over assets of the Nemaska Entities, other than the assets of Nemaska Lithium P1P Inc., to be discharged as a result of the RVO Transaction.

41.    The RVO Transaction contemplates that the rights of the Cree parties pursuant to the Chinuchi Agreement will not be affected.

42.    The Accepted Bid specifically provides that the Debtors and the Monitor shall use their commercially reasonable efforts to obtain the RVO and therein a declaration that the Whabouchi mine is conveyed free and clear of all encumbrances, including the alleged

2020 QCCS 3218 (CanLII)

22

2020 QCCS 3218 (CanLII)

500-11-057716-199

claims and rights of Victor Cantore, except for certain permitted encumbrances.

### G. BENEFITS OF THE PROPOSED TRANSACTION FOR STAKEHOLDERS

43. After submission by the Bid Group of their initial Qualified Bid, the Debtors successfully negotiated a higher consideration that eventually led to the Accepted Bid.

44. The RVO Transaction should enable the restart of the project and, therefore, the completion of the Whabouchi mine. By doing so, many creditors will benefit from conducting business with New Nemaska Lithium for the finalization of the mine.

45. Also, the RVO Transaction should allow the retention of substantially all of the current employees.

46. Finally, the RVO Transaction will enable Residual Nemaska Lithium to submit a plan of compromise and arrangement (the «**Plan**») to the Debtors' remaining creditors, excluding claims assumed by New Nemaska Lithium, which will account for the payment in full of the secured claims and will provide a cash pool for the unsecured creditors.

47. The Monitor has considered whether the Accepted Bid would be more beneficial to the Debtors stakeholders than a sale or disposition of assets under a bankruptcy.

48. Given the SISP and the value of the Debtors' assets, the Monitor is of the view that a sale or disposition of assets under a bankruptcy would not result in a better outcome for the Debtors' stakeholders.

49. The estimated amount to be distributed to the unsecured creditors can be illustrated as follows:
[…]
 [between] $14 240 000  [and]  $6 240 000
[…]

### H. CONCLUSION AND RECOMMANDATIONS

50. The Monitor is of the view that the Debtors have canvased [sic] the market since the beginning of 2019, including through the SISP, and that the Proposed Transaction is the best option available in the circumstances. The monitor is also of the view that:

    i.    The aggregate consideration provided under the Proposal Transaction is fair and reasonable in the circumstances; and

500-11-057716-199

2020 QCCS 3218 (CanLII)

ii. There is no evidence to suggest that any viable alternative exists that would allow a better recovery for the Debtors' stakeholders.

51. Accordingly, the Monitor recommends the approval by the Court of the Accepted Bid and the RVO Transaction.

[65]    À la lecture du Rapport, et constatant qu'aucune preuve n'a été présentée pour contredire son contenu, le Tribunal est d'avis, tel que mentionné précédemment, que tous les facteurs prévus à l'article 36(3) *LACC* sont rencontrés à sa satisfaction.

[66]    Tous les efforts raisonnables ont été déployés afin de trouver la meilleure offre dans les circonstances, la seule encore sur la table, et cela fut fait suivant un processus rigoureux, efficace, juste, équitable et transparent, en conformité avec l'Ordonnance SISP et les Procédures SISP.

[67]    Tel qu'expliqué ci-haut, les autres choix seraient catastrophiques, pour tous, y inclus le Créancier Cantore.

## 5.    MOTIFS D'OPPOSITION DU CRÉANCIER CANTORE

[68]    Le Créancier Cantore a soulevé plusieurs motifs pour tenter de convaincre le Tribunal qu'il ne devrait pas autoriser l'Offre Orion/IQ/Pallinghurst et que le Tribunal devrait donc refuser la Demande pour ODI.

[69]    Par contre, tel que déjà mentionné, si le prétendu Droit réel *sui generis* Cantore était réglé à la satisfaction du Créancier Cantore et le règlement convenu incorporé dans l'Offre Orion/IQ/Pallinghurst soumise pour l'approbation du Tribunal aux termes de la Demande pour ODI, alors le Créancier Cantore ne maintiendrait plus ses motifs d'opposition.

[70]    Nonobstant cela, le Tribunal revoit et commente ci-après, quoique brièvement, certains de ces motifs, lesquels sont inclus, soit dans l'«Objecting Party's Argument Brief» du 6 octobre 2020, soit dans la «Re-Modified and Restated Contestation of Nemaska's Approval Application» du 30 septembre 2020.

### 5.1    There is no authority to grant a vesting order in respect of anything other than a sale or disposition of assets

[71]    Le Tribunal est d'avis que les termes «disposer, notamment par vente, d'actifs hors du cours ordinaire de ses affaires» / «sell or otherwise dispose of assets outside the ordinary course of business» de l'article 36(1) *LACC* permettent un grand éventail d'actes et modes de disposition, incluant, en partie ou en totalité, par voie de «dévolution inversée», une solution innovatrice, à être analysée au cas par cas.

[72]    L'article 36(1) *LACC* ne comporte aucune restriction à cet égard.

24

500-11-057716-199

[73]    Sortir des sentiers battus n'est pas contre-indiqué, au contraire, surtout lorsque cela permet de meilleurs résultats.

[74]    D'ailleurs, dans l'Affaire *Callidus*, la Cour suprême mentionne ce qui suit quant au pouvoir discrétionnaire général du Tribunal prévu à l'article 11 *LACC* :

> «[…] le pouvoir conféré par l'art. 11 n'est limité que par les restrictions imposées par la *LACC* elle-même, ainsi que par l'exigence que l'ordonnance soit « indiquée » dans les circonstances.»[21]

[75]    Dans la présente affaire, la solution d'une «dévolution inversée», efficace et rapide, n'affecte pas le résultat final pour les créanciers des Débitrices, au contraire, elle l'améliore.

[76]    En effet, le maintien des permis, licences et autorisations existants et des contrats essentiels à l'exploitation des entreprises, et l'utilisation possible des divers attributs fiscaux disponibles[22], ont facilité l'obtention de concessions de la part des Offrants, et confirmées par le Contrôleur, ce qui devrait permettre qu'une distribution plus importante soit éventuellement effectuée au bénéfice des créanciers des Débitrices.

[77]    La vente n'est pas la structure proposée dans l'Offre Orion/IQ/Pallinghurst, elle prévoit plutôt une structure de «dévolution inversée», laquelle doit, soit être approuvée telle que soumise, soit être refusée par le Tribunal, chacun devant tirer ses propres conclusions de la décision à venir et en assumer les conséquences.

[78]    Parallèlement, la purge des droits réels prévue à l'article 36(6) *LACC* aide à la mise en œuvre d'une solution envisagée et autorisée aux termes des articles 36(1) et (3) *LACC*, autrement, les détenteurs de droits réels bénéficieraient d'un droit de veto sur toute telle solution, ce qui serait inacceptable, et ce, même lorsque des actifs ne sont pas effectivement transférés à l'extérieur du patrimoine d'une compagnie débitrice, comme dans la présente affaire.

[79]    Dans la mesure où la solution envisagée permet un meilleur résultat pour tous, et même l'améliore, il n'y a pas de raison pour que la purge des droits réels prévue à l'article 36(6) LACC ne puisse s'appliquer.

**5.2    The Proposed Transaction and RVO are impermissible under the CCAA because they permit the Debtor Entities to emerge from CCAA protection outside the confines of a plan of arrangement**

---

[21] *Supra*, note 16, paragr. [67]
[22] Pièce P-8A Y.

2020 QCCS 3218 (CanLII)

500-11-057716-199

[80]   Le Tribunal est d'avis qu'un recul s'impose lors de l'analyse d'une transaction comportant une structure de «dévolution inversée», telle que celle de l'Offre Orion/IQ/Pallinghurst, afin de la considérer dans son ensemble (*the global picture*).

[81]   Il ne faut pas chercher à décortiquer et analyser chacune des étapes et composantes d'une telle transaction afin d'y trouver, pour chacune d'elles, une assise légale aux termes de la *LACC*, tel que le fait le Créancier Cantore.

[82]   Procéder ainsi ne fait que restreindre sérieusement, et à mauvais escient, l'éventail de solutions innovatrices permettant de faire face aux problèmes commerciaux et sociaux contemporains, de plus en plus complexes.

[83]   Cet exercice requiert une grande flexibilité et, plus souvent que jamais, il permet d'accroître les bénéfices pour les parties intéressées, alors qu'un formalisme rigide devient un carcan qui limite sérieusement les choix et, plus souvent que jamais, au détriment des parties intéressées.

[84]   À preuve, refuser la seule offre sur la table suite au SISP, soit l'Offre Orion/IQ/Pallinghurst, et ce, après plus de 18 mois au total de démarchage, signifierait, tel que déjà mentionné, (i) la réalisation des sûretés détenues par Orion, (ii) la «mise en veilleuse» des Débitrices à un coût très élevé et sans aucune assurance qu'une meilleure offre puisse être obtenue dans plusieurs mois d'ici, surtout pas dans le contexte économique actuel, fort incertain et risqué, ou (iii) la faillite des Débitrices, entraînant, dans tous les cas, des conséquences catastrophiques pour les créanciers, les employés, les fournisseurs, la Communauté Cree et les régions affectées.

[85]   Par ailleurs, les créanciers des Débitrices n'ont pas à voter sur une demande aux termes de l'article 36 *LACC*, laquelle n'est soumise qu'à l'approbation du Tribunal, qui prend alors en considération, entre autres, les facteurs énumérés à l'article 36(3) *LACC*.

[86]   Tel que déjà mentionné, l'Offre Orion/IQ/Pallinghurst ne constitue pas un plan d'arrangement soumis au vote des créanciers des Débitrices.

[87]   En temps et lieu, fort probablement une fois que les Étapes de la transaction proposée aux termes de l'Offre Orion/IQ/Pallinghurst auront été complétées, New ParentCo et ResidualCo seront alors en mesure de soumettre un plan d'arrangement aux créanciers restants des Débitrices, et ils voteront à ce moment-là sur ce qui leur sera proposé.

**5.3    The Proposed Transaction contravenes the SISP Order on the basis that it is neither a Sale Proposal nor an Investment Proposal pursuant to the terms of the SISP Order**

[88]   L'Offre Orion/IQ/Pallinghurst est une proposition de transaction «hybride» et, aux termes de l'Ordonnance SISP et des Procédures SISP, les Débitrices et le Contrôleur

2020 QCCS 3218 (CanLII)

500-11-057716-199

bénéficiaient de la latitude nécessaire[23] afin de considérer et prévoir des modifications appropriées aux circonstances, d'autant plus qu'il n'y avait plus qu'une seule offre sur la table, le tout sujet à l'autorisation ultime du Tribunal, d'où la Demande pour ODI.

[89]    L'Ordonnance SISP et les Procédures SISP accordent ainsi la flexibilité nécessaire afin de trouver des solutions innovatrices à des problèmes sociaux et économiques contemporains, tel que discuté précédemment.

[90]    Il n'était pas nécessaire que les Débitrices et le Contrôleur s'adressent au Tribunal à chaque fois qu'une modification aux termes et conditions des Procédures SISP était envisagée et, dans les circonstances, il était préférable que cela soit fait à l'étape de la Demande pour ODI.

### 5.4    The Proposed Transaction and RVO contravenes applicable securities laws

[91]    Le procureur du Créancier Cantore a fait grand état du fait que la transaction proposée par l'Offre Orion/IQ/Pallinghurst ne respecterait pas certaines des dispositions du *Règlement 61-101 sur les mesures de protection des porteurs minoritaires lors d'opérations particulières* de la *Loi sur les valeurs mobilières*[24], ce que contestent vigoureusement les Débitrices.

[92]    À tout événement, le Tribunal ne croit pas approprié d'élaborer sur ce sujet, surtout à la lumière du courriel[25] reçu le 7 octobre 2020 15 :15 par Me Patrick Boucher de M. Patrick Théorêt de l'Autorité des Marchés Financiers, à l'effet suifant :

> «[…]
> Je te confirme que nous n'avons pas d'objection avec votre interprétation du Règlement 61-101 dans le contexte de l'opération projetée. Nous n'interviendrons pas à la Cour sur ce point.
>
> Nous comprenons par ailleurs que la demande de dispense des obligations d'information continue de NMX Debtor (tel que ce terme est défini dans le projet du «vesting order» déposé en Cour) faite à la Cour sera retirée du paragraphe 44 de la procédure.
> […]«

### 5.5    New ParentCo and ResidualCo cannot avail themselves of the CCAA

[93]    Le Créancier Cantore met énormément d'emphase sur le moment précis où les deux filiales nouvellement créées par la débitrice Nemaska Lithium inc., soit New

---

[23] Pièce P-1, voir, entre autres, les paragr. 1.5, 6.6, 11.2, 12.4. 12.9 et 17.2 des «SISP Procedures» jointes à titre de d'Annexe A à l'Ordonnance SISP.
[24] RLRQ, c. V-1.1, art. 331.1, r. 33.
[25] Pièce P-14.

2020 QCCS 3218 (CanLII)

500-11-057716-199

ParentCo et ResidualCo, deviendront insolvables et pourront alors bénéficier du régime de la *LACC*, soit à l'intérieur des quelques jours que durera la séance de clôture de la transaction résultant de l'Offre Orion/IQ/Pallinghurst, et donc après l'obtention de l'ODI du Tribunal.

[94]    Évidemment, tout ne peut pas être fait en même temps et, avant de débuter la séance de clôture de l'Offre Orion/IQ/Pallinghurst, encore faut-il que le Tribunal l'ait autorisée.

[95]    Tel que mentionné précédemment, un recul s'impose afin de considérer la transaction dans son ensemble (*the global picture*), en ayant toujours à l'esprit la Toile de fond, et ne pas chercher à analyser une étape précise, séparément des autres, aux fins d'identifier une assise légale la justifiant aux termes de la *LACC*.

[96]    À tout événement, le recours à la *LACC* est permis lorsqu'une insolvabilité est imminente[26], ce qui est définitivement le cas pour ces deux filiales, New ParentCo et ResidualCo, et ce, à la lumière de la vue d'ensemble des Étapes de la transaction projetée.

## 5.6    The Proposed transaction is an impermissible disguised substantive consolidation of the estates of the Debtors

[97]    Le Créancier Cantore a longtemps argumenté que les Débitrices n'avaient pas obtenu l'autorisation préalable du Tribunal pour présenter un plan «consolidé».

[98]    Or, la Demande pour ODI ne constitue nullement une demande d'approbation d'un plan «consolidé», mais constitue plutôt une demande d'approbation de l'Offre Orion/IQ/Pallinghurst, laquelle fut retenue par les Débitrices suite à l'obtention de l'Ordonnance SISP, incluant les Procédures SISP, et suivant le cadre et les instructions qui y sont inclus.

[99]    Tel que mentionné précédemment, l'Ordonnance SISP et les Procédures SISP visaient tous les actifs des Débitrices, sans distinction, dans un tout ou séparément, et permettaient donc aux soumissionnaires de présenter des offres comprenant tous les actifs des Débitrices, ou une partie seulement.

## 5.7    The release in favour of the directors and officers of the Debtors pursuant to the Proposed Transaction should not be authorized

[100] L'Offre Orion/IQ/Pallinghurst comprend une quittance générale au bénéfice, entre autres, des administrateurs et dirigeants des Débitrices.

---

[26] *Stelco Inc., Re*, 2004 CanLII 24933 (ON SC), paragr. 21, 25 et 26, Farley J. (permission d'en appeler à la CA refusée, 2004 CarswellOnt 2936 et permission d'en appeler à la CSC refusée, 2004 CarswellOnt 5200; voir aussi art. 3 *LACC*.

2020 QCCS 3218 (CanLII)

500-11-057716-199

[101]   Le Créancier Cantore, aussi actionnaire de la débitrice Nemaska Lithium inc., et l'actionnaire Brian Shenker se sont opposés à ce qu'une telle quittance soit autorisée par le Tribunal à ce stade-ci, et ils ont demandé que le débat sur ce sujet soit reporté au jour du dépôt du plan d'arrangement à venir.

[102]   Essentiellement, ces actionnaires ont l'intention de poursuivre, entre autres, les administrateurs et dirigeants des Débitrices au motif de leur comportement relié à certains événements.

[103]   Cette quittance générale demandée fait partie de l'Offre Orion/IQ/Pallinghurst et les Offrants l'ont incluse pour leurs propres raisons.

[104]   Il ne revient pas au Tribunal de leur ordonner de l'exclure, mais le Tribunal ne peut que constater qu'ils ont effectivement prévu une exception, reproduite dans le projet d'ODI soumis au Tribunal, soit :

> «[41]    […] provided that nothing in this paragraph shall waive, discharge, release, cancel or bar any claim against the Directors (as this term is defined in the Initial Order) of the Debtors that is not permitted to be released pursuant to section 5.1(2) of the CCAA.»

[105]   Or, l'article 5.1(2) *LACC* est à l'effet suivant :

> La transaction ne peut toutefois viser des réclamations portant sur des droits contractuels d'un ou de plusieurs créanciers ou fondées sur la fausse représentation ou la conduite injustifiée ou abusive des administrateurs.

[106]   Le Tribunal est d'avis que cette exception protège adéquatement les actionnaires à l'égard des administrateurs et dirigeants des Débitrices et il n'y a pas lieu d'élaborer davantage sur ce sujet.

### 5.8    The Court should not authorize the transfer of the Excluded Liabilities, the Agreement and/or the NSR Royalty to New ParentCo

[107]   Ce transfert fait partie de l'Offre Orion/IQ/Pallinghurst et de l'ensemble de la transaction projetée, et il n'y a pas lieu de l'analyser isolement, afin d'en décortiquer toutes les facettes.

[108]   À tout événement, dans le cadre d'une demande telle que celle de la Demande pour ODI, le Tribunal a le pouvoir nécessaire, après s'être satisfait que les critères de l'article 36(3) sont respectés, d'ordonner que ce transfert soit effectué, sans le consentement du Créancier Cantore, ou de tout autre créancier relativement à un contrat à être transféré, autrement le créancier concerné bénéficierait d'un droit de veto sur la transaction projetée, ce qui serait inacceptable.

2020 QCCS 3218 (CanLII)

500-11-057716-199

[109]   Dans le cadre de l'insolvabilité des Débitrices, le résultat global de la transaction projetée avec les Offrants est à l'avantage de tous, comparativement aux conséquences des autres choix mentionnés précédemment.

[110]   Certes, le Créancier Cantore souhaiterait que l'Entente prévoyant le paiement de la Royauté NSR soit entièrement protégée, sans aucune conséquence négative pour lui, mais le Tribunal ne peut pas accepter qu'il en soit ainsi, car cela signifierait l'échec de la transaction prévue dans l'Offre Orion/IQ/Pallinghurst.

[111]   Par ailleurs, le Créancier Cantore fait un parallèle entre le traitement qui lui est réservé et celui prévu par les Offrants pour le créancier garanti Johnson Matthew Battery Materials Ltd., et il voudrait qu'il en soit ainsi pour lui.

[112]   Les Offrants ont leurs propres raisons commerciales pour qu'il en soit ainsi avec ce créancier garanti et il ne revient pas au Tribunal à faire en sorte que tous les créanciers des Débitrices soient traités également dans l'Offre Orion/IQ/Pallinghurst.

[113]   Tel qu'expliqué précédemment, le Créancier Cantore est amplement protégé par ce qui a été convenu avec les Offrants quant au débat à venir sur son prétendu Droit réel *sui generis* Cantore.

[114]   S'il réussit à établir la validité de ce droit, alors certains des actifs acquis par les Offrants seront sujets à ce droit, et s'il ne réussit pas, il bénéficiera alors d'un droit personnel, lequel sera traité par les Débitrices comme tout autre droit personnel d'un créancier ordinaire des Débitrices non retenu par les Offrants dans le cadre de l'Offre Orion/IQ/Pallinghurst.

### 5.9   The Proposed transaction is not fair and reasonable

[115]   Tel qu'abordé à plusieurs occasions ci-haut, il ne fait aucun doute pour le Tribunal que l'Offre Orion/IQ/Pallinghurst est juste et raisonnable et qu'elle doit être acceptée telle que déposée, et ce, dans les meilleurs délais.

[116]   Depuis plusieurs mois, le Tribunal a été à même de constater tous les efforts déployés par les Débitrices afin de sauver leurs entreprises et, après de sérieuses démarches et un SISP mis en œuvre rigoureusement et en conformité avec l'Ordonnance SISP et les Procédures SISP, l'Offre Orion/IQ/Pallinghurst est la seule sur la table, et elle permet de redémarrer les opérations «épurées» des Débitrices, avec tout ce que cela comporte de positif au plan économique.

[117]   La refuser serait catastrophique!

### 5.10   The Monitor's commitment to use «commercially reasonable efforts to obtain the RVO» and other stipulations of the successful bid compromise the integrity of the SISP

2020 QCCS 3218 (CanLII)

500-11-057716-199

[118]   À plusieurs égards, le Créancier Cantore a mis en doute l'intégrité et l'impartialité du Contrôleur.

[119]   Le Tribunal rejette toutes les allégations à cet égard du Créancier Cantore, lesquelles sont totalement non fondées.

[120]   Il s'agit ici aussi d'une autre démonstration que le Créancier Cantore fait flèche de tout bois en référant à certains termes utilisés et à certains engagements pris par le Contrôleur dans le cadre des négociations avec les Offrants, ou autrement, afin d'amener le Tribunal à conclure comme il le souhaiterait.

[121]   Le Tribunal a eu plusieurs occasions de constater le haut professionnalisme du Contrôleur, sa rigueur et sa diligence. Le Tribunal était périodiquement tenu au courant de l'évolution du dossier, et le Contrôleur a toujours clairement répondu aux questions que le Tribunal pouvait lui poser de temps en temps.

[122]   Aucun événement, aucun fait, aucun geste ne permet au Tribunal de conclure qu'il n'en a pas été ainsi. Le Contrôleur s'est très bien déchargé de ses responsabilités dans le cadre de l'Ordonnance SISP et des Procédures SISP.

[123]   De plus, vu sa connaissance approfondie du dossier, il est définitivement approprié que le Contrôleur puisse jouer un rôle actif dans la mise en œuvre de certaines des étapes de la transaction prévue dans l'offre Orion/IQ/Pallinghurst.

[124]   Cela facilitera et permettra un dénouement plus rapide, et le Tribunal l'approuve.

## 6.    CONCLUSION ET JUGEMENT EXÉCUTOIRE NONBSTANT APPEL

[125]   Le Tribunal accueillera donc la Demande pour ODI suivant ses conclusions et suivant le projet qui lui a été soumis à cette fin.

[126]   Aussi, et tel que mentionné à plusieurs reprises ci-haut, il est urgent que l'Offre Orion/IQ/Pallinghurst soit approuvée et mise en œuvre dans les meilleurs délais, les Offrants n'ayant pas à subir davantage des délais que le Tribunal considère injustifiés dans les présentes circonstances.

[127]   En plus de nuire aux Offrants, tout délai additionnel nuit aux Débitrices, à leurs employés et fournisseurs, à leurs créanciers, à la Communauté Cree et aux économies des régions affectés par cette situation.

[128]   Par conséquent, le présent jugement et l'ordonnance de «dévolution inversée» qui y est jointe seront exécutoires immédiatement nonobstant appel et sans qu'il soit nécessaire de fournir quelque caution que ce soit.

**POUR CES MOTIFS, LE TRIBUNAL :**

500-11-057716-199

[129]  **ACCUEILLE** l'«Application Seeking Leave to Enter into the Orion/IQ/Pallinghurst Transaction with Issuance of an Approval and Vesting Order and Ancillary Relief» des Débitrices;

[130]  **REJETTE** la «Re-Modified and Restated Contestation of Nemaska's Approval Application» du Créancier Cantore;

[131]  **REND** l'ordonnance de «dévolution inversée» jointe au présent jugement et intitulée «Approval and Vesting Order»;

[132]  **DÉCLARE** le présent jugement et ladite ordonnance de «dévolution inversée» sont exécutoires immédiatement nonobstant appel et sans qu'il soit nécessaire de fournir quelque caution que ce soit;

[133]  **LE TOUT** avec les frais de justice.

_____
**LOUIS J. GOUIN, J.C.S.**

Mes Patrick Boucher, Gabriel Faure, Gabrielle Groulx-Maurer, Karine Joizil, Pascale Klees-Themens, Alain Tardif et François Alexandre Toupin
McCarthy Tétrault
Procureurs des Débitrices

Mes Jean Fontaine et Nathalie Nouvet
Stikeman Elliott
Procureurs du Contrôleur

Me Dimitri Maniatis
Accent Legal inc.
Procureur de Victor Cantore

Mes David Bish, Marie-Ève Gingras et Christopher Richter
Torys
Procureurs de Orion

Me Luc Morin
Norton Rose Fulbright
Procureurs de Investissement Québec

Mes Denis Ferland et Hannah Toledano
Davies Ward Phillips & Vineberg
Procureurs de Pallinghurst

2020 QCCS 3218 (CanLII)

500-11-057716-199

Mes François D. Gagnon et Kevin Mailloux
Borden Ladner Gervais
Procureurs de FMC Lithium USA Corp.

Mes Puya Fesharaki et Robert Thornton
TGF
Procureurs de Brian Shenker

Dates d'audition :    21, 24, 25 et 28 septembre et 1, 2, 6, 7 et 8 octobre 2020

2020 QCCS 3218 (CanLII)

**Arrangement relatif à Nemaska Lithium inc.**                    **2020 QCCA 1488**

# COURT OF APPEAL

CANADA
PROVINCE OF QUEBEC
REGISTRY OF MONTREAL

No:       500-09-029177-201, 500-09-029190-204
          (500-11-057716-199)

DATE:     November 11, 2020

_____

**BEFORE  THE HONOURABLE  GENEVIÈVE MARCOTTE, J.A.**

_____

*IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT OF*:

**Nº : 500-09-029177-201**

**VICTOR CANTORE**
        APPLICANT – Objecting Party
v.

**NEMASKA LITHIUM INC.**
and
**NEMASKA LITHIUM WHABOUCHI MINE INC.**
and
**NEMASKA LITHIUM SHAWINIGAN
TRANSFORMATION INC.**
and
**NEMASKA LITHIUM P1P INC.**
and
**NEMASKA LITHIUM INNOVATION INC.**
        RESPONDENTS –   Debtors
and
**PRICEWATERHOUSECOOPERS INC.**
        IMPLEADED PARTY – Monitor
and
**INVESTISSEMENT QUÉBEC**
and
**THE PALLINGHURST GROUP**
and
**OMF FUND II (K) LTD.**

2020 QCCA 1488 (CanLII)

2020 QCCA 1488 (CanLII)

**OMF FUND II (N) LTD.**
and
**FMC LITHIUM USA CORP.**
and
**BRIAN SHENKER**
        IMPLEADED PARTIES – Impleaded parties

---

*IN THE MATTER OF THE PLAN OF COMPROMISE OR ARRANGEMENT OF*:

Nº : <u>**500-09-029190-204**</u>

**BRIAN SHENKER**
        APPLICANT – Impleaded party
v.

**NEMASKA LITHIUM INC.**
and
**NEMASKA LITHIUM WHABOUCHI MINE INC.**
and
**NEMASKA LITHIUM SHAWINIGAN
TRANSFORMATION INC.**
and
**NEMASKA LITHIUM P1P INC.**
and
**NEMASKA LITHIUM INNOVATION INC.**
        RESPONDENTS – Debtors
and
**PRICEWATERHOUSECOOPERS INC.**
        IMPLEADED PARTY – Monitor
and
**INVESTISSEMENT QUÉBEC**
and
**THE PALLINGHURST GROUP**
and
**OMF FUND II (K) LTD.**
**OMF FUND II (N) LTD.**
and
**FMC LITHIUM USA CORP.**
        IMPLEADED PARTIES – Impleaded parties
and
**VICTOR CANTORE**
        IMPLEADED PARTY – Opposing creditor

2020 QCCA 1488 (CanLII)

---

## JUDGMENT

---

[1]    I am tasked with the determination of two applications for leave to appeal of a judgment rendered on October 15, 2020 by the Superior Court of Québec, district of Montreal (the honourable Louis J. Gouin) which approved a transaction and issued a reverse vesting order pursuant to sections 11 and 36 of the *Companies' Creditors Arrangement Act (CCAA)*.[1]

[2]    The CCAA proceedings were commenced in December 2019 with respect to the debtor companies (the "Nemaska entities") which are involved in the development of a lithium mining project in Quebec

[3]    In January 2020, the CCAA judge approved an uncontested sale or investment solicitation process (« SISP ») which led to the acceptance of an offer submitted by impleaded parties Investissement Québec, the Pallinghurst Group and OMG Fund II (K) Ltd. and OMG Fund II (N) Ltd (« Orion »), in the form of a bid that was made subject to the condition that a reverse vesting order (RVO) be issued.

[4]    The proposed RVO provides for the acquisition by the impleaded parties of the shares of Nemaska entities free and clear of the claims of creditors which are transferred along with unwanted assets[2] to a newly incorporated non-operating company, as part of a pre-closing reorganization.

[5]    The RVO allows the purchaser to continue to carry on the operations of the Nemaska entities in a highly regulated environment by maintaining their existing permits, licences, authorizations, essential contracts and fiscal attributes. It is essentially a credit bid whereby the shares of the Nemaska entities are acquired in return for the assumption of the secured debt[3].

---

[1]    R.S.C., 1985, c. C-36.

[2]    They essentially consist of residual cash defined as follows in the Accepted bid:

> 38.   The Residual Cash is comprised of: (i) the cash still on hand as at the closing date (to be determined and subject to adjustments), the amount of US$7M from the US$20M escrowed funds held in respect of the Livent litigation (plus accrued interest on US$20M), an amount under the Directors and Officers (the «**D&O**») trust of approximately $2M, less (ii) the sum of $12M to be retained by New Nemaska Lithium        to cover its assumption of the secured claim of JMBM.

[3]    The Accepted bid provides for the following consideration:

> 36.   The Accepted Bid is submitted as a credit bid and the full amount of the Orion Secured Claim is used as such by the Bid Group as consideration.

2020 QCCA 1488 (CanLII)

[6]    Applicant Victor Cantore (Cantore) is a shareholder of Nemaska and a creditor of royalties (a 3% net smelter return royalty on all metals), following the sale of his original mining titles to the Nemaska entities in 2009.

[7]    Cantore filed an application to have the Court recognize his "*bene esse* real rights" on the mining titles which the parties agreed to debate at a later date and have temporarily carved out of the proposed RVO.

[8]    Cantore nonetheless formally objected to the approval of the RVO, raising multiple grounds of contestation, including the CCAA judge's lack of authority to grant a vesting order for anything other than a sale or disposition of assets, the impossibility under the CCAA for debtor companies to emerge from CCAA protection outside a compromise or arrangement, the violation of securities laws and the improper release stipulated in favour of directors and officers without prior approval from creditors.

[9]    Applicant Brian Shenker ("Shenker") is a shareholder of Nemaska Lithium Inc. Along with other shareholders, he filed an *Application to declare certain claims as exempt and to permit the filing of certain claims in late September 2020*, namely against Nemaska entities' directors and officers for negligent misrepresentations.

[10]   While the application had not been heard by the CCAA judge at the time of the approval hearing, Shenker was allowed to make oral submissions regarding the granting of releases in favour of the directors and officers in the context of the proposed RVO.

[11]   Notwithstanding the Cantore objections and the Shenker representations, the CCAA judge approved the RVO following a 9 day hearing.

[12]   In his reasons, the CCAA judge reviewed the context of the transaction in detail and insisted on the purpose and efficiency of the RVO to maintain the going concern operations of the debtor companies, while also emphasizing that it is not up to the courts to dictate the terms and conditions to be included in the offer which stems from the uncontested SISP order.

---

37.  The consideration offered under the Accepted Bid includes (i) the assumption by New Nemaska Lithium of the Orion Secured Claim ($134,500,000); (ii) the assumption by New Nemaska Lithium of the Johnson Matthey Battery Materials Ltd. («**JMBM**») secured claim ($12,000,000); (iii) the assumption of various liabilities and obligation (including the Livent obligations and all of the Debtors' obligations under the Chinuchi Agreement from the closing onwards) and (iv) the transfer to Residual Nemaska Lithium of Nemaska Lithium's cash on hand on closing, subject to certain adjustments (the «**Residual Cash**») and any Excluded Assets.

2020 QCCA 1488 (CanLII)

[13]  He also reiterated that the approval of the RVO pursuant to s. 36 CCAA is subject to determining:

- Whether sufficient efforts to get the best price have been made and whether the parties acted providently;

- The efficacy and integrity of the process followed;

- The interests of the parties; and

- Whether any unfairness resulted from the process.[4]

[14]  He considered that these criteria had been met and found the issuance of the RVO to be a valid use of his discretion, insisting that it would serve to maximize creditor recoveries while maintaining the debtor companies as a going concern and allowing an efficient transfer of the necessary permits, licences and authorizations to the purchaser.

[15]  In coming to this conclusion, the CCAA judge relied extensively on the principles recently set out by the Supreme Court in the matter of *9354-9186 Quebec inc. c. Callidus Capital Corp.*[5] namely:

1. The evolution of CCAA proceedings and the important role of the CCAA supervising judge;

2. The remedial objectives of Canadian insolvency laws to provide timely, efficient and impartial resolution of a debtor's insolvency, preserve and maximize the value of a debtor's assets, ensure fair and equitable treatment of the claims against a debtor, protect the public interest, and balance the costs and benefits of restructuring or liquidating the debtor company;

3. The priority afforded by the CCAA to « "avoid [ing] the social and economic losses resulting from the liquidation of an insolvent company" by facilitating the reorganization and survival of the pre-filing debtor company, as a going concern;

4. The CCAA judge's wide discretion pursuant to s. 11 of the CCAA with a view to furthering the remedial objectives of the CCAA while keeping in mind three "baseline considerations," which the applicant has the burden of demonstrating: (1) that the order sought is appropriate in the circumstances, and (2) that the applicant has been acting in good faith and (3) with due diligence.

---

4    *AbitibiBowater inc. (Arrangement relatif à)*, 2010 QCCS 1742, para.34-35.
5    *9354-9186 Quebec inc. c. Callidus Capital Corp.[Callidus],* 2020 CSC 10, para. 38-52, 67-68.

2020 QCCA 1488 (CanLII)

[16]  After reviewing the Monitor's report and uncontradicted testimony, the CCAA judge dismissed the Cantore objections and concluded that the Nemaska entities had acted in good faith and with the required diligence, and that the approval of the RVO was the best possible outcome in light of the alternatives, being : (i) the realization of the rights held by secured creditors, (ii) the suspension of the restructuring process to attempt a new SISP at a high cost with an uncertain outcome in an uncertain market that had previously been thoroughly canvassed and had led to a single acceptable bid, or (iii) the bankruptcy of the debtor companies.

[17]  He underlined the catastrophical impact of these alternatives on all stakeholders being the employees, creditors, suppliers, the Cree community and local economies.

[18]  As far as the various arguments raised by Cantore are concerned, the CCAA judge pointed out that his attorney had conceded that his client would not have continued to oppose the RVO if his *sui generis* rights had been settled and incorporated into an offer to be approved by the Court.

[19]  The CCAA judge dismissed Cantore's argument regarding the Court's limited authority to grant a vesting order, stating that the terms « *Sell or otherwise dispose of assets outside the ordinary course of business* » under subsection 36 (1) CCAA should be broadly interpreted to allow a CCAA judge to grant innovative solutions such as RVOs on a case by case basis, in accordance with the wide discretionary powers afforded the supervising judge pursuant to section 11 CCAA, as recognized by the Supreme Court in *Callidus*.[6]

[20]  He insisted that this would be particularly appropriate, where the proposed RVO brings an outcome to creditors more favourable than the alternatives and where available tax attributes contribute to significantly improve the offer, to eventually bring a greater distribution to the creditors.

[21]  The CCAA judge also insisted on the fact that the expungement of real rights was contemplated by subsection 36(6) and was a necessary condition to the implementation of a solution, and served to prevent a veto on the part of the holders of those real rights.

[22]  The CCAA judge further held that the offer did not constitute a plan of arrangement subject to prior creditor approval and that the residual companies would be submitting a plan of arrangement to the remaining creditors for a vote once the first step, being the acquisition of the Nemaska shares by the impleaded parties, is accomplished.

[23]  He dismissed the argument of a potential violation of the applicable securities laws, insisting on the fact that the issue had become moot, given the written confirmation obtained from a representative of the Autorité des marchés financiers that

---

[6]    See Supra note 5.

they would not object to the interpretation of *Regulation 61-101 respecting Protection of Minority Security Holders in Special Transactions*[7] proposed in the context of the RVO.

[24]  He dismissed the argument related to an « impermissible disguised substantive consolidation » of the Nemaska entities and the alleged lack of approval of a consolidation plan, insisting on the fact that the offer had been made by the impleaded parties in response to a SISP process which had not been contested and clearly contemplated the purchase of all or part of the assets of the debtor companies.

[25]  Additionally, the CCAA judge held that the release in favour of the directors and officers of the debtor companies contained in the RVO was qualified in such a manner so as to protect the rights of shareholders and creditors whose claim is based on Section 5.1 (2) of the CCAA.

[26]  Moreover, he concluded that Cantore's sui generis real rights were being fully protected by the reserve set out under the RVO and he dismissed his proposition that the proposed transaction was not fair and reasonable or that the Monitor had acted in a partial or improper manner, given the serious efforts put forward to salvage the operations of the companies, the rigorous SISP process carried out and the fact that the offer at issue was the only acceptable and serious bid received and that it allowed the mining project operations to resume.

[27]  Lastly, he insisted on the urgency to approve the RVO and the fact that that any additional delay would work to the detriment of the impleaded parties as well as the debtor companies, their employees and suppliers, the Cree community and their local economies.

[28]  In the applications for leave to appeal, Applicants Cantore and Shenker both argue that the CCAA judgment is flawed, in that the CCAA judge did not have the power to approve a transaction which is structured in such manner as to allow the debtor companies to emerge from CCAA protection free and clear of their pre-filing obligations outside the confines of a plan of compromise or arrangement and without the benefit of an approval by the required majority of creditors.

[29]  Both Applicants add that the CCAA judge also erred in approving the broad releases in favour of third parties, including the directors and officers, outside the context of a plan of arrangement and without first determining whether they were fair, reasonable and necessary to the restructuring and whether they could prejudice creditor rights.

---

[7]    V-1.1, r. 33.

2020 QCCA 1488 (CanLII)

[30]  In addition Cantore raises essentially the same arguments which were previously dismissed by the CCAA judge, being that:

> 1.  The pre-filing obligations were essentially "novated" by the Court and consolidated (without prior determination of the need for such consolidation), and were illegally transferred to third parties without prior creditor consent;

> 2.  The CCAA judge erred in law by approving the transaction and issuing the RVO on the basis of evidence given by the Monitor who was not neutral nor impartial;

> 3.  The CCAA judge focused exclusively on the outcome of the proposed transaction which he qualified to be the "best and only alternative available in the circumstances", while failing to give any meaningful consideration to creditor rights.

> 4.  The CCAA judge approved a transaction that violates applicable securities law, more precisely the minority shareholder approval requirements.

> 5.  The CCAA erred in granting provisional execution and failed to support this order with sufficient reasons relating to the nature and the extent of the harm which could be suffered.

[31]  In order to obtain leave to appeal a judgment pursuant to section 13 CCAA, the Applicants must demonstrate that they satisfy the following four-pronged test in that:

> 1.  The point on appeal is of significance to the practice;

> 2.  The point is of significance to the action or proceedings;

> 3.  The appeal is prima facie meritorious;

> 4.  The appeal will not unduly hinder the progress of the proceedings[8].

[32]  Such leave is only granted sparingly given the nature of the powers afforded the CCAA judge.

---

[8]  See *Bridging Finance inc c. Béton Brunet 2001 inc.*, 2017 QCCA 138 para. 14 and 15 (per Kasirer, J.A., in chambers); *Statoil Canada Ltd. (Arrangement relatif à)*, 2012 QCCA 665, para. 4 (per Hilton, J.A., in chambers).

[33]  All parties agree that RVOs are a novelty and that, until now, they have only been granted by consent. They also agree that a delimitation of powers of the CCAA judge under section 11 of the *CCAA* where the RVO transaction is contested by certain creditors is a point of principle which could be of interest to the practice and could, in certain circumstances, justify granting leave to appeal[9].

[34]  They claim, however, that in the particular context of the transaction, such leave should not be granted as it will serve to hinder the progress of the CCAA proceedings in a context where the great majority of creditors will be prejudiced.

[35]  As underlined by the CCAA judge, the only determination that the courts are asked to make is whether or not to approve the RVO, without having the power to dictate its terms:

> [16]  L'offre Orion/IQ/Pallinghurst est soumise au Tribunal telle que déposée, et il ne revient pas au Tribunal d'indiquer aux Offrants quels termes et conditions doivent en faire partie.

> [17]  Le choix du Tribunal est le suivant : il approuve ou il refuse l'Offre Orion/IQ/Pallinghurst.

[36]  Certain issues raised in appeal do appear to qualify as being significant to the practice of insolvency. This is particularly the case regarding the issue of the scope of authority of the CCAA supervising judge in the context of an order that is not strictly limited to the "sale or disposition of assets" provided for under section 36 (6) CCAA, which, according to the Applicants, results in an outcome that would normally form part of an arrangement subject to prior approval by the creditors. There is also an issue of principle raised regarding the granting of broad third party releases (that are not limited to the transaction itself), outside the confines of an arrangement and without determining their appropriateness and submitting same to the required vote of creditors.

[37]  There is however reason to question the merit of the appeal in the particular context of the file. The CCAA judge's comments on Cantore's approach in the file (notwithstanding the parties' agreement to postpone the debate regarding the expungement of his "*bene esse* real rights" in the mining claims), provide the context in which his arguments are being advanced and somewhat affect their legitimacy:

> [30]    Le report de ce débat, lequel avait essentiellement pour but que la Demande Cantore ne soit plus un obstacle à l'obtention urgente de l'approbation par le Tribunal de l'Offre Orion/IQ/Pallinghurst, dans la mesure où le Tribunal était disposé à aller dans ce sens, n'a pas mis fin à l'opposition du Créancier Cantore à la Demande pour ODI, loin de là.

---

[9]    *Aviva Cie d'assurance du Canada c. Béton Brunet 2001 inc.*, 2016 QCCA 1837, para. 16.

2020 QCCA 1488 (CanLII)

2020 QCCA 1488 (CanLII)

[31]    Ainsi, le Créancier Cantore a continué à prétendre que le Tribunal n'avait tout simplement pas l'autorité et la compétence pour accueillir la Demande pour ODI sauf, par contre, si elle incluait aussi un règlement de la Demande Cantore qui serait alors approuvé par le Tribunal.

[32]    Tel que discuté ci-après, il est apparu clairement au Tribunal, tout au long de l'audition, que le Créancier Cantore, par les arguments qu'il présentait, ne prenait nullement en considération ce qui avait été décidé par l'Ordonnance SISP, la Toile de fond de la Demande pour ODI.

[33]    Tout était décortiqué à la pièce par le Créancier Cantore, isolé du portait global, loin de ce que le Tribunal avait déjà autorisé.

[34]    **À plusieurs occasions, le Tribunal a eu l'étrange impression que l'opposition du Créancier Cantore était un exercice de négociation avec les Débitrices et les Offrants, portant ainsi ombrage à la légitimité des arguments qu'il avançait.**

[35]    À un tel point tel que, le 8 octobre 2020 05 :19, le Tribunal a fait parvenir un courriel aux procureurs présents à l'audition, mentionnant, entre autres, ce qui suit :

> […]
>
> I ask you all to be practical and don't take a legal position in front of the Court on this issue, or any other issue, **as a bargaining tool.**
>
> […]

[Emphasis added]

[38]  As it turns out[10], the value of the Cantore provable claims (setting aside the later debate regarding his potential real rights) stands at $8,160 million out of a total value of provable claims of $200 million. Thus, Cantore's provable claims represent at this point in time 4% of the total value of unsecured creditors' claims as determined by the Monitor. Yet, Cantore is the only creditor having voiced an objection to the RVO approval. This begs the question: whose interest is being served by the proposed appeal? What would be the true impact of the Cantore vote on the RVO transaction if it were made subject to prior approval on the part of the creditors as he suggests?

---

[10]  In May 2020, Cantore delivered to the Monitor 5 proofs of claims which were disallowed in part by the Monitor by way of a Notice of Revision or Disallowance dated October 22, 2020, leaving an outstanding provable claim of $8,160,000. Cantore has since filed an application to appeal from the Monitor's revision or disallowance of a claim dated October 29, 2020.

2020 QCCA 1488 (CanLII)

[39]  In these circumstances, I am simply not convinced that the arguments that are advanced by Cantore are anything but a "bargaining tool", while he pursues multidirectional attacks on the RVO with the same arguments that were dismissed in first instance.

[40]  That being said, the applicants have also failed to convince me that their appeal will not hinder the progress of the proceedings and that it is not purely strategic (insofar as Applicant Cantore is concerned) or theoretical (insofar as Applicant Shenker is concerned).

[41]  Serious concerns were raised at the hearing regarding the fact that the RVO may be compromised if the closing (which has already been postponed on more than one occasion since the acceptance of the offer in June 2020) cannot take place as determined in the RVO by December 31, 2020. These concerns are compounded by the risk of a potential cash depletion as contemplated by the Monitor (in his Ninth Monitor's Report) at a monthly rate of $2.5 to $3 million. As well, the Monitor deems it unlikely that an alternative or any other new plan of arrangement could generate a distribution to unsecured creditors in the range currently estimated in the RVO (between $6 million and $14 million).

[42]  This makes the leave to appeal a risky proposition that could turn into the potential "catastrophy" that the CCAA judge referred to in his reasons, one in which all stakeholders, including creditors, employees, suppliers, the Cree community and the local economies stand to lose. In such event, the rights being debated even if important may become theoretical.

[43]  As far as Shenker is concerned, while the issues that he proposes to raise with respect to overreaching third party releases are not devoid of merit, granting leave is likely to seriously prejudice creditors, with limited gains to be had on the part of shareholders whose rights remain entirely subordinated to those of the creditors.[11] If the manner of constituting the releases makes them invalid or unopposable, then Shenker, and any other party with a claim against directors, may still have a recourse.

**THEREFORE, THE UNDERSIGNED:**

---

[11]   As highlighted by the CCAA judge during a management hearing held on September 18 2020 as reproduced at paragraph 37 of the judgment:

> De plus, le Tribunal tient à répéter que dans un contexte d'insolvabilité, tel que dans la présente affaire, les intérêts économiques des Actionnaires, si tant est que de tels intérêts existent encore, sont entièrement subordonnés à ceux de tous les créanciers des Débitrices, et ce, jusqu'à ce que ces créanciers aient été entièrement payés, ce qui n'est nullement envisagé dans le présent dossier et n'a, semble-t-il, jamais été envisagé par qui que ce soit. Il s'agit d'un principe fondamental en la matière et qui ne doit jamais être perdu de vue.

500-09-029177-201, 500-09-029190-204                                          PAGE: 12

[44]  **DISMISSES** the applications for leave to appeal;

[45]  **THE WHOLE**, with legal costs.


_____

GENEVIÈVE MARCOTTE, J.A.

Mtre Dimitrios Maniatis
ACCENT LÉGAL
Mtre Tom Provost
MLT AIKINS
For Applicant and impleaded party Victor Cantore

Mtre Neil Peden
Mtre Bogdan Catanu
WOODS
For Applicant Brian Shenker

Mtre Alain Tardif
Mtre Gabriel Faure
Mtre François Alexandre Toupin
Mtre Patrick Boucher
McCARTHY TÉTRAULT
For Respondents

Mtre C. Jean Fontaine
Mtre Nathalie Nouvet
STIKEMAN ELLIOT
For impleaded party Pricewaterhousecoopers inc.

Mtre Luc Morin
NORTON ROSE FULLBRIGHT CANADA
For impleaded party Investissement Québec

Mtre Denis Ferland
DAVIES WARD PHILLIPS & VINEBERG
For impleaded party The Pallinghurst Group

2020 QCCA 1488 (CanLII)

500-09-029177-201, 500-09-029190-204                                    PAGE: 13

Mtre Christopher Richter
Mtre Marie-Ève Gingras
SOCIÉTÉ D'AVOCATS TORYS
For impleaded party OMF Fund II (K) Ltd. and OMF Fund II (N) Ltd.

Mtre Kevin Mailloux
Mtre François Gagnon
BORDEN LADNER GERVAIS
For impleaded party FMC Lithium USA Corp.

Date of hearing:    November 2, 2020

2020 QCCA 1488 (CanLII)

2021 CanLII 35003 (SCC)

No. 39526

April 29, 2021

**BETWEEN:**

Brian Shenker

Applicant

- and -

Nemaska Lithium Inc., Nemaska Lithium
Whabouchi Mine Inc., Nemaska Lithium
Shawinigan Transformation Inc.,
Nemaska Lithium P1P Inc., Nemaska
Lithium Innovation Inc.,
PricewaterhouseCoopers Inc.,
Investissement Québec, Pallinghurst
Group, OMF Fund II (K) Ltd., OMF
Fund II(N) Ltd., FMC Lithium USA
Corp. and Victor Cantore

Respondents

JUDGMENT

The motion to be added as parties or for
leave to intervene is dismissed. The
application for leave to appeal from the
judgment of the Court of Appeal of
Quebec (Montréal), Number 500-09-
029190-204, 2020 QCCA 1488, dated

Le 29 avril 2021

**ENTRE :**

Brian Shenker

Demandeur

- et -

Nemaska Lithium Inc., Nemaska Lithium
Whabouchi Mine Inc., Nemaska Lithium
Shawinigan Transformation Inc.,
Nemaska Lithium P1P Inc., Nemaska
Lithium Innovation Inc.,
PricewaterhouseCoopers Inc.,
Investissement Québec, Pallinghurst
Group, OMF Fund II (K) Ltd., OMF Fund
II (N) Ltd., FMC Lithium USA Corp. et
Victor Cantore

Intimés

JUGEMENT

La requête en vue d'être ajoutés comme
parties ou pour permission d'intervenir est
rejetée. La demande d'autorisation d'appel
de l'arrêt de la Cour d'appel du Québec
(Montréal), numéro 500-09-029190-204,
2020    QCCA    1488    daté    du

- 2 -

No. 39526

| November 11, 2020, is dismissed with costs. | 11 novembre 2020, est rejetée avec dépens. |
|---|---|

C.J.C.
J.C.C.

2021 CanLII 35003 (SCC)

2022 ONSC 653 (CanLII)

**CITATION:** *Harte Gold Corp. (Re)*, 2022 ONSC 653
**COURT FILE NO.:** CV-21-00673304-00CL
**DATE:** 2022-02-04

**SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)**

**RE:**      THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED, Applicant

         **AND:**

         A PLAN OF COMPROMISE OR ARRANGEMENT OF HARTE GOLD CORP., Applicant

**BEFORE:**    Penny J.

**COUNSEL:**   *Guy P. Martel, Danny Duy Vu, Lee Nicholson, William Rodler Dumais* for the Applicant

         *Joseph Pasquariello, Chris Armstrong, Andrew Harmes* for the Court appointed Monitor

         *Leanne M. Williams* for the Board of Directors of the Applicant

         *Marc Wasserman, Kathryn Esaw, Dave Rosenblat, Justin Kanji* for 1000025833 Ontario Inc.

         *Stuart Brotman and Daniel Richer* for BNP Paribas

         *Sean Collins, Walker W. MacLeod and Natasha Rambaran* for Appian Capital Advisory LLP, 2729992 Ontario Corp., ANR Investments B.V. and AHG (Jersey) Limited

         *David Bish* for OMF Fund II SO Ltd., Orion Resource Partners (USA) LP and their affiliates

         *Orlando M. Rosa and Gordon P. Acton* for Netmizaaggamig Nishnaabeg First Nation (Pic Mobert First Nation)

         *Timothy Jones* for the Attorney General of Ontario

**HEARD:**     January 28, 2022

<u>**ENDORSEMENT**</u>

[1]    This is a motion by Harte Gold for an approval and reverse vesting order involving the sale of Harte Gold's mining enterprise to a strategic purchaser (that is, an entity in the gold

mining business) and for an order extending the stay and expanding the Monitor's powers to include new entities to be created for the purposes of implementing Harte Gold's proposed restructuring. There was no opposition to the relief sought. All those who appeared at the hearing supported approval of the transaction.

[2]    Following the conclusion of oral submissions on Friday, January 28, 2022, I issued the orders sought with written reasons to follow. These are the reasons.

## Background

[3]    Harte Gold is a public company incorporated under the *Business Corporations Act* (Ontario). Prior to January 17, 2022, its shares publicly traded on the Toronto Stock Exchange, Frankfurt Stock Exchange and over-the-counter. Harte Gold operates a gold mine located in northern Ontario within the Sault Ste. Marie Mining Division and approximately 30 km north of the town of White River. This mine, referred to as the Sugar Loaf Mine, produces gold bullion. Harte Gold has a total of 260 employees on payroll, as well as 19 employees retained through various agencies. Harte Gold's payroll obligations are current.

[4]    Of some importance to the form of transaction proposed in this case, involving an approval and reverse vesting order (RVO), is the fact that Harte Gold has 12 material permits and licenses that are required to maintain its mining operations, 24 active work permits and licenses that allow the performance of exploration work on various parts of the Sugar Loaf property and many other forest resource licenses, fire permits and the like, all necessary in one way or another to Harte Gold's continued operations. Harte Gold also has 513 mineral tenures, consisting of three freehold properties, seven leasehold properties, 468 mineral claims and 35 additional tenures. The transfer of these permits and licenses etc. would involve a complex transfer or new application process of indeterminate risk, delay and cost.

[5]    It is also important to note that Harte Gold is party to an Impact Benefits Agreement dated April 2018 between Harte Gold and Netmizaaggamig Nishnaabeg First Nation.

[6]    Harte Gold has two primary secured creditors. They are: a numbered company (833) owned by Silver Lake Resources Limited (an Australian gold mine company). 833 is a very recent assignee of significant secured debt from BNPP; and, AHG Jersey Limited (AHG is part of the Appian group). Appian entities are also counterparties to a number of offtake agreements under which Harte Gold sells gold in exchange for prices determined by a pricing formula tied to the London bullion market. Orion is, similarly, a counterparty to additional offtake agreements. BNPP, following the assignment of its secured debt, has retained additional obligations in respect of certain hedging arrangements provided to Harte Gold. Harte Gold also has a number of trade and other unsecured creditors who are owed an estimated $7.5 million for pre-filing obligations and further amounts for services rendered post-filing.

2022 ONSC 653 (CanLII)

2022 ONSC 653 (CanLII)

[7]     At the time of its initial application to the court, Harte Gold's assets were valued at $163.8 million. Its liabilities were valued at $166.1 million. On a balance sheet basis, therefore, Heart Gold was insolvent.

[8]     Since about 2019, Harte Gold has been pursuing a number of measures to address a growing liquidity problem, a problem only exacerbated by the Covid-19 pandemic. Despite these efforts, in 2020 Harte Gold was obliged to seek agreement from its prime lender, BNPP, to defer debt payments and to seek a forbearance from enforcement of BNPP's security. In May 2021, Harte Gold initiated a strategic review of options to achieve the desired liquidity and to fund the acquisition of new capital. Harte Gold appointed a strategic committee of its board and, shortly thereafter, a special committee of independent directors. The special committee retained FTI as financial advisor (FTI was subsequently appointed Monitor by this Court) and developed a plan to attract new capital through a potential sale.

[9]     This prefiling strategic process involved approaching over 250 potential buyers. 31 of these entities executed confidentiality agreements; 28 of those conducted due diligence through Harte Gold's virtual data room. Harte Gold received four nonbinding expressions of interest but, by the bid deadline in September 2021, no binding offers had been received.

[10]    In the aftermath of this unsuccessful process, Silver Lake through 833 acquired BNPP's debt and advanced a proposal to acquire Harte Gold's operations by way of a credit bid and to provide interim financing in connection with any proceedings under the CCAA. An initial order under the CCAA issued from this Court on December 7, 2021.

[11]    In the midst of this process, Harte Gold received a competing proposal to make a credit bid from Harte Gold's second secured creditor, Appian. As a result of these developments, Harte Gold resolved to conduct a further (albeit brief, given the extensive process that had just been completed) sale and investment solicitation process, this time with a stalking horse bid. Further competing proposals took place between Silver Lake and Appian over who would be the stalking horse bidder. As a result of this process, the stalking horse bid of Silver Lake was significantly improved. Appian was then content to let Silver Lake's credit bid form the basis of the SISP. I approved this process in an order dated December 20, 2021.

[12]    The Monitor provided a new solicitation notice to a total of 48 known and previously unknown potential bidders (other than Silver Lake and Appian). None of the potentially interested parties signed a confidentiality agreement or requested access to the data room.

[13]    Only one competing bid was received – a further credit bid from Appian with improved conditions over those proposed by Silver Lake. Ultimately, all parties agreed that the responding commitment from Silver Lake which was at least as favourable to stakeholders as the Appian bid would be, in effect, the prevailing and winning bid.

[14]    This took the form of a Second Amended and Restated Subscription Agreement (SARSA) with 833, the actual purchaser. The improved terms were: (a) the assumption by the purchaser of Harte Gold's office lease at 161 Bay Street in Toronto; (b)(i) the proviso that

the $10 million cap on payment of cure costs and pre-filing trade creditors does not apply to the assumption of post-filing trade creditor obligations; and (ii) all amounts owing by Harte Gold to any of the Appian parties are subject to a settlement agreement between 833 Ontario, Silver Lake and Appian and excluded from the prefiling cure costs; and, (c) the undertaking to pay an additional cash deposit of US$1,693,658.72, equivalent to approximately 5% of the Appian indebtedness.

[15]    In broad brush terms, the Silver Lake/833 purchase is structured as a reverse vesting order. The transaction will involve:

- the cancellation of all Harte Gold shares and the issue of new shares to the purchaser

- payment by the purchaser of all secured debt

- payment by the purchaser of virtually all prefiling trade amounts (estimated at $7.5 million but with a $10 million cap) and postfiling trade amounts

- certain excluded contracts and liabilities being assigned to newly formed companies which will, ultimately, be put into bankruptcy. The excluded contacts and liabilities include a number of agreements involving ongoing or future services in respect of which there is little if any money currently owed. They also include a number of contracts with Appian entities and Orion, both of which support approval of the transaction The emplyment contracts of four terminated executives will, however, be excluded liabilities, which will nullify the value of any termination claims. Notably, excluded liabilities does not include regulatory or environmental liabilities to any government authority

- retaining on the payroll all but four employees (the four members of the executive team whose employment contracts will be terminated), and

- releases, including of Harte Gold and its directors and officers, the Monitor and its legal counsel and Silver Lake and its directors and officers.

There is no provision for any break fee. Nor is there a request for any form of sealing order.

[16]    I should add that the value of what the purchaser is paying for Harte Gold's business, including the secured debt, the pre and postfiling trade amounts, interim financing and the like, totals well over $160 million.

## Issues

[17]    There are three principal issues:

(1)    Whether the proposed transaction should be approved, including the reverse vesting order transaction structure and the form of the proposed release;

(2)    Whether the stay should be extended; and,

2022 ONSC 653 (CanLII)

(3)     Whether the Monitor's mandate should be extended to included additional companies (newcos) being incorporated for the purposes of executing the proposed transaction.

## Analysis

[18]    Section 11 of the CCAA confers jurisdiction on the Court in the broadest of terms: "the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances".

[19]    Section 36(1) of the CCAA provides:

A debtor company in respect of which an order has been made under this Act may not sell or otherwise dispose of assets outside the ordinary course of business unless authorized to do so by a court. Despite any requirement for shareholder approval, including one under federal or provincial law, the court may authorize the sale or disposition even if shareholder approval was not obtained.

[20]    Section 36(3) of the CCAA provides a non-exhaustive list of factors to be considered on a motion to approve a sale. These include:

(a) whether the process leading to the proposed sale or disposition was reasonable in the circumstances;
(b) whether the monitor approved the process leading to the proposed sale or disposition;
(c) whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;
(d) the extent to which the creditors were consulted;
(e) the effects of the proposed sale or disposition on the creditors and other interested parties; and
(f) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

[21]    The s. 36(3) criteria largely correspond to the principles articulated in *Royal Bank v. Soundair Corp,* 1991 CanLII 2727 (ONCA) for the approval of the sale of assets in an insolvency scenario:

(a) whether sufficient effort has been made to obtain the best price and that the debtor has not acted improvidently;

(b) the interests of all parties;

(c) the efficacy and integrity of the process by which offers have been obtained; and

(d) whether there has been unfairness in the working out of the process:

2022 ONSC 653 (CanLII)

see *Target Canada Co. (Re),* 2015 ONSC 1487, at paras. 14-17.

[22]   The purchase transaction for which approval is being sought in this case does not provide for a sale of assets but, rather, provides for a "reverse vesting order" under which the purchaser will become the sole shareholder of Harte Gold and certain excluded assets, excluded contracts and excluded liabilities will be vested out to new companies incorporated for that purpose.

[23]   In determining whether the transaction should be approved and the RVO granted, it is appropriate to consider:

    (a) the statutory basis for a reverse vesting order and whether a reverse vesting order is appropriate in the circumstances; and,

    (b) the factors outlined in s. 36(3) of the CCAA, making provision or adjustment, as appropriate, for the unique aspects of a reverse vesting transaction.

### The Statutory Basis (Jurisdiction) for a Reverse Vesting Order

[24]   The first reverse vesting sale transaction appears to have been approved by this Court in *Plasco Energy (Re),* (July 17, 2015), CV-15-10869-00CL in the handwritten endorsement of Justice Wilton-Siegel. The use of the reverse vesting order structure was not in dispute (indeed, in most of the cases, reported and otherwise, there has been no dispute). Wilton-Siegel J. found "the Court has authority under section 11 of the CCAA to authorize such transactions notwithstanding that the applicants are not proceeding under s. 6(2) of the CCAA insofar as it is not contemplated that the applicants will propose a plan of arrangement or compromise."

[25]   A few dozen of these orders have been made since that time, mostly in a context where there was no opposition and no obvious or identified unfairness arising from the use of the RVO structure. The frequency of applications based on court approval of an RVO structure has increased significantly in the past few years.

[26]   More recently, two reverse vesting orders have been approved in contested cases and been considered by appellate courts in Canada. I cite these two cases in particular because, being opposed and appealed, there tends to be a more in-depth analysis of the issues than is usually the case in the context of unopposed orders.

[27]   In *Arrangement relatif à Nemaska Lithium Inc, 2020 QCCS 3218* at paras. 52 and 71 (leave to appeal to QCCA refused, *Arrangement relatif à Nemaska Lithium Inc,* 2020 QCCA 1488; leave to appeal to SCC refused, *Arrangement relatif à Nemaska Lithium Inc,* 2021 CarswellQue 4589), Justice Gouin of the Quebec Superior Court approved a reverse vesting transaction in the face of opposition by a creditor. Following a nine day hearing, Gouin J. reviewed the context of the transaction in detail and carefully analyzed the purpose and efficiency of the RVO in maintaining the going concern operations of the debtor companies. He also found that the approval of the RVO should be considered under s. 36 CCAA, subject to determining, for example:

2022 ONSC 653 (CanLII)

- Whether sufficient efforts to get the best price have been made and whether the parties acted providently

- The efficacy and integrity of the process followed

- The interests of the parties, and

- Whether any unfairness resulted from the process.

Gouin J. considered that these criteria had been met and found the issuance of the RVO to be a valid exercise of his discretion, concluding that it would serve to maximize creditor recoveries while maintaining the debtor companies as a going concern and allowing an efficient transfer of the necessary permits, licences and authorizations to the purchaser.

[28]    In denying leave to appeal, the Quebec Court of Appeal noted that the CCAA judge found that "the terms 'sell or otherwise dispose of assets outside the ordinary course of business' under subsection 36(1) of the CCAA should be broadly interpreted to allow a CCAA judge to grant innovative solutions such as RVOs on a case by case basis, in accordance with the wide discretionary powers afforded the supervising judge pursuant to section 11 CCAA, as recognized by the Supreme Court in *Callidus*": *Nemaska* QCCA at para 19.

[29]    Similarly, in *Quest University Canada (Re),* 2020 BCSC 1883, Justice Fitzpatrick of the British Columbia Supreme Court extensively reviewed the caselaw related to a CCAA court's authority to grant a reverse vesting order. Fitzpatrick J. found that the CCAA provided sufficient authority to grant the reverse vesting order being sought, which was consistent "with the remedial purposes of the CCAA" and consistent with the Supreme Court of Canada's ruling on CCAA jurisdiction in *9354-9186 Québec Inc. v. Callidus Capital Corp.,* 2020 SCC 10. She found, therefore, that the issue in each case is not whether the court has sufficient jurisdiction but whether the relief is "appropriate" in the circumstances and stakeholders are treated as fairly and reasonably as the circumstances permit.

[30]    In *Quest*, the debtor was in the process of putting forward a plan of compromise under the CCAA. It encountered resistance from an unsecured creditor whose vote could potentially have prevented the necessary creditor approval of the plan. The debtor revised its approach, deleting all conditions precedent requiring creditor and court approval and proceeded with a motion for the approval of an RVO to achieve what it was really after; that is, a sale of certain assets to a new owner with Quest continuing as a going concern academic institution.

[31]    Fitzpatrick J. relied on *Callidus* to the effect that:

- Courts have long recognized that s. 11 of the CCAA signals legislative endorsement of the "broad reading of CCAA authority developed by the jurisprudence". On the plain wording of the provision, the jurisdiction granted by s. 11 is constrained only

by restrictions set out in the CCAA itself, and the requirement that the order made be "appropriate in the circumstances"

- the CCAA generally prioritizes "avoiding the social and economic losses resulting from liquidation of an insolvent company"

- Where a party seeks an order relating to a matter that falls within the supervising judge's purview, and for which there is no CCAA provision conferring more specific jurisdiction, s. 11 necessarily is the provision of first resort in anchoring jurisdiction. As Blair J.A. put it in *Stelco*, s. 11 "for the most part supplants the need to resort to inherent jurisdiction" in the CCAA context

- The exercise of the discretion under s. 11 must further the remedial objectives of the CCAA and be guided by the baseline considerations of appropriateness, good faith, and due diligence

- Whether this discretion ought to be exercised in a particular case is a circumstance-specific inquiry that must balance the various objectives of the CCAA. The supervising judge is best positioned to undertake this inquiry.

[32]    The SCC in *Callidus* made an important point in the context of the limits of broad discretion; all discretion has limits and its exercise under s. 11 must accord with the objectives of the CCAA and other insolvency legislation in Canada. These objectives include: providing for timely, efficient and impartial resolution of a debtor's insolvency; preserving and maximizing the value of a debtor's assets; ensuring fair and equitable treatment of the claims against a debtor; protecting the public interest; and, in the context of a commercial insolvency, balancing the costs and benefits of restructuring or liquidating the company. Further, the discretion under s. 11 must also be exercised in furtherance of three baseline considerations: (a) that the order sought is appropriate in the circumstances, and (b) that the applicant has been acting in good faith and (c) with due diligence.

[33]    Ultimately, Fitzpatrick J. held that, in the complex and unique circumstances of that case, it was appropriate to exercise her discretion to allow the RVO structure. Quest sought this relief in good faith and while acting with due diligence to promote the best outcome for all stakeholders. She considered the balance between the competing interests at play and concluded that the proposed transaction was unquestionably the fairest and most reasonable means by which the greatest benefit can be achieved for the overall stakeholder group.

[34]    The British Columbia Court of Appeal refused leave to appeal, concluding that the appeal was not "meritorious", also noting that reverse vesting orders had been granted in other contested proceedings, namely *Nemaska*. The BCCA also stated that the reverse vesting order granted by Fitzpatrick J. "reflect[ed] precisely the type of intricate, fact-specific, real-time decision making that inheres in judges supervising CCAA proceedings": *Southern Star Developments Ltd. v. Quest University Canada*, 2020 BCCA 364.

2022 ONSC 653 (CanLII)

[35]     It is worthy of note that, in both *Nemaska* and *Quest*, the *bona fides* of the objectors were front and centre in the judicial analysis and, in both cases, the motivations and objectives of the objectors were found suspect and inadequate.

[36]     The jurisdiction of the court to issue an RVO is frequently said to arise from s. 11 and s. 36(1) of the CCAA. However, the structure of the transaction employing an RVO typically does not involve the debtor 'selling or otherwise disposing of assets outside the ordinary course of business', as provided in s. 36(1). This is because the RVO structure is really a purchase of shares of the debtor and "vesting out" from the debtor to a new company, of unwanted assets, obligations and liabilities.

[37]     I am, therefore, not sure I agree with the analysis which founds jurisdiction to issue an RVO in s. 36(1). But that can be left for another day because I am wholeheartedly in agreement that s. 11, as broadly interpreted in the jurisprudence including, most recently, *Callidus*, clearly provides the court with jurisdiction to issue such an order, provided the discretion available under s. 11 is exercised in accordance with the objects and purposes of the CCAA. And it is for this reason that I also wholeheartedly agree that the analytical framework of s. 36(3) for considering an asset sale transaction, even though s. 36 may not support a standalone basis for jurisdiction in an RVO situation, should be applied, with necessary modifications, to an RVO transaction.

[38]     Given this context, however, I think it would be wrong to regard employment of the RVO structure in an insolvency situation as the "norm" or something that is routine or ordinary course. Neither the BIA nor the CCAA deal specifically with the use or application of an RVO structure. The judicial authorities approving this approach, while there are now quite a few, do not generally provide much guidance on the positive and negative implications of this restructuring technique or what to look out for. Broader-based commentary and discussion is only now just now starting to emerge. This suggests to me that the RVO should continue to be regarded as an unusual or extraordinary measure; not an approach appropriate in any case merely because it may be more convenient or beneficial for the purchaser. Approval of the use of an RVO structure should, therefore, involve close scrutiny. The Monitor and the court must be diligent in ensuring that the restructuring is fair and reasonable to all parties having regard to the objectives and statutory constraints of the CCAA. This is particularly the case where there is no party with a significant stake in the outcome opposing the use of an RVO structure. The debtor, the purchaser and especially the Monitor, as the court appointed officer overseeing the process and answerable to the court (and in addition to all the usual enquiries and reporting obligations), must be prepared to answer questions such as:

(a)     Why is the RVO necessary in this case?

(b)     Does the RVO structure produce an economic result at least as favourable as any other viable alternative?

(c)     Is any stakeholder worse off under the RVO structure than they would have been under any other viable alternative? and

2022 ONSC 653 (CanLII)

(d) Does the consideration being paid for the debtor's business reflect the importance and value of the licences and permits (or other intangible assets) being preserved under the RVO structure?

[39] With this in mind, I will turn to the enumerated s. 36(3) factors. To the extent there are RVO specific issues of concern apart from those enumerated in s. 36(3), I will also address those in the following section of my analysis.

### *The Section 36 Factors in the RVO Context*

<u>Reasonableness of the Process Leading to the Proposed Sale</u>

[40] Between the pre-filing strategic review process and the court approved SISP, the business and assets of Harte Gold have been extensively marketed on a global basis. While the SISP was subject to variation from the format contemplated in my earlier order, the ability of the applicant, in conjunction with the Monitor, to vary the process was already established in that order. I find, in any event, that the adjustments made were appropriate in the circumstances, given there were no new bidders and the only offers came from the two competing secured creditors who had already been extensively involved in the process and whose status, interests and objectives were well known to the applicant and the Monitor.

[41] Prior to its appointment as Monitor, FTI was intimately involved at all stages of the strategic review process, including the implementation of the pre-filing marketing process and the negotiation of the original proposed subscription agreement that was executed prior to the commencement of the CCAA proceedings and subsequently replaced by the stalking horse bid and the SARSA.

[42] Following the commencement of the CCAA proceedings, the Monitor was involved in the negotiations that resulted in the execution of the stalking horse bid and the SARSA. In addition, the Monitor has overseen the implementation of the SISP and is satisfied that it was carried out in accordance with the SISP procedures, including the Monitor's consent to the amendment of the SISP procedures to cancel the auction as unnecessary and accept the SARSA as the best option available.

[43] The Monitor's opinion is that the process was reasonable, leading to the best outcome reasonably available in the circumstances.

[44] I am satisfied that the sales process was reasonable. The transaction now before the Court was the culmination of approximately seven months of extensive solicitation efforts on the part of both Harte Gold and FTI as part of the prefiling strategic process and the SISP.

[45] Harte Gold and FTI broadly canvassed the market by contacting 241 parties regarding their potential interest in acquiring Harte Gold's business and assets. This process ultimately culminated in initial competing bids from Silver Lake and Appian and, subsequently, additional competing bids from both entities as part of the SISP. The competitive tension in this process resulted in material improvements for stakeholders on both occasions.

Comparison with Sale in Bankruptcy

[46]   The Monitor has considered whether the completion of the transaction contemplated by the SARSA would be more beneficial to creditors of the applicant and stakeholders generally than a sale or disposition of the business and assets of Harte Gold under a bankruptcy. The Monitor is unambiguously of the view that the SARSA transaction is the vastly more beneficial option.

[47]   The SISP has shown that the SARSA represents the highest and best offer available for Harte Gold's business and assets. The Monitor is satisfied that the approval and completion of the transactions contemplated by the SARSA are in the best interests of the creditors of Harte Gold and its stakeholders generally.

[48]   In addition to anything else, a bankruptcy would jeopardize ongoing operations and the permits and licences necessary to maintain such operations. A sale in bankruptcy would delay and, again, jeopardize the approval and closing of the proposed transaction as it would be necessary to first assign Harte Gold into bankruptcy or obtain a bankruptcy order, convene a meeting of creditors, appoint inspectors and obtain the approval of the inspectors for the transaction prior to seeking a more traditional AVO or an RVO. Additional costs would also be incurred in undertaking those steps. Silver Lake would have to continue to advance additional funds to finance ongoing operations during this extended period. There is no indication it would be willing to do so. In any event, requiring such a process would fundamentally change the value proposition the purchaser has relied upon and is willing to accept.

[49]   Taking all this into account, a sale or disposition of the business and assets of the applicant in a bankruptcy would almost certainly result in a lower recovery for stakeholders and would not be more beneficial than closing the RVO transaction in the CCAA proceedings.

Consultation with Creditors

[50]   Harte Gold's major creditors are Silver Lake, the Appian parties and BNPP. BNPP still has potential claims of approximately $28 million in respect of its hedge agreements. Silver Lake has claims of approximately $95 million in respect of the DIP facility and the first lien credit facilities it acquired from BNPP. The Appian parties have claims of approximately US$34 million in respect of amounts owing under the Appian facility and additional potential claims in respect of obligations under royalty and offtake agreements.

[51]   BNPP was consulted throughout the strategic review process and has executed a support agreement with the purchaser. In addition, as previously described, the purchaser and the Appian Parties have been extensively involved in the SISP.

[52]   While there is no evidence of consultations with unsecured creditors, I do not regard that as a material deficiency given that virtually all creditors, secured and unsecured alike, are going to be paid in full under the terms of the SARSA.

2022 ONSC 653 (CanLII)

[53]  The Monitor is of the view that the degree of creditor consultation has been appropriate in the circumstances. The Monitor does not consider that any material change in the outcome of efforts to sell the business and assets of the Applicant would have resulted from additional creditor consultation.

[54]  I find, on the evidence, that the Monitor's assessment of this factor is well supported and correct.

<u>The Effect of the Proposed Sale on Creditors and Other Interested Parties</u>

[55]  The proposed transaction affords the following benefits to the creditors and to stakeholders generally:

(a) the retention and payment in full of the claims of almost all creditors of Harte Gold;

(b) continued employment for all except four of the Harte Gold's employees;

(c) ongoing business opportunities for suppliers of goods and services to the Sugar Loaf Mine; and

(d) the continuation of the benefits of the existing Impact Benefits Agreement with Netmizaaggamig Nishnaabeg First Nation.

[56]  The Monitor's opinion is that the effect of the proposed transaction is overwhelming positive for the vast majority of Harte Gold's creditors and other stakeholders apart (as discussed below) from the shareholders who have no reasonable economic interest at this point.

[57]  Unlike *Quest*, this is not a case in which the RVO is being used to thwart creditor opposition. Indeed, the evidence is that almost all creditors, secured and unsecured, will be paid in full. To the extent there might be concerns that an RVO structure could be used to thwart creditor democracy and voting rights, those concerns are not present here. This is not a traditional "compromise" situation. It is hard to see how anything would change under a creditor class vote scenario because almost all of the creditors are being paid in full.

[58]  The evidence is that there is no creditor being placed in a worse position, because of the use of an RVO transaction structure, than they would have been in under a more traditional asset sale and AVO structure (or, for that matter, under any plausible plan of compromise).

[59]  Because the transaction contemplates the cancellation of all existing shares and related rights in Harte Gold and the issue of new shares to the purchaser, the existing shareholders of Harte Gold will receive no recovery on their investment. Being a public company, Harte Gold has issued material change notices as the events described above were unfolding. By the time of the commencement of the CCAA proceedings, the shareholders had been advised in no uncertain terms that there was no prospect of shareholders realizing any value for their equity investment.

[60]    The evidence of Harte's financial problems and balance sheet insolvency, the unsuccessful prefiling strategic review process, and the hard reality that the only parties willing to bid anything for Harte Gold were the holders of secured debt (and only for, effectively, the value of the secured debt plus carrying and process costs) only serves to emphasize that equity holders will not see, and on any other realistic scenario would not see, any recovery of their equity investment in Harte Gold.

[61]    Under s. 186(1) of the OBCA, "reorganization" includes a court order made under the *Bankruptcy and Insolvency Act* or an order made under the *Companies Creditors Arrangement Act* approving a proposal. While the term "proposal" is unfortunate (because there are no formal "proposals" under the CCAA), I view the use of this term in the non-technical sense of the word; that is, as encompassing any proposal such as the proposed transaction brought forward for the approval of the Court under the provisions of the CCAA in this case.

[62]    Section 186(2) of the OBCA provides that if a corporation is subject to a reorganization, its articles may be amended by the court order to effect any change that might lawfully be made by an amendment under s. 168. Section 168(1)(g) provides that a corporation may from time to time amend its articles to add, change or remove any provision that is set out in its articles, including to change the designation of all or any of its shares, and add, change or remove any rights, privileges, restrictions and conditions, including rights to accrued dividends, in respect of all or any of its shares. This provides the jurisdiction of the court to approve the cancellation of all outstanding shares and the issuance of new shares to the purchaser.

[63]    Section 36(1) of the CCAA contemplates that despite any requirement for shareholder approval, the court may authorize a sale or disposition out of the ordinary course even if shareholder approval is not obtained. While, again, s. 36(1) is concerned with asset sales, the underlying logic of this provision applies to an assessment of cancellation of shares as well. In this case, there is no prospect of shareholder recovery on any realistic scenario.

[64]    Equity claims are subject to special treatment under the CCAA. Section 6(8) prohibits court approval of a plan of compromise if any equity is to be paid before payment in full of all claims that are not equity claims. Section 22(1) provides that equity claimants are prohibited from voting on a plan unless the court orders otherwise. In short, shareholders have no economic interest in an insolvent enterprise: *Sino-Forest Corporation (Re)*, 2012 ONSC 4377, paras. 23-29. In circumstances like Harte Gold's, where the shareholders have no economic interest, present or future, it would be unnecessary and, indeed, inappropriate to require a vote of the shareholders: *Stelco Inc. (Re),* 2006 CanLII 4500 at para. 11. The order requested for the cancellation of existing shares is, for these reasons, justified in the circumstances.

[65]    Taking all this into account, I find that the effect of the transaction on creditors and stakeholders is overwhelmingly positive and the best outcome reasonably available in the circumstances.

Fairness of Consideration

[66]     Harte Gold's business and assets have been extensively marketed both prior to and during the CCAA proceedings. At the conclusion of the SISP, two bids were available, which were equivalent in all material respects and represented the highest and best offers received. As described earlier, all parties concurred that the Silver Lake-sponsored SARSA should be determined to be the successful bid. As also described above, the closing of the SARSA transaction will provide a vastly superior recovery for creditors than would a liquidation of Harte Gold's assets in bankruptcy. Based on the market, therefore, the consideration must be considered fair and reasonable.[1]

[67]     A further concern with an RVO transaction structure such as this one could be whether, in effect, a purchaser making a credit bid might be getting something (i.e., the licences and permits) for nothing (i.e., the licences and permits were not subject to the creditor's security). It is possible that in a bankruptcy, for example, the licences and permits might have no value. The evidence here is that the purchaser is paying more than Harte Gold would be worth in a bankruptcy. The evidence is also that the purchaser is paying considerably more than just the value of the secured debt. This includes cure costs for third party trade creditors and DIP financing to keep the Mine operational – both payments being made to bring about the acquisition of the Mine as a going concern.

[68]     It is true that no attempt has been made to put an independent value on the transfer of the licences and permits. However, any strategic buyer (Silver Lake is a strategic buyer and acquired the BNPP debt for this purpose) would need the licences and permits. The results of the prefiling strategic process and the SISP constitutes evidence that no one else among the universe of potential purchasers of an operating gold mine in Northern Ontario was willing to pay more than Silver Lake was willing to pay. In the circumstances, I do not think it could be seriously suggested that Silver Lake is getting "something" for "nothing".

[69]     The Monitor is satisfied that the consideration is fair in the circumstances. I agree with the Monitor's assessment for the reasons outlined above.

Other Considerations Re Appropriateness of RVO vs. AVO

[70]     As noted, Harte Gold has twelve material permits and licenses that are required to maintain its mining operations, as well as twenty-four active work permits and licenses that allow the performance of exploration work and many other forest resource licences and fire permits.

[71]     The principal objective and benefit of employing the RVO approach in this case is the preservation of Harte Gold's many permits and licences necessary to conduct operations at the Sugar Loaf Mine. Under a traditional asset sale and AVO structure, the purchaser would

---

[1] The total value of the consideration is, perhaps coincidentally, also roughly equivalent to the value of Harte Gold's assets as shown in its audited financial statements in the last full year prior to the commencement of these proceedings.

Page: 15

2022 ONSC 653 (CanLII)

have to apply to the various agencies and regulatory authorities for transfers of existing licences and permits or, if transfers are not possible, for new licences and permits. This is a process that would necessarily involve risk, delay, and cost. The RVO sought in this case achieves the timely and efficient preservation of the necessary licences and permits necessary for the operations of the Mine.

[72]    It is no secret that time is not on the side of a debtor company faced with Harte Gold's financial challenges. It is also relevant that the purchaser has agreed to provide DIP financing up to $10.8 million and substantial cure costs of pre and post filing trade obligations. This is all financing required to be able to continue operations as a going concern at the Mine post closing and to fund the CCAA process.

[73]    The position of the purchaser is, not unreasonably, that it will not <u>both</u> continue to fund ongoing operations and the CCAA process <u>and</u> undertake a process of application to relevant government agencies for transfers of the Harte Gold licenses and permits (or, if necessary, for new ones) with all of the risks and uncertainties of possible adverse outcomes and indeterminant delays and costs associated with such a process. The RVO structure will enable the transaction to be completed efficiently and expeditiously, without exposure to these material risks, delays and costs.

[74]    The Monitor supports the use of the RVO transaction structure. The Monitor has also pointed out that the applicant holds some 513 mineral tenures, consisting of three freehold properties, seven leasehold properties, 468 mineral claims and 35 additional tenures. The reverse vesting structure avoids the need to amend the various registrations to reflect a new owner, which would add more cost and delay if the proposed purchase transaction was to proceed through a traditional asset purchase and vesting order.

[75]    In addition, Harte Gold has a significant number of contracts that will be retained under the SARSA. Again, the RVO transaction structure will avoid potentially significant delays and costs associated with having to seek consent to assignment from contract counter-parties or, if consents could not be obtained, orders assigning such contracts under s. 11.3 of the CCAA. The Monitor has also pointed out that under the SARSA and the RVO, the purchaser will be required to pay applicable cure costs in respect of the retained contracts which has been structured in substantially the same manner as contemplated by s. 11.3(4) of the CCAA if a contract was assigned by court order.

[76]    For all these reasons, I accept that the proposed RVO transaction structure is necessary to achieve the clear benefits of the Silver Lake purchase and that it is appropriate to approve this transaction in the circumstances.

<u>Conclusion on RVO/Section 36 Issues</u>

[77]    In all the circumstances, I find that the RVO sought in the circumstances of this case is in the interests of the creditors and stakeholders in general. I consider the RVO to be appropriate in the circumstances. The RVO will: provide for timely, efficient and impartial resolution of Harte Gold's insolvency; preserve and maximize the value of Harte Gold's

assets; ensure a fair and equitable treatment of the claims against Harte Gold; protect the public interest (in the sense of preserving employment for well over 250 employees as well as numerous third party suppliers and service providers and maintaining Harte Gold's commitments to the First Nations peoples of the area); and, balances the costs and benefits of Harte Gold's restructuring or liquidation.

**Release**

[78]    Harte Gold seeks a Release which includes the present and former directors and officers of Harte Gold and the newcos, the Monitor and its legal counsel, and the purchaser and its directors, and officers. The proposed Release covers all present and future claims against the released parties based upon any fact, matter of occurrence in respect of the SARSA transactions or Harte Gold and its assets, business or affairs, except any claim for fraud or willful misconduct or any claim that is not permitted to be released under s. 5.1(2) of the CCAA.

[79]    CCAA courts have frequently approved releases, both in the context of a plan and in the absence of a CCAA plan, both on consent and in contested matters. These releases have been in favour of the parties, directors, officers, monitors, counsel, employees, shareholders and advisors.

[80]    I find that the requested Release is reasonable and appropriate in the circumstances. I base my decision on an assessment of  following factors taken from *Lydian International Limited (Re)*, 2020 ONSC 4006 at para. 54. As is often the case in the exercise of discretionary powers, it is not necessary for each of the factors to apply for the release to be approved.

[81]    <u>Whether the claims to be released are rationally connected to the purpose of the restructuring</u>: The claims released are rationally connected to Harte Gold's restructuring. The Release will have the effect of diminishing claims against the released parties, which in turn will diminish indemnification claims by the released parties against the Administration Charge and the Directors' Charge. The result is a larger pool of cash available to satisfy creditor claims. Given that a purpose of a CCAA proceeding is to maximize creditor recovery, a release that helps achieve this goal is rationally connected to the purpose of the Company's restructuring.

[82]    <u>Whether the releasees contributed to the restructuring</u>: The released parties made significant contributions to Harte Gold's restructuring, both prior to and throughout these CCAA Proceedings. Among other things, the extensive efforts of the directors and management of Harte Gold were instrumental in the conduct of the prefiling strategic process, the SISP and the continued operations of Harte Gold during the CCAA proceedings. With a proposed sale that will maintain Harte Gold as a going concern and permit most creditors to receive recovery in full, these CCAA proceedings have had what must be considered a "successful" outcome for the benefit of Harte Gold's stakeholders. The released parties have clearly contributed time, energy and resources to achieve this outcome and accordingly, are deserving of a release.

2022 ONSC 653 (CanLII)

[83]    <u>Whether the Release is fair, reasonable and not overly broad</u>: The Release is fair and reasonable. Harte Gold is unaware of any outstanding director claims or liabilities against its directors and officers. Similarly, Harte Gold is unaware of any claims against the advisors related to their provision of services to Harte Gold or to the purchaser relating to Harte Gold or these CCAA proceedings. As such, the Release is not expected to materially prejudice any stakeholders. Further, the Release is sufficiently narrow. Regulatory or environmental liabilities owed to any government authority have not been disclaimed and the language of the  Release was specifically negotiated with the Ministry of Northern Development and Mines to preserve those identified obligations. Further, the Release carves out and preserves claims that are not permitted to be released pursuant to s. 5.1(2) of the CCAA and claims arising from fraud or wilful misconduct. The scope of the Release is sufficiently balanced and will allow Harte Gold and the released parties to move forward with the transaction and to conclude these CCAA proceedings.

[84]    <u>Whether the restructuring could succeed without the Release</u>: The Release is being sought, with the support of Silver Lake and the Appian parties (the most significant stakeholders in these CCAA proceedings) as it will enhance the certainty and finality of the transaction. Additionally, Harte Gold and the purchaser both take the position that the Release is an essential component to the transaction.

[85]    <u>Whether the Release benefits Harte Gold as well as the creditors generally</u>: The Release benefits Harte Gold and its creditors and other stakeholders by reducing the potential for the released parties to seek indemnification, thus minimizing further claims against the Administration Charge and the Directors' Charge.

[86]    <u>Creditors' knowledge of the nature and effect of the Release</u>: All creditors on the service list were served with materials relating to this motion. Harte Gold also made additional efforts to serve all parties with excluded claims under the transaction. Additionally, the form of the Release was included in the draft approval and reverse vesting order that was included in the original Application Record in these CCAA proceedings. All of this provided stakeholders with ample notice and time to raise concerns with Harte Gold or the Monitor. No creditor (or any other stakeholder) has objected to the Release. A specific claims process for claims against the released parties in these circumstances would only result in additional costs and delay without any apparent corresponding benefit.

**Extension of the Stay**

[87]    The current stay period expires on January 31, 2022. Under s. 11.02 of the CCAA, the court may grant an extension of a stay of proceedings where: (a) circumstances exist that make the order appropriate; and (b) the debtor company satisfies the court that it has acted, and is acting, in good faith and with due diligence.

[88]    Harte Gold is seeking to extend the stay period to and including March 29, 2022 to allow it to proceed with the closing of the Silver Lake transaction, while at the same time preserving the status quo and preventing creditors and others from taking any steps to try and better their positions in comparison to other creditors.

2022 ONSC 653 (CanLII)

2022 ONSC 653 (CanLII)

[89]    No creditors are expected to suffer material prejudice as a result of the extension of the stay of proceedings. Harte Gold is acting in good faith and will continue to pay its post-filing obligations in the ordinary course. As detailed in Harte Gold's cash flow forecast, it is expected to have sufficient liquidity to continue its operations during the contemplated extension of the stay.

[90]    For these reasons the stay is extended to March 29, 2022.

## Expansion of Monitor's Powers

[91]    The CCAA provides the Court with broad discretion in respect of the Monitor's functions. Section 23(1)(k) of the CCAA provides that the Monitor can "carry out any other functions in relation to the [debtor] company that the court may direct". In addition, of course, s. 11 of the CCAA authorizes this Court to make any order that is necessary and appropriate in the circumstances.

[92]    The order for the Monitor's expanded powers is intended to provide the Monitor with the power, effective upon the issuance of the approval and reverse vesting order, to administer the affairs of the newcos (which is necessary to complete the transaction), along with powers necessary to wind down these CCAA proceedings and to put the newcos into bankruptcy following the close of the transaction. No creditor is prejudiced by the expansion of the Monitor's powers to facilitate the transaction and the wind-down of the CCAA proceedings. On the contrary, the granting of such powers is necessary to achieve the benefits of the transaction to stakeholders which have been described above.

[93]    I approve the grant of the requested powers to the Monitor.

## Conclusion

[94]    For all these reasons, the motion for an order approving the Silver Lake transaction, including the RVO structure, is granted. The additional requests for orders extending the stay and expanding the Monitor's powers are also granted.

_____

**Penny J.**

**Date:** 2022-02-04

**Proposition de Brunswick Health Group Inc.**                **2023 QCCS 4643**

# SUPERIOR COURT

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No.:      500-11-062636-234
          500-11-063060-236

DATE:   DECEMBER 6, 2023
_____

**BY  THE HONOURABLE   CHRISTIAN IMMER, J.S.C.**
_____

In the Matter of the Notice of Intention to Make a Proposal Under the *Bankruptcy And Insolvency Act*, RSC 1985, c B-3 of :

**BRUNSWICK HEALTH GROUP INC.**
**BRUNSWICK MEDICAL CENTER INC.**
**DMSC REAL ESTATE INC.**
**THE CHILDREN'S CLINIC @ POINTE-CLAIRE INC.**
**SANOMED SOLUTIONS INC.**
**BRUNSWICK MEDICAL CENTRE @ GLEN INC.**
**BRUNSWICK RESEARCH INC.**
**BRUNSWICK MINOR SURGERY CENTER INC.**
**BRUNSWICK ENDOSCOPY INC.**
**6892094 CANADA INC.**
**8981515 CANADA INC.**

          Debtors / Applicants

**BRUNSWICK LABS & TESTS INC.**

          Debtors / Applicants

**MNP LTD.**

          BLT NOI Trustee

**C.S. ADJAMI INC.**

2023 QCCS 4643 (CanLII)

500-11-062636-234                                                      PAGE : 2

    NOI Trustee

_____

JUDGMENT
Reasons for order rendered
on November 28, 2023
(Sections 50.4, 50.6, 64.2 and 183 of the *BIA*)
_____

2023 QCCS 4643 (CanLII)

[1] The application is presented in two files.

   1.1 <u>500-11-062636-234</u>: this file began with the filing of notices of intention to make a proposal ("**NOI**") under the *Bankruptcy and Insolvency Act* ("BIA"). It regroups the NOIs of the parent company Brunswick Health Group inc. ("**BHG**") and its ten subsidiaries (the "**Subsidiaries**"):

> ➢ Brunswick Medical Center Inc. ("**BMC**"),
>
> ➢ DMSC Real Estate Inc. ("**DMSC**"),
>
> ➢ The Children's Clinic @ Pointe Claire Inc. ("**TCC PC**");
>
> ➢ Sanomed Solutions Inc., ("**Sanomed**");
>
> ➢ Brunswick Medical Centre @ Glen Inc. ("**Brunswick Montreal**");
>
> ➢ Brunswick Research Inc. ("**BRI**");
>
> ➢ Brunswick Minor Surgery Center Inc. ("**BMSC**");
>
> ➢ Brunswick Endoscopy Inc., ("**BEI**");
>
> ➢ 6894094 Canada Inc. ("**JV**"),
>
> ➢ 8981515 Canada Inc. ("**TCC Montreal**")

   1.2. <u>500-11-063060-236</u>: This file began with the filing of an NOI by Brunswick Lab & Tests Inc. ("**BLT**"), which is owned by one of the seven shareholders, Vince Trevisonno.

[2]    All these entities – the BHG Group – act in four sectors:

   2.1. <u>Real Estate</u>:  DMSC owns a building situated in Pointe-Claire (the "**Building**"). Its leases are mainly entered into with the Subsidiaries and BLT and entities in which JV has an interest.

2023 QCCS 4643 (CanLII)

2.2. <u>Clinics operating in the Building</u>: BMC, DMSC, TCC PC, BRI, BEI and BLT all operate out of premises rented in the Building.

2.3. <u>Clinics operating or which have operated out of premises leased by the McGill University Health Center ("MUHC")</u>: TCC Montreal operates out of premises it rents from the McGill University health centre ("**MUHC**"). So did Brunswick Montreal, before its assets were sold in January 2023.

2.4. <u>JV</u>: it holds investment in joint ventures. It holds 49% of the shares in a radiology clinic, Brunswick Radiology (6892116 Canada inc.), the other 51% being owned by 11545060 Canada inc. It also owns shares in 10162884 Canada inc. which operates a Starbucks franchise.

[3]     The Group's and the Subsidiaries' operations are financed primarily by two secured lenders (the "**Primary Lenders**"): The Toronto-Dominion Bank ("**TD**") and the Business Development Bank of Canada ("**BDC**").

[4]     The Primary Lenders hold security interest on most of the assets of the Group on a *pari passu basis* (except for some specific equipment that solely relates to a BDC loan). These assets are comprised of the operating assets of the Group's medical activities and the Building. In addition, the Bank of Nova Scotia has provided an overdraft facility to BMS and has registered security over its moveable property.

[5]     The Court has already provided the context in the reasons it provided in August 2022.[1] The Court will not repeat *in extenso* what it has written on that occasion and refers the reader to those reasons.

[6]     The BHG Group, its financial advisors PricewaterhouseCoopers Corporate Finance Inc. ("**PwC**") and Carl Adjami - who is now the Trustee - have been attempting to restructure or sell the operations of the BHG Group since to close to a year.

[7]     By the summer of 2023, there was still no transaction, but discussions with one offeror were sufficiently advanced that it could be envisaged that one would be forthcoming with one offeror in particular for at least the clinics operating out of the Building.

[8] Time was however running out; financial pressures were intense and therefore, the Group filed a NOI on July 14, 2023 to complete its negotiations with an offeror.  It was clear at this time that negotiations would have to be carried out distinctly: first for the clinics – most likely only those operating out of the Building - and then for the Building, the fate of TCC Montreal remaining unclear.

---

[1]     *Proposition de Brunswick Health Group Inc.*, 2023 QCCS 3224

[9]      In August 2023, the Court, exercising its powers under the BIA, rendered, amongst others, the following orders:[2]

> 9.1. It authorized the Group to borrow from the Primary Lenders such amounts from time to time as they may consider necessary or desirable, up to a maximum principal amount of $1,000,000 and declared that all present and future assets, rights, undertakings and properties of every nature and kind whatsoever, and wherever situated, including all proceeds thereof and all bank accounts, be subject to an **Interim Financing Charge** for an aggregate amount of $1,250,000 ;

> 9.2. It appointed Stein & Stein Inc as the *Representative Counsel* to represent the interest of the physicians affiliated to the Debtors' clinics in connection with the Cycle 28 Payment and the Physicians' billings during the NOI Proceedings and ordered the Debtors to pay, subject to the Interim Financing Conditions, the reasonable and documented fees and disbursements of the Representative Counsel incurred after the date of this Order up to a maximum amount of $35,000 and the declared that all Property be subject to a **Representative Counsel Charge**, hypothec and security in the Property to the extent of the aggregate amount of $35,000 ;

> 9.3. It declared an **Administration Charge** in the amount of $150,000;

> 9.4. It ordered that the Debtors to pay a fee equal to the percentage provided for the sale of the Medical and Corporate Segment, as specified in the engagement letter dated January 25, 2023, Exhibit P-11 (*under seal*) on the Total Enterprise Value with respect to the Transaction and subject to the Interim Financing Conditions, to PwC up to a maximum amount of $350,000, but only in the event that the Transaction (as defined below) is closed prior to the September 30, 2023 and constituted a **Financial Advisor Charge**;

[10]     The stay was extended on several occasions.

[11]     An Amended and Restated Share Purchase Agreement (the "**Transaction**") was then entered into by various parties. As a result thereof, the shares of BHG and BLT will be transferred to 15529301 Canada Inc. (the "**Purchaser**"). Prior, to this Transaction, the debtors seek to transfer all Excluded Assets including the shares of DSMR, TCC Montreal and Brunswick Montreal, all Excluded Contracts and all Excluded Liabilities to newly formed corporations.

[12]     The reorganization and Transactions will result in what is known commonly as a **Reverse Vesting Order** ("**RVO**").

---

[2]      The order can be found at *Proposition de Brunswick Health Group Inc.*, 2023 QCCS 3219.

2023 QCCS 4643 (CanLII)

[13]    It is this Transaction, along with the reorganization that it entails, that the Court was called upon to authorize and did authorize amongst various other orders on November 28, 2023 (the "**Order**").

[14]    A redacted copy of the Transaction is filed in the Court record. Only sections 3.2, 3.3 and 3.4 dealing with consideration are redacted. Given that the Transaction is not yet consummated, it is important to retain the confidentiality of the consideration to protect the integrity of any future offering process and negotiations, in the event that a new call for offers must be carried out. All the key provisions and the schedules are however set out in the Order. Suffice it to say that the consideration only represents a small fraction of the secured lenders indebtedness, the payment of which will depend on the sale of the Building.

[15]    A first day of hearing was held on November 22, 2023. The Court remarked that some – those found on the distribution list – but not all Retained and Excluded Contracts had received notification of the motion. In *PaySlate*,[3] lack of service was one of the two reasons given to refuse at the first occasion it was presented, a motion seeking the Courts authorization for the issuance of an RVO.

[16]    "RVOs require special scrutiny by the courts, even where uncontested, since they deviate from the statutory framework intended to provide all creditors with an opportunity to be heard in the process".[4] As professor Janis Sarra has posited in matters of RVOs: "Reasons are important for stakeholders to understand the benefits and prejudice that may accrue to any particular transaction[5]".

[17]    Here are the Court's reasons why it has signed the RVO order.

## 1.  <u>THE RVO</u>

[18]    The Court will provide its reasons under the three following headings: (1.1) the Transaction and the preliminary steps called for, (2) the Court's powers to render the orders sought and (3) why it was appropriate to do so.

### 1.1  The Reorganization and exclusion of assets, contracts and liabilities and the Transaction

[19]    As indicated above, at present, seven shareholders own the shares of the parent, BHG. BHG in turn holds the shares of the Subsidiaries. Trevisonno holds the shares of BLT.

---

[3]    *PaySlate Inc. (Re),* 2023 BCSC 608, par. 86 ["*PaySlate #1*"]; Justice Walker did ultimately grant it on a second application*: PaySlate Inc. (Re)*, 2023 BCSC 977 ["*PaySlate #2*"].

[4]    *PaySlate #1,* par. 89.

[5]    Janis P Sarra, *Reverse Vesting Orders – Developing Principles and Guardrails to Inform Judicial* Decisions, Canadian Legal Information Institute, 2022 CanLIIDocs 431.

[20]    The Purchaser wishes to purchase in the shares of the parent BHG, BLT, and, through the parent, the shares of seven of the Subsidiaries (the "**Targets Entities**").

[21]    DSMC is not part of the Transaction and the Purchaser, at this juncture, has no interest for the shares of TCC Montreal. Finally, there is no purpose of transferring the shares of Brunswick Montreal to the Purchaser. Amongst other assets, these will be considered Excluded Assets.

[22]    The Purchaser is not willing to be burdened with certain contracts and liabilities of BHG, BLT and the Targets Entities, namely the Excluded Contracts and Liabilities. Cure Costs linked to the Retained Contracts will be paid by the Purchaser.[6]

[23]    In order to achieve this result, a four-step process is proposed which the Court will now review.

[24]    Step 1: Four entities are incorporated and their shares subscribed to:

  Step 1.1:    BHG incorporates 9503-6737 Québec Inc. ("**BHG ResidualCo**") with an authorized share capital consisting of class A voting and fully participating common shares and a Class B of non-voting and fully participating common shares;

  Step 1.2:    BHG incorporates 9503-6760 Québec Inc. ("**BLT ResidualCo**") BLT ResidualCo, 9503-6752 Québec Inc. ("**DMSC ResidualCo**") and 9503-6802 Québec Inc. ("**ResidualCo**") in each case with one class of voting and participating shares;

  Step 1.3:    BHG subscribes to 1 share of BHG ResidualCo;

  Step 1.4:    BHG ResidualCo subscribes to 100 BLT Residual Co Common Shares, one DMSC ResCo Common Share and one ResidualCo Common Share.

[25]    Step 2: BHG, BLT and the Target Companies keep the Retained Assets, Retained Contracts and Retained Liabilities, but transfer the undesired Excluded Assets, Excluded Contracts and Excluded Liabilities to either of BHG ResidualCo, BLT ResidualCo, DMSC Residual Co or ResidualCo.

[26]    Retained and Excluded Assets are defined as follows:

  ➢  "**Retained Assets**" means all of the assets owned by any Target Entity immediately prior to the Pre-Closing Reorganization other than the Excluded Assets, which include, for greater certainty, the Excluded Shares, and the BLT

---

[6]    See section 2.2 (3) of the Transaction.

2023 QCCS 4643 (CanLII)

Excluded Assets; for greater certainty, the Retained Assets will include the rights, title and interest in and to the assets set out in Schedule "E".

➢ **"Excluded Assets"** means the properties and assets of the BHG Target Entities listed in Schedule "C", as supplemented in accordance with section 4.1 of the Purchase Agreement, as the case may be.

[27]    Schedule E lists the following Retained Assets:

➢ All of the outstanding and issued shares, as at the Closing Time, in the share capital of the Target Entities:

➢ All the Target Entities' rights and interests under or pursuant to all warranties, representations and guarantees, express, implied or otherwise, of or made by suppliers or others in connection with the Retained Assets or the Retained Liabilities or otherwise arising from the operation of any Target Entity's business; all Account Receivables; All Intellectual Property; all the Retained Contracts; all the Permits and Licences; all the Books and Records; all goodwill; all Hardware; all proceeds of any or all of the foregoing received or receivable after the Closing Time.

➢ 50% of all of the issued and outstanding shares, in the share capital of 10162884 Canada Inc.

➢ For JV, 49% of all of the outstanding and issued shares, in the share capital of 6892116 Canada Inc. (d.b.a. Centre de Radiologie Brunswick).

[28]    Schedules C lists the following Excluded Assets:

➢ The shares of TCC Montreal and Brunswick Montreal which includes all assets, Contracts and Liabilities relating thereto;

➢ The shares of DMSC, which includes the Building and all rights and interest of DMSC in, to and under all leases and offers to lease, or lease arrangements (written, verbal or tacit) for the occupation of space in the Building and all other assets, Contracts and Liabilities;

➢ (i) The cash in excess of the amount payable, as the case may be, for the working capital adjustment (ii) and all amounts of GST and QST that is actually recovered, whether by refund or credit against GST or QST payable, in connection with the jointly identified professional fees incurred in connection with the BIA Proceedings and prior to the Closing Time of TCC Montreal, Brunswick Montreal, DSMC and all the Target Entities.

➢ For BLT, (i) all the cash, (ii) all rights of BLT in connection with any reviewable transactions[7], (iii) certain moveable assets and (iv) all amounts of GST and QST that is actually recovered, whether by refund or credit against GST or

---

[7]    Further investigations must be carried out in this regard.

2023 QCCS 4643 (CanLII)

QST payable, in connection with the jointly identified professional fees incurred in connection with the BIA Proceedings and prior to the Closing Time.

[29]    Retained and Excluded Contracts are defined as follows:

> ➤ "**Retained Contracts**" means the Contracts listed in Schedule "G" hereto, all employment agreements and all Contracts with any of the physicians affiliated to the BHG Target Entities to which any Target Entity is a party or by which any Target Entity or any of the Retained Assets is bound or under which any Target Entity has rights. For greater certainty, the Retained Contracts shall not include the Excluded Contracts and the Retained Contracts shall include all contracts of employment of Employees.

> ➤ "**Excluded Contracts**" means all Contracts which are not Retained Contracts, including those listed in Schedule "D".

[30]    Schedule G sets out a long list of contracts made with service providers for BHG and the Target Companies. Schedule C sets out a very limited list of Excluded Contracts which comprises the following:

> ➤ BGH's IT Consulting and Support Contract MSP365 with Mips Media Inc.;

> ➤ Any and all leases for space at the Glen site of the MUHC used in connection with the operations of 8981515 Canada Inc., a list of which shall be provided by the BLT Shareholder and approved by the Purchaser prior to the Closing Date;

> ➤ Any and all contracts relating to the Marge de crédit Solution Libre-Affaires made available to Brunswick Labs & Tests Inc. by Fédération des caisses Desjardins du Québec.

[31]    Retained and Excluded Liabilities are defined as follows:

> ➤ "**Retained Liabilities**" means the Liabilities of the Target Entities listed in Schedule "F", unless any of them have been designated as Excluded Liabilities in accordance with Section 4.6 of the Purchase Agreement, as the case may be.

> ➤ "**Excluded Liabilities**" means all Liabilities of the Target Subsidiaries other than the Retained Liabilities in respect of the Target Subsidiaries.

[32]    Schedule F lists the Retained Liabilities. They are, for BHG, BLT and all the Target Companies all Liabilities under the Retained Contracts accruing and arising from and after the Closing Time and all Liabilities with respect to the Employee Plans of the Retained Employees.

[33]    Ultimately, BHG ResidualCo will hold the shares of TCC Montreal and the BHG Excluded Liabilities. ResidualCo holds the shares of Brunswick Montreal and the Excluded Assets, Excluded Contracts and Excluded Liabilities of all Target Companies. DMSC ResidualCo will hold the shares of DMSC. ResidualCo holds the BLT Excluded Assest, the BLT Excluded Contracts and the BLT Excluded Liabilities.

[34]    <u>Step 3</u>: the transfer of shares

> ➢ Step 3.1: BHG transfers its BHG ResidualCo Shares to the seven BHG Shareholders for a Nominal Consideration. The Existing Shareholders therefore own both BHG and BHG ResidualCo's shares.

> ➢ Step 3.2: The BHG shareholders transfer the shares they hold in BHG to BHG ResidualCo in exchange for the issuance of BHG ResidualCo on a tax deferred roll-over basis pursuant to section 85 of the ITA.

[35]    <u>Step 4</u>: the shares of BHG which now in turns owns the shares of only the Target Entities and of BLT are sold to the Purchaser for a cash consideration which for the moment is confidential.

## 1.2    The legal principles

[36]    The Court will examine (1.2.1) why the judge hearing an application for an RVO has the power to render such order under the *BIA*. Having concluded that exceptionally in the appropriate circumstances it may, the Court will then review (1.2.2) which factors must be examined when hearing such an application.

### 1.2.1    Jurisdiction to render an RVO

[37]    Professor Sarra explains the RVO as follows:

> The result of an RVO is to expunge the existing corporate structure of the debtor company of anything the purchaser does not want. The newco is added to the insolvency proceeding and continues in that process while the debtor company exits the insolvency proceeding with broad liability releases; then the newco is liquidated or placed in bankruptcy to be liquidated. The transaction takes place outside of a negotiated and court-approved plan of arrangement or compromise. The RVO structure was crafted to allow those businesses to continue through the debtor company, since it was that corporate vehicle who owned the valuable "assets" that could be not transferred.[8]

---

[8]    Reverse Vesting Orders – Developing Principles and Guardrails to Inform Judicial Decisions, 2022 CanLIIDocs 431.

[38]     RVO's (or ordonnance de dévolution inversée in French) are a relatively new tool in Canadian insolvency practice.[9] Although regularly ordered by Canadian Courts, no appellate judgment as yet rendered detailed reasons why a court would have the power to issue them nor, in what circumstances and under which conditions. Indeed, leave applications of RVOs which could have generated such judgements were not granted. In *Nemaska*, Justice Marcotte remarked that using s. 36 *BIA*'s vesting powers in an order " that is not strictly limited to the "sale or disposition of assets"" raises issues that "qualify as being significant to the practice of insolvency". Her observation was then cited with approval in *Blackrock*, where Justice Healy also stated that "the ramifications of RVO's with regard to the powers given to a judge under the CCAA have not been addressed, to date, by an appellate court in Canada". [10] In *Quest*, the Court of Appeal, in refusing to grant leave, noted that the use of RVOs is of "significance to the practice".[11] In all these cases, it was held that allowing the appeal would have had very negative consequences on the debtors.

[39]     Often, RVOs are granted in *CCAA* settings in non contested proceedings.[12] The vigorous contestation in *Nemaska*, *Quest*, and *BlackRock* generated judgments with very detailed reasons. Justice Penny in *Harte Gold*,[13] although deciding an unopposed application, also provided extensive reasons. Having reviewed these cases, the Court draws the following principles:

39.1.     The RVO structure was crafted to allow businesses to continue through the debtor company, when the corporate vehicle owned the valuable "assets" that could be not transferred.[14]

39.2.     The following are examples of situations where valuable assets cannot be transferred:

- if the debtor operates in a highly-regulated environment in which its existing permits, licenses or other rights are difficult or impossible to reassign to a purchaser;

- if the debtor company is a party to certain key agreements that would be difficult or impossible to assign to a purchaser; or

---

[9]     Janis P Sarra, Reverse Vesting Orders – Developing Principles and Guardrails to Inform Judicial Decisions, Canadian Legal Information Institute, 2022 CanLIIDocs 431, p.1

[10]    *Arrangement relatif à Blackrock Metals Inc.*, 2022 QCCA 1073; application for leave to the Supreme Court of Canada was dismissed: *Winner World Holdings Limited, et al.* v. *Blackrock Metals Inc., et al.*, 2023 CanLII 36969 (SCC),

[11]    *Southern Star Developments Ltd.* v. *Quest University Canada*, 2020 BCCA 364 ("*Quest*")

[12]    In Sarra, *supra*, the author makes the following observation : "Overall, we are left with 20 recent proceedings in which RVO have been approved outside of a plan of arrangement, with few guardrails or principles set out in 16 of these decisions."

[13]    *RE Harte Gold Corp.*, 2021 ONSC 8307 ["*Harte Gold, Re*"]

[14]    *Id.*, par. 160.

- if maintaining the existing legal entities would preserve certain tax attributes that would otherwise be lost in a traditional vesting order transaction tax losses.[15]

39.3.    When deciding to grant relief, Courts must rely first on an interpretation of the provisions of the *CCAA*'s text before turning to inherent or equitable jurisdiction to anchor measures taken in a CCAA proceeding.[16]

39.4.    The features of an RVO make it different from the transaction contemplated by par. 36(1) *CCAA*, because what is contemplated is not the sale of assets of the debtor, but rather "a purchase of the shares of the debtor and "vesting out" from the debtor to a new company of unwanted assets, obligations and liabilities".[17]

39.5.    Given that s. 36(1) may not anchor an RVO, the inherent or equitable jurisdiction of Section 11 of the *CCAA* must be relied on.

39.6.    S. 11 confers jurisdiction on the supervising court to "make any order that it considers appropriate in the circumstances". This power is vast.[18]

39.7.    The jurisdiction granted by s. 11 is constrained only by restrictions set out in the *CCAA* itself, and the requirement that the order made be "appropriate in the circumstances".  The exercise of this discretion must further the remedial objectives of the *CCAA* and be guided by the baseline considerations of appropriateness – i.e. whether it advances the policy objectives of the *CCAA* - , good faith, and due diligence. [19]

39.8.    Resort to RVOs must be unusual and extraordinary and involve close scrutiny.[20]

39.9.    The debtor must seek the relief in good faith and while acting with due

---

[15]   See also *Quest*, par. 161; *Harte Gold Corp. (Re)*, par. 71,

[16]   *9354-9186 Québec inc.* v. *Callidus Capital Corp.*, 2020 SCC 10 (CanLII), [2020] 1 SCR 521, par. 65 ["*Callidus*"].

[17]   *Harte Gold Corp. (Re),* par. 36.; see also discussion in Sarra, supra, where professor Sarra states the following: "With great respect, s. 36 discusses asset sales outside the ordinary course of business and there is nothing in the statutory language that refers to vesting liabilities. (…) Moreover, s. 36(6) expressly states that where the court authorizes a sale free of any security or charge, it "shall order" that other assets of the company or the proceeds of the sale be subject to a security, charge or other restriction in favour of the affected creditor. There has been no judicial consideration of what that provision means in the context of an RVO, and arguably, it does not mean leaving the charge over assets that have little or no value as the assets of value have been moved out of reach of creditors."

[18]   *Canada* v. *Canada North Group Inc.*, 2021 SCC 30, par. 21 ["*Canada North*"]

[19]   *Callidus* par. 49 and 50.

[20]   *Harte Gold Corp. (Re)*, par. 38.

2023 QCCS 4643 (CanLII)

diligence to promote the best outcome for all stakeholders.

39.10.    Debtors should not seek an RVO structure simply to expedite their desired result without regard to the remedial objectives of the CCAA.[21]

[40]    These principles therefore establish why there is jurisdiction to issue an RVO under the *CCAA*.

[41]    The following question must then be answered: does the *BIA* grant the same powers to issue an RVO?

[42]    Paragraphs 65.13(1) and 65.13(4) of the *BIA* are a mirror of paragraphs 36(1) and 36(3) of the *CCAA*. Hence, since paragraphs 36(1) and 36(3) *CCAA* do not, in of themselves, anchor the jurisdiction to issue an RVO in a *CCAA* proceeding, s. 65.13 also is an insufficient basis to issue an RVO in a *BIA* proceeding. Resort must be had to some other general power under the *BIA*. As stated, in a *CCAA* proceeding, the power set out at S. 11 *CCAA* can be relied on. This power is "vast"[22].

[43]    In *Century Services Inc.*, the Supreme Court of Canada observed that the *BIA* serves the same remedial purpose as the *CCAA*: permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. It noted that in the *BIA* context, this is achieved through a rules-based mechanism that offers less flexibility[23]. Indeed, the *CCAA* is "famously more skeletal in nature"[24].

[44]    Absent a mirror provision to s. 11 *CCAA* in the *BIA*, could RVOs be justified under the *BIA*?

[45]    Very recently, in *Chronométriq*, Justice Schrager writing for the Court of Appeal, examined whether the findings in *Canada North* regarding the power of a judge to order that the interim financing charge prime the *Income Tax Act* ["*ITA*"] deemed trust, could also be applied in a *BIA* setting.

[46]    At the outset, he made this observation: "proposal provisions in the BIA serve, inter alia, the same remedial purpose as those in the CCCA – i.e., the financial rehabilitation of an insolvent corporate debtor. […] To the extent possible, the two statutes should be treated in a harmonized fashion."[25]

---

[21]    *Quest*, par. 171.
[22]    *Canada North*, par. 21.
[23]    *Century Services Inc.* v. *Canada (Attorney General)*, 2010 SCC 60 (CanLII), [2010] 3 SCR 379, par. 15.
[24]    *Canada North Group,* par. 138.
[25]    *Syndic de Chronométriq inc.*, 2023 QCCA 1295, par. 58 [« *Chronométriq* »]

[47]   He then proceeded to carry out the statutory interpretation of the *BIA* and concluded that the judge did indeed have the explicit power to order the interim financing charge to prime over the *ITA* deemed trust using sub-paragraph 50(6)(3) *BIA*.

[48]   He then presented a subsidiary justification to support the judge's power to so order, in the event that his statutory interpretation was wrong. He concluded that, similarly to the general power granted by s. 11 *BIA*, the Superior Court has the inherent jurisdiction to order the charge to prime, under s. 183 *BIA,* as well as by application of art. 49 of the Quebec Code of Civil Procedure.[26]

[49]   Justice Schrager did however call for the exercise of caution when invoking this inherent jurisdiction: 'the inherent jurisdiction must be used sparingly and with caution because of its broad and loosely defined nature. Inherent jurisdiction cannot be used in contravention of statutory provisions. It is also limited by the nature of the *BIA*."[27] He concludes as follows:

> [60]  I would point out that inherent jurisdiction attaches to the Superior Court, such that the same inherent jurisdiction exists whether the CCAA or the BIA is applied. Historically, inherent jurisdiction has been exercised more often upon application of the CCAA, presumably because its skeletal nature makes for more gaps than is the case for the BIA, which offers a detailed rules-based regime. That being said, when a gap is identified upon applying the BIA, the inherent jurisdiction allows the gap to be filled when and as appropriate.

[50]   Courts have issued RVO orders in a BIA setting, but not necessarily with reasons.[28] Justice Walker did provide detailed reasons in *PaySlate*.[29] He concluded that he had jurisdiction under the *BIA* to issue an RVO. He invoked s. 183 *BIA* to give effect to the *BIA*'s purposes, including those purposes applying "to proposals such as s. 65.13(4)".[30]

[51]   Taking all this into consideration, given the similarity between s. 65.13 *BIA* and s. 36 *CCAA*, given *PaySlate* and given the Superior Court's inherent jurisdiction as defined in *Chronométriq*, the Court may, in exceptional and unusual circumstances, issue an RVO order.

[52]   Having concluded that the Court can issue RVOs in a NOI setting in appropriate circumstances which are, necessarily, unusual and extraordinary, the Court must now be review what factors and considerations will guide it in this discretionary exercise.

---

[26] *Id.*, par. 57.
[27] Chronom
[28] *PaySlate Inc. #1*, par. 86.
[29] *Idem.*
[30] *PaySlate* #1, par. 85.

### 1.2.2  Factors and conditions

[53]    The case law and the *BIA* offer various considerations and factors to be considered.

[54]    The 65.13(4) *BIA* set out six factors:

(a) whether the process leading to the proposed sale or disposition was reasonable in the circumstances;

(b) whether the trustee approved the process leading to the proposed sale or disposition;

(c) whether the trustee filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;

(d) the extent to which the creditors were consulted;

(e) the effects of the proposed sale or disposition on the creditors and other interested parties; and

(f) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

[55]    Justice Fitzpatrick in *Quest* discusses other considerations which overlap these criteria, namely: (i) whether the party conducting the sale made sufficient efforts to obtain the best price and did not act improvidently; (ii) the interests of all parties; (iii) the efficacy and integrity of the process by which offers were obtained; and, (iv) whether there has been any unfairness in the sales process.

[56]    In scrutinizing the Transaction, Justice Penny suggests the following factors.

(a) Why is the RVO necessary in this case?

(b) Does the RVO structure produce an economic result at least as favourable as any other viable alternative?

(c) Is any stakeholder worse off under the RVO structure than they would have been under any other viable alternative? and

(d) Does the consideration being paid for the debtor's business reflect the importance and value of the licences and permits (or other intangible assets) being preserved under the RVO structure?

[57]    Professor Sarra proposes this extensive list of considerations to be examined:

• Is the monitor satisfied that the debtor acted with due diligence and in good faith to comply with the statutory framework and that all parties are acting in

2023 QCCS 4643 (CanLII)

2023 QCCS 4643 (CanLII)

good faith; and has the monitor satisfied the court that the relief sought is appropriate in the circumstances and accords with the statutory objectives and framework of the CCAA in both what the order will achieve and the means to achieve those objectives?

- Has the monitor discharged its responsibility, as a court-appointed officer, to provide the court with evidence that there are compelling and exceptional circumstances such that the RVO transaction cannot be undertaken as a plan of arrangement or compromise pursuant to s. 6 of the CCAA, including evidence as to why a creditor vote is not possible? Has the monitor given an opinion that the creditors should be permitted to vote on the proposed RVO under a plan, or why the circumstances are so exceptional that some of the most significant requirements of the statute should be bypassed?

- Has the monitor in its report offered an evidence-based rationale as to why the proposed transaction is at least equivalent to respecting the rights and remedies of creditors under a plan of arrangement?

- Are the assets or value of the assets being transferred to newco at least equivalent to the value of assets that would be available to meet creditors' claims under a CCAA plan, BIA proposal or a bankruptcy liquidation? The consideration given in the transfer of the unwanted assets and liaiblities should be at least equivalent to assets that are available under the insolvency framework, which includes, either transferring some the debtor's most valuable assets to newco; or paying a price for the licenses, permits, and tax attributes that leaves creditors in the same position that they would be in if they were able to vote on a plan. Merely approving clauses that specify that creditors will continue to have all the rights, remedies, and recourses against the newco created during the RVO as they did against the debtor originally is just not sufficient in itself.  The value of assets to satisfy the claims must also be transferred to protect the integrity of the system.

- Has the objective of preserving the going-concern value of the business been balanced against the prejudice to creditors and other stakeholders? Has the court required objective evidence of the balance of protections and prejudice?

- Has the monitor given an opinion that it is confident that the RVO is not being sought to bypass employment agreements and pension and benefits obligations that would otherwise continue in a going-concern resolution or where their claims are being extinguished without equivalent compensation?

- Has the monitor given an opinion that it is confident that the RVO is not being used to avoid or bypass environmental reclamation responsibilities and the relevant regulator has been given notice of and supports the transaction? If the regulator does not support the transaction, has the monitor opined that the RVO is still the most viable alternative and complies with any applicable remedial legislation, along with the appropriate reasons?

- Is the court satisfied that any requested releases in favour of the debtor's directors, officers and third-parties under the RVO do not inappropriately shield them from claims and meet the tests articulated by the courts? Is the court satisfied that the RVO approach is not being used to achieve third-party releases without creditors being asked to vote on the issue?

- Where claims are preserved in the newco, are there sufficient assets also allocated to newco or set aside in trust for a period to be available to satisfy claims? Are the rights and remedies of creditors preserved until the vote on a plan with newco?

[58]    Having ascertained its jurisdiction to do so and identified the factors and considerations which must govern it, the Court will now explain why it found it appropriate to issue the RVO.

### 1.3    Is it appropriate to authorize the RVO?

[59]    The Court will regroup the factors and considerations under the four following headings in order to analyze the Transaction.

### 1.3.1    Is an RVO necessary?

[60]    The Court is of the view that it this is an exceptional situation where an RVO can be appropriate for three reasons: the highly regulated environment, the relationship between the physician and the patient and the confidentiality of the patient records.

[61]    <u>The regulated environment</u>: BMC and TCC Pointe Claire operate in a highly-regulated environment. Indeed, BMC is qualified as a Groupe de médecine familiale (GMF) and a participant in the *mécanisme régional d'accès pour les patients sans médecin de famille* (GMF-R).  TCC Pointe Claire is also a GMF. In GMFs, patients have a family doctor while GFM-Rs are walk-in clinics.

[62]    GMFs and GMF-Rs are tied to a Québec governmental program which aims to increase front line access to family doctors. Governmental financing is provided for the operation of the GMF or GMF-R. Professionals (including a pharmacist) and social services support is provided to them. The number of patients for a GMF or the number of patient visits for the GMF-R will determine into which of twelve levels they will be placed. This will in turn determine the amount operating financing they will receive, the contribution which will be made towards the pharmacist's revenue and the number of personnel equivalents (nurses, social workers and other professional) which will be ascribed to them.

[63]    This program is decentralized and is administered by the agencies, namely the centres intégrés de santé et de services sociaux (CISSS) or centres intégrés universitaires de santé et de services sociaux (CIUSSS).

[64]    To receive government financing and professional and social services support, GMFs and GMF-Rs must be deemed admissible and must have signed a contract with the relevant body.

[65]    TCC Montreal signed an agreement with the relevant agency, the Centre intégré de santé et services sociaux de l'Ouest de l'Île de Montréal (« CIUSSS ») to be recognized as a GMF, while BMC signed an agreement with the CIUSSS to be recognized as both a GMF and a GMF-R.

[66]    In the case of the BMC GMF, the CIUSSS, aside from financing, provides and pays for a nurse, a nutritionist and a kinesiologist. For the BMC GMF-R and the TCC Montreal GMF, aside from financing, the CIUSSS provides and pays for a nurse.

[67]    If BMC's assets were merely transferred, the GMF and GMF-R contracts would not follow and the process for qualification as a GMF and GMF-R would have to be started anew. The number of patients would depend on the number of physicians who would continue working in the GMF and GMF-R.

[68]    From the testimony of Vince Trevisono, the Court concludes that given the level of financial and human resources support provided by the program, the operation of the clinics would not be viable and no interest could be solicited from eventual buyers.

[69]    It is not possible to separate the other clinics from these two clinics as their operations are intimately linked and share BHG's administrative services.

[70]    The tripartite patient-physician-clinic: The patients are in a direct contractual relationship with the doctor who bills the Régie d'assurance-maladie du Québec ("**RAMQ**") for the medical acts he or she exercises. The clinics receive a percentage of these billings. This constitutes a large part of the clinic's revenue stream. Put simply, without the physicians, there is no business.  Any delay or lapse in a sale of assets may lead a physician to simply move to another clinic which is up and running.

[71]    Patient confidentiality: The confidentiality of patient files also greatly complicates matters. This confidentiality must be protected both by the doctors and the clinic. It is in fact the physician's clear professional ethical duty to uphold this confidentiality and the professional secrecy. Transferring the patient files to a new entity raises complex administration issues to ensure that this confidentiality is protected at all times.

[72]    The Court therefore concludes that the very particular nature of the business and the ethical confidentiality requirements related to patient files generate an unusual and exceptional circumstance where an RVO can be *prima facie* warranted, subject to the analysis of the other factors.

[73]    The debtors have also advanced the tax losses as a possible basis to justify the exceptional resort to the RVO. Debtors file a NOI under the BIA or seek relief under the CCAA because they are in financial difficulty. Most likely if not invariably, they will be

2023 QCCS 4643 (CanLII)

accumulating losses. The Court is not willing in of itself to consider the use of tax losses by a purchaser as an exceptional and unusual circumstances which justifies an RVO. That being said, it is an additional factor that can be considered but to which the Court does not give much weight.

### 1.3.2 What is the impact on interested parties and are they worse off as a result of the RVO ?

[74]    Answering this general question also entails answering the following related questions: Who are the interested parties? Were they consulted? Are employment agreements or other service agreements of professionals being bypassed? How is the interest in the going concern balanced with the prejudice caused to the creditors and stakeholders? Why should the creditors not be allowed to vote on plan?

[75]    The Court will focus on six groups of interested parties.

[76]    The patients: There is an average of 300 000 patient visits to the clinics per year. Any discontinuity in service will have grave deleterious effects on numerous Québécois and Québécoises who depend on these clinics for essential care. The Court takes judicial notice of the extreme pressures on the Québec health system to provide access and timely and appropriate care to patients. Hence, the SPA which offers continuity and clarity is clearly in their advantage.

[77]    The physicians. Through their Representative Counsel, the physicians were consulted throughout. They agree with the Transaction, subject to the removal of releases in the Order. Amendments were therefore brought to the Order which was signed by the Court so as to remove releases.

[78]    The Transaction provides them with certainty and financial protection.

78.1.    Certainty as they will remain in the same clinic, with the same personnel.

78.2.    Financial protection because for most of the physicians, the Group was billing the RAMQ on their behalf, collecting the sums, withholding its service fee and then distributing the rest to the physician by way of cheque. Pursuant to the filing of the NOI, in August, the Court ordered that the cycle 28 fees be paid to the physicians and named an interim receiver for the sole purpose of receiving and distributing future billings. Unfortunately, at the date of filing of the NOI, certain physicians had not cashed cheques from previous billing cycles. $667,100 had not been collected. As appears from the unredacted section 3.3 of the Transaction, the consideration to be paid is to be reduced by an amount equal to all the pre-filing amounts owed to the physicians affiliated to any BHG Target Entity and will be held in trust and distributed to the physicians to whom sums are owed by the Trustee.

2023 QCCS 4643 (CanLII)

[79]    This is certainly a substantial benefit for the physicians.

[80]    <u>The employees</u>: The Group employs approximately 150 employees who all are Retained Employees. As indicated above, they are Retained Liabilities, so that all liabilities with respect to Employee Plans are retained. This is certainly a substantial benefit for the employees.

[81]    <u>Other professionals</u>: Among the Retained Contracts and associated Cure Costs listed in Schedule G to the Transaction, one finds the professional services contract entered into between the pharmacist and the GMF to which a Cure Cost of $88,000 is associated. The Transaction therefore allows her contract to be maintained, her clients to continue to be serviced and the amounts outstanding to be paid. This is obviously a substantial benefit.

[82]    <u>The CIUSSS</u>: is also concerned as they are the agency that the government has identified to carry out its policy of access to patients. The *Entente entre un GMG et un établissement du reseau de la santé et des services sociaux dans la cadre d'une désignation accès réseau* and any other contract in connection with a GMF and GMF-R are considered  The Transaction will allow seamless operations. This is a substantial benefit to the CIUSSS. The CIUSSS' attorneys were present at some of the hearings it supports this RVO

[83]    <u>The creditors</u>: the position of the secured and unsecured creditors must be examined.

[84]    The secured lender are owed close to $38 million. Municipal taxes are owing to the tune of $1,420,000. Cross-guarantees are provided by the parent and all subsidiaries. The collateral are all assets including the shares and the Building. As indicated in the overview, the consideration to be paid will only cover a small fraction of their indebtedness. Furthermore, the charges must first be paid, including the Interim Financing Charge. In the last Trustee's report, it is indicated that 650 000$ has been advanced. However, ensuring the stability of the clinics and the radiology clinic will greatly enhance the value of the Building and will make it more attractive to potential buyers. Consequently, this will most likely increase the proceeds of any sale of the Building.

[85]    As for the unsecured creditors, the Trustee has provided an estimated collocation as of July 10, 2023 by company of the creditors. It is divided amongst the parent, and five subsidiaries.

85.1.    The physicians are the most important creditors to the tune of close to $670,000 owed by the subsidiaries.  They will be paid in the Transaction.

85.2.    The Canadian government for the COVID assistance programs for a total of approximately $300,000 to the Subsidiaries ($279,100), DMSC ($60,000), BLT ($60K) and BHG ($60,000) and $36,000 for GST and QST.  Its attorneys were present at the hearing and did not voice any objection.

2023 QCCS 4643 (CanLII)

2023 QCCS 4643 (CanLII)

85.3.    Accounts payable total $602,300 for the following Target Entities: BMC ($273,300), Sanomed ($3,000), BMS ($80,600), Endoscopy ($128,700) and TCC PC ($116,900).

85.4.    Accounts payable of BHG total $176,600. There are also shareholder advances in the amount of $1,370,000 and private loans totalling $400,000.

85.5.    Accounts payable of BLT total $895,000.

[86]    The creditors of DSMC and TCC Montreal are not concretely affected by the Transaction.

[87]    The creditors of BHG are not in a worse off position after the RVO and could potentially gain from it if the Building is sold at a high price which ensures payment of the secured creditors and the DMSC ResidualCo Excluded Liabilities and generates an excess to be paid to the parent.

[88]    Some creditors who will hold Excluded Liabilities in the Target Entities or BLT will most likely receive very little if anything. Of these, certain, totalling close to $100,000 will see their receivables paid by way of the Cure Costs mechanism. The main unsecured creditor of BLT, CDL Laboratories, is linked with the Purchaser and the sums owing to it are taken into account when determining the consideration to be paid in the Transaction.

[89]    Ultimately, the creditors who remain suppliers of the Target Entities or BLT will gain by continuing to offer their services.

[90]    The Court understands that the creditors holding the Excluded Liabilities will not be given a chance to vote on this proposal and attempt to get a better deal. Realistically, there is no better deal and the creditors are not worse off as a result of the RVO. In fact, they are better off.

[91]    The *BIA* aims to avoid the social and economic costs and social effects of liquidating assets. Taking into consideration the interests of all stakeholders, the RVO clearly contributes to ensure these goals.

### 1.3.3   Is the consideration paid fair and reasonable?

[92]    Answering this question also entails answering the following related questions: What efforts were deployed to obtain that price? Was the process leading to the proposed sale or disposition reasonable in the circumstances? Was it carried out with efficacy and integrity? Does the consideration being paid for the debtor's business reflect the importance and value of the permits and licences?

[93]    The Court believes the answer to be yes, based on the testimony of the financial advisor, the Trustee and the position of the secured lenders.

2023 QCCS 4643 (CanLII)

93.1.    Éric Lemay of PwC, who has extensive experience in assisting the sale or financing of businesses, in particular in the health services industry has been hired since March 2023.  He has canvassed 39 potential offerors who are either Québec actors well versed in the particularities of this highly regulated industry, health industry consolidators on a Canadian national level or real estate holdings. Fifteen showed sufficient interest to sign a non-disclosure agreement. He explains without ambiguity whatsoever that the Transaction is the highest value which could be obtained and that the consideration is truly fair.

93.2.    The secured lenders are those who would lose if the value was not fair and reasonable. They have been involved in all steps and their counsel indicated that they are satisfied. It is their interim financing which has permitted the clinics to be operated during the NOI. Otherwise, there would most likely have been a flight of the physicians to other clinics thereby annihilating the clinics' activities value.

[94]    Ultimately, this Transaction is a prelude to, hopefully, a far more important transaction, from a financial standpoint, i.e., the sale of the Building. The Transaction will ensure that the price of the Building is maximized, a consideration which must be taken into account when measuring the fairness and reasonableness of the Transaction.

### 1.3.4  To what extent was the Trustee been involved and what weight must be given to his recommendations

[95]    Related questions to this enquiry are: has the trustee approved the process?  Has he provided a report?

[96]    The Group's Trustee is in a privileged position having been involved in the Group's restructuring efforts well before the NOI. He fully understands its financial situation, its operational and regulatory complexities. He has filed detailed reports at each renewal of stays and has provided a report in which he explains why it is that he recommends the Transaction. This report is evidence based. The Trustee's favourable recommendation therefore carries significant weight.

[97]    BLT's Trustee, MNP Ltd. has also provided a report in which it comments on the Transaction and explains the Transaction's advantages. He explains, with relevant financial data, that BLT will run out of cash if the Transaction is not approved and that this will inevitably lead to bankruptcy. He explains that BLT's assets consist mainly of office furniture that would clearly not generate more value for the creditors if sold in a liquidation process than the value created by being incorporated in the proposed transaction.

## 2.  <u>STAY EXTENSION</u>

[98]    To complete the transaction, the Group asked that the time in which to file a proposal and the corresponding stay of proceedings be extended to December15, 2023. The Court acceded to this request for the following reasons.

[99]    Subsection 50.4(9) *BIA* states that the Court may make such an order, provided that three conditions are met.

[100]   First the Group must have acted and is acting in good faith and with due diligence. The Group has completed a Transaction. An extension of the stay is paramount to ensure that the modalities of the Transaction including the reorganization be carried out.

[101]   Secondly, the Court must determine if the Group will be likely to make a viable proposal if the extension is granted. The reprieve continues to ensure that the medical activities at the Building to be carried out in an orderly fashion. This in turn allows for maximization of their realization value and will eventually enhance the Building's commercial value. How this will play out remains to be seen, but for the moment the Court holds that this condition is met.

[102]   The lack of progress regarding the operations of TCC Montreal remains a matter of grave concern for the Court, as was the case in August 2023. The Trustee and the Group are still not paying post-filing rents. In fact, they had not paid several months of prefiling rents either. Furthermore, given how the clinics affairs are structured, it may be that the MUHC must pay municipal business taxes. There does not seem to be a sense of urgency on the part of the interested parties despite a potential bankruptcy. Nevertheless, it serves no purpose for the moment to not extend the stay for this one entity and MUHC's counsel has expressly indicated that this is not what they are looking for at this juncture. However, they insist that there must be resolution of this situation, in one way or another.

[103]   Finally, no creditor, save for the MUHC, is prejudiced. Aallowing the business' continuation on a going concern is to the advantage of all stakeholders. The TD and BDC have given their support. No creditor has objected. Not maintaining the Group as a going concern will have disastrous effects on its value, on its patients, its employees and the associated physicians.

## 3.  <u>MODIFICATION OF THE FINANCIAL ADVISOR CHARGE</u>

[104]   As explained in the Court's August reasons, PwC has since January 2023 played a key role in securing the LOI and ensured that the transaction could close.

[105]   The Court granted a charge, hypothec and security in the proceeds of the Transaction to cover their fees related to the Transaction only, in the amount of $350,000

2023 QCCS 4643 (CanLII)

on the condition that a transaction close by September 30, 2023. It did not, but the Transaction that was contemplated has finally closed.

[106]  PwC's representative has testified on all the efforts they have expended. The Transaction is a direct result thereof and the signing was delayed through no fault of PwC. The Primary Lenders and the Trustee consent to the Financial Advisor's Charge be modified and the delay for closing be extended. The Court also agreed and did modify the Financial Advisor's Charge accordingly.

2023 QCCS 4643 (CanLII)

500-11-062636-234                                                    PAGE : 24

[107]  It is for all these reasons therefore that the Court signed its Order on November 28, 2023.

_____

CHRISTIAN IMMER, J.S.C.

Me François Alexandre Toupin
Me Pierre-Gabriel Grégoire
McCarthy Tétrault
For the Debtors


Me Martin Jutras
Kaufman Avocats LLP
For the Toronto-Dominion Bank

Me Rim Afegrouch
Attorney General of Canada

Me Marc Duchesne
Border Ladner Gervais LLP
For the Business Development Bank of Canada

Me François Gagnon
Borden Ladner Gervais LLP
For the MUHC

Me Neil Stein
Me Nicholas Chine
Stein & Stein Lawyers inc.
For a group of 25 physicians and as prospective representative counsel

Me Lora Cianci
Cabinet d'avocat Lexcial Inc.
Me Jean-Philippe Gervais
GBC Légal s.e.n.c.r.l.

For 11545060 CANADA INC.


Hearing date:        November 22 and 27, 2023

2023 QCCS 4643 (CanLII)

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:      *Quest University Canada (Re),*
              2020 BCSC 1883

Date: 20201202
Docket: S200586
Registry: Vancouver

2020 BCSC 1883 (CanLII)

**In the Matter of the *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C-36, as amended**

- and -

**In the Matter of the *SEA TO SKY UNIVERSITY ACT*, S.B.C. 2002, c. 54**

- and -

**In the Matter of A PLAN OF COMPROMISE AND ARRANGEMENT OF QUEST
UNIVERSITY CANADA**

Petitioner

Before: The Honourable Madam Justice Fitzpatrick

## Reasons for Judgment
## (Sale Approval)

| | |
|---|---|
| Counsel for the Petitioner: | J.R. Sandrelli |
| | V. Cross |
| Counsel for the Monitor PricewaterhouseCoopers Inc.: | V.L. Tickle |
| Counsel for Primacorp Ventures Inc.: | P. Rubin |
| | G. Umbach |
| Counsel for RCM Capital Management Ltd. and SESA-BC Holdings Ltd.: | K. Jackson |
| | G. Nesbitt |
| Counsel for Southern Star Developments Ltd.: | P. Reardon |
| | K. Strong |
| Counsel for Vanchorverve Foundation: | C.D. Brousson |
| Counsel for Dana Hospitality LP: | D.V. Bateman |

Counsel for Halladay Education Group:    D. Lawrenson

Counsel for Capilano University:    K. Mak

Counsel for Landrex Ventures Inc.:    J. D. West

Counsel for Quest University Faculty Union:    J. Sanders
S. Rogers

Counsel for Bank of Montreal:    K. Davies

Counsel for Her Majesty The Queen In    A. Welch
Right of Province of British Columbia and
the Ministry of Advanced Education Skills
and Training:

Counsel for 1114586 B.C. Ltd.:    K.E. Siddall

Counsel for Association for the    L. Hiebert
Advancement of Scholarship:

Place and Date of Hearing:    Vancouver, B.C.
November 12-13, 16, 2020

Place and Date of Decision with Written    Vancouver, B.C.
Reasons to Follow:    November 16, 2020

Place and Date of Written Reasons:    Vancouver, B.C.
December 2, 2020

2020 BCSC 1883 (CanLII)

2020 BCSC 1883 (CanLII)

## INTRODUCTION

[1]      On November 3, 2020, the petitioner, Quest University Canada ("Quest"), applied for various orders in these *Companies' Creditors Arrangement Act,* R.S.C. 1985 c. C-36 ("*CCAA*") proceedings. Orders sought by Quest included approval of a sale transaction with Primacorp Ventures Inc. ("Primacorp") and orders necessary to facilitate that transaction, namely allowing Quest to implement a claims process and calling a meeting to consider its plan of arrangement.

[2]      On November 3, 2020, I granted the Claims Process Order and a Meeting Order to allow the creditors to consider Quest's plan of arrangement dated November 1, 2020 (the "Plan"). I also approved Quest's agreement to pay Primacorp a Break Up Fee and granted a charge to secure that amount: *Quest University Canada (Re)*, 2020 BCSC 1845.

[3]      I adjourned Quest's application for a Transaction Approval and Vesting Order (TAVO) to approve the Primacorp transaction to these hearing dates to allow opposing parties to consider the matter further and prepare necessary materials.

[4]      Southern Star Developments Ltd. ("Southern Star") has since formalized its opposition to the granting of the TAVO. Indeed, its opposition has since increased in force because Quest and Primacorp have now changed the relief sought to approve the Primacopr transaction within the context of a "reverse vesting order" ("RVO"), as explained below. Southern Star also now applies for an order prohibiting Quest from disclaiming certain subleases, as is required in order for the Primacorp transaction to proceed.

[5]      In the meantime, other parties have joined in opposing the approval of the Primacorp transaction for a variety of reasons, including those advanced by Southern Star in relation to the RVO.

[6]      At the conclusion of this hearing, I granted the RVO and dismissed Southern Star's application, with written reasons to follow. These are my reasons for those orders.

## BACKGROUND FACTS

[7]      This *CCAA* proceeding has been underway for almost ten months, after the granting of the Initial Order on January 16, 2020.

[8]      Since that time, the Court has extended the stay of proceedings a number of times, to allow Quest to undertake efforts to find a restructuring solution to its financial difficulties that would allow it to continue its educational endeavours. Many stakeholders have been actively involved in these proceedings, including secured creditors who, collectively, will be owed approximately $30.7 million by the end of December 2020.

[9]      I have also approved interim financing to allow Quest to continue its operations while in this proceeding, with that debt now approaching $11 million.

[10]     Quest's assets include lands in Squamish, BC, being Lot 1, on which the campus is located (the "Campus Lands"), as well as the surrounding 38 acres (the "Development Lands".) Lot 1 is encumbered by various charges, liens, interests, mortgages and assignments of rent, including a mortgage held by Capilano University ("CapU"). In addition, CapU holds various rights of first refusal, including a right of first refusal to purchase, a right of first refusal to lease and rights of first refusal to acquire the charges of Quest's major secured creditor, Vanchorverve Foundation ("VF") (collectively, the "ROFR").

[11]     Quest is also the registered owner of five real property lots (Lots A-E), four of which are the sites of its university residences (on Lots A-D) (collectively, the "Residences").

[12]     One of the significant flashpoints in this proceeding has been, and continues to be, in relation to the Residences that Quest leases from Southern Star. After the Residences became vacant in March 2020 following the onset of the COVID-19 pandemic, Quest attempted to defer payment of the substantial lease payments owed to Southern Star. On June 19, 2020, I denied that relief: *Quest University Canada (Re)*, 2020 BCSC 921 (the "Rent Deferral Reasons").

[13]    Quest's principal focus in these proceedings has been toward identifying a partner/investor to purchase its land assets and/or identifying an academic partner/investor that would permit Quest to continue as a post-secondary institution.

[14]    Since January 2020, Quest's Board of Governors and its Restructuring Committee have been working with a private educational consultant, Halladay Education Group Inc. to find a prospective academic partner. In addition, since March 2020, Quest has been working with Colliers Macaulay Nicolls Inc. to find prospective purchasers for Quest's real property assets.

[15]    There is no dispute that the sale and partner search process (SISP) has been extensive, as confirmed by the Monitor. Quest submits, and I accept that its management, the Restructuring Committee, and the Board analyzed all proposals based on a number of factors, including:

   a)    Creditor recovery from the purchase price or other consideration under the proposal;

   b)    That the proposal would result in a completed transaction;

   c)    That the proposal offered allowed for Quest's long-term continuation as a post-secondary academic institution; and

   d)    That the proposal would lead to the continuation of a school on Quest's lands that aligned with Quest's current vision and academic quality.

[16]    The SISP resulted in a number of academic and real estate organizations approaching Quest to express interest in pursuing a transaction. Quest engaged with a number of potential purchasers or partners from Canada, the United States and other countries. Some parties executed Non-Disclosure Agreements (NDAs) and Quest received numerous Letters of Intent (LOIs) and other proposals.

[17]    On May 28, 2020, this Court granted an extension of the stay of proceedings. At that time, Quest stated that there was a realistic potential of a transaction with the

2020 BCSC 1883 (CanLII)

2020 BCSC 1883 (CanLII)

party identified as the "Academic Partner". Unfortunately, that transaction did not proceed.

[18]    On August 7, 2020, this Court granted a further extension of the stay of proceedings to December 24, 2020 to allow Quest to continue seeking proposals towards a transaction by that deadline and to allow Quest to offer the fall term to its students. Quest was still in discussions with various interested parties at that time. By then, Quest had received LOIs, including one from Primacorp (identified as "Academic Partner #2") as of July 29, 2020.

[19]    Since August 7, 2020, Quest and Primacorp have worked extensively to negotiate the definitive documents toward completing a transaction. On September 16, 2020, Quest and Primacorp executed a Purchase and Sale Agreement (the "Primacorp PSA").

[20]    The Primacorp transaction, as originally presented, provided for:

a)      Sufficient funds to pay Quest's secured creditors' claims, including claims secured by the *CCAA* charges;

b)      Funding for a plan of arrangement to be voted on by Quest's unsecured creditors;

c)      Funds for these insolvency proceedings; and

d)      A working capital facility, and marketing and recruiting support to permit Quest to become self-sustaining as a post-secondary institution.

[21]    The main and subsidiary agreements executed between Quest and Primacorp in September/October 2020 are complex. They were complete by October 28, 2020 and included, as defined in the Monitor's Fourth Report, the Primacorp PSA, the Campus Lease, an Operating Loan Agreement and an Operating Agreement. Significant terms included:

2020 BCSC 1883 (CanLII)

a) Primacorp will purchase substantially all of Quest's lands and related assets, including the Campus Lands, the Development Lands, the residence Lands (Lots A-E; four of which involve Southern Star's subleases), chattels and vehicles;

b) Primacorp will lease specific Campus Lands back to Quest under a long-term lease arrangement;

c) Primacorp will provide marketing and recruiting expertise to support Quest as a university;

d) The Purchase Price will satisfy all of Quest's secured lenders and any commissions on sales;

e) Primacorp will fund sufficient monies to pay the lesser of the Unsecured Creditor Claims and $1.35 million under Quest's Plan; and

f) Primacorp will provide Quest with a $20 million secured working capital facility to support its operations.

[22] The Primacorp transaction was subject to a number of significant conditions:

a) Quest's disclaimer of the four Southern Star subleases of the Residences or an agreement with Southern Star. On October 23, 2020, Quest disclaimed those subleases;

b) Court approval of the Primacorp transaction including approval of a Break Up Fee and Break Up Fee Charge to secure Primacorp's costs. On November 3, 2020, I approved the Break Up Fee and granted a charge to secure this amount;

c) Creditor approval of Quest's Plan under the *CCAA*. On November 3, 2020, I granted the Meeting Order to allow Quest to present the Plan, after having completed a claims process under the Claims Process Order, also granted on that date; and

d)      Court approval of the Plan under the *CCAA*.

[23]    On November 3, 2020, when Quest sought the TAVO (which was adjourned), Quest asserted that the Primacorp transaction was beneficial in many respects. Quest argued that it maximized the value of Quest's assets, offered the greatest benefit to stakeholders, had a high likelihood of completing, provided a recovery for secured and unsecured creditors, and had the highest likelihood that Quest will continue to operate within its current academic model.

[24]    The Monitor concurred. In its Fourth Report dated November 2, 2020, the Monitor referred to the fact that there were only two viable proposals, with Primacorp's offer being the superior one. The Monitor's Supplemental and Confidential Report dated November 2, 2020 (the "Confidential Report") is also before the Court, although filed under seal. That Confidential Report referred to four other proposals received by Quest that were "not currently at a stage such that they are capable of being accepted by Quest".

[25]    Quest and Primacorp both see the closing of the Primacorp transaction as very time sensitive. Pursuant to agreements with the Interim Lender, Quest was required to enter into a transaction by October 30, 2020 with an anticipated closing of November 30, 2020. The Interim Lender has since agreed to amend that requirement to extend the necessary closing date to December 24, 2020 in accordance with the Primacorp transaction.

[26]    In addition to satisfying increasing pressure to repay its secured creditors, Quest seeks to exit these *CCAA* proceedings as soon as possible to allow it to recruit and plan for the upcoming 2021/22 academic year. Finally, there are other more financially driven and critical concerns. The Interim Lender has indicated that it will not fund its loan past December 2020. Without funding of some sort, Quest has no liquidity or financial ability after that time to continue operations.

## ISSUES

[27]    The paramount issue for consideration is, of course, whether the Court should approve the Primacorp transaction under s. 36 of the *CCAA*. A number of subsidiary issues also emerged at this hearing, as a result of submissions from various stakeholders:

a)    <u>Lot E</u>: Southern Star objects to the TAVO (now RVO), as vesting off any interest it may have under an unregistered lease of Lot E;

b)    <u>ROFR</u>: CapU objects to the sale to Primacorp, asserting that Quest is ignoring its rights under the ROFR that allows CapU to purchase/lease Quest's lands;

c)    <u>Other Offer</u>: Landrex Ventures Inc. ("Landrex"), together with CapU, assert that they should be given further time to finalize their offer for Quest's assets;

d)    <u>Disclaimers</u>: Southern Star, supported by its secured creditor, Bank of Montreal (BMO), applies for an order that the subleases of the Residences not be disclaimed by Quest; and

e)    <u>RVO</u>: Southern Star and another unsecured creditor, Dana Hospitality LP ("Dana"), object to the TAVO (now RVO), as being inappropriate and unfair in the circumstances and contrary to the spirit of the *CCAA*.

[28]    I will address the subsidiary issues in the first instance, before turning to an overall assessment of the Primacorp transaction and whether the Court should approve that transaction.

### Lot E

[29]    As I described in the Rent Deferral Reasons (at para. 62), Quest, Southern Star and other parties are involved in a complex suite of agreements concerning the Residences that were built some time ago.

2020 BCSC 1883 (CanLII)

[30]    Quest is the limited partner in a limited partnership agreement with Southern Star, who is the General Partner (GP). They formed the Southern Star Developments Limited Partnership (the "LP") to build the Residences. Quest, as the owner of Lots A-D, leases those lands under Ground Leases to Southern Star (as the GP of the LP). The ground leases are at a nominal rate. In turn, Southern Star (the GP), as landlord, and Quest, as tenant, entered into Subleases for the Residences, once they were built.

[31]    The initial arrangements between Quest and Southern Star anticipated that a fifth student residence would be built on Lot E, the lot adjacent to Lot D.

[32]    In September 2017, as part of those arrangements, Quest and Southern Star executed certain Land Title documents (Form C Charges) attaching a Ground Lease and a Sublease with respect to Lot E. When the parties executed the Form C Charges, the Ground Lease was incomplete in many respects; it did not include any legal description because Lot E was created after the execution of the Form C Charges; and, it did not specify the applicable dates of the 99-year term. Finally, the Schedules to the Ground Lease included various documents between Quest, Southern Star and Southern Star's lender intended to be later executed once the Ground Lease, the Sublease and the mortgage were finalized and registered at the Land Title Office.

[33]    The parties delivered to Form C Charges to a law firm to be held in escrow pending the commencement of construction of the Lot E residence. Only recently, in response to this application, did a lawyer of the law firm complete the legal description for Lot E. Quest authorized this addition some time ago and I do not consider that matter as determinative of Southern Star's rights, if any, under the Lot E Ground Lease.

[34]    At present, Quest's title to Lot E remains clear of any registration relating to Southern Star's Ground Lease so there is no need for Quest to obtain a vesting order to remove it from the title. However, Quest and Primacorp seek an order that any claims that arise from the yet incomplete and unregistered Ground Lease on

2020 BCSC 1883 (CanLII)

Lot E shall not attach to Quest's assets that are to be vested in Primacorp. They also seek an order permanently enjoining Southern Star from registering the Lot E Ground Lease against title to Lot E.

[35]     Southern Star objects to the RVO as vesting off any interest it may have in the unregistered Lot E Ground Lease, arguing:

> a)      This Court has no jurisdiction to do so under the *CCAA*. Southern Star argues that this is simply a disguised disclaimer of the Ground Lease that the *CCAA* expressly prohibits. Disclaimers are allowed pursuant to s. 32 of the *CCAA*, however, limits are imposed by s. 32(9)(d) which provides that disclaimers can not be made:
>
> > . . . in respect of real property or of an immovable if the company is the lessor.
>
> b)      If such jurisdiction exists under the *CCAA*, the relief sought is not fair and equitable in the circumstances.

[36]    I will begin by discussing the nature of any interest held by Southern Star in relation to the Lot E Ground Lease.

[37]    In my view, no "lease" *per se* is yet in existence and valid and enforceable between Quest and Southern Star. Although the parties executed the Form C Charges relating to the Lot E Ground Lease, Southern Star's principal, Michael Hutchison, acknowledges that they were not to be registered until construction had commenced. I conclude that the parties did not intend that the Ground Lease would be valid and effective between them until that time, in conjunction with the registration of the Sublease and the execution and registration of Southern Star's mortgage that would allow construction to begin.

[38]    Southern Star does not argue that it has acquired any legal or beneficial interest in Lot E. At its highest, I conclude that Southern Star's rights to Lot E are purely contractual; Quest agreed that it would grant the Lot E Ground Lease in the future and it would become effective upon certain conditions being satisfied – in

2020 BCSC 1883 (CanLII)

essence, an agreement to agree. Those conditions included that Quest would decide to build a residence building on Lot E and that Southern Star would arrange financing to construct the building. In these circumstances, I readily conclude that this condition has not been satisfied and will never be satisfied by Quest given Quest's insolvency.

[39]    Further, even assuming that this is a "disguised" disclaimer, I conclude that Quest is not a "lessor" as that term is used in s. 32(9)(d) of the *CCAA*. Quest agreed that, if certain conditions were satisfied, it would become a "lessor" under the Ground Lease; however, that has not come to pass.

[40]    I conclude that I have the jurisdiction under s. 11 of the *CCAA* to grant the order sought by Quest to ensure that Southern Star does not assert any rights under the Lot E Ground Lease at a future date. In addition, I rely on s. 36(6) of the *CCAA* that allows the Court to exercise its jurisdiction to vest off "other restrictions".

[41]    The exercise of the Court's jurisdiction under s. 11 and 36 of the *CCAA* requires that the relief sought be "appropriate". This is in the sense that it accords with the statutory objectives of the *CCAA*, not only in terms of what the order will achieve, but the means by which it employs to that end: *Century Services Ltd. v. Canada (Attorney General)*, 2010 SCC 60 at para. 70.

[42]    In this respect, the parties have advanced arguments as to equitable considerations in terms of whether such relief is appropriate in the circumstances, while taking into account the respective positions of the parties. While in the receivership context, Quest has referred to various authorities that discuss the balancing of interests in similar situations where leases (in these cases effective and enforceable) were vested off title: *Meridian Credit Union Ltd. v. 984 Bay Street Inc.*, [2006] O.J. No. 3169 (Ont. S.C.J.) at paras. 19-23, citing *New Skeena Forest Products Inc. v. Kitwanga Lumber Co.*, 2005 BCCA 154; *Romspen Investments Corp. v. Woods Property Development Inc.*, 2011 ONSC 3648 at para. 66; rev'd other grounds *Romspen Investment Corp. v. Woods Property Development Inc.*, 2011 ONCA 817 at para. 25.

2020 BCSC 1883 (CanLII)

[43]    Southern Star argues that the equities favour it, not Quest, in these circumstances.

[44]    Southern Star contends that neither Quest nor Primacorp have made any attempt to negotiate with it concerning its interest in Lot E. I would not accede to this argument. While the negotiations between Quest, Primacorp and Southern Star were not fruitful, it remains the case that Quest has made good faith efforts to address Southern Star's interests, although its ability in that respect were hampered by Primacorp's willingness to accommodate those interests.

[45]    Southern Star also argues that it will be prejudiced if its contractual right is vested off in that Quest and Primacorp are not offering compensation for the loss of that interest. Southern Star focusses on what it says is the "status *quo*", arguing that it has the "right" to build a residence on Lot E. However, any such "right" is illusory at best, since Quest has no present ability to occupy the Residences, let alone the financial capability to participate in the construction of a fifth one on Lot E. Nor is there any realistic prospect that Quest will be in a position to do so in the future.

[46]    Southern Star's argument in relation to Lot E is an attempt to gain leverage more than anything else. If Southern Star's argument succeeds and the relief sought is refused, Southern Star would be in the same position—facing a sale of Lot E and a likely order vesting off any rights or interests it may have. It is a condition of the Primacorp transaction that Lot E be transferred to it without any further involvement with Southern Star. Without an order rejecting Southern Star's claim in respect of the escrowed Ground Lease on Lot E, the likely result would be the end of these proceedings and the commencement of realization proceedings by the Interim Lender and other secured creditors.

[47]    The Ground Lease is not effective and enforceable; the Ground Lease is not registered on title to Lot E. Given the circumstances, Quest has no ability to build a residence on Lot E and there is no reasonable prospect of that happening, given its insolvency and the need to dispose of its assets, including Lot E.

2020 BCSC 1883 (CanLII)

[48]    While I acknowledge the negative impact on Southern Star arising from this relief, that impact must be balanced in the context of Quest's restructuring efforts in this proceeding. Those efforts are intended to address not only Southern Star's interests, but also the myriad interests held by other stakeholders. The sale of Lot E to Primacorp will allow Quest to realize on its interest in Lot E to the benefit of the stakeholders as a whole.

[49]    I conclude that the relief sought by Quest in the RVO in relation to Lot E is appropriate and it is granted.

### CapU ROFR

[50]    Lot 1 and Lots A-E are subject to various charges in favour of CapU.

[51]    In March 2019, Quest granted mortgage security in favour of CapU in connection with a loan made to Quest. As part of these agreements, in April 2019, Quest also granted the ROFR in favour of CapU. CapU registered the ROFR against these lands. Under the Primacorp transaction, Quest is required to obtain title to Lot 1 and Lots A-E without reference to the ROFR.

[52]    Pursuant to s. 9 of the *Property Law Act*, R.S.B.C. 1996, c. 377, a right of first refusal to land is an equitable interest in land.

[53]    CapU has referred to two non-*CCAA* cases that discuss ROFRs generally.

[54]    In *Adesa Auctions of Canada Corp. v. Southern Railway of B.C.*, 2001 BCSC 1421 at paras. 26-30, the Court found that the contractual terms were to be strictly enforced and that the rights under the ROFR could not be defeated or circumvented by an offer that included other lands not covered by the ROFR. To similar effect, *Alim Holdings Ltd. v. Tom Howe Holdings Ltd.*, 2016 BCCA 84 at para. 41 states, following *Adesa*, that a ROFR will be triggered by a package sale that includes the subject property, subject to contrary language in the ROFR.

2020 BCSC 1883 (CanLII)

[55]    It is common ground, however, that different considerations may also apply in the *CCAA* context. Having said that, there is little case authority on the ability of a court in *CCAA* proceedings to vest off a ROFR, whether triggered or not.

[56]    In "Rights of First Refusal and Options to Purchase in Insolvency Proceedings" (2019) 8 J.I.I.C. 103 (the "ROFR Article"), the authors Virginie Gauthier, David Sieradzki and Hugo Margoc extensively review the issue, including in relation to Options to Purchase (OTPs). At 106, the authors state:

> . . . Section 11 of the *CCAA* grants courts the right to "make any order that it considers appropriate in the circumstances" except as limited by the CCAA. As such, the *CCAA* court is well equipped to approve the sale of an OTP- or ROFR-encumbered asset to a party other than the rights-holder and without having first complied with the restrictive covenants if the transaction is in the best interests of the creditors at large, provided that the interest of the OTP or ROFR-holders is taken into account. The court will consider, *inter alia,* the monitor's views on these issues before making any such approvals.

[57]    At 118-119, the authors conclude that:

> While jurisprudence on this matter is not conclusive, it appears that a *CCAA* court would likely only vest out a valid and unexpired OTP that runs with the land in exceptional circumstances such as in the context of a going-concern restructuring where obtaining the highest possible price for the encumbered asset is paramount to support the restructuring efforts of the debtor company, and where the OTP rights-holders are also creditors in the proceeding and could seek compensation for any loss incurred due to the removal of the OTP right.
>
> . . .
>
> In summary, common law *CCAA* courts may vest out valid or unexpired ROFRs and OPTs in a case where the equities favour such an order or on consent.

[58]    Quest has referred to *Bear Hills Pork Producers Ltd. (Re),* 2004 SKQB 213*,* additional reasons 2004 SKQB 216. In that *CCAA* proceeding, the debtors sought approval of a sale of bundled assets relating to a hog farm, in the face of a ROFR that applied to the land only. Justice Kyle referred to the overall security affecting the assets; the court also commented that a withdrawal of the lands from the sale would not allow the proposed sale to complete, leading possibly to a liquidation (at paras. 4-5).

[59]    However, in *Bear Hills*, Kyle J. relied on authorities that have since been questioned in *Alim Holdings* (see paras. 38-41). Justice Kyle's conclusion at para. 10 that the ROFR was not triggered runs contrary to the court's conclusion in *Alim Holdings* at para. 41.

[60]    I have no doubt that courts across Canada have vested off ROFRs in the context of assets sales approved in *CCAA* proceedings. For example, Quest refers to *Artic Glacier Income Fund (Re)*, [2012] M.J. No. 451 (Q.B.) where a ROFR was vested off title, although the circumstances under which that *CCAA* relief was granted is not clear.

[61]    Similarly, in *Great Slave Helicopters Ltd. v. Gwichin Development Corp.* (November 23, 2018), CV-18-604434-00CL (Ont. S.C.J.), Justice Hainey's endorsement directed that a purchaser of aggregated assets in a *CCAA* proceeding provide certain information to the holder of the ROFR with respect to the purchase price allocation. The ROFR Article, which discusses the circumstances before the court in *Great Slave Helicopters* at 108-109, indicates that the issue of the exercise of the ROFR was ultimately resolved consensually.

[62]    Fortunately, in this case, there is no dispute concerning the Court's jurisdiction to address CapU's rights arising under the ROFR. Both Quest and CapU agree that the Court has jurisdiction under the *CCAA* to vest off the ROFR, subject to a consideration of the equities as between the parties.

[63]    For the following reasons, I conclude that a balancing of the equities favours vesting off CapU's ROFR to allow the Primacorp transaction to proceed:

a)    Since January 2020, Quest has been pursuing a going concern restructuring that will permit it to remain as a university and employer in the Squamish area. CapU has been involved in this proceeding from the outset and was well aware of the opportunity to participate in that pursuit;

2020 BCSC 1883 (CanLII)

b)      There is a significant issue as to whether the ROFR has even been triggered by delivery of the Primacorp PSA. The definition provided in the ROFR of "Bona Fide Offer to Purchase" means, in part, an offer that is:

> (iii) only for the entirety of the Property [the lands] and all chattels thereto and <u>no other property, rights or assets</u>
>
> [Emphasis added.]

The definition of "Purchased Assets" in the Primacorp PSA is broad and refers not only to lands and chattels, but a variety of other assets (for example, contracts, plans, permits, vehicles and intellectual property). This express language is what the court in *Alim Holdings*, at para. 41, described could indicate an intention that any such aggregated offer would *not* trigger the ROFR;

c)      The term of the ROFR expires in March 2024. The ROFR appears to contemplate that, even if CapU does not exercise the ROFR, the purchaser of the lands must still agree to grant CapU a ROFR on the same terms. Similarly, "change of control" provisions are potentially effective that would allow CapU to later acquire control of Quest in place of anyone else. This would frustrate Primacorp's expectation under the Primacorp PSA that it would have the right to nominate the board of governors for Quest after closing;

Primacorp does not agree to assume these restrictions. In addition, every other offer for Quest's assets required that the ROFR be vested off title to the lands. It is difficult to see that any purchaser would agree to take title to purchased assets with such significant restrictions. If the ROFR is effective, this would give rise to a severe "chilling effect" on the market, with potentially disastrous results for Quest's restructuring efforts;

2020 BCSC 1883 (CanLII)

d)     The 60-day period within which CapU is entitled to consider any "Bona Fide Offer to Purchase" is simply unworkable in these circumstances. This is not a matter of expediency, without regard to any rights held by CapU. Quest will have no funds to continue its operations past December 2020 and, if realizations by the secured creditors ensue, CapU's ROFR rights will be illusory at best;

e)     CapU complains that it received the redacted Primacorp PSA only recently, on October 29, 2020. CapU then requested an unredacted copy, which Quest agreed to do upon CapU executing an NDA. CapU refused to sign the NDA, stating that it would hamper its ability to participate in its own offer. Again, CapU has had months to formulate its own offer;

f)     Quest asserts that CapU has no intention to or ability to make its own offer for all of Quest's assets in competition to the Primacorp transaction. CapU has not put forward any evidence at this hearing to confirm such intention or ability. Similarly, there is no evidence that CapU truly wishes to or is able to exercise any rights under the ROFR to purchase Quest's lands and chattels;

g)     I consider that the evidence conclusively supports that CapU advances its arguments under the ROFR simply as a tactic to oppose the Primacorp transaction and delay the matter so that it and Landrex can seek to advance their own joint competing offer;

h)     As I will discuss below, the terms of the joint Landrex/CapU proposal is only semi-formed at this point and Quest has indicated that some major terms are not acceptable. As such, it is highly questionable that this joint offer is, as CapU asserts, a "better, higher offer";

i)     I conclude that Quest has given proper regard to and has not ignored CapU's rights under the ROFR in the context of these proceedings.

2020 BCSC 1883 (CanLII)

CapU has had sufficient information even from the redacted Primacorp PSA to discern the substance of the Primacorp transaction in terms of advancing any competing offer or exercising the ROFR;

j)    Given the above circumstances, including CapU's involvement in Quest's lengthy efforts to restructure, I cannot conclude that CapU will suffer significant prejudice if the ROFR is vested off. Quest has indicated that CapU will have the opportunity to file a proof of claim in respect of any loss alleged to arise because of the vesting off of the ROFR. Of course, the value of any such claim would be questionable unless CapU can establish that its rights were triggered by the Primacorp transaction and that it had the ability to complete under the ROFR; and

k)    The Monitor supports the Primacorp sale, as maximizing the value of Quest's assets for the stakeholders and allowing a successful restructuring of Quest's business.

[64]    If CapU has rights under the ROFR, allowing CapU to assert those rights would delay the Primacorp sale and potentially negate it, all with potentially devastating effect on the broader stakeholder group. The Primacorp sale is the only sale that is before the Court that would result in a restructuring of Quest for the benefit of the stakeholders. Clearly, within that context, the rights of all affected stakeholders must be balanced in respect of any rights held by CapU.

[65]    In *Bear Hills,* similar considerations were before the court. The Saskatchewan Court of Queen's Bench approved a bundled sale of assets, without first requiring compliance with a ROFR. In part, the prospective purchaser would only consider purchasing the complete bundle of properties for an aggregate purchase price and did not allocate value on a property-by-property basis.

[66]    As I have sought to do here, the court in *Bear Hills* (at para. 9) was attuned to the overarching and remedial statutory purpose and objective of the *CCAA* to avoid

the "social and economic losses resulting from liquidation of an insolvent company": *Century Services* at para. 70 and *9354-9186 Québec inc. v. Callidus Capital Corp.*, 2020 SCC 10 at paras. 40-41. This objective is not to be achieved simply in the most expedient manner and without due regard to interests of stakeholders that are affected in that process. As the Court further stated in *Century Services* at para. 70, any restructuring is best achieved when "all stakeholders are treated as advantageously and fairly as the circumstances permit".

[67]    I am satisfied that it is appropriate, in the context of the Primacorp transaction, to vest off the ROFR held by CapU. In that regard, I have also considered the factors set out in s. 36(3) of the *CCAA* in terms of assessing any rights of CapU under the ROFR in that context.

### Landrex / CapU Offer

[68]    Landrex, supported by CapU, opposes approval of the Primacorp transaction. Landrex argues that they should be given further time to present an offer for Quest's assets in competition with the Primacorp transaction.

[69]    As with CapU, Landrex has been fully engaged in discussions with Quest for some time now, having been alerted to the possibility of a transaction as long ago as fall 2019. Landrex's interest in Quest has always been in conjunction with securing an academic partner, namely, CapU.

[70]    In June 2020, Landrex and Quest entered into an agreement for a sale; however, the conditions lapsed.

[71]    On October 8, 2020, Landrex and Quest executed a further purchase and sale agreement (the "Landrex PSA") providing for a purchase price of $51 million for most of Quest's assets (Lot 1 only and excluding Lots A-E: obviating any need for disclaimers of the Southern Star Subleases or vesting off any of Southern Star's rights under the Lot E Ground Lease). The closing date under the Landrex PSA is December 23, 2020.

[72]    By the start of this hearing, significant conditions precedent in respect of the Landrex PSA were still outstanding. Those included the financing condition in favour of Landrex and the mutual condition by which "another party" (CapU) was to have secured a sublease with Quest after Landrex had granted CapU a lease in the first instance.

[73]    Landrex suggests that Quest is contractually bound to honour the Landrex PSA by allowing it further time to remove the conditions precedent, citing the good faith organizing principle discussed in *Bhasin v. Hrynew*, 2014 SCC 71. Further, Landrex argues that Quest has a duty to take all reasonable steps to satisfy the conditions precedent: *Dynamic Transport Ltd. v. O.K. Detailing Ltd.*, [1978] 2 S.C.R. 1072.

[74]    Further discussions and negotiations continued between Landrex and Quest beyond October 8, 2020; however, matters under the Landrex PSA were not advanced.

[75]    By late October 2020, Quest was under significant pressure, if not a legal requirement from the Interim Lender, to conclude a transaction. At that time, only two potentially viable proposals were on the table, one being from Primacorp. As above, where the Monitor noted in its Confidential Report that other proposals were "not currently at a stage such that they are capable of being accepted by Quest", those "other proposals" included the Landrex PSA.

[76]    By the time the Landrex PSA was executed on October 8, 2020, Landrex was not aware that Quest had already signed the Primacorp PSA. However, I agree with Quest's counsel that Landrex had not secured any rights of exclusivity in terms of advancing its offer. The Landrex PSA provided:

> 20.2    Notwithstanding anything else contained herein, Landrex acknowledges and agrees that, following from date of the acceptance of this Offer by the Vendor until the date that the Vendor waives or declares satisfied the Vendor's Condition, the Vendor will be authorized to negotiate with or offer the Property for sale to any third party (including the entering into of any agreement by the Vendor with any third party). . . .

2020 BCSC 1883 (CanLII)

[77]    Under the Landrex PSA, Quest's Vendor's Condition was approval from its Board of Governors. Quest never obtained that approval because Quest's Board of Governors did not agree to certain deal terms under the Landrex PSA.

[78]    By October 29, 2020, Landrex would have been fully aware that its offer was not going to be advanced by Quest any further since, by then, Quest had chosen Primacorp.

[79]    On November 2, 2020, Landrex made a further offer for $53.5 million. The only other significant change to their offer was to describe the requirement for a lease/sublease arrangement between Landrex, "another party" (intended to be CapU) and Quest as Landrex's condition precedent, not a mutual condition precedent. Quest did not accept this offer.

[80]    In any event, by that time, Landrex's financing condition was far from being satisfied. On November 9, 2020, TD Asset Management ("TD"), Landrex's lender, provided a letter simply stating that it was continuing to work with Landrex and CapU to provide that financing.

[81]    I acknowledge that, since the initial hearing date of November 3, 2020, Landrex has moved to finalize its offer but it has only done so to some extent.

[82]    On November 13, 2020, Landrex secured a letter from TD that referred to a term sheet being in place after a final financing structure was negotiated (no documents were disclosed). However, TD's commitment is clearly conditional upon CapU's board approving the lease between Landrex and CapU at a meeting that is not scheduled to take place until November 24, 2020. There is no evidence as to what those lease terms are and whether there is a reasonable likelihood that CapU's board will approve it. Further, this whole arrangement continues to hinge on a negotiated sublease between CapU and Quest, which is not in place.

[83]    On November 16, 2020, Landrex's counsel advised of yet further developments: (i) removal of its financing condition; (ii) an LOI with Southern Star by

which it would take over the Residences but not require disclaimer of the Subleases; and, (iii) agreement with CapU to remove the ROFR.

[84]    Despite these developments, Quest advised that it was still not agreeable to the terms of the Landrex transaction. In addition, the Monitor continues to support approval of the Primacorp transaction, noting the uncertainty and potential delay of CapU obtaining ministerial approval to allow its participation in the Landrex transaction.

[85]    The s. 36(3) factors continue to provide a useful structure for consideration of the Landrex transaction, and these late breaking developments.

[86]    I am satisfied that Landrex was given a reasonable opportunity to participate in the SISP and that it has been aware of this opportunity for many months, even before it officially began. The fact that the cash consideration under the Landrex transaction exceeds that of Primacorp is deserving of consideration. However, other considerations arise, including that the Primacorp transaction involves significant other benefits to Quest in terms of its future operations, including the working capital facility of $20 million.

[87]    Both Quest and the Monitor continue to be of the view that the Primacorp transaction is more beneficial to the creditors. I agree with this, particularly considering the continuing uncertainty and risk associated with the Landrex/CapU transaction that is yet to be resolved, leaving aside that Quest has unequivocally stated that it has no intention to pursue it. Even if the further negotiations required under the Landrex sale were advanced in an expeditious manner, it seems unlikely to be finalized by the end of the year. To the contrary, the Primacorp transaction has been finalized after weeks of complex negotiations and Quest and Primacorp are ready to close without further delay. I agree that time is of the essence at this stage of the proceedings, for the reasons already noted above.

[88]    In the overall circumstances here, I see no reason to delay, if not risk, the "bird in hand" transaction that arose through a reasonable sales process, in the hope that a more uncertain transaction may be finalized, such as with Landrex.

### Southern Star Disclaimers

[89]    On October 23, 2020, and with the approval of the Monitor, Quest issued notices of disclaimer (the "Disclaimers") to Southern Star relating to the Subleases on Lots A-D by which Southern Star leases those lands and the Residences to Quest.

[90]    A condition precedent of the Primacorp transaction is that either Quest will disclaim the Subleases or Primacorp will have entered into an agreement with Southern Star to its satisfaction. The evidence discloses that negotiations did take place between the parties but they did not reach a mutually acceptable agreement.

[91]    Quest's rent payments to Southern Star under the Subleases for the Residences on Lots A-D total approximately $236,218 per month.

[92]    Very recently, on November 15, 2020, before the conclusion of this hearing, Quest voluntarily withdrew the Disclaimers with respect to Lots A-B. Accordingly, failing an agreement between Primacorp and Southern Star, it remains a condition of the Primacorp transaction that Quest's Disclaimers of the Subleases in relation to Lots C-D be upheld.

[93]    The Ground Leases are registered against Lots A-D. BMO's security is registered against Southern Star's interest under the Ground Leases; in addition, Fivestone Capital Corp. ("Fivestone"), a company controlled by Mr. Hutchison, has registered security against the Grounds Leases. Quest does not seek any relief in respect of the Ground Leases; unlike Lot E, those documents are fully effective and enforceable and have been the basis upon which the parties have developed those properties.

2020 BCSC 1883 (CanLII)

[94]    What remains to be addressed is Southern Star's application pursuant to s. 32(2) of the *CCAA*, supported by BMO, for an order disallowing any disclaimer by Quest of the Subleases of the Residences on Lots C-D. Section 32(4) of the *CCAA* lists various non-exhaustive factors that the court is to consider in relation to disputes over disclaimers:

> In deciding whether to make the order, the court is to consider, among other things,
>
> (a)    whether the monitor approved the proposed disclaimer or resiliation;
>
> (b)    whether the disclaimer or resiliation would enhance the prospects of a viable compromise or arrangement being made in respect of the company; and
>
> (c)    whether the disclaimer or resiliation would likely cause significant financial hardship to a party to the agreement.

[95]    In *League Assets Corp. (Re)*, 2016 BCSC 2262, I discussed the significance of disclaimers in *CCAA* proceedings, both from the point of view of the counterparty and that of the entire stakeholder group:

> [49]    These *CCAA* provisions are not inconsequential in the face of this type of proceedings. At this point, the matter is no longer between the debtor company and a counterparty. There are other stakeholders involved and the statutory provisions, and the provisions of court orders such as the Initial Order, are meant to protect the stakeholder group as a whole, while also allowing a certain amount of flexibility for the debtor company. A disclaimer of a contract has consequences not only to the debtor company, but the estate generally. Such an action can substantially increase the debt being faced by the estate or divest the debtor of a substantial benefit that might be realized for the benefit of the creditors. It is in that context that the *CCAA* requires that certain procedures be followed by the debtor company, with the necessary oversight by the Court's officer, the Monitor, as to whether any disclaimer will be approved or not.

[96]    The factor under s. 32(4)(b) of the *CCAA* as to enhancing the prospects of a viable restructuring applies equally in respect of disclaimers in the context of a sales process by which the business is to continue as a going concern: *Timminco Ltd. (Re)*, 2012 ONSC 4471 at paras. 51-52 and *Aveos Fleet Performance Inc. (Re)*, 2012 QCCS 6796 at paras. 48-50. In addition, the disclaimer need not be proven as "essential", only "advantageous and beneficial": *Timminco* at para. 54.

2020 BCSC 1883 (CanLII)

[97]    Quest asserts that the Disclaimers are necessary to pursue and complete the Primacorp transaction, which it considers the best possible outcome for Quest and its stakeholders, including students, faculty, staff, secured and unsecured creditors, suppliers and vendors. In its letter dated October 28, 2020 to Southern Star, Quest also refers to its liquidity crisis and that amounts owing to its secured creditors became due some time ago.

[98]    In its Fourth Report dated November 2, 2020, the Monitor confirmed its approval of the Disclaimers, based on:

> 2.8.1    The residences are not currently being used by Quest (other than two units being used by staff members and some limited use by a film crew recently) given on-line learning format being employed as a result of COVID 19;
>
> 2.8.2    It is a term of the Primacorp Agreement that the subleases be disclaimed; and,
>
> 2.8.3    The Monitor noted that the two most promising alternative parties in discussions with Quest also required the Southern Star subleases to be disclaimed.

[99]    Southern Star advances a number of arguments in relation to the Disclaimers.

[100]   Firstly, it argues that the Disclaimers will not result in a viable compromise or arrangement. Southern Star argues that there is no indication that Quest and Primacorp do not wish to continue to have the Residences as part of the student experience for those attending Quest.

[101]   I agree that, in the Rent Deferral Reasons, many of my comments (at paras. 23-26, 90) were confirmatory of the importance of the Residences to Quest in respect of its future operations. However, that was then and this is now. The pandemic continues in full force and Quest is necessarily required to make decisions in the face of current circumstances. I agree that it is likely that Quest will seek to continue the student residence experience once the pandemic has receded, however, when that might happen is anyone's guess.

[102]   In the meantime, Quest, under the Primacorp transaction, must make decisions as to its financial capabilities going forward. Maintaining two empty

Residences with accompanying rent payments is, on its face, not a reasonable business decision in the circumstances. It was Primacorp, an arms length purchaser, who has imposed this condition.

[103]   Further, the Monitor agrees with Quest that the Disclaimers are necessary to enhance the prospects of Quest making a viable compromise or arrangement in these proceedings. There is no reason to question the Monitor's view as it is apparent that the Monitor has considered all relevant matters.

[104]   I agree that the Disclaimers will enhance the prospects of Quest making a viable compromise or arrangement. The Monitor overwhelmingly agrees after a consideration of all the circumstances including those particularly faced by Southern Star as a result.

[105]   Secondly, Southern Star argues that Quest delivered the Disclaimers simply to secure a bargaining advantage for Quest and Primacorp toward a re-visitation of the rent deferral issue or to attempt to reduce the rent. I agree that there is some indication that Quest and Primacorp had that in mind; however, that is often the reality that arises after a debtor concludes that it is no longer viable to abide by those contractual commitments and that a disclaimer is appropriate. If it were possible to come to an amicable resolution with Southern Star in the context of the Primacorp transaction, I expect Quest would have done so.

[106]   Southern Star refers to the statements in *Allarco Entertainment Inc. (Re)*, 2009 ABQB 503 at para. 59, where Justice Veit considered whether certain contracts should be terminated. She was attuned to whether the termination was fair, appropriate and reasonable and whether it arose after good faith negotiations. In this case, there is no evidence to suggest that the parties did not approach the negotiations in good faith. Clearly, it is not my role on this application to assess the reasonableness of the respective positions of Quest, Primacorp and Southern Star in those negotiations. It does appear, however, that Quest and Primacorp have moved toward a middle ground by the withdrawal of the Disclaimers in relation to Lots A-B.

2020 BCSC 1883 (CanLII)

[107]   Thirdly, Southern Star places great emphasis on what it says will be the significant hardship it will suffer if the Disclaimers are upheld. Southern Star says that it has spent approximately $41.7 million to construct the Residences.

[108]   The monthly mortgage payments to BMO and Fivestone are approximately $220,000. The outstanding balance of the BMO loan facility is $34.4 million. Mr. Hutchison indicates that, without payment of rent by Quest, Southern Star will not be able to make its mortgage payments to BMO. In that event, BMO will be in a position to foreclose on the Ground Leases. Mr. Hutchison has guaranteed the BMO debt, as has another of Mr. Hutchison's companies.

[109]   As noted by Quest, any financial consequences to Southern Star will largely depend on what mitigating measures are undertaken. Those could include a re-letting of the Residences or a sale of its interests under the Ground Leases. At present, with no clear indication as to how those matters might evolve, I am unable to conclude with certainty that any hardship suffered by Southern Star would be "significant".

[110]   Regardless of any hardship faced by Southern Star, the reality is that Quest has only one viable means by which to advance the restructuring at this time – the Primacorp transaction. Within the confines of that transaction, Primacorp sees no merit in maintaining the Subleases on these two Residences. Apparently, no other interested party expressed an interest in maintaining the Subleases besides Landrex. In light of Landrex's submissions at the conclusion of this hearing on November 16, 2020, I have considered that the Landrex/CapU transaction may have presented a more palatable resolution of the Subleases given the recent LOI between Landrex and Southern Star. However, I conclude that delaying the Primacorp sale, on the prospect that the Landrex/CapU transaction will come about, is not a viable option for the reasons discussed above.

[111]   I agree that this decision will visit hardship, even arguably significant hardship, upon Southern Star. However, it is difficult to see that preventing delivery of the Disclaimers would avoid that result in any event. If the Primacorp transaction

does not proceed, there is no transaction and Quest has no financial means to continue past December 2020. The Interim Lender has indicated that it will not advance funds to Quest beyond that date, and specifically, that it has no interest in funding continued rent payments to Southern Star.

[112]   In that event, Southern Star will be in the same position post December 2020, with Quest unable to pay the rent for the Residences at that time: see *Target Canada Co. (Re)*, 2015 ONSC 1028 at paras. 27-28.

[113]   As the court noted in *Target Canada* at paras. 24-25, the court must give due consideration to the stakeholder group as a whole in assessing whether the Disclaimers are fair and reasonable: *Doman Industries Ltd. (Re)*, 2004 BCSC 733 at para. 33. The price of setting aside the Disclaimers is that the Primacorp transaction will not proceed and a receivership at the behest of the Interim Lender will likely follow. In my view, this is not in the best interests of that larger stakeholder group which, in my view, has primacy here even in the face of the hardship and prejudice caused to Southern Star.

[114]   I dismiss Southern Star's application for order that the Subleases of the Residences on Lots C-D not be disclaimed by Quest.

### RVO

[115]   At the November 3, 2020 hearing, when Quest originally sought the TAVO, Quest was seeking to uphold the Disclaimers of the Subleases. At that time, Southern Star's evidence and submissions were to the effect that, if the Court upheld the Disclaimers, it would have a substantial unsecured claim against the estate. As indicated above, the amount of any claim that Southern Star might advance in the estate is far from clear, given possible mitigation, although there is potential for a significant claim.

[116]   This position did not come as a surprise to Quest; however, it appears that Quest did not appreciate the potential magnitude of Southern Star's claim. More importantly, Quest has not fully appreciated that a very unhappy claimant – Southern

Star under the Disclaimers – was not likely to vote in favour of the Plan and that the value of its claim could swamp the class votes to prevent any approval by the creditors. Again, creditor approval of the Plan is a requirement of the Primacorp Transaction.

[117]   In early November 2020, known unsecured creditor's claims were estimated at approximately $2.3 million. "Restructuring Claims" (which will include any claim of Southern Star under the Disclaimers) were yet unknown.

[118]   Initially, Primacorp agreed to fund Quest's Plan in the amount of the lesser of 50% of the claims or $1.35 million. The Monitor now states that there is a "high probability" that Southern Star's claim will be large enough such that Southern Star will control the value of the votes at the creditors meeting. Other major unsecured creditor claims have also since emerged, being that of Dana (estimated $1 million) and the Association for the Advancement of Scholarship (estimated $5 million).

[119]   As the Monitor notes, any of these claims could effectively veto the Plan.

[120]   Quest and Primacorp were then facing a dilemma. They determined that, while they might succeed on the Disclaimer issue, they could not likely obtain approval of the Plan, a further requirement of the Primacorp PSA, if Southern Star carried through with its suggested negative vote. While Quest could raise arguments in relation to the value of any claim advanced by Southern Star, uncertain and lengthy litigation would likely result; even if Quest was successful, it would be too late to factor into this restructuring.

[121]   Quest, with Primacorp's approval, solved this dilemma by revising the TAVO to an RVO. In addition, the Primacorp PSA was amended to delete the conditions precedent requiring creditor and court approval of the Plan. Accordingly, the only condition precedent that remains before closing of the Primacorp transaction is the granting of the RVO.

[122]   The Monitor supports this change as necessary in the circumstances in order to allow Quest to complete the Primacorp transaction. The Monitor supports the granting of the RVO.

[123]   In its Fifth Report dated November 10, 2020, the Monitor describes the characteristics of the new structure and steps under the RVO, which involves Quest's subsidiary, Guardian Properties Ltd. ("Guardian"):

> RVO Structure & Impact
>
> 2.6      The RVO provides for the following to occur in sequential order on the closing of the Primacorp Transaction:
>
> 2.6.1    A wholly owned subsidiary of Quest, Quest Guardian Properties Ltd. ("Guardian") shall be added as a Petitioner in these CCAA proceedings. Guardian was incorporated on January 25, 2018 and has never carried on any business and has never held any assets or liabilities;
>
> 2.6.2    All of Quest's right, title and interest in and to the Excluded Assets (as defined in the Primacorp PSA and the RVO) shall be transferred to and vested in Guardian;
>
> 2.6.3    All Contracts (other than Approved Contracts), Claims and Liabilities of Quest shall be transferred to Guardian and Quest shall be released from and in respect of all obligations in respect of such Contracts, Claims and Liabilities;
>
> 2.6.4    Primacorp will pay the Purchase Price to the Monitor to the extent of the Secured Charges and all the Secured Claims and the Secured Charges shall be extinguished and cancelled. The Purchase Price will stand in the place of the Purchased Assets;
>
> 2.6.5    All of Quests right, title and interest in the Purchased Assets shall vest in Primacorp free and clear of any security interests, Claims and Liabilities; and,
>
> 2.6.6    Quest will cease to be a Petitioner in these CCAA proceedings leaving Guardian as the sole Petitioner.
>
> 2.7      The RVO contains release provisions similar to those contained in the Plan. Quest, its employees, legal advisors and other representatives, Quest's Governors and Officers, and the Monitor and its legal counsel shall be released from any and all demands and claims relating to, arising out of, or in connection with these CCAA Proceedings. The releases do not apply in the case of wilful misconduct or fraud.
>
> 2.8      As a result of the amendments to the Primacorp Transaction and the RVO, if the RVO is granted:
>
> 2.8.1    There will be no uncertainty as to whether the Primacorp Transaction can close and the condition precedent for the

2020 BCSC 1883 (CanLII)

approval of the Plan is no longer applicable. As a result, there will be certainty for the go-forward operations of Quest, thereby creating security for the Quest students, faculty and staff leading into the critical enrolment period for the winter term;

2.8.2   Guardian will become responsible for the obligations under the Southern Star subleases should they not be disclaimed. As Guardian will not have the financial resources to meet those obligations, it is expected that Guardian would default on the Southern Star subleases in January 2021; and

2.8.3   The Plan, which will now compromise the debts of Guardian, will be funded through the Primacorp Transaction and therefore this aspect of the Primacorp Transaction and the Plan has not changed.

[124]   As I will discuss below, the effect and substance of the RVO is to achieve what Quest has originally sought by way of a restructuring in these proceedings; namely, a sale of certain assets to Primacorp and, importantly, Quest continuing as a going concern as an academic institution, in partnership with Primacorp. The only aspect now missing is that, under the RVO, Quest will avoid having to obtain creditor or Court approval of the Plan.

[125]   The intention is that the amounts that Primacorp was to fund under the Plan will now be transferred to Guardian to be distributed under Guardian's plan in relation to the Quest's liabilities that are to be transferred to Guardian. Effectively, Guardian will be funded just as it was originally intended that Quest's Plan was to have been funded to resolve those claims.

[126]   Southern Star and Dana, as unsecured creditors of Quest, object to the granting of an RVO, contending that it effectively and unfairly negates their right to vote on Quest's Plan under s. 6 of the *CCAA*. They object to the transfer of their claims to Guardian. They say that, although they will have the ability to vote on Guardian's plan, it will effectively mean that they cannot vote to block Quest's restructuring to enable it to continue as a going concern within the context of the Primacorp transaction.

### *RVO Jurisdiction and Authorities*

[127]   There is no dispute between the parties that this Court has authority to grant the RVO under its general statutory jurisdiction found in s. 11 of the *CCAA*.

[128]   Quest has referred me to a number of decisions across Canada where courts have exercised that jurisdiction to grant an RVO in the context of sale approvals considered under s. 36 of the *CCAA*. I will review those decisions in some detail below to highlight the relevant circumstances.

[129]   In *Re T. Eaton Co.* 2000 CarswellOnt 4502, 26 C.C.P.B. 295, the Ontario court granted such an order under its *CCAA* proceedings. There are no written reasons discussing the circumstances in that case. The only brief reference to that structure is found in Claims Officer Houlden's decision in *Eaton's* that addressed an unrelated issue. The agreed statement of facts before the Claims Officer provided:

> 5.    The *CCAA* Plan contemplated that all of the assets of Eaton's which were not being retained by Eaton's under the Sears Agreement would be transferred to a new corporation, Distributionco Inc. ("Distributionco"). These assets would then be liquidated by Richter & Partners Inc. ("Richter") in its capacity as court-appointed liquidator of the estate and effects of Distributionco. Richter would then distribute the assets of Distributionco to unsecured creditors and others in accordance with priorities set out in the *CCAA* Plan.

> 6.    Under the *CCAA* Plan, unsecured creditor claims against Eaton's are converted into a right to participate in distributions in the liquidation of Distributionco based on the amount of the creditor's claim against Eaton's. Accordingly, a critical initial step in the liquidation of Distributionco is the determination of the validity and amount of claims asserted against Eaton's. For this purpose the *CCAA* Plan establishes a Claims Procedure for the resolution of such claims, of which the parties to this matter are aware.

[130]   It is unclear as to the basis upon which the court approved this structure in *Eaton's* although, as Southern Star notes, it was a transaction approved within the context of a *CCAA* Plan.

[131]   More recently, this structure was approved in *Plasco Energy* (July 17, 2015), Toronto CV-15-10869-00C (Ont. S.C.J. [Comm. List]). In those *CCAA* proceedings,

an agreement was approved that "effectively" transferred current tax losses and intellectual property to a purchaser. Justice Wilton-Siegel's endorsement stated:

> The Global Settlement contemplates implementation of a corporate reorganization by which the shares of Plasco will be transferred to an acquisition corporation owned by NSPG and CWP and the remaining assets of the applicants will be held by a new corporation, referred to as "New Plasco", which will assume all of the liabilities and obligations of Plasco. I am satisfied that the Court has authority under section 11 of the *CCAA* to authorize such transactions notwithstanding that the applicants are not proceeding under s. 6(2) of the *CCAA* insofar as it is not contemplated that the applicants will propose a plan of arrangement or compromise. For this purpose, I consider that the Global Settlement is analogous to such a plan in the context of these particular proceedings. …

[132]   Justice Gouin granted an RVO in the *CCAA* proceedings of *Stornoway Diamond Corporation* (October 7, 2019), Montreal 500-11-057094-191 (Q.C.S.C. [Comm. Div.]). There are no written reasons from the court; however, the motion materials disclose that, under the transaction, the purchasers acquired substantially all the debtor's assets by purchasing 100% of the shares of one debtor company (SDCI, which held the acquired assets). In consideration, the purchaser released certain liabilities owed by the debtors and agreed to assume others.

[133]   In *Stornoway Diamond*, to ensure the purchaser acquired the assets free and clear of all encumbrances, the debtors incorporated a new subsidiary (Newco), added Newco as an applicant in the *CCAA* proceedings, and transferred all liabilities, obligations, and unacquired assets of SDCI to Newco. The debtor's motion referred to this transaction as the only viable alternative to preserve the going concern value of the debtor. The debtor noted that the equity and "non-operational related unsecured claims" had no value. As in the RVO sought here, the court's order included familiar aspects found in sanction orders, including releases.

[134]   An RVO was also approved in the *CCAA* proceedings of *Wayland Group Corp.* (April 21, 2020), Toronto CV-19-00632079-00CL (Ont. S.C.J. [Comm. List]). Approval was sought in the context of preserving valuable cannabis licenses. Justice Hainey's brief endorsement indicates that the relief was unopposed. The court

approved a sale of substantially all of the debtor's assets to the successful bidder under a share purchase agreement after a sales and investment solicitation process.

[135]   Other information before me regarding the *Wayland Group* transaction is found in the applicant's factum. The factum refers to both *Plasco Energy* and *Stornoway Diamond*, while also referring to ss. 11 and 36(3) of the *CCAA* as the jurisdictional basis for the relief. The applicants argued that transferring certain assets and liabilities of the debtors into a "newco" would ensure that the purchaser acquired the underlying assets of the target company free and clear of all claims and encumbrances and allow the business to continue as a going-concern. They asserted that this was the "only way" to complete the sale to realize the value in the assets; it was also argued that this transaction was in the best interests of stakeholders and did not prejudice major creditors. In *Wayland Group*, the transaction value was only sufficient to repay the interim lender and perhaps some amount for the first secured creditor.

[136]   The Ontario court again approved a similar RVO transaction in the *CCAA* proceedings of *Comark Holdings Inc.* (July 13, 2020), Toronto CV-20-00642013-00CL (Ont. S.C.J. [Comm. List]). Justice Hainey granted the RVO while again indicating in a brief endorsement that the relief was unopposed. The share sale preserved the tax attributes of the debtor, which the purchaser viewed as critical for the success of the future business. The purchaser was a related party who was making a credit bid for the assets.

[137]   In *Comark Holdings*, the purchaser acquired all the issued and outstanding shares of the primary *CCAA* debtor and agreed to pay out all the secured debt and priority claims. The excluded assets, agreements, liabilities and encumbrances were transferred to another entity that became a debtor in the *CCAA* proceedings, with the result that the *CCAA* debtor held its assets free and clear of all claims and encumbrances and was then removed from the *CCAA* proceedings. The purchaser and the primary *CCAA* debtor then amalgamated. The new *CCAA* debtor (Newco) was authorized to make an assignment into bankruptcy. The monitor, along with the

principal secured creditors, including the interim lender, supported the transactions. As in *Plasco Energy*, *Stornoway Diamond* and *Wayland Group*, the debtors in *Comark Holdings* argued that this was the "only option" to preserve the business, that the value in that business would be lost in a liquidation and that the transaction was in the best interests of the stakeholders generally.

[138]   Justice Conway granted an RVO in the *CCAA* proceedings of *Beleave Inc.* (September 18, 2020), Toronto, CV-20-00642097-00CL (Ont. S.C.J. [Comm. List]). As in *Wayland Group*, the preservation of valuable cannabis licenses were at stake. The motion was supported by the monitor and unopposed. Justice Conway stated in her brief endorsement:

> The Applicants seek approval of the transaction whereby . . . (the Purchaser) will acquire the operating business of the Applicants. The structure of the transaction is partly by share sale and partly by asset sale. The reason for the structure is to accommodate the licensing requirements of Health Canada. The order is structured as a reverse vesting order, in which excluded liabilities and assets will be transferred to "Residualco", which will then become one of the Applicants in the *CCAA* proceedings. Reverse vesting orders have been approved by the courts in other cases: see *Re Stornoway Diamond Corporation* . . . and *Re Wayland Group Corp.* . . .
>
> The transaction is the culmination of a stalking horse sales process approved by the court. The motion is unopposed. The Monitor recommends and supports the transaction in its Fourth Report. In particular, the Monitor states that the proposed transaction is economically superior to the estimated liquidation value of the Beleave Group's assets and operations, will allow the Purchaser to maintain operations and use of the Cannabis licenses and will provide for continued employment for a majority of the existing employees. In my view, the transaction satisfies s. 36(3) of the *CCAA* and the *Soundair* test and should be approved.

[139]   In *Beleave*, the RVO included releases of claims similar to that granted in other RVO decisions. These provisions were also consistent generally with sanction orders and are similar to the relief sought by Quest here.

[140]   Even more recently, the Alberta court approved an RVO structure in the *CCAA* proceedings of *JMB Crushing Systems Inc.* (October 16, 2020), Calgary 2001-05482 (A.B.Q.B.). Justice Eidsvik approved the RVO structure as part of a sale approval. No written reasons of the court are available, however, the monitor's bench brief discloses the relevant facts.

2020 BCSC 1883 (CanLII)

[141]   As in the above cases, the transaction addressed in *JMB Crushing* arose from a sale and investment solicitation process that yielded only one offer, with the RVO described as a critical component. The underlying intention was to preserve the value of the paid up capital and regulatory permits in the *CCAA* debtor.

[142]   In *JMB Crushing*, the monitor relied on the orders granted in *Plasco Energy*, *Stornoway Diamond*, *Wayland Group* and *Beleave*, arguing that the RVO structure was justified in those circumstances:

> 24.   In recent *CCAA* proceedings, where it was not practical to compromise amounts owed to creditors through a traditional plan of compromise and arrangement, but it was critical to the viability of a transaction to "cleanse" the debtor company, such that a prospective purchaser may: (i) utilize non-transferrable regulatory licenses (by way of amalgamation or the purchase of the shares of the debtor company); or, (ii) make use of tax attributes of the debtor company, such as [paid up capital], Courts have recently approved and utilized reverse vesting orders to achieve such objectives.

> 25.   The purpose of a reverse vesting order is to transfer and vest all of the assets and liabilities of a debtor company, which are not subject to a sale, to another company within the same *CCAA* proceedings. The cleansed debtor company is then able to: (i) be utilized by a purchaser as a go-forward vehicle, without any concern regarding creditors and obligations that may otherwise be "laying in the weeds"; and, (ii) allow the purchaser to make use of the debtor company's tax attributes and non-transferrable regulatory licenses. This approach is necessary in situations where the parties would otherwise be unable to preserve the value of significant assets that are subject to restraints on alienation and to provide a corresponding realizable benefit for creditors and stakeholders.

[143]   In *JMB Crushing*, the monitor further justified the RVO structure in asserting that the debtor's secured creditors would suffer a shortfall even with such measures. The monitor stated that the unsecured creditors had no economic interest in the transaction and there was no reasonable prospect of any recovery to them. The debtor did not intend to undertake a claims process or present a plan to its unsecured creditors.

[144]   By pure coincidence, another and perhaps more compelling authority came to the attention of the parties during this hearing.

[145]   On November 11, 2020, the Québec Court of Appeal dismissed an application for leave to appeal the granting of an RVO by Gouin J. of the Québec Superior Court on October 15, 2020: *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218; leave to appeal denied *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCA 1488. The Court of Appeal's decision is in English; Gouin J.'s decision is in French and no English translation was available. As such, all references to *Nemaska Lithium* will be to the QCCA.

[146]   All counsel agree that Gouin J.'s decision in *Nemaska Lithium* is the first time a Canadian court has granted an RVO in contested *CCAA* proceedings.

[147]   In *Nemaska Lithium* (at para. 5), the court stated that the RVO allowed the purchaser to carry on the operations of the Nemaska Lithium entitles (mining in James Bay) by maintaining existing permits, licenses and authorizations. This goal was accomplished via a credit bid for the shares in Nemaska Lithium in return for assumption of the secured debt. At para. 22, the court refers to the intention of the "residual companies" to later present a plan of arrangement to the "remaining creditors", but the details are not disclosed.

[148]   In denying leave to appeal in *Nemaska Lithium*, the court stated that an appeal would hinder the progress of the proceedings. More relevant to this application were the court's comments on the legitimacy of the position of the only objecting creditor, Cantore, and the court's rejection that it was appropriate to allow Cantore to exercise a veto in the restructuring:

> [38]     As it turns out, the value of the Cantore provable claims (setting aside the later debate regarding his potential real rights) stands at $8,160 million out of a total value of provable claims of $200 million. Thus, Cantore's provable claims represent at this point in time 4% of the total value of unsecured creditors'' claims as determined by the Monitor. Yet, Cantore is the only creditor having voiced an objection to the RVO approval. This begs the question: whose interest is being served by the proposed appeal? What would be the true impact of the Cantore vote on the RVO transaction if it were made subject to prior approval on the part of the creditors as he suggests?

> [39]     In these circumstances, I am simply not convinced that the arguments that are advanced by Cantore are anything but a "bargaining tool", while he pursues multidirectional attacks on the RVO with the same arguments that were dismissed in the first instance.

[149]   Similar to Cantore's position in the *Nemaska Lithium* restructuring, Southern Star and Dana's objections to the RVO are grounded in the assertion it will negate their effective veto on the Plan (and hence the Primacorp transaction) by which they seek to leverage further concessions. For obvious reasons, those concessions can only come about at a cost to other stakeholders, whose interests remain to be addressed.

### Discussion

[150]   Quest, with the support of the Monitor, submits that the Primacorp transaction satisfies s. 36 of the *CCAA* and that the Court should grant the RVO pursuant to ss. 11 and 36 of the *CCAA*.

[151]   As with the structures approved in the above *CCAA* proceedings, the RVO has certain aspects that Southern Star says are objectionable. Those include primarily: (i) the addition of Guardian as a petitioner in the *CCAA* proceeding; (ii) the vesting of the Excluded Liabilities and Excluded Contracts in Guardian; (iii) Quest's exit from this *CCAA* proceeding; and (iv) the release of Quest in respect of the Excluded Liabilities and Excluded Contracts.

[152]   Essentially, unsecured claims against Quest and minor assets are transferred to Guardian and Quest continues as a going concern after having transferred the bulk of its assets to Primacorp free and clear of any encumbrances (save for certain Retained Liabilities). Quest no longer requires approval of the Plan by the creditors and the Court to complete the Primacorp transaction.

[153]   At para. 19, the QCCA in *Nemaska Lithium* referred to Gouin J.'s comment that s. 36 of the *CCAA* allows the court a broad discretion to consider and, if appropriate, grant relief that represents an innovative solution to any challenges in a proceeding. Justice Gouin considered that approving an RVO structure was such an innovative solution. Indeed, this is the history of *CCAA* jurisprudence under the court's broad statutory discretion and court approval of innovative solutions continues to this time.

[154]   That said, the ability of a *CCAA* court to be innovative and creative is not boundless; as always, the court must exercise its discretion with a view to the statutory objectives and purposes of the *CCAA*: *Century Services.*

[155]   I find further support for Quest's position in the recent comments of the Court in *Callidus.* The Court was there addressing a different issue – whether a *CCAA* judge has jurisdiction under s. 11 to bar a creditor from voting where the creditor is "acting for an improper purpose" – but the Court's comments on the exercise of jurisdiction under the *CCAA* ring true in relation to the RVO structure:

> [49]    The discretionary authority conferred by the *CCAA*, while broad in nature, is not boundless. This authority must be exercised in furtherance of the remedial objectives of the *CCAA*, which we have explained above (see *Century Services*, at para. 59). Additionally, the court must keep in mind three "baseline considerations" (at para. 70), which the applicant bears the burden of demonstrating: (1) that the order sought is appropriate in the circumstances, and (2) that the applicant has been acting in good faith and (3) with due diligence (para. 69).
>
> [50]    The first two considerations of appropriateness and good faith are widely understood in the *CCAA* context. Appropriateness is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*" (para. 70). Further, the well-established requirement that parties must act in good faith in insolvency proceedings has recently been made express in s. 18.6 of the *CCAA*, which provides:
>
> > Good faith
> >
> > 18.6(1) Any interested person in any proceedings under this Act shall act in good faith with respect to those proceedings.
> >
> > Good faith — powers of court
> >
> > (2)      If the court is satisfied that an interested person fails to act in good faith, on application by an interested person, the court may make any order that it considers appropriate in the circumstances.
> >
> > (See also *BIA*, s. 4.2; *Budget Implementation Act*, *2019, No. 1*, S.C. 2019, c. 29, ss. 133 and 140.)
>
> . . .
>
> [65]    There is no dispute that the *CCAA* is silent on when a creditor who is otherwise entitled to vote on a plan can be barred from voting. However, <u>*CCAA* supervising judges are often called upon "to sanction measures for which there is no explicit authority in the *CCAA*"</u> (*Century Services*, at para. 61; see also para. 62). In <u>*Century Services*, this Court endorsed a "hierarchical" approach to determining whether jurisdiction exists to sanction</u>

a proposed measure: "courts [must] rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding" (para. 65). In most circumstances, a purposive and liberal interpretation of the provisions of the *CCAA* will be sufficient "to ground measures necessary to achieve its objectives" (para. 65).

. . .

[67]    Courts have long recognized that s. 11 of the *CCAA* signals legislative endorsement of the "broad reading of *CCAA* authority developed by the jurisprudence" (*Century Services*, at para. 68). . . .

On the plain wording of the provision, the jurisdiction granted by s. 11 is constrained only by restrictions set out in the *CCAA* itself, and the requirement that the order made be "appropriate in the circumstances".

[68]    Where a party seeks an order relating to a matter that falls within the supervising judge's purview, and for which there is no *CCAA* provision conferring more specific jurisdiction, s. 11 necessarily is the provision of first resort in anchoring jurisdiction. As Blair J.A. put it in *Stelco*, s. 11 "for the most part supplants the need to resort to inherent jurisdiction" in the *CCAA* context (para. 36).

. . .

[70]    . . . The exercise of this discretion must further the remedial objectives of the *CCAA* and be guided by the baseline considerations of appropriateness, good faith, and due diligence. This means that, where a creditor is seeking to exercise its voting rights in a manner that frustrates, undermines, or runs counter to those objectives — that is, acting for an "improper purpose" — the supervising judge has the discretion to bar that creditor from voting.

. . .

[75]    We also observe that the recognition of this discretion under the *CCAA* advances the basic fairness that "permeates Canadian insolvency law and practice" (Sarra, "The Oscillating Pendulum: Canada's Sesquicentennial and Finding the Equilibrium for Insolvency Law", at p. 27; see also *Century Services*, at paras. 70 and 77). As Professor Sarra observes, fairness demands that supervising judges be in a position to recognize and meaningfully address circumstances in which parties are working against the goals of the statute:

> The Canadian insolvency regime is based on the assumption that creditors and the debtor share a common goal of maximizing recoveries. The substantive aspect of fairness in the insolvency regime is based on the assumption that all involved parties face real economic risks. Unfairness resides where only some face these risks, while others actually benefit from the situation . . . . *If the CCAA is to be interpreted in a purposive way, the courts must be able to recognize when people have conflicting interests and are working actively against the goals of the statute.*

> ("The Oscillating Pendulum: Canada's Sesquicentennial and
> Finding the Equilibrium for Insolvency Law", at p. 30
> (emphasis added))
>
> In this vein, the supervising judge's oversight of the *CCAA* voting regime
> must not only ensure strict compliance with the Act, but should further its
> goals as well. We are of the view that the policy objectives of the *CCAA*
> necessitate the recognition of the discretion to bar a creditor from voting
> where the creditor is acting for an improper purpose.
>
> [76]    Whether this discretion ought to be exercised in a particular case is a
> circumstance-specific inquiry that must balance the various objectives of the
> *CCAA*. As this case demonstrates, the supervising judge is best-positioned to
> undertake this inquiry.
>
> [Underline emphasis added; italic emphasis in original.]

[156]   Quest is not seeking to bar Southern Star or Dana from voting on the Plan. It is seeking approval of a structure that would result in Guardian submitting its own plan to the unsecured creditors, which would include Southern Star and Dana, at which time they are generally free to vote their "self-interest" subject to any relevant constraint (for example, if the court finds that they are voting for an improper purpose): *Callidus* at para. 24 and 56.

[157]   There is no provision in the *CCAA* that prohibits an RVO structure. As is usually the case in *CCAA* matters, the court must ensure that any relief is "appropriate" in the circumstances and that all stakeholders are treated as fairly and reasonably "as the circumstances permit": *Century Services* at para. 70.

[158]   As with the sales considered in most of the above RVO cases, including *Nemaska Lithium*, this is the *only* transaction that has emerged to resolve the financial affairs of Quest. No other options are before the stakeholders and the Court that would suggest another path forward. As was noted by Gouin J. in *Nemaska Lithium* (at para. 12), it is not up to the Court to dictate the terms and conditions that are included in an offer. Primacorp has presumably made the best offer that it is prepared to make in the circumstances – that is the offer the Court must consider.

[159]   I agree with the Monitor that, without the RVO structure, the Primacorp transaction is in jeopardy. The only other likely path forward for Quest is

receivership, liquidation and bankruptcy, a future that looms in early 2021 if the transaction is not approved.

[160]   Many of the RVO cases cited above involve a sale of an ongoing business with a purchaser. The RVO structure was crafted to allow those businesses to continue through the debtor company, since it was that corporate vehicle who owned the valuable "assets" that could be not transferred.

[161]   Akin to the tax losses, permits and licences that could not be transferred in those RVO cases, is Quest's ability to confer degrees under its statutory authority under s. 4(2) of the *Sea to Sky Act*, S.B.C. 2002, c. 54 (the "*Sea to Sky Act*"). Quest cannot sell its ability to grant degrees under s. 4(2) of the *Sea to Sky Act*. Nor can any purchaser acquire the right to grant degrees indirectly through a purchase of the shares in Quest. Pursuant to s. 2 of the *Sea to Sky Act*, Quest is a corporation "composed of the members of the board" and no shareholders exist. Pursuant to s. 1 of the *Sea to Sky Act*, the "board" means the board of governors of the university.

[162]   It is a critical requirement under the Primacorp transaction that Quest remain a viable entity to continue its operations and, in particular, continue to grant degrees. That is a significant component of the Primacorp transaction and the value that Primacorp is prepared to pay under the transaction reflects that component. In other words, the stakeholders are receiving a benefit from this transaction by which Primacorp ensures that Quest continues after exiting these *CCAA* proceedings.

[163]   At para. 38, the court in *Nemaska Lithium* asked:

> . . . whose interest is being served by the proposed appeal? What would be the true impact of the Cantore vote on the RVO transaction if it were made subject to prior approval on the part of the creditors as he suggests?

[164]   I acknowledge the negative consequences that arise particularly for Southern Star if the Primacorp transaction is approved, although there is significant uncertainty about the extent of any loss that may be suffered. Dana's unsecured claim has little, if any value, outside of the benefits of the Primacorp transaction.

2020 BCSC 1883 (CanLII)

2020 BCSC 1883 (CanLII)

[165]   In that light, I would ask Southern Star and Dana a similar question to that of the QCCA—to what end is your veto if Quest's Plan is put presented for creditor approval?

[166]   Both creditors potentially hold the sword of Damocles over the head of the significant broad stakeholder group who stand to benefit from the Primacorp transaction. Recently, Southern Star has secured further benefits by the withdrawal of two of the Disclaimers. Both objecting creditors have nothing to lose at this point in this dangerous game of chicken with Primacorp, with only the oversight of this Court to oversee this strategy. By any stretch, no one is blinking at this point, while significant other interests hang in the balance.

[167]   The Monitor's comments in its Fifth Report as to the jeopardy to those other interests are apt:

> 2.15    The Monitor has considered the competing interests of Southern Star and the interests of Quest's other stakeholders. In the Monitor's view, the Primacorp Transaction should not be jeopardized by the lack of agreement between Southern Star and Primacorp. Southern Star can mitigate its financial hardship by entering into an agreement with Primacorp for use of some or all of the residences. By contrast, Quest's other stakeholders have no ability to mitigate their potential losses in the event that the Primacorp Transaction does not close. They are reliant on the completion of the Primacorp Transaction or face significant losses themselves should it not complete.

[168]   In my view, in the vein of the Court's discussion in *Callidus*, these are unique and exceptional circumstances where the Court may grant the relief by allowing Quest to employ the RVO structure within the context of this sale transaction.

[169]   Southern Star and Dana seek to effectively block the only reasonable outcome here by insisting that they must approve of Quest's Plan in conjunction with the sale. However, creditor approval of a sale is not required under s. 36 of the *CCAA*.

[170]   The granting of the RVO in these circumstances is in accordance with the remedial purposes of the *CCAA*. To use the words of Dr. Sarra, quoted above in

2020 BCSC 1883 (CanLII)

*Callidus*, I conclude that Southern Star and Dana are working actively against the goals of the *CCAA* by their opposition to the RVO.

[171]   I do not consider that an RVO structure would be generally employed or approved in a *CCAA* restructuring to simply rid a debtor of a recalcitrant creditor who may seek to exert leverage through its vote on a plan while furthering its own interests. Clearly, every situation must be considered based on its own facts; different circumstances may dictate different results. A debtor should not seek an RVO structure simply to expedite their desired result without regard to the remedial objectives of the *CCAA*.

[172]   Here, in these complex and unique circumstances, I conclude that it is appropriate to exercise my discretion to allow the RVO structure. Quest seeks this relief in good faith and while acting with due diligence to promote the best outcome for all stakeholders. I have considered the balance between the competing interests at play. This transaction is unquestionably the fairest and most reasonable means by which the greatest benefit can be achieved for the overall stakeholder group, a group that includes Southern Star and Dana.

[173]   The structure also allows Quest to continue its operations in partnership with Primacorp, a result that will avoid the devastating social and economic consequences that will be visited upon the stakeholders if this transaction is not approved. Ironically, the continuation of Quest's operations will also benefit Southern Star in the future through the continued payment of rent for two of the Residences. Other potential benefits may also arise if Southern Star and Quest are later able to come to terms once the pandemic has receded and students return to campus.

## THE PRIMACORP TRANSACTION

[174]   Quest applies for the granting of the RVO in favour of Primacorp pursuant to s. 36(1) of the *CCAA*.

2020 BCSC 1883 (CanLII)

[175]   Section 36(1) of the CCAA allows the court to authorize the sale of a debtor company's assets out of the ordinary course of business. Section 36(3) of the *CCAA* lists the relevant non-exhaustive factors to be considered:

> (a)      whether the process leading to the proposed sale or disposition was reasonable in the circumstances;
>
> (b)      whether the monitor approved the process leading to the proposed sale or disposition;
>
> (c)      whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;
>
> (d)      the extent to which the creditors were consulted;
>
> (e)      the effects of the proposed sale or disposition on the creditors and other interested parties; and
>
> (f)      whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.

[176]   The well-known considerations identified in *Royal Bank v. Soundair Corp.* (1991), 4 O.R. (3d) 1 at 6 (C.A.) are consistent with and overlap many of the s. 36(3) factors: see *Veris Gold Corp. (Re)*, 2015 BCSC 1204 at para. 25, referring to various authorities such as *Canwest Publishing Inc. (Re)*, 2010 ONSC 2870 at para. 13. Those considerations include: (i) whether the party conducting the sale made sufficient efforts to obtain the best price and did not act improvidently; (ii) the interests of all parties; (iii) the efficacy and integrity of the process by which offers were obtained; and, (iv) whether there has been any unfairness in the sales process.

[177]   More generally, in analyzing whether a transaction should be approved, taking into consideration the s. 36(3) and *Soundair* factors, a court is to consider the transaction as a whole and decide whether or not the sale is appropriate, fair and reasonable: *Veris Gold* at para. 23.

[178]   I conclude that the s. 36(3) and *Soundair* factors all favour approving the Primacorp transaction and granting the RVO. Specifically:

> a)      The process leading to the Primacorp transaction has been lengthy and exhaustive. The Monitor has overseen that entire process;

b)      Quest 's Restructuring committee and its Board of Governors have sought and obtained professional advice throughout the *CCAA* process toward finding a suitable academic partner and/or a purchaser/developer for Quest's lands;

c)      No stakeholder objects to the proposition that the sales process was conducted in an appropriate, fair and reasonable manner;

d)      The Primacorp transaction will see the repayment of Quest's secured creditors, now totalling approximately $42.2 million in what has been an increasingly pressurized environment to do so after long standing defaults;

e)      Since August 7, 2020, the Interim Lender and VF, Quest's major secured creditors, have been kept apprised of developments. They both support the Primacorp transaction. In addition, other secured creditors have been involved throughout these proceedings and support the transaction;

f)      There has been significant community and stakeholder involvement throughout the sales process;

g)      The Primacorp transaction will ensure that Quest continues as a going concern, by continuing operations as a post-secondary institution in Squamish. This will result in continuing benefits to the broad stakeholder group. This includes faculty, staff, students, secured and unsecured creditors, suppliers, landlords and the community generally;

h)      The broader stakeholder interests must be balanced against those who will be negatively affected by the transaction, such as Southern Star under the Disclaimers, although no viable offer has emerged that does not include the Disclaimers;

i)      Quest's Board of Governors have exercised their business judgment and determined that the Primacorp transaction is the best option to fulfil the goals of Quest's restructuring;

j)      The Primacorp transaction will fund a Plan for unsecured creditors;

k)      The Primacorp transaction provides Quest with significant benefits in terms of its future operations. These include the $20 million working capital facility and Primacorp support for Quest's marketing, recruiting and operations to allow it to continue as a post-secondary institution into the future;

l)      No other or better offer or proposal has emerged that can be considered superior to the Primacorp transaction;

m)      The Monitor is satisfied that the consideration to be received from Primacorp is reasonable and fair, taking into account the market value of the assets and the other unique factors of these proceedings;

n)      The Monitor is of the view that this transaction will yield a greater benefit to the stakeholders than might be achieved in a liquidation or bankruptcy;

o)      Any delay of approval is likely to lead to ruinous consequences after December 2020, when Quest will be out of funds and the Interim Lender will be in a position to commence a receivership and liquidation of Quest's assets; and

p)      Simply, Quest has run out of time to find a restructuring solution and the Primacorp transaction presently stands as the *only* viable option to avoid the devastating social and economic consequences to its stakeholders if a liquidation results.

## CONCLUSIONS

[179]   I grant the RVO as sought by Quest, and as supported by the Monitor.

[180]   The Primacorp transaction is the best option available that maximizes recovery for Quest's creditors and preserves Quest's university operations. Allowing Quest to continue as a university will benefit all stakeholders, including Quest's current and former employees, current and future students of Quest and the community generally. The RVO structure is an appropriate means to accomplish this result in these unique and exceptional circumstances.

"Fitzpatrick J."

2020 BCSC 1883 (CanLII)

1991 CanLII 2727 (ON CA)

Royal Bank of Canada v. Soundair Corp., Canadian Pension
Capital Ltd. and Canadian Insurers Capital Corp.

Indexed as: Royal Bank of Canada v. Soundair Corp.
(C.A.)

4 O.R. (3d) 1
[1991] O.J. No. 1137
Action No. 318/91

ONTARIO
Court of Appeal for Ontario
Goodman, McKinlay and Galligan JJ.A.
July 3, 1991

 Debtor and creditor -- Receivers -- Court-appointed receiver
accepting offer to purchase assets against wishes of secured
creditors -- Receiver acting properly and prudently -- Wishes
of creditors not determinative -- Court approval of sale
confirmed on appeal.

 Air Toronto was a division of Soundair. In April 1990, one of
Soundair's creditors, the Royal Bank, appointed a receiver to
operate Air Toronto and sell it as a going concern. The
receiver was authorized to sell Air Toronto to Air Canada, or,
if that sale could not be completed, to negotiate and sell Air
Toronto to another person. Air Canada made an offer which the
receiver rejected. The receiver then entered into negotiations
with Canadian Airlines International (Canadian); two
subsidiaries of Canadian, Ontario Express Ltd. and Frontier
Airlines Ltd., made an offer to purchase on March 6, 1991 (the
OEL offer). Air Canada and a creditor of Soundair, CCFL,
presented an offer to purchase to the receiver on March 7, 1991
through 922, a company formed for that purpose (the 922 offer).
The receiver declined the 922 offer because it contained an
unacceptable condition and accepted the OEL offer. 922 made a

second offer, which was virtually identical to the first one
except that the unacceptable condition had been removed. In
proceedings before Rosenberg J., an order was made approving
the sale of Air Toronto to OEL and dismissing the 922 offer.
CCFL appealed.

 Held, the appeal should be dismissed.

 Per Galligan J.A.: When deciding whether a receiver has acted
providently, the court should examine the conduct of the
receiver in light of the information the receiver had when it
agreed to accept an offer, and should be very cautious before
deciding that the receiver's conduct was improvident based upon
information which has come to light after it made its decision.
The decision to sell to OEL was a sound one in the
circumstances faced by the receiver on March 8, 1991. Prices in
other offers received after the receiver has agreed to a sale
have relevance only if they show that the price contained in
the accepted offer was so unreasonably low as to demonstrate
that the receiver was improvident in accepting it. If they do
not do so, they should not be considered upon a motion to
confirm a sale recommended by a court-appointed receiver. If
the 922 offer was better than the OEL offer, it was only
marginally better and did not lead to an inference that the
disposition strategy of the receiver was improvident.

 While the primary concern of a receiver is the protecting of
the interests of creditors, a secondary but important
consideration is the integrity of the process by which the sale
is effected. The court must exercise extreme caution before it
interferes with the process adopted by a receiver to sell an
unusual asset. It is important that prospective purchasers know
that, if they are acting in good faith, bargain seriously with
a receiver and enter into an agreement with it, a court will
not lightly interfere with the commercial judgment of the
receiver to sell the asset to them.

 The failure of the receiver to give an offering memorandum to
those who expressed an interest in the purchase of Air Toronto
did not result in the process being unfair, as there was no
proof that if an offering memorandum had been widely

distributed among persons qualified to have purchased Air
Toronto, a viable offer would have come forth from a party
other than 922 or OEL.

  The fact that the 922 offer was supported by Soundair's
secured creditors did not mean that the court should have given
effect to their wishes. Creditors who asked the court to
appoint a receiver to dispose of assets (and therefore
insulated themselves from the risks of acting privately) should
not be allowed to take over control of the process by the
simple expedient of supporting another purchaser if they do not
agree with the sale by the receiver. If the court decides that
a court-appointed receiver has acted providently and properly
(as the receiver did in this case), the views of creditors
should not be determinative.

  Per McKinlay J.A. (concurring in the result): While the
procedure carried out by the receiver in this case was
appropriate, given the unfolding of events and the unique
nature of the assets involved, it was not a procedure which was
likely to be appropriate in many receivership sales.

  Per Goodman J.A. (dissenting): The fact that a creditor has
requested an order of the court appointing a receiver does not
in any way diminish or derogate from his right to obtain the
maximum benefit to be derived from any disposition of the
debtor's assets. The creditors in this case were convinced that
acceptance of the 922 offer was in their best interest and the
evidence supported that belief. Although the receiver acted in
good faith, the process which it used was unfair insofar as 922
was concerned and improvident insofar as the secured creditors
were concerned.

 Cases referred to

 Beauty Counsellors of Canada Ltd. (Re) (1986), 58 C.B.R.
(N.S.) 237 (Ont. Bkcy.); British Columbia Development Corp.
v. Spun Cast Industries Inc. (1977), 5 B.C.L.R. 94, 26 C.B.R.
(N.S.) 28 (S.C.); Cameron v. Bank of Nova Scotia (1981), 38
C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303, 86 A.P.R. 303 (C.A.);
Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87, 22 C.P.C.

(2d) 131, 67 C.B.R. (N.S.) 320 (note), 39 D.L.R. (4th) 526
(H.C.J.); Salima Investments Ltd. v. Bank of Montreal
(1985), 41 Alta. L.R. (2d) 58, 65 A.R. 372, 59 C.B.R. (N.S.)
242, 21 D.L.R. (4th) 473 (C.A.); Selkirk (Re) (1986), 58 C.B.R.
(N.S.) 245 (Ont. Bkcy.); Selkirk (Re) (1987), 64 C.B.R.
(N.S.) 140 (Ont. Bkcy.)

Statutes referred to

Employment Standards Act, R.S.O. 1980, c. 137
Environmental Protection Act, R.S.O. 1980, c. 141


 APPEAL from the judgment of the General Division, Rosenberg
J., May 1, 1991, approving the sale of an airline by a
receiver.


 J.B. Berkow and Steven H. Goldman, for appellants.

 John T. Morin, Q.C., for Air Canada.

 L.A.J. Barnes and Lawrence E. Ritchie, for Royal Bank of
Canada.

 Sean F. Dunphy and G.K. Ketcheson for Ernst & Young Inc.,
receiver of Soundair Corp., respondent.

 W.G. Horton, for Ontario Express Ltd.

 Nancy J. Spies, for Frontier Air Ltd.


 GALLIGAN J.A.:-- This is an appeal from the order of
Rosenberg J. made on May 1, 1991 (Gen. Div.). By that order, he
approved the sale of Air Toronto to Ontario Express Limited and
Frontier Air Limited and he dismissed a motion to approve an
offer to purchase Air Toronto by 922246 Ontario Limited.

 It is necessary at the outset to give some background to the
dispute. Soundair Corporation (Soundair) is a corporation

engaged in the air transport business. It has three divisions. One of them is Air Toronto. Air Toronto operates a scheduled airline from Toronto to a number of mid-sized cities in the United States of America. Its routes serve as feeders to several of Air Canada's routes. Pursuant to a connector agreement, Air Canada provides some services to Air Toronto and benefits from the feeder traffic provided by it. The operational relationship between Air Canada and Air Toronto is a close one.

In the latter part of 1989 and the early part of 1990, Soundair was in financial difficulty. Soundair has two secured creditors who have an interest in the assets of Air Toronto. The Royal Bank of Canada (the Royal Bank) is owed at least $65,000,000. The appellants Canadian Pension Capital Limited and Canadian Insurers Capital Corporation (collectively called CCFL) are owed approximately $9,500,000. Those creditors will have a deficiency expected to be in excess of $50,000,000 on the winding-up of Soundair.

On April 26, 1990, upon the motion of the Royal Bank, O'Brien J. appointed Ernst & Young Inc. (the receiver) as receiver of all of the assets, property and undertakings of Soundair. The order required the receiver to operate Air Toronto and sell it as a going concern. Because of the close relationship between Air Toronto and Air Canada, it was contemplated that the receiver would obtain the assistance of Air Canada to operate Air Toronto. The order authorized the receiver:

  (b) to enter into contractual arrangements with Air Canada to retain a manager or operator, including Air Canada, to manage and operate Air Toronto under the supervision of Ernst & Young Inc. until the completion of the sale of Air Toronto to Air Canada or other person ...

Also because of the close relationship, it was expected that Air Canada would purchase Air Toronto. To that end, the order of O'Brien J. authorized the receiver:

  (c) to negotiate and do all things necessary or desirable to complete a sale of Air Toronto to Air Canada and, if a sale

to Air Canada cannot be completed, to negotiate and sell Air
Toronto to another person, subject to terms and conditions
approved by this Court.

Over a period of several weeks following that order,
negotiations directed towards the sale of Air Toronto took
place between the receiver and Air Canada. Air Canada had an
agreement with the receiver that it would have exclusive
negotiating rights during that period. I do not think it is
necessary to review those negotiations, but I note that Air
Canada had complete access to all of the operations of Air
Toronto and conducted due diligence examinations. It became
thoroughly acquainted with every aspect of Air Toronto's
operations.

Those negotiations came to an end when an offer made by Air
Canada on June 19, 1990, was considered unsatisfactory by the
receiver. The offer was not accepted and lapsed. Having regard
to the tenor of Air Canada's negotiating stance and a letter
sent by its solicitors on July 20, 1990, I think that the
receiver was eminently reasonable when it decided that there
was no realistic possibility of selling Air Toronto to Air
Canada.

The receiver then looked elsewhere. Air Toronto's feeder
business is very attractive, but it only has value to a
national airline. The receiver concluded reasonably, therefore,
that it was commercially necessary for one of Canada's two
national airlines to be involved in any sale of Air Toronto.
Realistically, there were only two possible purchasers whether
direct or indirect. They were Air Canada and Canadian Airlines
International.

It was well known in the air transport industry that Air
Toronto was for sale. During the months following the collapse
of the negotiations with Air Canada, the receiver tried
unsuccessfully to find viable purchasers. In late 1990, the
receiver turned to Canadian Airlines International, the only
realistic alternative. Negotiations began between them. Those
negotiations led to a letter of intent dated February 11, 1991.
On March 6, 1991, the receiver received an offer from Ontario

1991 CanLII 2727 (ON CA)

Express Limited and Frontier Airlines Limited, who are subsidiaries of Canadian Airlines International. This offer is called the OEL offer.

In the meantime, Air Canada and CCFL were having discussions about making an offer for the purchase of Air Toronto. They formed 922246 Ontario Limited (922) for the purpose of purchasing Air Toronto. On March 1, 1991, CCFL wrote to the receiver saying that it proposed to make an offer. On March 7, 1991, Air Canada and CCFL presented an offer to the receiver in the name of 922. For convenience, its offers are called the 922 offers.

The first 922 offer contained a condition which was unacceptable to the receiver. I will refer to that condition in more detail later. The receiver declined the 922 offer and on March 8, 1991, accepted the OEL offer. Subsequently, 922 obtained an order allowing it to make a second offer. It then submitted an offer which was virtually identical to that of March 7, 1991, except that the unacceptable condition had been removed.

The proceedings before Rosenberg J. then followed. He approved the sale to OEL and dismissed a motion for the acceptance of the 922 offer. Before Rosenberg J., and in this court, both CCFL and the Royal Bank supported the acceptance of the second 922 offer.

There are only two issues which must be resolved in this appeal. They are:

(1) Did the receiver act properly when it entered into an agreement to sell Air Toronto to OEL?

(2) What effect does the support of the 922 offer by the secured creditors have on the result?

I will deal with the two issues separately.

I.  DID THE RECEIVER ACT PROPERLY

IN AGREEING TO SELL TO OEL?

 Before dealing with that issue there are three general
observations which I think I should make. The first is that the
sale of an airline as a going concern is a very complex
process. The best method of selling an airline at the best
price is something far removed from the expertise of a court.
When a court appoints a receiver to use its commercial
expertise to sell an airline, it is inescapable that it intends
to rely upon the receiver's expertise and not upon its own.
Therefore, the court must place a great deal of confidence in
the actions taken and in the opinions formed by the receiver.
It should also assume that the receiver is acting properly
unless the contrary is clearly shown. The second observation is
that the court should be reluctant to second-guess, with the
benefit of hindsight, the considered business decisions made by
its receiver. The third observation which I wish to make is
that the conduct of the receiver should be reviewed in the
light of the specific mandate given to him by the court.

 The order of O'Brien J. provided that if the receiver could
not complete the sale to Air Canada that it was "to negotiate
and sell Air Toronto to another person". The court did not say
how the receiver was to negotiate the sale. It did not say it
was to call for bids or conduct an auction. It told the
receiver to negotiate and sell. It obviously intended, because
of the unusual nature of the asset being sold, to leave the
method of sale substantially in the discretion of the receiver.
I think, therefore, that the court should not review minutely
the process of the sale when, broadly speaking, it appears to
the court to be a just process.

 As did Rosenberg J., I adopt as correct the statement made by
Anderson J. in Crown Trust Co. v. Rosenberg (1986), 60 O.R.
(2d) 87, 39 D.L.R. (4th) 526 (H.C.J.), at pp. 92-94 O.R.,
pp. 531-33 D.L.R., of the duties which a court must perform
when deciding whether a receiver who has sold a property acted
properly. When he set out the court's duties, he did not put
them in any order of priority, nor do I. I summarize those
duties as follows:

1. It should consider whether the receiver has made a sufficient effort to get the best price and has not acted improvidently.

2. It should consider the interests of all parties.

3. It should consider the efficacy and integrity of the process by which offers are obtained.

4. It should consider whether there has been unfairness in the working out of the process.


 I intend to discuss the performance of those duties separately.

1. Did the receiver make a sufficient effort to get the best price and did it act providently?

 Having regard to the fact that it was highly unlikely that a commercially viable sale could be made to anyone but the two national airlines, or to someone supported by either of them, it is my view that the receiver acted wisely and reasonably when it negotiated only with Air Canada and Canadian Airlines International. Furthermore, when Air Canada said that it would submit no further offers and gave the impression that it would not participate further in the receiver's efforts to sell, the only course reasonably open to the receiver was to negotiate with Canadian Airlines International. Realistically, there was nowhere else to go but to Canadian Airlines International. In doing so, it is my opinion that the receiver made sufficient efforts to sell the airline.

 When the receiver got the OEL offer on March 6, 1991, it was over ten months since it had been charged with the responsibility of selling Air Toronto. Until then, the receiver had not received one offer which it thought was acceptable. After substantial efforts to sell the airline over that period, I find it difficult to think that the receiver acted improvidently in accepting the only acceptable offer which it had.

1991 CanLII 2727 (ON CA)

On March 8, 1991, the date when the receiver accepted the OEL offer, it had only two offers, the OEL offer which was acceptable, and the 922 offer which contained an unacceptable condition. I cannot see how the receiver, assuming for the moment that the price was reasonable, could have done anything but accept the OEL offer.

When deciding whether a receiver had acted providently, the court should examine the conduct of the receiver in light of the information the receiver had when it agreed to accept an offer. In this case, the court should look at the receiver's conduct in the light of the information it had when it made its decision on March 8, 1991. The court should be very cautious before deciding that the receiver's conduct was improvident based upon information which has come to light after it made its decision. To do so, in my view, would derogate from the mandate to sell given to the receiver by the order of O'Brien J. I agree with and adopt what was said by Anderson J. in Crown Trust v. Rosenberg, supra, at p. 112 O.R., p. 551 D.L.R.:

> Its decision was made as a matter of business judgment on the elements then available to it. It is of the very essence of a receiver's function to make such judgments and in the making of them to act seriously and responsibly so as to be prepared to stand behind them.

> If the court were to reject the recommendation of the Receiver in any but the most exceptional circumstances, it would materially diminish and weaken the role and function of the Receiver both in the perception of receivers and in the perception of any others who might have occasion to deal with them. It would lead to the conclusion that the decision of the Receiver was of little weight and that the real decision was always made upon the motion for approval. That would be a consequence susceptible of immensely damaging results to the disposition of assets by court-appointed receivers.

(Emphasis added)

I also agree with and adopt what was said by Macdonald J.A.

in Cameron v. Bank of Nova Scotia (1981), 38 C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303 (C.A.), at p. 11 C.B.R., p. 314 N.S.R.:

In my opinion if the decision of the receiver to enter into an agreement of sale, subject to court approval, with respect to certain assets is reasonable and sound under the circumstances at the time existing it should not be set aside simply because a later and higher bid is made. To do so would literally create chaos in the commercial world and receivers and purchasers would never be sure they had a binding agreement.

(Emphasis added)

On March 8, 1991, the receiver had two offers. One was the OEL offer which it considered satisfactory but which could be withdrawn by OEL at any time before it was accepted. The receiver also had the 922 offer which contained a condition that was totally unacceptable. It had no other offers. It was faced with the dilemma of whether it should decline to accept the OEL offer and run the risk of it being withdrawn, in the hope that an acceptable offer would be forthcoming from 922. An affidavit filed by the president of the receiver describes the dilemma which the receiver faced, and the judgment made in the light of that dilemma:

24. An asset purchase agreement was received by Ernst & Young on March 7, 1991 which was dated March 6, 1991. This agreement was received from CCFL in respect of their offer to purchase the assets and undertaking of Air Toronto. Apart from financial considerations, which will be considered in a subsequent affidavit, the Receiver determined that it would not be prudent to delay acceptance of the OEL agreement to negotiate a highly uncertain arrangement with Air Canada and CCFL. Air Canada had the benefit of an "exclusive" in negotiations for Air Toronto and had clearly indicated its intention to take itself out of the running while ensuring that no other party could seek to purchase Air Toronto and maintain the Air Canada connector arrangement vital to its survival. The CCFL offer represented a radical reversal of this position by Air Canada at the eleventh hour. However, it

contained a significant number of conditions to closing which
were entirely beyond the control of the Receiver. As well,
the CCFL offer came less than 24 hours before signing of the
agreement with OEL which had been negotiated over a period of
months, at great time and expense.

(Emphasis added)
I am convinced that the decision made was a sound one in the
circumstances faced by the receiver on March 8, 1991.

 I now turn to consider whether the price contained in the OEL
offer was one which it was provident to accept. At the outset,
I think that the fact that the OEL offer was the only
acceptable one available to the receiver on March 8, 1991,
after ten months of trying to sell the airline, is strong
evidence that the price in it was reasonable. In a
deteriorating economy, I doubt that it would have been wise to
wait any longer.

 I mentioned earlier that, pursuant to an order, 922 was
permitted to present a second offer. During the hearing of the
appeal, counsel compared at great length the price contained in
the second 922 offer with the price contained in the OEL offer.
Counsel put forth various hypotheses supporting their
contentions that one offer was better than the other.

 It is my opinion that the price contained in the 922 offer is
relevant only if it shows that the price obtained by the
Receiver in the OEL offer was not a reasonable one. In Crown
Trust v. Rosenberg, supra, Anderson J., at p. 113 O.R., p. 551
D.L.R., discussed the comparison of offers in the following
way:

 No doubt, as the cases have indicated, situations might arise
 where the disparity was so great as to call in question the
 adequacy of the mechanism which had produced the offers. It
 is not so here, and in my view that is substantially an end
 of the matter.

 In two judgments, Saunders J. considered the circumstances in
which an offer submitted after the receiver had agreed to a

sale should be considered by the court. The first is Re Selkirk
(1986), 58 C.B.R. (N.S.) 245 (Ont. Bkcy.), at p. 247:

 If, for example, in this case there had been a second offer
 of a substantially higher amount, then the court would have
 to take that offer into consideration in assessing whether
 the receiver had properly carried out his function of
 endeavouring to obtain the best price for the property.

 The second is Re Beauty Counsellors of Canada Ltd. (1986), 58
 C.B.R. (N.S.) 237 (Ont. Bkcy.), at p. 243:

 If a substantially higher bid turns up at the approval stage,
 the court should consider it. Such a bid may indicate, for
 example, that the trustee has not properly carried out its
 duty to endeavour to obtain the best price for the estate.

 In Re Selkirk (1987), 64 C.B.R. (N.S.) 140 (Ont. Bkcy.), at
 p. 142, McRae J. expressed a similar view:

   The court will not lightly withhold approval of a sale by
 the receiver, particularly in a case such as this where the
 receiver is given rather wide discretionary authority as per
 the order of Mr. Justice Trainor and, of course, where the
 receiver is an officer of this court. Only in a case where
 there seems to be some unfairness in the process of the sale
 or where there are substantially higher offers which would
 tend to show that the sale was improvident will the court
 withhold approval. It is important that the court recognize
 the commercial exigencies that would flow if prospective
 purchasers are allowed to wait until the sale is in court for
 approval before submitting their final offer. This is
 something that must be discouraged.

(Emphasis added)

 What those cases show is that the prices in other offers have
relevance only if they show that the price contained in the
offer accepted by the receiver was so unreasonably low as to
demonstrate that the receiver was improvident in accepting it.
I am of the opinion, therefore, that if they do not tend to

show that the receiver was improvident, they should not be considered upon a motion to confirm a sale recommended by a court-appointed receiver. If they were, the process would be changed from a sale by a receiver, subject to court approval, into an auction conducted by the court at the time approval is sought. In my opinion, the latter course is unfair to the person who has entered bona fide into an agreement with the receiver, can only lead to chaos, and must be discouraged.

If, however, the subsequent offer is so substantially higher than the sale recommended by the receiver, then it may be that the receiver has not conducted the sale properly. In such circumstances, the court would be justified itself in entering into the sale process by considering competitive bids. However, I think that that process should be entered into only if the court is satisfied that the receiver has not properly conducted the sale which it has recommended to the court.

It is necessary to consider the two offers. Rosenberg J. held that the 922 offer was slightly better or marginally better than the OEL offer. He concluded that the difference in the two offers did not show that the sale process adopted by the receiver was inadequate or improvident.

Counsel for the appellants complained about the manner in which Rosenberg J. conducted the hearing of the motion to confirm the OEL sale. The complaint was, that when they began to discuss a comparison of the two offers, Rosenberg J. said that he considered the 922 offer to be better than the OEL offer. Counsel said that when that comment was made, they did not think it necessary to argue further the question of the difference in value between the two offers. They complain that the finding that the 922 offer was only marginally better or slightly better than the OEL offer was made without them having had the opportunity to argue that the 922 offer was substantially better or significantly better than the OEL offer. I cannot understand how counsel could have thought that by expressing the opinion that the 922 offer was better, Rosenberg J. was saying that it was a significantly or substantially better one. Nor can I comprehend how counsel took the comment to mean that they were foreclosed from arguing that

the offer was significantly or substantially better. If there
was some misunderstanding on the part of counsel, it should
have been raised before Rosenberg J. at the time. I am sure
that if it had been, the misunderstanding would have been
cleared up quickly. Nevertheless, this court permitted
extensive argument dealing with the comparison of the two
offers.

 The 922 offer provided for $6,000,000 cash to be paid on
closing with a royalty based upon a percentage of Air Toronto
profits over a period of five years up to a maximum of
$3,000,000. The OEL offer provided for a payment of $2,000,000
on closing with a royalty paid on gross revenues over a five-
year period. In the short term, the 922 offer is obviously
better because there is substantially more cash up front. The
chances of future returns are substantially greater in the OEL
offer because royalties are paid on gross revenues while the
royalties under the 922 offer are paid only on profits. There
is an element of risk involved in each offer.

 The receiver studied the two offers. It compared them and
took into account the risks, the advantages and the
disadvantages of each. It considered the appropriate
contingencies. It is not necessary to outline the factors which
were taken into account by the receiver because the manager of
its insolvency practice filed an affidavit outlining the
considerations which were weighed in its evaluation of the two
offers. They seem to me to be reasonable ones. That affidavit
concluded with the following paragraph:

 24. On the basis of these considerations the Receiver has
 approved the OEL offer and has concluded that it represents
 the achievement of the highest possible value at this time
 for the Air Toronto division of SoundAir.

 The court appointed the receiver to conduct the sale of Air
Toronto and entrusted it with the responsibility of deciding
what is the best offer. I put great weight upon the opinion of
the receiver. It swore to the court which appointed it that the
OEL offer represents the achievement of the highest possible
value at this time for Air Toronto. I have not been convinced

that the receiver was wrong when he made that assessment. I am, therefore, of the opinion that the 922 offer does not demonstrate any failure upon the part of the receiver to act properly and providently.

It follows that if Rosenberg J. was correct when he found that the 922 offer was in fact better, I agree with him that it could only have been slightly or marginally better. The 922 offer does not lead to an inference that the disposition strategy of the receiver was inadequate, unsuccessful or improvident, nor that the price was unreasonable.

I am, therefore, of the opinion that the receiver made a sufficient effort to get the best price and has not acted improvidently.

2. Consideration of the interests of all parties

It is well established that the primary interest is that of the creditors of the debtor: see Crown Trust Co. v. Rosenberg, supra, and Re Selkirk (1986, Saunders J.), supra. However, as Saunders J. pointed out in Re Beauty Counsellors, supra, at p. 244 C.B.R., "it is not the only or overriding consideration".

In my opinion, there are other persons whose interests require consideration. In an appropriate case, the interests of the debtor must be taken into account. I think also, in a case such as this, where a purchaser has bargained at some length and doubtless at considerable expense with the receiver, the interests of the purchaser ought to be taken into account. While it is not explicitly stated in such cases as Crown Trust Co. v. Rosenberg, supra, Re Selkirk (1986, Saunders J.), supra, Re Beauty Counsellors, supra, Re Selkirk (1987, McRae J.), supra, and Cameron, supra, I think they clearly imply that the interests of a person who has negotiated an agreement with a court-appointed receiver are very important.

In this case, the interests of all parties who would have an interest in the process were considered by the receiver and by Rosenberg J.

3. Consideration of the efficacy and integrity of the process
by which the offer was obtained

 While it is accepted that the primary concern of a receiver
is the protecting of the interests of the creditors, there is a
secondary but very important consideration and that is the
integrity of the process by which the sale is effected. This is
particularly so in the case of a sale of such a unique asset as
an airline as a going concern.

 The importance of a court protecting the integrity of the
process has been stated in a number of cases. First, I refer to
Re Selkirk (1986), supra, where Saunders J. said at p. 246
C.B.R.:

   In dealing with the request for approval, the court has to
  be concerned primarily with protecting the interest of the
  creditors of the former bankrupt. A secondary but important
  consideration is that the process under which the sale
  agreement is arrived at should be consistent with commercial
  efficacy and integrity.

   In that connection I adopt the principles stated by
  Macdonald J.A. of the Nova Scotia Supreme Court (Appeal
  Division) in Cameron v. Bank of N.S. (1981), 38 C.B.R. (N.S.)
  1, 45 N.S.R. (2d) 303, 86 A.P.R. 303 (C.A.), where he said at
  p. 11:

   In my opinion if the decision of the receiver to enter
  into an agreement of sale, subject to court approval, with
  respect to certain assets is reasonable and sound under the
  circumstances at the time existing it should not be set aside
  simply because a later and higher bid is made. To do so would
  literally create chaos in the commercial world and receivers
  and purchasers would never be sure they had a finding
  agreement. On the contrary, they would know that other bids
  could be received and considered up until the application for
  court approval is heard -- this would be an intolerable
  situation.

While those remarks may have been made in the context of a

bidding situation rather than a private sale, I consider them
to be equally applicable to a negotiation process leading to
a private sale. Where the court is concerned with the
disposition of property, the purpose of appointing a receiver
is to have the receiver do the work that the court would
otherwise have to do.

In Salima Investments Ltd. v. Bank of Montreal (1985), 41
Alta. L.R. (2d) 58, 21 D.L.R. (4th) 473 (C.A.), at p. 61 Alta.
L.R., p. 476 D.L.R., the Alberta Court of Appeal said that sale
by tender is not necessarily the best way to sell a business as
an ongoing concern. It went on to say that when some other
method is used which is provident, the court should not
undermine the process by refusing to confirm the sale.

Finally, I refer to the reasoning of Anderson J. in Crown
Trust Co. v. Rosenberg, supra, at p. 124 O.R., pp. 562-63
D.L.R.:

   While every proper effort must always be made to assure
maximum recovery consistent with the limitations inherent in
the process, no method has yet been devised to entirely
eliminate those limitations or to avoid their consequences.
Certainly it is not to be found in loosening the entire
foundation of the system. Thus to compare the results of the
process in this case with what might have been recovered in
some other set of circumstances is neither logical nor
practical.

(Emphasis added)

It is my opinion that the court must exercise extreme caution
before it interferes with the process adopted by a receiver to
sell an unusual asset. It is important that prospective
purchasers know that, if they are acting in good faith, bargain
seriously with a receiver and enter into an agreement with it,
a court will not lightly interfere with the commercial judgment
of the receiver to sell the asset to them.

Before this court, counsel for those opposing the
confirmation of the sale to OEL suggested many different ways

in which the receiver could have conducted the process other than the way which he did. However, the evidence does not convince me that the receiver used an improper method of attempting to sell the airline. The answer to those submissions is found in the comment of Anderson J. in Crown Trust Co. v. Rosenberg, supra, at p. 109 O.R., p. 548 D.L.R.:

  The court ought not to sit as on appeal from the decision of the Receiver, reviewing in minute detail every element of the process by which the decision is reached. To do so would be a futile and duplicitous exercise.

  It would be a futile and duplicitous exercise for this court to examine in minute detail all of the circumstances leading up to the acceptance of the OEL offer. Having considered the process adopted by the receiver, it is my opinion that the process adopted was a reasonable and prudent one.

4. Was there unfairness in the process?

  As a general rule, I do not think it appropriate for the court to go into the minutia of the process or of the selling strategy adopted by the receiver. However, the court has a responsibility to decide whether the process was fair. The only part of this process which I could find that might give even a superficial impression of unfairness is the failure of the receiver to give an offering memorandum to those who expressed an interest in the purchase of Air Toronto.

  I will outline the circumstances which relate to the allegation that the receiver was unfair in failing to provide an offering memorandum. In the latter part of 1990, as part of its selling strategy, the receiver was in the process of preparing an offering memorandum to give to persons who expressed an interest in the purchase of Air Toronto. The offering memorandum got as far as draft form, but was never released to anyone, although a copy of the draft eventually got into the hands of CCFL before it submitted the first 922 offer on March 7, 1991. A copy of the offering memorandum forms part of the record and it seems to me to be little more than puffery, without any hard information which a sophisticated

purchaser would require in order to make a serious bid.

  The offering memorandum had not been completed by February 11, 1991. On that date, the receiver entered into the letter of intent to negotiate with OEL. The letter of intent contained a provision that during its currency the receiver would not negotiate with any other party. The letter of intent was renewed from time to time until the OEL offer was received on March 6, 1991.

  The receiver did not proceed with the offering memorandum because to do so would violate the spirit, if not the letter, of its letter of intent with OEL.

  I do not think that the conduct of the receiver shows any unfairness towards 922. When I speak of 922, I do so in the context that Air Canada and CCFL are identified with it. I start by saying that the receiver acted reasonably when it entered into exclusive negotiations with OEL. I find it strange that a company, with which Air Canada is closely and intimately involved, would say that it was unfair for the receiver to enter into a time-limited agreement to negotiate exclusively with OEL. That is precisely the arrangement which Air Canada insisted upon when it negotiated with the receiver in the spring and summer of 1990. If it was not unfair for Air Canada to have such an agreement, I do not understand why it was unfair for OEL to have a similar one. In fact, both Air Canada and OEL in its turn were acting reasonably when they required exclusive negotiating rights to prevent their negotiations from being used as a bargaining lever with other potential purchasers. The fact that Air Canada insisted upon an exclusive negotiating right while it was negotiating with the receiver demonstrates the commercial efficacy of OEL being given the same right during its negotiations with the receiver. I see no unfairness on the part of the receiver when it honoured its letter of intent with OEL by not releasing the offering memorandum during the negotiations with OEL.

  Moreover, I am not prepared top find that 922 was in any way prejudiced by the fact that it did not have an offering memorandum. It made an offer on March 7, 1991, which it

1991 CanLII 2727 (ON CA)

contends to this day was a better offer than that of OEL. 922
has not convinced me that if it had an offering memorandum its
offer would have been any different or any better than it
actually was. The fatal problem with the first 922 offer was
that it contained a condition which was completely unacceptable
to the receiver. The receiver properly, in my opinion, rejected
the offer out of hand because of that condition. That condition
did not relate to any information which could have conceivably
been in an offering memorandum prepared by the receiver. It was
about the resolution of a dispute between CCFL and the Royal
Bank, something the receiver knew nothing about.

 Further evidence of the lack of prejudice which the absence
of an offering memorandum has caused 922 is found in CCFL's
stance before this court. During argument, its counsel
suggested, as a possible resolution of this appeal, that this
court should call for new bids, evaluate them and then order a
sale to the party who put in the better bid. In such a case,
counsel for CCFL said that 922 would be prepared to bid within
seven days of the court's decision. I would have thought that,
if there were anything to CCFL's suggestion that the failure to
provide an offering memorandum was unfair to 922, it would have
told the court that it needed more information before it would
be able to make a bid.

 I am satisfied that Air Canada and CCFL have, and at all
times had, all of the information which they would have needed
to make what to them would be a commercially viable offer to
the receiver. I think that an offering memorandum was of no
commercial consequence to them, but the absence of one has
since become a valuable tactical weapon.

 It is my opinion that there is no convincing proof that if an
offering memorandum had been widely distributed among persons
qualified to have purchased Air Toronto, a viable offer would
have come forth from a party other than 922 or OEL. Therefore,
the failure to provide an offering memorandum was neither
unfair nor did it prejudice the obtaining of a better price on
March 8, 1991, than that contained in the OEL offer. I would
not give effect to the contention that the process adopted by
the receiver was an unfair one.

There are two statements by Anderson J. contained in Crown Trust Co. v. Rosenberg, supra, which I adopt as my own. The first is at p. 109 O.R., p. 548 D.L.R.:

The court should not proceed against the recommendations of its Receiver except in special circumstances and where the necessity and propriety of doing so are plain. Any other rule or approach would emasculate the role of the Receiver and make it almost inevitable that the final negotiation of every sale would take place on the motion for approval.

The second is at p. 111 O.R., p. 550 D.L.R.:

It is equally clear, in my view, though perhaps not so clearly enunciated, that it is only in an exceptional case that the court will intervene and proceed contrary to the Receiver's recommendations if satisfied, as I am, that the Receiver has acted reasonably, prudently and fairly and not arbitrarily.

In this case the receiver acted reasonably, prudently, fairly and not arbitrarily. I am of the opinion, therefore, that the process adopted by the receiver in reaching an agreement was a just one.

In his reasons for judgment, after discussing the circumstances leading to the 922 offer, Rosenberg J. said this [at p. 31 of the reasons]:

They created a situation as of March 8, where the receiver was faced with two offers, one of which was in acceptable form and one of which could not possibly be accepted in its present form. The receiver acted appropriately in accepting the OEL offer.

I agree.

The receiver made proper and sufficient efforts to get the best price that it could for the assets of Air Toronto. It adopted a reasonable and effective process to sell the airline

which was fair to all persons who might be interested in purchasing it. It is my opinion, therefore, that the receiver properly carried out the mandate which was given to it by the order of O'Brien J. It follows that Rosenberg J. was correct when he confirmed the sale to OEL.

## II.   THE EFFECT OF THE SUPPORT OF THE 922 OFFER
## BY THE TWO SECURED CREDITORS

As I noted earlier, the 922 offer was supported before Rosenberg J., and in this court, by CCFL and by the Royal Bank, the two secured creditors. It was argued that, because the interests of the creditors are primary, the court ought to give effect to their wish that the 922 offer be accepted. I would not accede to that suggestion for two reasons.

The first reason is related to the fact that the creditors chose to have a receiver appointed by the court. It was open to them to appoint a private receiver pursuant to the authority of their security documents. Had they done so, then they would have had control of the process and could have sold Air Toronto to whom they wished. However, acting privately and controlling the process involves some risks. The appointment of a receiver by the court insulates the creditors from those risks. But insulation from those risks carries with it the loss of control over the process of disposition of the assets. As I have attempted to explain in these reasons, when a receiver's sale is before the court for confirmation the only issues are the propriety of the conduct of the receiver and whether it acted providently. The function of the court at that stage is not to step in and do the receiver's work or change the sale strategy adopted by the receiver. Creditors who asked the court to appoint a receiver to dispose of assets should not be allowed to take over control of the process by the simple expedient of supporting another purchaser if they do not agree with the sale made by the receiver. That would take away all respect for the process of sale by a court-appointed receiver.

There can be no doubt that the interests of the creditor are an important consideration in determining whether the receiver has properly conducted a sale. The opinion of the creditors as

to which offer ought to be accepted is something to be taken
into account. But, if the court decides that the receiver has
acted properly and providently, those views are not necessarily
determinative. Because, in this case, the receiver acted
properly and providently, I do not think that the views of the
creditors should override the considered judgment of the
receiver.

 The second reason is that, in the particular circumstances of
this case, I do not think the support of CCFL and the Royal
Bank of the 922 offer is entitled to any weight. The support
given by CCFL can be dealt with summarily. It is a co-owner of
922. It is hardly surprising and not very impressive to hear
that it supports the offer which it is making for the debtors'
assets.

 The support by the Royal Bank requires more consideration and
involves some reference to the circumstances. On March 6, 1991,
when the first 922 offer was made, there was in existence an
interlender agreement between the Royal Bank and CCFL. That
agreement dealt with the share of the proceeds of the sale of
Air Toronto which each creditor would receive. At the time, a
dispute between the Royal Bank and CCFL about the
interpretation of that agreement was pending in the courts. The
unacceptable condition in the first 922 offer related to the
settlement of the interlender dispute. The condition required
that the dispute be resolved in a way which would substantially
favour CCFL. It required that CCFL receive $3,375,000 of the
$6,000,000 cash payment and the balance, including the
royalties, if any, be paid to the Royal Bank. The Royal Bank
did not agree with that split of the sale proceeds.

 On April 5, 1991, the Royal Bank and CCFL agreed to settle
the interlender dispute. The settlement was that if the 922
offer was accepted by the court, CCFL would receive only
$1,000,000 and the Royal Bank would receive $5,000,000 plus any
royalties which might be paid. It was only in consideration of
that settlement that the Royal Bank agreed to support the 922
offer.

 The Royal Bank's support of the 922 offer is so affected by

the very substantial benefit which it wanted to obtain from the settlement of the interlender dispute that, in my opinion, its support is devoid of any objectivity. I think it has no weight.

While there may be circumstances where the unanimous support by the creditors of a particular offer could conceivably override the proper and provident conduct of a sale by a receiver, I do not think that this is such a case. This is a case where the receiver has acted properly and in a provident way. It would make a mockery out of the judicial process, under which a mandate was given to this receiver to sell this airline, if the support by these creditors of the 922 offer were permitted to carry the day. I give no weight to the support which they give to the 922 offer.

In its factum, the receiver pointed out that, because of greater liabilities imposed upon private receivers by various statutes such as the Employment Standards Act, R.S.O. 1980, c. 137, and the Environmental Protection Act, R.S.O. 1980, c. 141, it is likely that more and more the courts will be asked to appoint receivers in insolvencies. In those circumstances, I think that creditors who ask for court-appointed receivers and business people who choose to deal with those receivers should know that if those receivers act properly and providently their decisions and judgments will be given great weight by the courts who appoint them. I have decided this appeal in the way I have in order to assure business people who deal with court-appointed receivers that they can have confidence that an agreement which they make with a court-appointed receiver will be far more than a platform upon which others may bargain at the court approval stage. I think that persons who enter into agreements with court-appointed receivers, following a disposition procedure that is appropriate given the nature of the assets involved, should expect that their bargain will be confirmed by the court.

The process is very important. It should be carefully protected so that the ability of court-appointed receivers to negotiate the best price possible is strengthened and supported. Because this receiver acted properly and providently in entering into the OEL agreement, I am of the opinion that

Rosenberg J. was right when he approved the sale to OEL and dismissed the motion to approve the 922 offer.

I would, accordingly, dismiss the appeal. I would award the receiver, OEL and Frontier Airlines Limited their costs out of the Soundair estate, those of the receiver on a solicitor-and-client scale. I would make no order as to the costs of any of the other parties or interveners.

MCKINLAY J.A. (concurring in the result):-- I agree with Galligan J.A. in result, but wish to emphasize that I do so on the basis that the undertaking being sold in this case was of a very special and unusual nature. It is most important that the integrity of procedures followed by court-appointed receivers be protected in the interests of both commercial morality and the future confidence of business persons in their dealings with receivers. Consequently, in all cases, the court should carefully scrutinize the procedure followed by the receiver to determine whether it satisfies the tests set out by Anderson J. in Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87, 39 D.L.R. (4th) 526 (H.C.J.). While the procedure carried out by the receiver in this case, as described by Galligan J.A., was appropriate, given the unfolding of events and the unique nature of the assets involved, it is not a procedure that is likely to be appropriate in many receivership sales.

I should like to add that where there is a small number of creditors who are the only parties with a real interest in the proceeds of the sale (i.e., where it is clear that the highest price attainable would result in recovery so low that no other creditors, shareholders, guarantors, etc., could possibly benefit therefrom), the wishes of the interested creditors should be very seriously considered by the receiver. It is true, as Galligan J.A. points out, that in seeking the court appointment of a receiver, the moving parties also seek the protection of the court in carrying out the receiver's functions. However, it is also true that in utilizing the court process the moving parties have opened the whole process to detailed scrutiny by all involved, and have probably added significantly to their costs and consequent shortfall as a result of so doing. The adoption of the court process should in

1991 CanLII 2727 (ON CA)

no way diminish the rights of any party, and most certainly not
the rights of the only parties with a real interest. Where a
receiver asks for court approval of a sale which is opposed by
the only parties in interest, the court should scrutinize with
great care the procedure followed by the receiver. I agree with
Galligan J.A. that in this case that was done. I am satisfied
that the rights of all parties were properly considered by the
receiver, by the learned motions court judge, and by Galligan
J.A.

 GOODMAN J.A. (dissenting):-- I have had the opportunity of
reading the reasons for judgment herein of Galligan and
McKinlay JJ.A. Respectfully, I am unable to agree with their
conclusion.

 The case at bar is an exceptional one in the sense that upon
the application made for approval of the sale of the assets of
Air Toronto two competing offers were placed before Rosenberg
J. Those two offers were that of Frontier Airlines Ltd. and
Ontario Express Limited (OEL) and that of 922246 Ontario
Limited (922), a company incorporated for the purpose of
acquiring Air Toronto. Its shares were owned equally by
Canadian Pension Capital Limited and Canadian Insurers Capital
Corporation (collectively CCFL) and Air Canada. It was conceded
by all parties to these proceedings that the only persons who
had any interest in the proceeds of the sale were two secured
creditors, viz., CCFL and the Royal Bank of Canada (the Bank).
Those two creditors were unanimous in their position that they
desired the court to approve the sale to 922. We were not
referred to nor am I aware of any case where a court has
refused to abide by the unanimous wishes of the only interested
creditors for the approval of a specific offer made in
receivership proceedings.

 In British Columbia Development Corp. v. Spun Cast Industries
Inc. (1977), 5 B.C.L.R. 94, 26 C.B.R. (N.S.) 28 (S.C.), Berger
J. said at p. 95 B.C.L.R., p. 30 C.B.R.:

   Here all of those with a financial stake in the plant have
   joined in seeking the court's approval of the sale to Fincas.
   This court does not having a roving commission to decide what

is best for investors and businessmen when they have agreed among themselves what course of action they should follow. It is their money.

I agree with that statement. It is particularly apt to this case. The two secured creditors will suffer a shortfall of approximately $50,000,000. They have a tremendous interest in the sale of assets which form part of their security. I agree with the finding of Rosenberg J., Gen. Div., May 1, 1991, that the offer of 922 is superior to that of OEL. He concluded that the 922 offer is marginally superior. If by that he meant that mathematically it was likely to provide slightly more in the way of proceeds it is difficult to take issue with that finding. If on the other hand he meant that having regard to all considerations it was only marginally superior, I cannot agree. He said in his reasons [pp. 17–18]:

  I have come to the conclusion that knowledgeable creditors such as the Royal Bank would prefer the 922 offer even if the other factors influencing their decision were not present. No matter what adjustments had to be made, the 922 offer results in more cash immediately. Creditors facing the type of loss the Royal Bank is taking in this case would not be anxious to rely on contingencies especially in the present circumstances surrounding the airline industry.

I agree with that statement completely. It is apparent that the difference between the two offers insofar as cash on closing is concerned amounts to approximately $3,000,000 to $4,000,000. The Bank submitted that it did not wish to gamble any further with respect to its investment and that the acceptance and court approval of the OEL offer, in effect, supplanted its position as a secured creditor with respect to the amount owing over and above the down payment and placed it in the position of a joint entrepreneur but one with no control. This results from the fact that the OEL offer did not provide for any security for any funds which might be forthcoming over and above the initial downpayment on closing.

In Cameron v. Bank of Nova Scotia (1981), 38 C.B.R. (N.S.) 1, 45 N.S.R. (2d) 303 (C.A.), Hart J.A., speaking for the majority

of the court, said at p. 10 C.B.R., p. 312 N.S.R.:

> Here we are dealing with a receiver appointed at the instance
> of one major creditor, who chose to insert in the contract of
> sale a provision making it subject to the approval of the
> court. This, in my opinion, shows an intention on behalf of
> the parties to invoke the normal equitable doctrines which
> place the court in the position of looking to the interests
> of all persons concerned before giving its blessing to a
> particular transaction submitted for approval. In these
> circumstances the court would not consider itself bound by
> the contract entered into in good faith by the receiver but
> would have to look to the broader picture to see that the
> contract was for the benefit of the creditors as a whole.
> When there was evidence that a higher price was readily
> available for the property the chambers judge was, in my
> opinion, justified in exercising his discretion as he did.
> Otherwise he could have deprived the creditors of a
> substantial sum of money.

This statement is apposite to the circumstances of the case
at bar. I hasten to add that in my opinion it is not only price
which is to be considered in the exercise of the judge's
discretion. It may very well be, as I believe to be so in this
case, that the amount of cash is the most important element in
determining which of the two offers is for the benefit and in
the best interest of the creditors.

It is my view, and the statement of Hart J.A. is consistent
therewith, that the fact that a creditor has requested an order
of the court appointing a receiver does not in any way diminish
or derogate from his right to obtain the maximum benefit to be
derived from any disposition of the debtor's assets. I agree
completely with the views expressed by McKinlay J.A. in that
regard in her reasons.

It is my further view that any negotiations which took place
between the only two interested creditors in deciding to
support the approval of the 922 offer were not relevant to the
determination by the presiding judge of the issues involved in
the motion for approval of either one of the two offers nor are

they relevant in determining the outcome of this appeal. It is sufficient that the two creditors have decided unanimously what is in their best interest and the appeal must be considered in the light of that decision. It so happens, however, that there is ample evidence to support their conclusion that the approval of the 922 offer is in their best interests.

 I am satisfied that the interests of the creditors are the prime consideration for both the receiver and the court. In Re Beauty Counsellors of Canada Ltd. (1986), 58 C.B.R. (N.S.) 237 (Ont. Bkcy.) Saunders J. said at p. 243:

  This does not mean that a court should ignore a new and higher bid made after acceptance where there has been no unfairness in the process. The interests of the creditors, while not the only consideration, are the prime consideration.

 I agree with that statement of the law. In Re Selkirk (1986), 58 C.B.R. (N.S.) 245 (Ont. Bkcy.) Saunders J. heard an application for court approval for the sale by the sheriff of real property in bankruptcy proceedings. The sheriff had been previously ordered to list the property for sale subject to approval of the court. Saunders J. said at p. 246 C.B.R.:

  In dealing with the request for approval, the court has to be concerned primarily with protecting the interests of the creditors of the former bankrupt. A secondary but important consideration is that the process under which the sale agreement is arrived at should be consistent with the commercial efficacy and integrity.

 I am in agreement with that statement as a matter of general principle. Saunders J. further stated that he adopted the principles stated by Macdonald J.A. in Cameron, supra, at pp. 92-94 O.R., pp. 531-33 D.L.R., quoted by Galligan J.A. in his reasons. In Cameron, the remarks of Macdonald J.A. related to situations involving the calling of bids and fixing a time limit for the making of such bids. In those circumstances the process is so clear as a matter of commercial practice that an interference by the court in such process might have a

deleterious effect on the efficacy of receivership proceedings in other cases. But Macdonald J.A. recognized that even in bid or tender cases where the offeror for whose bid approval is sought has complied with all requirements a court might not approve the agreement of purchase and sale entered into by the receiver. He said at pp. 11-12 C.B.R., p. 314 N.S.R.:

There are, of course, many reasons why a court might not approve an agreement of purchase and sale, viz., where the offer accepted is so low in relation to the appraised value as to be unrealistic; or, where the circumstances indicate that insufficient time was allowed for the making of bids or that inadequate notice of sale by bid was given (where the receiver sells property by the bid method); or, where it can be said that the proposed sale is not in the best interest of either the creditors or the owner. Court approval must involve the delicate balancing of competing interests and not simply a consideration of the interests of the creditors.

The deficiency in the present case is so large that there has been no suggestion of a competing interest between the owner and the creditors.

I agree that the same reasoning may apply to a negotiation process leading to a private sale but the procedure and process applicable to private sales of a wide variety of businesses and undertakings with the multiplicity of individual considerations applicable and perhaps peculiar to the particular business is not so clearly established that a departure by the court from the process adopted by the receiver in a particular case will result in commercial chaos to the detriment of future receivership proceedings. Each case must be decided on its own merits and it is necessary to consider the process used by the receiver in the present proceedings and to determine whether it was unfair, improvident or inadequate.

It is important to note at the outset that Rosenberg J. made the following statement in his reasons [p. 15]:

On March 8, 1991 the trustee accepted the OEL offer subject to court approval. The receiver at that time had no other

offer before it that was in final form or could possibly be accepted. The receiver had at the time the knowledge that Air Canada with CCFL had not bargained in good faith and had not fulfilled the promise of its letter of March 1. The receiver was justified in assuming that Air Canada and CCFL's offer was a long way from being in an acceptable form and that Air Canada and CCFL's objective was to interrupt the finalizing of the OEL agreement and to retain as long as possible the Air Toronto connector traffic flowing into Terminal 2 for the benefit of Air Canada.

In my opinion there was no evidence before him or before this court to indicate that Air Canada with CCFL had not bargained in good faith and that the receiver had knowledge of such lack of good faith. Indeed, on this appeal, counsel for the receiver stated that he was not alleging Air Canada and CCFL had not bargained in good faith. Air Canada had frankly stated at the time that it had made its offer to purchase which was eventually refused by the receiver that it would not become involved in an "auction" to purchase the undertaking of Air Canada and that, although it would fulfil its contractual obligations to provide connecting services to Air Toronto, it would do no more than it was legally required to do insofar as facilitating the purchase of Air Toronto by any other person. In so doing Air Canada may have been playing "hard ball" as its behaviour was characterized by some of the counsel for opposing parties. It was nevertheless merely openly asserting its legal position as it was entitled to do.

Furthermore there was no evidence before Rosenberg J. or this court that the receiver had assumed that Air Canada and CCFL's objective in making an offer was to interrupt the finalizing of the OEL agreement and to retain as long as possible the Air Toronto connector traffic flowing into Terminal 2 for the benefit of Air Canada. Indeed, there was no evidence to support such an assumption in any event although it is clear that 922 and through it CCFL and Air Canada were endeavouring to present an offer to purchase which would be accepted and/or approved by the court in preference to the offer made by OEL.

To the extent that approval of the OEL agreement by Rosenberg

J. was based on the alleged lack of good faith in bargaining and improper motivation with respect to connector traffic on the part of Air Canada and CCFL, it cannot be supported.

 I would also point out that, rather than saying there was no other offer before it that was final in form, it would have been more accurate to have said that there was no unconditional offer before it.

 In considering the material and evidence placed before the court I am satisfied that the receiver was at all times acting in good faith. I have reached the conclusion, however, that the process which he used was unfair insofar as 922 is concerned and improvident insofar as the two secured creditors are concerned.

 Air Canada had been negotiating with Soundair Corporation for the purchase from it of Air Toronto for a considerable period of time prior to the appointment of a receiver by the court. It had given a letter of intent indicating a prospective sale price of $18,000,000. After the appointment of the receiver, by agreement dated April 30, 1990, Air Canada continued its negotiations for the purchase of Air Toronto with the receiver. Although this agreement contained a clause which provided that the receiver "shall not negotiate for the sale ... of Air Toronto with any person except Air Canada", it further provided that the receiver would not be in breach of that provision merely by receiving unsolicited offers for all or any of the assets of Air Toronto. In addition, the agreement, which had a term commencing on April 30, 1990, could be terminated on the fifth business day following the delivery of a written notice of termination by one party to the other. I point out this provision merely to indicate that the exclusivity privilege extended by the Receiver to Air Canada was of short duration at the receiver's option.

 As a result of due diligence investigations carried out by Air Canada during the month of April, May and June of 1990, Air Canada reduced its offer to 8.1 million dollars conditional upon there being $4,000,000 in tangible assets. The offer was made on June 14, 1990 and was open for acceptance until June

29, 1990.

 By amending agreement dated June 19, 1990 the receiver was
released from its covenant to refrain from negotiating for the
sale of the Air Toronto business and assets to any person other
than Air Canada. By virtue of this amending agreement the
receiver had put itself in the position of having a firm offer
in hand with the right to negotiate and accept offers from
other persons. Air Canada in these circumstances was in the
subservient position. The receiver, in the exercise of its
judgment and discretion, allowed the Air Canada offer to lapse.
On July 20, 1990 Air Canada served a notice of termination of
the April 30, 1990 agreement.

 Apparently as a result of advice received from the receiver
to the effect that the receiver intended to conduct an auction
for the sale of the assets and business of the Air Toronto
Division of Soundair Corporation, the solicitors for Air Canada
advised the receiver by letter dated July 20, 1990 in part as
follows:

   Air Canada has instructed us to advise you that it does not
   intend to submit a further offer in the auction process.

 This statement together with other statements set forth in
the letter was sufficient to indicate that Air Canada was not
interested in purchasing Air Toronto in the process apparently
contemplated by the receiver at that time. It did not form a
proper foundation for the receiver to conclude that there was
no realistic possibility of selling Air Toronto to Air Canada,
either alone or in conjunction with some other person, in
different circumstances. In June 1990 the receiver was of the
opinion that the fair value of Air Toronto was between
$10,000,000 and $12,000,000.

 In August 1990 the receiver contacted a number of interested
parties. A number of offers were received which were not deemed
to be satisfactory. One such offer, received on August 20,
1990, came as a joint offer from OEL and Air Ontario (an Air
Canada connector). It was for the sum of $3,000,000 for the
good will relating to certain Air Toronto routes but did not

include the purchase of any tangible assets or leasehold interests.

In December 1990 the receiver was approached by the management of Canadian Partner (operated by OEL) for the purpose of evaluating the benefits of an amalgamated Air Toronto/Air Partner operation. The negotiations continued from December of 1990 to February of 1991 culminating in the OEL agreement dated March 8, 1991.

On or before December, 1990, CCFL advised the receiver that it intended to make a bid for the Air Toronto assets. The receiver, in August of 1990, for the purpose of facilitating the sale of Air Toronto assets, commenced the preparation of an operating memorandum. He prepared no less than six draft operating memoranda with dates from October 1990 through March 1, 1991. None of these were distributed to any prospective bidder despite requests having been received therefor, with the exception of an early draft provided to CCFL without the receiver's knowledge.

During the period December 1990 to the end of January 1991, the receiver advised CCFL that the offering memorandum was in the process of being prepared and would be ready soon for distribution. He further advised CCFL that it should await the receipt of the memorandum before submitting a formal offer to purchase the Air Toronto assets.

By late January CCFL had become aware that the receiver was negotiating with OEL for the sale of Air Toronto. In fact, on February 11, 1991, the receiver signed a letter of intent with OEL wherein it had specifically agreed not to negotiate with any other potential bidders or solicit any offers from others.

By letter dated February 25, 1991, the solicitors for CCFL made a written request to the Receiver for the offering memorandum. The receiver did not reply to the letter because he felt he was precluded from so doing by the provisions of the letter of intent dated February 11, 1991. Other prospective purchasers were also unsuccessful in obtaining the promised memorandum to assist them in preparing their bids. It should be

1991 CanLII 2727 (ON CA)

noted that exclusivity provision of the letter of intent expired on February 20, 1991. This provision was extended on three occasions, viz., February 19, 22 and March 5, 1991. It is clear that from a legal standpoint the receiver, by refusing to extend the time, could have dealt with other prospective purchasers and specifically with 922.

It was not until March 1, 1991 that CCFL had obtained sufficient information to enable it to make a bid through 922. It succeeded in so doing through its own efforts through sources other than the receiver. By that time the receiver had already entered into the letter of intent with OEL. Notwithstanding the fact that the receiver knew since December of 1990 that CCFL wished to make a bid for the assets of Air Toronto (and there is no evidence to suggest that at any time such a bid would be in conjunction with Air Canada or that Air Canada was in any way connected with CCFL) it took no steps to provide CCFL with information necessary to enable it to make an intelligent bid and, indeed, suggested delaying the making of the bid until an offering memorandum had been prepared and provided. In the meantime by entering into the letter of intent with OEL it put itself in a position where it could not negotiate with CCFL or provide the information requested.

On February 28, 1991, the solicitors for CCFL telephoned the receiver and were advised for the first time that the receiver had made a business decision to negotiate solely with OEL and would not negotiate with anyone else in the interim.

By letter dated March 1, 1991 CCFL advised the receiver that it intended to submit a bid. It set forth the essential terms of the bid and stated that it would be subject to customary commercial provisions. On March 7, 1991 CCFL and Air Canada, jointly through 922, submitted an offer to purchase Air Toronto upon the terms set forth in the letter dated March 1, 1991. It included a provision that the offer was conditional upon the interpretation of an interlender agreement which set out the relative distribution of proceeds as between CCFL and the Royal Bank. It is common ground that it was a condition over which the receiver had no control and accordingly would not have been acceptable on that ground alone. The receiver did not, however,

contact CCFL in order to negotiate or request the removal of
the condition although it appears that its agreement with OEL
not to negotiate with any person other than OEL expired on
March 6, 1991.

 The fact of the matter is that by March 7, 1991, the receiver
had received the offer from OEL which was subsequently approved
by Rosenberg J. That offer was accepted by the receiver on
March 8, 1991. Notwithstanding the fact that OEL had been
negotiating the purchase for a period of approximately three
months the offer contained a provision for the sole benefit of
the purchaser that it was subject to the purchaser obtaining:

  ... a financing commitment within 45 days of the date hereof
  in an amount not less than the Purchase Price from the Royal
  Bank of Canada or other financial institution upon terms and
  conditions acceptable to them. In the event that such a
  financing commitment is not obtained within such 45 day
  period, the purchaser or OEL shall have the right to
  terminate this agreement upon giving written notice of
  termination to the vendor on the first Business Day following
  the expiry of the said period.

The purchaser was also given the right to waive the condition.

 In effect the agreement was tantamount to a 45-day option to
purchase excluding the right of any other person to purchase
Air Toronto during that period of time and thereafter if the
condition was fulfilled or waived. The agreement was, of
course, stated to be subject to court approval.

 In my opinion the process and procedure adopted by the
receiver was unfair to CCFL. Although it was aware from
December 1990 that CCFL was interested in making an offer, it
effectively delayed the making of such offer by continually
referring to the preparation of the offering memorandum. It did
not endeavour during the period December 1990 to March 7, 1991
to negotiate with CCFL in any way the possible terms of
purchase and sale agreement. In the result no offer was sought
from CCFL by the receiver prior to February 11, 1991 and
thereafter it put itself in the position of being unable to

1991 CanLII 2727 (ON CA)

negotiate with anyone other than OEL. The receiver, then, on
March 8, 1991 chose to accept an offer which was conditional in
nature without prior consultation with CCFL (922) to see
whether it was prepared to remove the condition in its offer.

 I do not doubt that the receiver felt that it was more likely
that the condition in the OEL offer would be fulfilled than the
condition in the 922 offer. It may be that the receiver, having
negotiated for a period of three months with OEL, was fearful
that it might lose the offer if OEL discovered that it was
negotiating with another person. Nevertheless it seems to me
that it was imprudent and unfair on the part of the receiver to
ignore an offer from an interested party which offered
approximately triple the cash down payment without giving a
chance to the offeror to remove the conditions or other terms
which made the offer unacceptable to it. The potential loss was
that of an agreement which amounted to little more than an
option in favour of the offeror.

 In my opinion the procedure adopted by the receiver was
unfair to CCFL in that, in effect, it gave OEL the opportunity
of engaging in exclusive negotiations for a period of three
months notwithstanding the fact that it knew CCFL was
interested in making an offer. The receiver did not indicate a
deadline by which offers were to be submitted and it did not at
any time indicate the structure or nature of an offer which
might be acceptable to it.

 In his reasons Rosenberg J. stated that as of March 1, CCFL
and Air Canada had all the information that they needed and any
allegations of unfairness in the negotiating process by the
receiver had disappeared. He said [p. 31]:

 They created a situation as of March 8, where the receiver
 was faced with two offers, one of which was in acceptable
 form and one of which could not possibly be accepted in its
 present form. The receiver acted appropriately in accepting
 the OEL offer.

If he meant by "acceptable in form" that it was acceptable to
the receiver, then obviously OEL had the unfair advantage of

1991 CanLII 2727 (ON CA)

its lengthy negotiations with the receiver to ascertain what kind of an offer would be acceptable to the receiver. If, on the other hand, he meant that the 922 offer was unacceptable in its form because it was conditional, it can hardly be said that the OEL offer was more acceptable in this regard as it contained a condition with respect to financing terms and conditions "acceptable to them".

 It should be noted that on March 13, 1991 the representatives of 922 first met with the receiver to review its offer of March 7, 1991 and at the request of the receiver withdrew the inter-lender condition from its offer. On March 14, 1991 OEL removed the financing condition from its offer. By order of Rosenberg J. dated March 26, 1991, CCFL was given until April 5, 1991 to submit a bid and on April 5, 1991, 922 submitted its offer with the interlender condition removed.

 In my opinion the offer accepted by the receiver is improvident and unfair insofar as the two creditors are concerned. It is not improvident in the sense that the price offered by 922 greatly exceeded that offered by OEL. In the final analysis it may not be greater at all. The salient fact is that the cash down payment in the 922 offer constitutes approximately two-thirds of the contemplated sale price whereas the cash down payment in the OEL transaction constitutes approximately 20 to 25 per cent of the contemplated sale price. In terms of absolute dollars, the down payment in the 922 offer would likely exceed that provided for in the OEL agreement by approximately $3,000,000 to $4,000,000.

 In Re Beauty Counsellors of Canada Ltd., supra, Saunders J. said at p. 243 C.B.R.:

 If a substantially higher bid turns up at the approval stage, the court should consider it. Such a bid may indicate, for example, that the trustee has not properly carried out its duty to endeavour to obtain the best price for the estate. In such a case the proper course might be to refuse approval and to ask the trustee to recommence the process.

 I accept that statement as being an accurate statement of the

law. I would add, however, as previously indicated, that in determining what is the best price for the estate the receiver or court should not limit its consideration to which offer provides for the greater sale price. The amount of down payment and the provision or lack thereof to secure payment of the balance of the purchase price over and above the down payment may be the most important factor to be considered and I am of the view that is so in the present case. It is clear that that was the view of the only creditors who can benefit from the sale of Air Toronto.

 I note that in the case at bar the 922 offer in conditional form was presented to the receiver before it accepted the OEL offer. The receiver in good faith, although I believe mistakenly, decided that the OEL offer was the better offer. At that time the receiver did not have the benefit of the views of the two secured creditors in that regard. At the time of the application for approval before Rosenberg J. the stated preference of the two interested creditors was made quite clear. He found as a fact that knowledgeable creditors would not be anxious to rely on contingencies in the present circumstances surrounding the airline industry. It is reasonable to expect that a receiver would be no less knowledgeable in that regard and it is his primary duty to protect the interests of the creditors. In my view it was an improvident act on the part of the receiver to have accepted the conditional offer made by OEL and Rosenberg J. erred in failing to dismiss the application of the receiver for approval of the OEL offer. It would be most inequitable to foist upon the two creditors who have already been seriously hurt more unnecessary contingencies.

 Although in other circumstances it might be appropriate to ask the receiver to recommence the process, in my opinion, it would not be appropriate to do so in this case. The only two interested creditors support the acceptance of the 922 offer and the court should so order.

 Although I would be prepared to dispose of the case on the grounds stated above, some comment should be addressed to the question of interference by the court with the process and

procedure adopted by the receiver.

  I am in agreement with the view expressed by McKinlay J.A. in
her reasons that the undertaking being sold in this case was of
a very special and unusual nature. As a result the procedure
adopted by the receiver was somewhat unusual. At the outset, in
accordance with the terms of the receiving order, it dealt
solely with Air Canada. It then appears that the receiver
contemplated a sale of the assets by way of auction and still
later contemplated the preparation and distribution of an
offering memorandum inviting bids. At some point, without
advice to CCFL, it abandoned that idea and reverted to
exclusive negotiations with one interested party. This entire
process is not one which is customary or widely accepted as a
general practice in the commercial world. It was somewhat
unique having regard to the circumstances of this case. In my
opinion the refusal of the court to approve the offer accepted
by the receiver would not reflect on the integrity of
procedures followed by court-appointed receivers and is not the
type of refusal which will have a tendency to undermine the
future confidence of business persons in dealing with
receivers.

  Rosenberg J. stated that the Royal Bank was aware of the
process used and tacitly approved it. He said it knew the terms
of the letter of intent in February 1991 and made no comment.
The Royal Bank did, however, indicate to the receiver that it
was not satisfied with the contemplated price nor the amount of
the down payment. It did not, however, tell the receiver to
adopt a different process in endeavouring to sell the Air
Toronto assets. It is not clear from the material filed that at
the time it became aware of the letter of intent, it knew that
CCFL was interested in purchasing Air Toronto.

  I am further of the opinion that a prospective purchaser who
has been given an opportunity to engage in exclusive
negotiations with a receiver for relatively short periods of
time which are extended from time to time by the receiver and
who then makes a conditional offer, the condition of which is
for his sole benefit and must be fulfilled to his satisfaction
unless waived by him, and which he knows is to be subject to

court approval, cannot legitimately claim to have been unfairly
dealt with if the court refuses to approve the offer and
approves a substantially better one.

 In conclusion I feel that I must comment on the statement
made by Galligan J.A. in his reasons to the effect that the
suggestion made by counsel for 922 constitutes evidence of lack
of prejudice resulting from the absence of an offering
memorandum. It should be pointed out that the court invited
counsel to indicate the manner in which the problem should be
resolved in the event that the court concluded that the order
approving the OEL offer should be set aside. There was no
evidence before the court with respect to what additional
information may have been acquired by CCFL since March 8, 1991
and no inquiry was made in that regard. Accordingly, I am of
the view that no adverse inference should be drawn from the
proposal made as a result of the court's invitation.

 For the above reasons I would allow the appeal with one set
of costs to CCFL-922, set aside the order of Rosenberg J.,
dismiss the receiver's motion with one set of costs to CCFL-922
and order that the assets of Air Toronto be sold to numbered
corporation 922246 on the terms set forth in its offer with
appropriate adjustments to provide for the delay in its
execution. Costs awarded shall be payable out of the estate of
Soundair Corporation. The costs incurred by the receiver in
making the application and responding to the appeal shall be
paid to him out of the assets of the estate of Soundair
Corporation on a solicitor-and-client basis. I would make no
order as to costs of any of the other parties or interveners.

                                        Appeal dismissed.

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:    *Southern Star Developments Ltd. v. Quest University Canada,* 2020 BCCA 364

Date: 20201217
Docket: CA47138

In the Matter of the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended

In the Matter of the *Sea to Sky University Act,* S.B.C. 2002, c. 54

In the Matter of A Plan of Compromise and Arrangement of Quest University Canada

Between:

## Southern Star Developments Ltd.

Appellant

And

## Quest University Canada

Respondent
(Petitioner)

Before:    The Honourable Mr. Justice Harris
(In Chambers)

On appeal from:  An order of the Supreme Court of British Columbia, dated November 16, 2020 (*Quest University (Re)*, 2020 BCSC 1883, Vancouver Docket S-200586).

| | |
|---|---|
| Counsel for the Appellant (via teleconference): | P.J. Reardon K. Strong |
| Counsel for the Respondent (via teleconference): | J.R. Sandrelli T.R.M. Jeffries V.L. Cross |
| Counsel for Primacorp Ventures Inc. (via teleconference): | G.W. Umbach P.L Rubin |

2020 BCCA 364 (CanLII)

| | |
|---|---|
| Counsel for PricewaterhouseCoopers Inc., in its capacity as Monitor of Quest University Canada (via teleconference): | V.L. Tickle |
| Counsel for RCM Capital Management Ltd. and SESA-BC Holdings Ltd. (via teleconference): | K.M. Jackson |
| Counsel for Vanchorverve Foundation (via teleconference): | C.D. Brousson |
| Counsel for 1114586 B.C. Ltd. (via teleconference): | K.E. Siddall |
| Place and Date of Hearing: | Vancouver, British Columbia December 7, 2020 |
| Place and Date of Judgment with Written Reasons to Follow: | Vancouver, British Columbia December 7, 2020 |
| Place and date of Written Reasons: | Vancouver, British Columbia December 17, 2020 |

2020 BCCA 364 (CanLII)

*Summary:*

*Application for leave to appeal an order approving a transaction in CCAA proceedings. Held: Application dismissed, reasons following. Given the high degree of deference shown to discretionary decisions by supervising judges in CCAA proceedings, and the finding that this transaction is the only viable transaction with the potential to protect the interests of stakeholders, the interests of justice do not justify granting leave, even if the appeal raises some issues that would be of interest to the practice.*

**Reasons for Judgment of the Honourable Mr. Justice Harris:**

[1]      The appellant, Southern Star Developments Ltd. ("Southern Star"), seeks leave to appeal the order below pursuant to s. 13 of the *Companies' Creditors Arrangement Act,* R.S.C., 1985, c. C-36 [*CCAA*], and that the order be stayed pending the outcome of that appeal.

[2]      At the conclusion of the argument, I dismissed the applications for leave and a stay with reasons to follow. These are those reasons.

## Background

[3]      Quest University ("Quest") is a not-for-profit post-secondary educational institution operating in Squamish, B.C. On 16 January 2020, Quest obtained creditor protection under the *CCAA* to enable it to restructure its debts. Quest subsequently sought approval under the *CCAA* for a transaction with Primacorp Ventures Inc. ("Primacorp") as a restructuring solution.

[4]      On 16 November 2020, Justice Fitzpatrick, the supervisory judge for the *CCAA* proceedings, approved the transaction with written reasons to follow which were dated 2 December 2020: *Quest University Canada (Re)*, 2020 BCSC 1883 (Chambers). She found that the transaction with Primacorp was "the *only* viable option to avoid the devastating social and economic consequences to [Quest's] stakeholders if a liquidation results": at para. 178(p). She also found the Primacorp transaction to be the best option available to maximize recovery for Quest's creditors and preserve Quest's university operations: at para. 180.

2020 BCCA 364 (CanLII)

[5]      Southern Star, one of Quest's stakeholders, objected to the transaction. The Primacorp proposal required Quest to disclaim certain subleases it had executed in favour of Southern Star, as they were not economical for Quest (the "Subleases"): paras. 91–93, 97–98. The Subleases concern campus residence buildings located on four lots of land ("Lots A–D") that have been sitting largely vacant as a result of the COVID-19 pandemic. Quest and Southern Star had executed an unregistered lease of a fifth lot, "Lot E", in 2017. When the parties executed the documents, the Ground Lease contained a number of incomplete or blank terms, including a legal description, lease term and information about Southern Star's lender: at para. 32. Southern Star objected to the judge vesting off any interest it had in the unregistered Lot E Ground Lease: at para. 35, arguing that the judge did not have the jurisdiction to do so because of s. 32(9)(d) of the *CCAA*.

[6]      Fitzpatrick J. concluded the parties did not intend for the Ground Lease to become effective between them until certain conditions were satisfied; namely, that Quest would decide to build a residence building on Lot E and Southern Star would arrange financing to construct the building. At that point, the Ground Lease would come into effect, in conjunction with the registration of a Sublease and the execution and registration of Southern Star's mortgage. Those conditions were never satisfied, and the supervisory judge concluded that no valid and enforceable lease yet existed between the parties in respect of Lot E: at paras. 36–39. Accordingly, Lot E could be vested off to Primacorp because to do so did not conflict with any prohibition in the *CCAA*.

[7]      Southern Star also applied to the court, pursuant to s. 32(2) of the *CCAA*, for an order disallowing any disclaimer by Quest of the Subleases for two of the lots (Lots C–D). In evaluating this application, the chambers judge had regard to s. 32(4) of the *CCAA* which provides:

> Factors to be considered
>
> (4) In deciding whether to make the order, the court is to consider, among other things,
>
>> (a) whether the monitor approved the proposed disclaimer or resiliation;

> (b) whether the disclaimer or resiliation would enhance the prospects of a viable compromise or arrangement being made in respect of the company; and

> (c) whether the disclaimer or resiliation would likely cause significant financial hardship to a party to the agreement.

[8]     Fitzpatrick J. dismissed Southern Star's application. The Disclaimer of the Subleases had been approved by the court-appointed Monitor for the *CCAA* proceedings: at para. 98. She agreed with the Monitor that the Disclaimers would enhance the prospects of Quest making a viable compromise or arrangement: at para. 104. She found that "[m]aintaining two empty Residences with accompanying rent payments is, on its face, not a reasonable business decision in the circumstances", as evidenced by Primacorp's requirement that the Subleases be disclaimed: at para. 102. She also noted that Quest and Primacorp had already made efforts to find a middle ground by withdrawing disclaimers which had initially been filed in relation to the two other lots (Lots A–B): at para. 106. She finally stated that any hardship imposed on Southern Star would be no less if she disapproved the Disclaimers, as Quest would have no funds to pay rent under the Subleases if the sale did not go through: at paras. 111–12.

[9]     Fitzpatrick J. also granted a reverse vesting order ("RVO") approving the sale to Primacorp. That form of order was also supported by the Monitor: at para. 122. She found that she had jurisdiction to grant the order under ss. 11 and 36 of the *CCAA*. Section 11 provides:

> General power of court

> 11  Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act,* if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

Section 36(6) provides:

> Assets may be disposed of free and clear

> (6) The court may authorize a sale or disposition free and clear of any security, charge or other restriction and, if it does, it shall also order that other

2020 BCCA 364 (CanLII)

assets of the company or the proceeds of the sale or disposition be subject to
a security, charge or other restriction in favour of the creditor whose security,
charge or other restriction is to be affected by the order.

[10]    This type of order was sought especially in light of Southern Star's dissent, as
it enabled the transaction to close without creditors' approval, but in a way that
preserved overall economic recovery for creditors. The size of Southern Star's claim
relative to other creditors created the possibility that Southern Star could effectively
veto the restructuring plan if approval was required: at para. 116.

[11]    While there is no specific jurisdiction in the *CCAA* to grant RVOs,
Fitzpatrick J. canvassed a number of cases in which courts had relied on ss. 11
and 36 to do so: paras. 127–49. While an RVO had only been ordered once
previously in a contested proceeding (*Arrangement relatif à Nemaska Lithium inc.*,
2020 QCCA 1488), it had been approved in a number of other proceedings which
were not contested. She also relied on case law referring to the broad discretionary
authority conferred on courts by the *CCAA*, by which courts are able to be innovative
and creative when called upon to approve solutions for which there is no explicit
authority in the *CCAA*, as long as they do so in light of its objectives: at paras. 153–
55.

[12]    The transaction between Quest and Primacorp must close by
24 December 2020, or Primacorp has the right to walk away and Quest loses its
funding. Conditions precedent of the transaction are the Disclaimer of the Subleases
with Southern Star and the RVO.

## Positions of the Parties

### Appellant (Applicant)

[13]    The appellant's grounds of appeal are:

1. The chambers judge erred in law in finding she had the jurisdiction under
the *CCAA* to approve the transaction which included the transfer of lands
legally described as PID 030-469-074, Lot E District Lot 512 Group 1 New
Westminster District Plan EPP77026 ("Lot E") free and clear of the leasehold
interest of the appellant in Lot E.

2020 BCCA 364 (CanLII)

2. The chambers judge erred in principle in approving the disclaimer of two subleases between the appellant and Quest University Canada ("Quest") pursuant to s. 32 of the *CCAA*.

3. The chambers judge erred in principle in approving a reverse vesting order specifically designed to deprive the appellant of its right under sections 4 and 6 of the *CCAA* to participate in a plan of arrangement process that effected a fair and equitable compromise of its claims.

[14]    Southern Star argues that leave to appeal should be granted. It contends that the interpretation of the disclaimer provisions in the *CCAA* and the approval of an RVO in a contested proceeding is of significance to the practice, especially given lack of appellate authority on this point. It argues that the appeal is important to the action and the parties, as Southern Star's claim and potential loss is substantial. Southern Star also suggests that the appeal would not unduly hinder the restructuring proceedings as it proposes to have the appeal heard on an expedited basis and because the judge's order below permitted Quest and Primacorp to extend their closing date to 31 January 2020.

[15]    While acknowledging the deference conferred on supervisory judges in *CCAA* proceedings, Southern Star nonetheless maintains that all three of its grounds of appeal are meritorious. It argues that the judge engaged in improper balancing under s. 32(4) by approving the Disclaimers. It also contends that granting the RVO was not within the judge's discretion under the *CCAA*, as it was "a last minute reverse vesting order expressly targeted at one creditor" and was in any case not necessary under the circumstances. Finally, it contends that the sale of Lot E is expressly prohibited by s. 32(9)(d) of the *CCAA*, which does not permit disclaimers to be issued in the case of "a lease of real property or of an immovable if the company is the lessor."

[16]    The Lot E ground of appeal featured prominently in Southern Star's oral submissions. Southern Star argues that the judge below fundamentally misinterpreted the parties' intention as to when the Ground Lease for Lot E would become effective between them. Specifically, it suggests that the blank terms in the lease documents for Lot E were present in all the leases between the parties at the time of their execution, and that the leases contemplated those terms being filled out

at the time of registration, which was flexible under the agreements. However, the leases became effective the moment they were executed. Accordingly, the judge's approval of the sale of Lot E was barred by s. 32(9)(d) of the *CCAA* by virtue of the Ground Lease between Quest and Southern Star attaching to that property.

[17]    With respect to the stay, Southern Star argues that the appeal is meritorious, that it would suffer irreparable harm if a stay was not granted because its appeal would be rendered moot by the closing transaction, and that the balance of convenience favours granting the stay. In terms of the latter, Southern Star suggests that the harm to Quest of granting a stay is minimal, again because Quest can extend its closing date with Primacorp, and because the appeal will be sought on an expedited basis. By comparison, Southern Star suggests it will suffer irreparable harm because its claim will far exceed the pool of available funds allocated to unsecured creditors. It argues that this transaction has been approved unfairly at its expense.

### Respondent

[18]    Quest argues that leave to appeal should not be granted and that the RVO and Disclaimers should not be stayed. Quest acknowledges that jurisprudence on RVOs might be of interest to the practice, but contends that this factor is outweighed by the catastrophic effects leave would have on the progress of the *CCAA* proceedings. It further argues that the points on appeal are only of significance to Southern Star, personally, for strategic purposes; namely, to levy a negotiation with Primacorp for rent related to the residence buildings. Quest maintains that Southern Star will be better off financially with the transaction than without it in a liquidation scenario.

[19]    Quest also contends that the appeal is frivolous, as the court's broad and flexible authority to make a range of orders in *CCAA* proceedings has recently been confirmed by the Supreme Court in *9354-9186 Québec inc. v. Callidus Capital Corp.*, 2020 SCC 10 at paras. 53–54. Quest points out that, in this case, the judge had been overseeing the *CCAA* proceedings for over ten months. Quest says that the

judge's decisions are well within her discretion and expertise—including vesting off the Lot E lease, approving the disclaimers, and approving the RVO—and are entitled to deference. Finally, Quest argues that it is not in the interests of justice to grant leave to appeal given the devastating impacts that doing so would have on Quest's attempt to restructure, and because Southern Star is only seeking leave to appeal for strategic purposes related to ongoing negotiations with Primacorp.

[20]    Quest also argues that the relevant factors do not support staying the RVO and Disclaimers. Southern Star cannot succeed in its appeal. Furthermore, Southern Star will not suffer irreparable harm if the orders are not stayed. Notably, Southern Star will be worse off without the transaction than if it closes, as Quest will be able to continue paying rent on two of the Subleases after the deal closes. By contrast, if a stay is granted, Quest will be unable to survive and/or to offer a Winter 2021 semester to students, faculty and staff. All of Quest's stakeholders, including Southern Star, will be prejudiced if a stay is granted and the deal does not close. The balance of convenience does not favour granting a stay.

## Law & Analysis

### Legal Framework

[21]    Leave to appeal is required by the *CCAA* and can be sought from this Court:

> Leave to appeal
>
> 13 Except in Yukon, any person dissatisfied with an order or a decision made under this Act may appeal from the order or decision on obtaining leave of the judge appealed from or of the court or a judge of the court to which the appeal lies and on such terms as to security and in other respects as the judge or court directs.
>
> Court of appeal
>
> 14 (1) An appeal under section 13 lies to the highest court of final resort in or for the province in which the proceeding originated.

[22]     The criteria for leave to appeal were stated by Saunders J.A. in *Goldman, Sachs & Co. v. Sessions*, 2000 BCCA 326 (Chambers), at para. 10:

> [10]     The criteria for leave to appeal are well known. As stated *in Power Consolidated (China) Pulp Inc. v. B.C. Resources Investment Corp.* (1988), 19 C.P.C. (3d) 396 (C.A.) they include:
>
> > (1) whether the point on appeal is of significance to the practice;
> >
> > (2) whether the point raised is of significance to the action itself;
> >
> > (3) whether the appeal is *prima facie* meritorious or, on the other hand, whether it is frivolous; and
> >
> > (4) whether the appeal will unduly hinder the progress of the action.
>
> See also *Chavez v. Sundance Cruises Corp.* (1993), 77 B.C.L.R. (2d) 328 (C.A.).

[23]     Even where the four criteria have been met, leave may still be denied where granting it would not be in the interests of justice: *Movassaghi v. Aghtai*, 2010 BCCA 175 at para. 27 (Smith J.A. in Chambers).

[24]     Where the order under consideration is discretionary, leave to appeal will generally only be granted where the order is clearly wrong, where a serious injustice would occur if leave were refused, or where discretion was exercised on a wrong principle: see e.g., *Strata Plan LMS 2019 v. Green*, 2001 BCCA 286 (Chambers). A high degree of deference is owed to the discretionary decisions of judges supervising *CCAA* proceedings as they are "steeped in the intricacies of the *CCAA* proceedings they oversee": *Callidus* at para. 54. In *Callidus*, at para. 54, the Supreme Court quoted with approval the words of Justice Tysoe in *Edgewater Casino Inc., (Re)*, 2009 BCCA 40 at para. 20:

> ... one of the principal functions of the judge supervising the *CCAA* proceeding is to attempt to balance the interests of the various stakeholders during the reorganization process, and it will often be inappropriate to consider an exercise of discretion by the supervising judge in isolation of other exercises of discretion by the judge in endeavoring to balance the various interests. ... *CCAA* proceedings are dynamic in nature and the supervising judge has intimate knowledge of the reorganization process. The nature of the proceedings often requires the supervising judge to make quick decisions in complicated circumstances.

[25]    Accordingly, leave in *CCAA* proceedings is only granted sparingly: *Edgewater* at paras. 12–14.

### Application

[26]    I dismissed the application for leave to appeal for the following reasons.

[27]    Southern Star accepts that with one exception the judge had the jurisdiction to reach the conclusions she did. In substance, the complaint is about the manner in which the judge exercised her discretion. I will deal shortly with the issue of Lot E and the suggestion that the alleged error in relation to that issue entailed that the judge could not approve the transaction.

[28]    I accept, for the purpose of this application, that the nature of the order sought to be appealed, at least so far as approval of the RVO is concerned, is unusual in *CCAA* proceedings and is of significance to the practice and to the parties. Additionally, in the recent words of the Alberta Court of Appeal, the disclaimer of contracts under the *CCAA* "is a significant issue in insolvency practice generally" and can significantly impact *CCAA* proceedings: *Bellatrix Exploration Ltd. v. BP Canada Energy Group ULC*, 2020 ABCA 178 at paras. 21–24.

[29]    However, I am not persuaded the appeal is meritorious. I consider the prospects that a division of this Court would interfere with the judge's exercise of discretion to be remote. This is especially so in light of the judge's assessment, grounded in months of experience of managing the proceedings, that the consequences of not approving the transaction would be catastrophic. The grounds of appeal advanced by Southern Star raise essentially the same arguments which were dismissed by Fitzpatrick J., with one exception as to the argument for Lot E, which I will address below. I do not think she erred in principle, as alleged by the applicant. I agree with Quest that the orders she made were well within her broad discretion and considerable expertise as a supervisory judge of ten months in the matter, who was alive to the intricacies of the commercial realities confronting the parties.

[30]    In arriving at her conclusion, Fitzpatrick J. considered and applied the principles recently set out by the Supreme Court of Canada in *Callidus,* which affirm the broad and flexible discretion of judges under the *CCAA* to make orders that are appropriate in the circumstances. She was also alive to the limits of her discretion; namely, that any order must conform to the objectives and purposes of the *CCAA*: at para. 154. She carefully evaluated each factor under s. 32(4) in making her determination that the Disclaimers were appropriate. With respect to the lease for Lot E, she found that no lease was in effect between Quest and Southern Star, so the prohibition in s. 32(9)(d) was inapplicable: at paras. 37–40. Finally, she recognized that this case presented unique and complex circumstances which made it appropriate to grant the RVO: at paras. 168, 172. While jurisprudential authority for making such an order in a contested proceeding is limited, it is notable that leave to appeal was refused in the one case in which it has been done, and under similar factual circumstances: *Nemaska*, *supra*.

[31]    Fitzpatrick J. acknowledged the negative impact to Southern Star arising from the relief she granted, though she questioned the extent of that damage; she gave some credence to the suggestion, as Quest argues in this application, that Southern Star's arguments were made strategically with a view to gaining leverage, while significant other interests hung in the balance: at paras. 46, 164–66. Whether that was so did not, however, drive her conclusions. Ultimately, she accepted that Southern Star would suffer harm but balanced that impact with the "myriad interests held by other stakeholders" and chose the best option for everyone involved, including Southern Star: at paras. 48, 111, 164.

[32]    The judge's order reflects precisely the type of intricate, fact-specific, real-time decision making that inheres in judges supervising *CCAA* proceedings, and which forms the basis for the considerable deference their decisions are afforded on review. Respectfully, in my opinion, if a division of this Court were to set aside the order it would be acting contrary to the instruction of the Supreme Court of Canada in *Callidus* that appellate courts should defer to the exercise of discretion by supervising judges in these kinds of proceedings.

[33]    Southern Star argued in oral submissions that Fitzpatrick J.'s interpretation of the Lot E Ground Lease was not an exercise of her discretion as a supervisory judge, but rather was a legal error. She wrongly concluded that the parties had only agreed to agree, and not entered into a binding lease agreement that meant that Quest was a lessor for the purposes of s. 32(9)(d) of the *CCAA.* As I understood the argument, the judge had misapprehended the facts in reaching her conclusion. I will not rehearse the details of those alleged misapprehensions here. I do not accept Southern Star's argument, however, that the judge's interpretation of the Ground Lease turned on the existence of blank terms in a document and the impact of certain other documents; rather, I think that she made an assessment of the parties' objective intentions with respect to when the lease would be valid and effective between them. She concluded that would occur when Quest decided to construct a building on Lot E and Southern Star arranged for financing to facilitate that construction. This, it appears to me, was a conclusion open to her on the evidence.

[34]    It is well settled now that, as a general rule, a judge's conclusions about matters of contractual interpretation are reviewed on a highly deferential standard. As I see the matter, a division of this Court would have to be persuaded that the judge made palpable and overriding errors in her conclusion. I am not persuaded that Southern Star has advanced anything more at its highest than an arguable, but hardly a strong case, that the judge erred as alleged. The likelihood that, even if this issue stood alone, a division of this Court would interfere with the judge's conclusion, is remote, in my opinion.

[35]    Southern Star argues that if the judge erred on the Lot E issue, she could not have approved the transaction. Even if I accepted that the merits threshold had been met by the Lot E issue, and that the appeal raises issues that are, in an abstract sense, of interest to the parties, I would not have granted leave to appeal. These factors are overwhelmed by other elements of the test such as the fourth factor of the test for leave. This factor has traditionally been considered the most important factor in the test for leave to appeal, and that is true of the case at bar: see *Hockin v. Bank of British Columbia* (1989), 37 B.C.L.R. (2d) 139 at para. 20 (Wallace J.A. in

C.A. Chambers). In this case, granting leave to appeal would unduly hinder the progress of the action, with catastrophic effects. As the supervisory judge recognized, time is of the essence in this proceeding: para. 87. The Primacorp transaction, which she viewed to be the only viable option to save Quest and all those interested in it, would collapse if the transaction was not approved.

[36]    In my opinion, granting leave would most probably have equally disastrous consequences for the myriad stakeholders affected by Quest's financial circumstances. There is no realistic prospect, in my view, that this Court could reasonably be expected to hear and decide this appeal on a timeframe that would preserve the transaction if the appeal were to be dismissed, as it surely would be given its merits. The fundamental and overarching question ultimately is whether it is in the interests of justice to grant leave. In my opinion, it would defeat the interests of justice and frustrate the purposes of the *CCAA* to grant leave. It is for these reasons, I dismissed the application. As a result, the application for a stay was also dismissed.

[37]    I am grateful to counsel for their submissions.


"The Honourable Mr. Justice Harris"

2020 BCCA 364 (CanLII)

2021 CanLII 34999 (CSC)

No. 39464

| | |
|---|---|
| April 29, 2021 | Le 29 avril 2021 |
| **BETWEEN:** | **ENTRE :** |
| Victor Cantore | Victor Cantore |
| Applicant | Demandeur |
| - and - | - et - |
| Nemaska Lithium Inc. (Formerly Nemaska Lithium Inc., Nemaska Lithium Whabouchi Mine Inc., Nemaska Lithium Shawinigan Transformation Inc., Nemaska Lithium P1p Inc. and Nemaska Lithium Innovation Inc.), PricewaterhouseCoopers Inc., Investissement Québec, Pallinghurst Group, OMF Fund II (K) Ltd., OMF Fund II (N) Ltd., FMC Lithium USA Corp. and Brian Shenker | Nemaska Lithium Inc. (anciennement Nemaska Lithium Inc., Nemaska Lithium Whabouchi Mine Inc., Nemaska Lithium Shawinigan Transformation Inc., Nemaska Lithium P1p Inc. et Nemaska Lithium Innovation Inc.), PricewaterhouseCoopers Inc., Investissement Québec, Pallinghurst Group, OMF Fund II (K) Ltd., OMF Fund II (N) Ltd., FMC Lithium USA Corp. et Brian Shenker |
| Respondents | Intimés |
| JUDGMENT | JUGEMENT |
| The motion to be added as parties or for leave to intervene is dismissed. The application for leave to appeal from the | La requête en vue d'être ajoutés comme parties ou pour permission d'intervenir est rejetée. La demande d'autorisation d'appel |

- 2 -

No. 39464

judgment of the Court of Appeal of Quebec (Montréal), Number 500-09-029177-201, 2020 QCCA 1488, dated November 11, 2020, is dismissed with costs.

de l'arrêt de la Cour d'appel du Québec (Montréal), numéro 500-09-029177-201, 2020 QCCA 1488, daté du 11 novembre 2020, est rejetée avec dépens.

C.J.C.
J.C.C.

2023 CanLII 36969 (SCC)

No. 40401

May 4, 2023                                     Le 4 mai 2023

**BETWEEN:**                                     **ENTRE :**

Winner World Holdings Limited, 4470524          Winner World Holdings Limited, 4470524
Canada Inc., Golden Surplus Trading,             Canada Inc., Golden Surplus Trading,
Prosperity Steel                                 Prosperity Steel

Applicants                                      Demandeurs

- and -                                         - et -

Blackrock Metals Inc., Investissement           Métaux Blackrock Inc., Investissement
Québec, OMF Fund II H LTD.                       Québec, OMF Fund II H LTD.

Respondents                                     Intimés

JUDGMENT                                        JUGEMENT

The application for leave to appeal from the     La demande d'autorisation d'appel de l'arrêt
judgment of the Court of Appeal of Quebec        de la Cour d'appel du Québec (Montréal),
(Montréal), Number 500-09-030101-224,            numéro 500-09-030101-224, 2022 QCCA
2022 QCCA 1073, dated August 5, 2022, is         1073, daté du 5 août 2022, est rejetée avec
dismissed with costs.                            dépens.

J.S.C.C.
J.C.S.C.